No. 25-1727

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BROWN UNIVERSITY; CALIFORNIA INSTITUTE OF TECHNOLOGY; CORNELL UNIVERSITY; BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; REGENTS OF THE UNIVERSITY OF MICHIGAN; BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; TRUSTEES OF PRINCETON UNIVERSITY; UNIVERSITY OF ROCHESTER,

Plaintiffs-Appellees,

v.

DEPARTMENT OF ENERGY; CHRIS WRIGHT, in the official capacity as Secretary of the Department of Energy,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRIAN C. LEA
  *Deputy Associate Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

COURTNEY L. DIXON
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................... 1

STATEMENT OF JURISDICTION ........................................... 3

STATEMENT OF THE ISSUES ............................................... 4

STATEMENT OF THE CASE .................................................. 4

    A.    Statutory and Regulatory Background ........................ 4

        1.    Department of Energy Grants ........................... 4

        2.    Department of Energy Indirect Cost Policies .................... 6

    B.    The April 2025 "Policy Flash" .................................. 8

    C.    Procedural History ................................................... 11

SUMMARY OF ARGUMENT ................................................ 16

STANDARD OF REVIEW ..................................................... 20

ARGUMENT ........................................................................ 21

I.    The District Court Lacked Subject-Matter Jurisdiction Over Plaintiffs' Claims ............................................................... 21

    A.    The APA Does Not Apply When Relief Is Impliedly Precluded By The Tucker Act .................................... 21

    B.    The District Court Erred In Asserting Jurisdiction Over This Contractual Dispute .................................. 26

II.    The Policy Flash Is Lawful .............................................. 39

    A.    The Policy Flash Is Authorized By Regulation And Is Reasonably Explained ............................................. 40

1.    The Policy Flash Follows 2 C.F.R. § 200.414................... 40

2.    The Policy Flash Is Reasonable And Reasonably Explained ....................................................................... 47

B.    The Policy Flash Is Not Impermissibly Retroactive ................... 54

CONCLUSION........................................................................................ 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ....................................................... 22, 29, 35

*American Ass'n of Colls. for Teacher Educ. v. McMahon*,
    No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ....................... 33

*American Petroleum Inst. v. U.S. Dep't of Interior*,
    81 F.4th 1048 (10th Cir. 2023) ............................................................... 53

*American Sci. & Eng'g, Inc. v. Califano*,
    571 F.2d 58 (1st Cir. 1978) ............................................................. 23, 34

*Bennett v. New Jersey*,
    470 U.S. 632 (1985) ............................................................................ 27

*Berman v. United States*,
    264 F.3d 16 (1st Cir. 2001) ............................................................. 21, 29

*Boaz Hous. Auth. v. United States*,
    994 F.3d 1359 (Fed. Cir. 2021) ............................................................ 22

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ............................................................................ 54

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ...................................................................... 35, 36

*Brighton Vill. Assocs. v. United States*,
    52 F.3d 1056 (Fed. Cir. 1995)............................................................... 32

*Burgos v. Milton*,
    709 F.2d 1 (1st Cir. 1983) .................................................................... 23

*California v. U.S. Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025) ................................................................. 24

*Coggeshall Dev. Corp. v. Diamond*,
    884 F.2d 1 (1st Cir. 1989) .................................................................... 28

*Cohen v. Postal Holdings, LLC*,
    873 F.3d 394 (2d Cir. 2017) ................................................................. 23

iii

*Columbus Reg'l Hosp. v. United States*,
  990 F.3d 1330 (Fed. Cir. 2021) ............................................................ 27

*Coskery v. Berryhill*,
  892 F.3d 1 (1st Cir. 2018) .................................................................... 20

*Crowley Gov't Servs., Inc. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ....................................................... 21, 27

*Department of Educ. v. California*,
  604 U.S. 650 (2025) ...................................... 3, 12, 17, 24, 26, 28, 31, 32 35

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................. 53

*Diaz v. Johnson*,
  No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ...................... 23

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................................... 47, 53

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................. 47

*Fernandez-Vargas v. Gonzales*,
  548 U.S. 30 (2006) ............................................................................... 54

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ............................................................................. 24

*Glidden Co. v. Zdanok*,
  370 U.S. 530, 557 (1962) (plurality op.) ................................................ 32

*Historic Bridge Found. v. Buttigieg*,
  22 F.4th 275 (1st Cir. 2022) ................................................................. 20

*Housatonic River Initiative v. U.S. Env't Prot. Agency*,
  75 F.4th 248 (1st Cir. 2023) ................................................................. 51

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ........................................................... 22, 32

*Jaffee v. United States*,
  592 F.2d 712 (3d Cir. 1979) ................................................................. 23

iv

*Jette v. United of Omaha Life Ins. Co.*,
18 F.4th 18 (1st Cir. 2021) ....................................................... 20

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ......................................................... 54, 56

*Marasco & Nesselbush, LLP v. Collins*,
6 F.4th 150 (1st Cir. 2021) ...................................................... 20

*Martin v. Hadix*,
527 U.S. 343 (1999) ..................................................... 54, 55, 56

*Massachusetts v. NIH*,
770 F. Supp. 3d 277 (D. Mass. 2025) .................................... 57

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .............................................................. 21

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......................................... 23, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................47, 49

*National Insts. of Health v. American Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ...................... 3, 17, 24, 25, 26, 27, 28, 33, 34, 35, 37

*National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.*,
927 F.3d 1263 (Fed. Cir. 2019) ............................................. 53

*Sorreda Transp., LLC v. U.S. Dep't of Transp.*,
980 F.3d 1 (1st Cir. 2020) ...................................................... 47

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ................................26, 28, 31, 34

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
480 F.3d 1116 (Fed. Cir. 2007) ........................................ 29, 38

*Sustainability Inst. v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ............... 30-31, 33

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
770 F. Supp. 3d 155 (D.D.C. 2025) .................................... 38-39

v

*Widakuswara v. Lake,*
  Nos. 25-5144 et al., 2025 WL 1288817 (D.C. Cir. May 3, 2025)  .............  33

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 702  ........................................................................2, 12, 30, 36
  5 U.S.C. § 704  ..................................................................................  36

Tucker Act:
  28 U.S.C. § 1491  ...........................................................................4, 17
  28 U.S.C. § 1491(a)(1)  ...............................................2, 12, 22, 24, 31, 32

28 U.S.C. § 1291  ....................................................................................  4

28 U.S.C. § 1331  ....................................................................................  3

28 U.S.C. § 1346(a)(2)  ...........................................................................  22

**Regulations:**

2 C.F.R. § 200.1  ....................................................................................  43

2 C.F.R. § 200.204  ................................................................................  6

2 C.F.R. § 200.340  ................................................................................  28

2 C.F.R. § 200.340(a)  ..................................................................  41, 45, 57

2 C.F.R. § 200.340(b)  ......................................................................  45, 57

2 C.F.R. § 200.413(a)  ............................................................................  5

2 C.F.R. § 200.413(b)  ............................................................................  5

2 C.F.R. § 200.414  ..........................................................................  39, 42

2 C.F.R. § 200.414(a)  ............................................................................  5

2 C.F.R. § 200.414(c)  .........................................  6, 9, 13, 16, 18, 28, 42, 46, 51

2 C.F.R. § 200.414(c)(1)  .................................. 7, 8, 14, 19, 40, 42, 44, 45, 57

2 C.F.R. § 200.414(c)(2)  ....................................................... 9, 44

2 C.F.R. § 200.414(c)(3)  .................................... 8, 19, 40, 43, 46

2 C.F.R. § 200.414(c)(4)  ....................................................... 6, 45

2 C.F.R. § 200.414(f)  .......................................................... 41

2 C.F.R. pt. 200, app. III (C)(7)  ......................................... 7, 41

2 C.F.R. pt. 200, app. III (C)(11)(a)(1)  .................................. 7, 41

2 C.F.R. § 910.120(a)  ........................................................ 6, 7

**Rule:**

Fed. R. App. P. 4(a)(1)(B)  ............................................................ 4

**Other Authority:**

Restatement (Second) of Contracts § 357 (A.L.I. 1981)  .............................. 28

## INTRODUCTION

The Department of Energy expends billions of dollars of taxpayer funds each year on research projects intended to address energy, environmental, and nuclear challenges through transformative science and technology solutions. It provides those funds to institutes of higher education via grant agreements, a form of federal contract.

In April 2025, the Department of Energy took steps to achieve a longstanding goal across Administrations: to establish new contract terms that rein in spending on administrative overhead, which has increasingly displaced the Department's ability to fund direct research. By limiting such overhead, known as "facilities and administrative" or "indirect" costs, the Department seeks to "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." ADD.53-54. Specifically, as announced in an April 2025 "Policy Flash," the Department directed that it would apply "a standardized 15 percent indirect cost rate for all grant awards to [institutions of higher education]." ADD.54. The Policy Flash stated that the Department would "terminate all grant awards to [institutions of higher education] that do not conform with this updated policy." ADD.54. Likewise, the Policy Flash announced that "[a]ll

future Department grant awards to [institutions of higher education] will default to this 15 percent indirect cost rate." ADD.54.

Plaintiffs in this case are institutions of higher education and various higher-education associations that receive Department of Energy grants and historically have benefited from higher negotiated indirect-cost rates. They do not deny that the Department of Energy has express regulatory authority to deviate from negotiated rates. They nevertheless maintain that the Policy Flash is unlawful and brought suit seeking to enjoin the Department so that they and the grantees they represent may receive larger indirect cost payments they claim are owed to them under the terms of their grant agreements.

The district court erred in crediting plaintiffs' challenges. As an initial matter, the court lacked jurisdiction over plaintiffs' challenge to the portion of the Policy Flash that announced changes the indirect cost rates for their existing grants. Although styled as an Administrative Procedure Act (APA) challenge, that portion of plaintiffs' claim is essentially contractual in nature. The APA's waiver of sovereign immunity for equitable relief, *see* 5 U.S.C. § 702, does not apply when another statute granting consent to sue impliedly precludes the relief sought. Here, the Tucker Act, 28 U.S.C. § 1491(a)(1), provides the relevant statutory waiver of immunity, and it allows only money damages, not injunctions to compel specific performance. For the same

2

reasons that the Supreme Court in *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam) and *National Institutes of Health v. American Public Health Ass'n* (*APHA*), 145 S. Ct. 2658 (2025), recently disapproved similar district court injunctions in other grant disputes, the district court likewise lacked jurisdiction over plaintiffs' challenge to the Policy Flash's announcement of changes to the rates paid under existing grants.

In all events, the district court erred in holding the Policy Flash to be unlawful. Contrary to the court's reasoning, the Department's action is pursuant to and in compliance with applicable regulations. And the district court's concerns about reliance interests and retroactivity are particularly misplaced with respect to the portion of the Policy Flash that announces an indirect cost rate to be used in future grants; plaintiffs can have no legally protectible reliance interests in grants that have not yet been awarded. Even as to existing grants, the Policy Flash is reasonably explained and accounts for plaintiffs' reliance interests. And it is not impermissibly retroactive because it applies only to indirect costs on a prospective basis, not to costs previously incurred. For the reasons set forth below, this Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs asserted claims under the APA and invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA28. As set forth below, defendants

3

maintain that the district court lacked jurisdiction over at least a portion of plaintiffs' claims.  The district court entered its final judgment on June 30, 2025.  JA443.  A timely notice of appeal was filed on July 31, 2025.  JA446; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court lacked jurisdiction over plaintiffs' APA claims because they are precluded by the Tucker Act, 28 U.S.C. § 1491.

2. Whether the district court erred in finding the Policy Flash to be (a) contrary to the Department of Energy's regulations, (b) arbitrary and capricious, and (c) impermissibly retroactive.

## STATEMENT OF THE CASE

**A.    Statutory and Regulatory Background**

**1.    Department of Energy Grants**

The Department of Energy's mission is to ensure America's security and prosperity by addressing its energy, environmental, and nuclear challenges through transformative science and technology solutions.  To further that mission, the Department awards over $2.5 billion in research grants to more than 300 different institutions of higher education across the country.  *See* JA305.

These grants generally cover two kinds of expenses: direct costs and indirect costs. "Direct costs" are costs "identified specifically with a particular" research project or activity—*i.e.*, the specific research that the Department of Energy intends to support with the grant. 2 C.F.R. § 200.413(a). This can include, for example, the cost of "supplies needed to achieve the award's objectives" and "compensation" for employees who work on that research, including their related "fringe benefits." *Id.* § 200.413(b). Direct costs may also include general costs "if they are directly related to a specific award," such as if the research requires "extraordinary utility consumption," or "materials supplied from stock or services rendered by specialized facilities." *Id.*

Department of Energy grants may also cover "indirect costs," which are not tied to one specific research project or activity but include related "facilities and administration" expenses. 2 C.F.R. § 200.414(a). "Facilities" costs include "depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id.* "Administration" costs, in turn, include "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed" elsewhere. *Id.*

The Department of Energy's grant award process typically begins with the publication of a "Notice of Funding Opportunity," which contains a description of the details, terms, and conditions of the funding, including information about the program or activity to be funded; application deadlines and requirements; and the process for negotiations with the selectee and finalizing the award.  JA383; 2 C.F.R. § 200.204.  The Notice of Funding Opportunity must also include "policies relating to indirect cost rate reimbursement or cost share as approved."  2 C.F.R. § 200.414(c)(4).  When the Department selects an applicant for an award, it notifies the applicant, begins negotiations over the final award terms, and prepares the final award documents, which typically include a financial assistance agreement, and documents detailing the terms and conditions of the award.  JA384.

### 2.    Department of Energy Indirect Cost Policies

Department of Energy grant funds are generally disbursed in installments.  JA34.  A grantee draws down its grants on a periodic, as-needed basis, based on costs it incurred or expects to incur during the relevant period.

Generally, pursuant to Office of Management and Budget (OMB) guidance that the Department of Energy has adopted, the Department has paid indirect costs based on an "indirect cost rate" periodically negotiated with each grantee institution.  *See* 2 C.F.R. § 200.414(c); *id.* § 910.120(a) (reflecting the

6

Department of Energy's adoption of the "[OMB] Guidance in 2 CFR part 200").  For institutions of higher education like the plaintiffs here, that negotiated indirect cost rate is typically negotiated by either the Department of Health & Human Services or the Department of Defense's Office of Naval Research, depending on which of the two agencies provided more funds to the relevant institution in the last three years.  ADD.54; *see also* 2 C.F.R. pt. 200, app. III(C)(11)(a)(1).

To facilitate these negotiations, the institutions are required to conduct and submit comprehensive cost analyses, which are reviewed and verified by the cognizant agency.  Afterward, the final negotiated indirect cost rate is memorialized in writing, in a document commonly referred to as a "Negotiated Indirect Cost Rate Agreement," or "NICRA."  That negotiated rate may then be used for all of the institution's grants across the entire federal government during the period that the negotiated rate is in effect, which is typically at least one year, although in some cases that rate can remain in effect for up to four years.  The higher the indirect-cost rate, the more the government will reimburse.

Federal regulations generally require the Department of Energy to adhere to these negotiated indirect cost rates by default.  2 C.F.R. § 200.414(c)(1); *id.* § 910.120(a).  However, the Department may deviate from

this rate for a "class of Federal awards" in two instances: first, "when required by Federal statute or regulation," and second, "when approved by the awarding Federal agency [*i.e.*, the Department of Energy] in accordance with paragraph (c)(3) of this section." *Id.* § 200.414(c)(1). Paragraph (c)(3), in turn, provides that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." *Id.* § 200.414(c)(3). Aside from that procedural requirement, the regulations impose no substantive constraint on the ability of the Department of Energy to deviate from the default negotiated indirect-cost rates, whether "for a class of Federal awards or a single Federal award." *Id.* § 200.414(c)(1).

Historically, indirect costs have consumed a substantial share of Department of Energy grant funding, in accordance with negotiated indirect cost rates that vary significantly from institution to institution. For example, at Cornell University, which has an indirect cost rate of 64%, JA102, the Department may ultimately pay up to $164,000 in total costs for a $100,000 research grant.

### B.    The April 2025 "Policy Flash"

The Department of Energy's Office of Acquisition Management periodically issues "Policy Flashes" to disseminate information, guidance, and

updates to its procurement and financial assistance personnel.  JA299.  To promote transparency, these Policy Flashes are viewable by the public on the Department's webpage.

On April 11, 2025, the Department of Energy issued the Policy Flash at issue here.  That document—titled "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)"—advises that "hereinafter, the Department will no longer use the negotiated indirect cost rate" for one class of Federal awards: grant awards to institutions of higher education.  ADD.54.  Instead, the Department "is setting a standardized 15 percent indirect cost rate for" those grant awards.  ADD.54.

The Department stated that it was taking this revised approach pursuant to its authority under 2 C.F.R. § 200.414(c), which (as noted above) permits agencies to "deviat[e]" and "use a rate different from the negotiated rate" for a class of Federal awards.  ADD.54; 2 C.F.R. § 200.414(c)(1).  The Department explained that as a responsible steward of funds entrusted to it by the American people, the Department has a responsibility to ensure those funds were put to "appropriate use on grant programs," as well as to "improve efficiency and curtail costs where appropriate."  ADD.53.  The Department further explained that although "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards,"

9

those payments "are not for the Department's direct research funding." ADD.53.  And the Department concluded that a standardized indirect cost rate for institutions of higher education would "better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."  ADD.53.

The Policy Flash stated that "[a]ll future Department grant awards to [institutions of higher education] will default to this 15 percent indirect cost rate."  ADD.54.  And it advised that "[c]onsistent with this memorandum, the Department is undertaking action to terminate all grant awards to [institution of higher education] that do not conform with this updated policy," which will be communicated through "separate notice and guidance."  ADD.54.

On April 14, 2025, the business day after the Policy Flash issued, the Department sent letters to grant recipients whose grant awards reflected a higher indirect cost rate, informing them that the Department "is conditionally terminating [their] grant awards, effective thirty (30) days from the date of this notice."  JA287.  Those letters stated that the recipients could "avoid termination of these awards" by confirming their agreement "to an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025."  JA287.

10

### C.    Procedural History

**1.** Plaintiffs in this case are various higher-education associations and several public and private universities.  On April 14, 2025, plaintiffs filed suit under the APA challenging the Policy Flash on various grounds and, in the interim, demanded emergency relief requesting that the district court enjoin the Department from implementing the Policy Flash, modifying negotiated indirect cost rates in their existing awards, and terminating any grants based on a grantee's refusal to accept an indirect cost rate less than the negotiated rate.

At plaintiffs' request, the district court immediately entered a temporary restraining order enjoining the Department from implementing the Policy Flash and from terminating any grants pursuant to it.  JA293.  The court then extended that temporary restraining order while it considered the parties' arguments in a preliminary-injunction posture.

The government opposed plaintiffs' motions for preliminary relief.  It explained that plaintiffs' claims were not actionable in district court because they seek to enforce contractual grant-making arrangements for which relief is limited to that authorized by the Tucker Act.  In all events, the government explained that the Policy Flash's announcement of a new indirect cost rate for grant awards to institutions of higher education was a permissible exercise of

11

the Department of Energy's regulatory authority and was lawful and reasonable in all other respects.

**2.** On May 15, 2025, the district court entered a nationwide preliminary injunction. ADD.1-49.

**a.** At the threshold, the district court rejected the government's argument that the court lacked jurisdiction over plaintiffs' APA claims. ADD.11-15. The court acknowledged that courts lack subject-matter jurisdiction over claims against the United States absent a "waiver of sovereign immunity," and it did not dispute that the APA's waiver in 5 U.S.C. § 702 is inapplicable "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" ADD.11 (quoting *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam)). The court further acknowledged that the Tucker Act, 28 U.S.C. § 1491(a)(1), contains a separate waiver of immunity against the United States applicable to claims sounding in contract, ADD.11-12, and agreed that the "Notice of Award" pursuant to which each recipient institution draws grant funding "operates as a contract," ADD.16 (quotation marks omitted). Indeed, the court noted that in *Department of Education*, 605 U.S. 650, the Supreme Court had stayed an injunctive order in another grant dispute on the ground that the Tucker Act likely precluded district-court jurisdiction over APA challenges to the termination of grants.

12

The district court nevertheless concluded that plaintiffs' claims here could proceed, opining that "many facts . . . distinguish this case from *California*." ADD.15. The court stated that "[a]lthough the negotiated rates" here "are ultimately incorporated into written agreements and awards, and an injunction here may impact payments on current and future grants, Plaintiffs are not suing to enforce those rates or to collect those costs." ADD.14. "Rather, Plaintiffs are seeking to protect their right to *maintain* the memorialized rates" for current grants "and to be able to *negotiate* those rates, institution by institution" for future awards. ADD.14. The court acknowledged that "[i]t may well be" that these factual differences "would not differentiate this case from *California* in the eyes of the Supreme Court," but nonetheless declined to read "those tea leaves." ADD.15. Instead, the court "agree[d] with the well-reasoned opinion of a sister session" of the same district court, addressing a similar across-the-board cap on indirect costs for grants awarded to institutes of higher education by the National Institutes of Health, that plaintiffs' challenge could proceed under the APA. ADD.15.

**b.** On the merits, the district court determined that plaintiffs established a likelihood of success on their APA claims in several respects. ADD.23-38.

*First*, the district court concluded that the policy likely exceeded the Department's regulatory authority. The court acknowledged that the

13

governing regulation authorizes the Department to "deviat[e]" from negotiated indirect cost rates for a "class of Federal awards." 2 C.F.R. § 200.414(c). But the court reasoned that the regulation requires "a step-by-step process for a change to a negotiated indirect cost rate," rather than what the district court understood to be a "one fell swoop approach invalidating all pre-existing NICRAs," concluding the latter approach would "conflate[] or otherwise read[] out numerous procedural safeguards contemplated by the regulations' plain text." ADD.33; ADD.36. The court also viewed the regulation as requiring a "strong" or "'documented' justification" before any deviation from negotiated rates could be implemented, which the court perceived to be absent from the publicly available record. ADD.33. Finally, the court expressed doubt that the Policy Flash could be construed as applying to a "'class of Federal awards'" within the meaning of the regulation. ADD.31 & n.4 (quoting 2 C.F.R. § 200.414(c)(1)).

*Second*, the district court concluded that the Policy Flash was likely arbitrary and capricious. ADD.23-29. The court stated that it could not "discern any 'reasoned explanation' for the change" in the Department's treatment of indirect costs. ADD.25. It acknowledged that the Policy Flash "articulates very reasonable agency goals," including "'improv[ing] efficiency and curtail[ing] costs where appropriate,'" but reasoned that "[s]tatements of

14

aspirational goals . . . are not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals." ADD.25.  Among other things, the court found fault with the Department's failure to explain why a standardized rate was superior to "the current negotiation and audit system," ADD.26, or to account for the universities' perceived reliance interests on that system, ADD.29.

*Third*, the district court determined that plaintiffs were likely to succeed in showing that the Policy Flash is impermissibly retroactive.  ADD.36-38.  It concluded that, "at least as to current grants," the Policy Flash would impermissibly "impair the rights that the institution possessed when accepting the Notice of Award," including the "negotiated . . . indirect cost rate" then in effect.  ADD.38 (quotation marks omitted).  Having concluded that plaintiffs were likely to succeed for at least those reasons, the district court declined to reach plaintiffs' additional challenges arguing that the Policy Flash was contrary to statute and other regulations.

The court concluded that the remaining preliminary injunction factors favored plaintiffs.  ADD.39-46.  And addressing the scope of relief, the court found that the equities supported a nationwide injunction.  ADD.46-47.

**3.** Because the court's preliminary injunction order fully addressed the relevant record and decided the dispositive legal questions, the parties agreed

that further proceedings in district court were unnecessary. The government

accordingly moved for entry of final judgment, with plaintiffs' consent.

On June 30, 2025, the district court entered final judgment. JA443-45.

The court found that plaintiffs had demonstrated that the Department

"departed from negotiated cost rates in violation of 2 C.F.R. § 200.414," that

the Policy Flash was arbitrary and capricious, and that it was impermissibly

retroactive. JA444. The court further concluded that nationwide relief was

appropriate and vacated the Policy Flash in its entirety. JA444.

## SUMMARY OF ARGUMENT

The Department of Energy issued the Policy Flash to address a

longstanding policy concern: the substantial share of taxpayer funds that are

annually expended on administrative overhead rather than direct research.

Although indirect costs can support related research functions, every dollar

spent on indirect costs is one not spent on the Department's core mission. The

Department determined, after considering its regulatory authority, that a

deviation from previously negotiated indirect-cost rates was warranted under 2

C.F.R. § 200.414(c) and that a standard rate of 15% for institutions of higher

education would best accommodate the competing policy concerns at stake.

Plaintiffs, who prefer their higher negotiated indirect cost rates, assert that the

standard rate set forth in the Policy Flash would breach the Department of Energy's grant obligations, and they sued to prevent that breach.

**I.** The district court erred in assuming jurisdiction over plaintiffs' challenge to the portion of the Policy Flash that announces changes to the indirect cost rates for existing grants.

Jurisdiction exists over claims against the United States only if sovereign immunity has been waived, and the APA waives immunity for nonmonetary relief only if another statute granting consent to sue does not impliedly forbid that relief.  Thus, as the Supreme Court recently recognized in other grant-related disputes, the APA's limited waiver of sovereign immunity does not provide district courts with jurisdiction to adjudicate claims "'based on'" existing research-related grants or to "order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *APHA*, 145 S. Ct. at 2659 (quoting *Department of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam)).  Such claims are instead governed by the Tucker Act, which authorizes money damages in the event of contract breach but does not allow courts to grant specific performance.  28 U.S.C. § 1491.

The Supreme Court's reasoning in *Department of Education* and *APHA* strongly supports dismissal here.  Plaintiffs' challenge to the portion of the Policy Flash that announces a change in the rates to be paid under existing

17

grants (or otherwise directs termination of those grants) is, in essence, contractual. As the district court recognized, plaintiffs' challenge to that portion of the Policy Flash "seek[s] to protect their right to *maintain*" the indirect cost rate "memorialized" in their current grant agreements. *See* ADD.14. But plaintiffs cannot obtain an order directing the Department of Energy to perform according to their preferred contractual terms. Instead, plaintiffs must pursue any claims based on their existing grants in the Court of Federal Claims.

**II.** The district court also erred in holding the Policy Flash unlawful.

As an initial matter, the district court's reasoning on the merits failed to distinguish between plaintiffs' challenge to the portion of the Policy Flash that affects the indirect cost rates paid under existing grants and the portion that announces a rate to be used in future grants. That is significant because the district courts concerns about plaintiffs' reliance interests and retroactivity were central to its conclusion that the Policy Flash was arbitrary and capricious. But those concerns apply only insofar as the Policy Flash announces changes to the indirect-cost rate paid under *existing* grants. And as noted, the district court lacked jurisdiction over that aspect of plaintiffs' challenge. Those concerns cannot apply to the portion of the Policy Flash that announces rates to be used in *future* grants; plaintiffs have no legally protectible reliance

interests in grants that have not yet been awarded.  In any event, the Policy Flash is lawful in all its applications.

**A.**  The Department of Energy issued the Policy Flash pursuant to express regulatory authority under 2 C.F.R. § 200.414(c).  That regulation allows the Department to "use a rate different from the negotiated [indirect cost] rate" for "a class of Federal awards" when, as here, the deviation is "approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."  2 C.F.R. § 200.414(c)(1).  Paragraph (c)(3), in turn, states that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  *Id.* § 200.414(c)(3).  The Department did so through the Policy Flash, and the district court erred in construing the regulation to impose further, atextual limitations on the Department's authority to "use a rate different from the negotiated rate."  *Id.* § 200.414(c)(1).

Further, the Policy Flash concisely articulates the basis for the Department of Energy's concerns about indirect rates and the reasons why it has chosen to address those concerns by implementing a new uniform rate of 15% for institutions of higher education.  And it expressly acknowledges the reliance interests of recipient institutions in the prior negotiated-cost regime.

19

The district court's criticisms of the Policy Flash amount to a policy disagreement with the Department's actions and do not identify any legal deficiency in the Department's explanation.

**B.** The Policy Flash is not retroactive.  By its terms, the 15% indirect cost rate would apply "hereinafter," and subsequent letters from the Department to grantees confirmed that the new indirect cost rate would not be effective until a date certain after the issuance of the Policy Flash.  The Policy Flash did not announce an intent to pay a lower rate for costs that the recipient institutions had already incurred.  Neither governing principles of retroactivity nor Department of Energy regulations afford recipient institutions a blanket exemption from future changes in Department policy during the life of their grants.  Plaintiffs' concerns with the policy present, at most, a question of reliance interests that are addressed under APA arbitrary-and-capricious review, not under retroactivity doctrine.

## STANDARD OF REVIEW

All issues before this Court are questions of law reviewed de novo.  *See Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 166 (1st Cir. 2021) ("whether a claim is justiciable under the APA"); *Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 26 (1st Cir. 2021) (regulatory interpretation); *Historic Bridge Found.*

*v. Buttigieg*, 22 F.4th 275, 282 (1st Cir. 2022) (arbitrary-and-capricious review);

*Coskery v. Berryhill*, 892 F.3d 1, 4-5 (1st Cir. 2018) (retroactivity).

## ARGUMENT

### I.    The District Court Lacked Subject-Matter Jurisdiction Over Plaintiffs' Claims

#### A.    The APA Does Not Apply When Relief Is Impliedly Precluded By The Tucker Act

**1.** The APA provides "a limited waiver of sovereign immunity for claims

against the United States" that seek "'relief other than money damages.'"

*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting

5 U.S.C. § 702).  But that waiver of immunity facially "does not apply 'if any

other statute that grants consent to suit expressly or impliedly forbids the relief

which is sought.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

*Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  That carve-out

"prevents plaintiffs from exploiting the APA's waiver to evade limitations on

suit contained in other statutes."  *Id.*; *see, e.g.*, *Berman v. United States*, 264 F.3d

16, 21 (1st Cir. 2001) (holding that Section 702 did not waive immunity where

"other statute"—there, a tax statute—"expressly forbids" the relief sought).

Where, as here, a party demands continued payment of funds it believes

the federal government is obligated to pay by contract, the relevant "statute

that grants consent to suit" is the Tucker Act.  The Tucker Act vests the Court

of Federal Claims with exclusive "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States" for amounts over $10,000.  28 U.S.C. § 1491(a)(1).[1]

As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation marks omitted).  This prohibition extends to claims founded on grants that are implemented through "contracts to set the terms of and receive commitments from recipients."  *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).  The proper recourse for asserted violations of such grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach."  *Id.*  This jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area.  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

As this Court has long recognized, a plaintiff's own characterization of its claims does not control the question of whether jurisdiction lies exclusively

---

[1]  A parallel provision, the Little Tucker Act, authorizes concurrent district-court jurisdiction but only for claims "not exceeding $10,000 in amount."  28 U.S.C. § 1346(a)(2).  That provision is not applicable here.

in the Court of Federal Claims.  If "the essence of the action is in contract," a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).

In particular, "[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (quoting *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979)); *see Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) ("Because it seems clear that the injury [the plaintiff] is alleging is pecuniary in nature and at bottom what he seeks is monetary relief based on what he perceived as a contract . . . [he] cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act.").

Other courts of appeals, applying these same principles, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test).  If a plaintiff's claim rests on the notion that the government purportedly breached its contract and seeks to

23

compel the government to pay sums allegedly due under the contract, that is a Tucker Act claim, not an APA claim.

**2.** The Supreme Court recently confirmed the Tucker Act's substantial preclusive scope in *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam) and *APHA*, 145 S. Ct. 2658 (2025). In *Department of Education*, this Court had initially declined to disturb a district court order requiring the government to fulfill certain grant agreements. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). But the Supreme Court then stayed the district court's order, concluding that the government was likely to succeed in showing the court "lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court confirmed that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Department of Educ.*, 604 U.S. at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

The Court's decision in *APHA* reaffirms these principles. That case concerned two separate legal challenges. First, plaintiffs challenged a series of memoranda that provided guidance to institutes or components of the

24

National Institutes of Health (NIH) on how to exercise their discretion relating to grants to advance administration priorities. *See APHA*, 145 S. Ct. at 2659. Those plaintiffs claimed, among other things, that the memoranda were unconstitutionally void for vagueness. Around the same time that these memoranda issued, NIH and its components reviewed their grant portfolio to identify and cancel specific grants that no longer serve agency priorities. *See id.* at 2661 (Barrett, J., concurring in the partial grant of the application for stay). The *APHA* plaintiffs separately claimed that these grant terminations violated statutory and regulatory provisions governing the administration of grants. *See id.*

A majority of the Court declined to stay the district court's order to the extent it vacated the internal guidance documents, but it granted a stay of the court's order to the extent the court had vacated the government's grant terminations. *See APHA*, 145 S. Ct. at 2659; *see also id.* at 2661 (Barrett, J., concurring in the partial grant of the application for stay). In so holding, a majority of the Court agreed that the APA "does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* at 2659 (quoting *Department of Educ.*, 604 U.S. at 651).

**B.    The District Court Erred In Asserting Jurisdiction Over This Contractual Dispute**

**1.** As in *Department of Education* and *APHA*, the Tucker Act precludes district-court jurisdiction over plaintiffs' challenge to the portion of the Policy Flash that affects the terms of plaintiffs' existing grants. That claim is both "'based on'" existing research-related grants and seeks "relief designed to enforce" the government's alleged "'obligation to pay money' pursuant to" those grants. *APHA*, 145 S. Ct. at 2659 (quoting *Department of Educ.*, 604 U.S. at 651). The claim is thus founded upon contract for purposes of the Tucker Act and must be brought in the Court of Federal Claims. *Id.*; *see also Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985).

*First*, "'the source of the rights upon which the plaintiff[s] base[] [their] claims'"—and the basis for their Article III standing—is their existing contracts with the Department of Energy. *Spectrum Leasing*, 764 F.2d at 893 (quoting *Megapulse*, 672 F.2d at 968). Although plaintiffs have styled their claim as an APA challenge to the Policy Flash, the Policy Flash merely announces that the Department of Energy will no longer pay negotiated indirect cost rates for grant awards to institutions of higher education and will terminate existing grants that incorporate a higher indirect cost rate.

Thus, as the district court recognized, the crux of plaintiffs' suit is that they wish to "protect their right to *maintain* the memorialized rates" in their

26

Negotiated Indirect Cost Rate Agreements, which are "incorporated into" their existing grant awards.  ADD.14.  Without doubt, plaintiffs' claims are "based on . . . research-related grants" awarded by the United States.  *APHA*, 145 S. Ct. at 2659 (quotation marks omitted); *cf.* ADD.16 (acknowledging that the "Notice of Award operates as a contract"); *see also, e.g.*, *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many . . . federal grant programs" are "much in the nature of a contract" (quotation marks omitted)); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (generally "treating federal grant agreements as contracts when the standard conditions for a contract are satisfied").

*Second*, the relief the district court ordered strongly weighs against plaintiffs.  The continued payment of grant funds at the higher negotiated indirect cost rates, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit.  *Crowley*, 38 F.4th at 1112 (quotation marks omitted).  Indeed, shortly after plaintiffs filed their complaint, the district court granted plaintiffs' motion for preliminary injunctive relief, prohibiting the Department from taking any action to implement the rate change announced in the Policy Flash or from terminating existing grants that reflected a higher indirect cost rate.  And in granting final judgment, the district court vacated the Policy Flash, achieving the same result.

27

*See* JA444 (concluding that vacatur of the Policy Flash "moots" plaintiffs' remaining claims, including a claim that the grant terminations directed by the Policy Flash were unlawful under 2 C.F.R. §§ 200.340, 200.414(c)); JA48-49. Although styled as an equitable remedy, the district court's order effectively "compell[ed] the government to pay money" under the terms of plaintiffs' existing grant agreements—rather than terminate those grants—which is the "classic contractual remedy of specific performance." *Spectrum Leasing*, 764 F.2d at 895; *see also* Restatement (Second) of Contracts § 357 cmt. A (A.L.I. 1981), Westlaw (database updated Oct. 2024) ("An order of specific performance . . . orders a party to render the performance that he promised.").

As the Supreme Court has made clear, the APA's limited waiver of sovereign immunity does not provide the district court with jurisdiction to order relief designed to enforce any obligation to pay pursuant to any existing grant agreement. *APHA*, 145 S. Ct. at 2659; *Department of Educ.*, 604 U.S. at 651. Indeed, even if plaintiffs had properly pursued their contract claim in the Court of Federal Claims under the Tucker Act, specific performance would not be available. A plaintiff's remedy for a breach of contract claim against the federal government is damages for any underpayment, not an injunction to continue payments. *See Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have the power to order specific performance by

the United States of its alleged contractual obligations."); *Berman*, 264 F.3d at 21 (similar).

Plaintiffs cannot circumvent this limitation by restyling their contract claim as an APA challenge. On the contrary, "the Tucker Act impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not." *Albrecht*, 357 F.3d at 67-68 (quotation marks omitted). Because the Tucker Act "impliedly forbids" the relief sought, the APA's limited waiver of sovereign immunity does not apply, and plaintiffs cannot pursue their claims in district court. 5 U.S.C. § 702.

**2. a.** The district court erroneously held that it could properly exercise jurisdiction over plaintiffs' challenge to the portion of the Policy Flash that affects existing grants, the "source" of the right upon which plaintiffs base their claims is the "regulatory structure" governing indirect costs, rather than the grant agreements themselves. ADD.14.

But as discussed, in determining jurisdiction, courts must "look beyond the form of the pleadings to the substance of the claim." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). And here, the substance of plaintiffs' claim is contractual, as the Policy Flash itself reflects: the very purpose of the Policy Flash is to set forth

29

permissible contract terms. Indeed, the district court's own reasoning on their merits belies the contractual nature of plaintiffs' claim: the court held that the Policy Flash was arbitrary and capricious because it "displac[ed] the institutions' right to the previously negotiated—and legally binding indirect cost rate upon which they have operated and relied since accepting the award." *See* ADD.37-38.

In the district court, plaintiffs urged that their challenge to the Policy Flash was based not on contract, but on federal regulations that govern how the Department may permissibly administer its grants. In particular, they alleged that, by regulation, the indirect-cost rates reflected in their Negotiated Indirect Cost Rate Agreements are binding on "the entire federal government during the period that the" agreement is in effect and should be used in any grant that covers indirect costs unless the agency awarding the grant properly approved a deviation from that rate. JA37. They further urged that any change to the Department's policies regarding the payment of these negotiated rates "must occur when the grant is being negotiated, not in the middle of an existing grant." JA48-49.

Critically, however, the federal regulations on which plaintiffs rely do not guarantee plaintiffs the right to indirect cost payments of any kind. Rather, that right arises from the operative grant agreements. *See Sustainability Inst. v.*

30

*Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) ("While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds.").  Thus, at best, plaintiffs' legal theory urges that federal regulations "impose procedural requirements on the government having some impact on the contract."  *Spectrum Leasing*, 764 F.2d at 894.  But this does not change the fact that the "ultimate source" of plaintiffs' alleged right to continue to be paid at the higher negotiated indirect-cost rates arises from their existing grants.  *Id.*

Plaintiffs' claim that they are entitled "*maintain* the memorialized rates," ADD.14, is thus undoubtedly "based on" an "'express or implied contract with the United States,'" *Department of Educ.*, 604 U.S. at 651 (quoting 28 U.S.C. § 1491(a)(1)).  If the Department of Energy were to pay plaintiffs less money than they believe they are owed under the terms of their grants, plaintiffs could bring suit in the Court of Federal Claims under the Tucker Act.  That plaintiffs identified an alleged final agency action (the Policy Flash) announcing such purported infringement on their contractual rights does not divest the Court of Federal Claims of jurisdiction.

Likewise, the fact that plaintiffs believe that the Department's announcement of a new indirect-cost rate for existing grants violates applicable

31

regulatory provisions does not oust their claim from Tucker Act jurisdiction. On the contrary, the Tucker Act embraces monetary claims based on "any Act of Congress or any regulation of an executive department."  28 U.S.C. § 1491(a)(1).  And plaintiffs in breach-of-contract suits against the federal government often rely on statutes and regulations to argue that the government's actions were unlawful.  *See, e.g.*, *Glidden Co. v. Zdanok*, 370 U.S. 530, 557 (1962) (plurality op.) (recognizing that Court of Claims enjoys broad "freedom . . . to inquire into the legality of government action," even as it awards only "damages, not specific relief"); *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059 n.3 (Fed. Cir. 1995) (reaffirming that the Court of Federal Claims "retain[s] jurisdiction over contract actions 'founded upon statute, rules, and regulations'"); *cf. Ingersoll-Rand Co.*, 780 F.2d at 77 (reaffirming "the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act] merely by alleging violations of regulatory or statutory provisions rather than breach of contract").

Indeed, the plaintiffs in *Department of Education* likewise urged that their suit could proceed under the APA because their "claims are 'derived from' statutes and regulations, not contracts."  Opposition to Application at 22, *Department of Educ.*, 604 U.S. 650 (No. 24A910), 2025 WL 963588, at *2.  In staying that order, the Supreme Court necessarily rejected the suggestion that a

mere reliance on "statutes and regulations" can allow plaintiffs to escape the Tucker Act's preclusive scope, as other courts have since recognized.[2]

The district court sought to distinguish *Department of Education* on the theory that plaintiffs in that case, which involved terminations of already awarded grants, "asserted violations of governing law rooted in regulations about terminating rather than awarding grants," which the court believed made the case "more akin to a contract action." ADD.14. But that suggests, at best, that plaintiffs' challenge to the Policy Flash's announcement of a rate that will be used in future, hypothetical grants is not a claim "based on" contract. It supplies no basis for distinguishing plaintiffs' challenge to the portion of the Policy Flash that affects their *existing* grants. On the contrary, as in *Department of Education*, plaintiffs here sought to enjoin and vacate the Policy Flash to prohibit the termination of their grant awards. *See* JA275 (notifying the district court that plaintiffs had received letters "conditionally terminating"

---

[2] *See, e.g.*, *Widakuswara v. Lake*, Nos. 25-5144 et al., 2025 WL 1288817, at *2-5 (D.C. Cir. May 3, 2025) (per curiam) (granting stay where government would likely succeed in showing that district court lacked jurisdiction to "compel the agency to restore [plaintiffs'] FY 2025 grants"); *American Ass'n of Colls. for Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (granting a stay of a district court order requiring the Government to "restore [the plaintiffs'] access to grant funds immediately" and prohibiting the Government from "freezing, terminating, or otherwise interfering with the funding of [the grants] . . . without written authorization from the Court" (third alteration in original)).

their grant awards).  By the district court's own reasoning, this demonstrates that plaintiffs' claim is "based on" contract and must proceed exclusively in the Court of Federal Claims.  *APHA*, 145 S. Ct. at 2659.

**b.** The district court's reasoning also fails to account for the fact that plaintiffs are, in "essence", seeking a contract remedy—specific performance— that is impliedly forbidden under the Tucker Act.  *American Sci. & Eng'g*, 571 F.2d at 63; *see also Spectrum Leasing*, 764 F.2d at 894-95.

This distinguishes this case from the challenge to the internal guidance at issue in *APHA*.  As noted, when the Supreme Court stayed the vacatur of grant terminations in that case, it declined to stay the district court's vacatur of a series of memoranda describing how institutions and components of NIH should exercise their discretion relating to grants in order to advance administration priorities.  *See* 145 S. Ct. at 2659; *id.* at 2661 (Barrett, J., concurring in the partial grant of the application for stay).  Critically, however, the constitutional challenge to the guidance documents at issue in *APHA* was "legally distinct" from the challenge to the grant terminations.  *Id.* at 2661 (Barrett, J. concurring in the partial grant of the application for stay).  Vacating the guidance insofar as it might apply prospectively would not "reinstate terminated grants" or else compel the government to specifically perform under existing contracts.  *Id.*; *see also id.* at 2662 (opining that the government's

34

application for a stay of the grant terminations had "largely ignore[d] the guidance, which suggests that this aspect of the judgments causes it no irreparable harm").

By contrast, here, plaintiffs' APA challenge to the portion of the Policy Flash that affects existing grants is inextricably entwined with the type of contract claim that belongs in the Court of Federal Claims. As discussed above, the Policy Flash is itself the agency's announcement that it "will no longer use the negotiated indirect cost rate for grants awarded to" institutions of higher education and that it will instead "set[] a standardized 15 percent indirect cost rate" for all such grants. ADD.54. And as already discussed, the district court's injunction and subsequent vacatur of that announcement effectively ordered specific performance of plaintiffs' contracts; it required the government to continue paying plaintiffs at the higher negotiated rate incorporated into the terms of their existing grants, rather than terminate those grants or pay the lower rate announced in the Policy Flash. This demonstrates that plaintiffs' challenge to the Policy Flash cannot proceed under the APA, because the Tucker Act "impliedly forbids" that relief. *Albrecht*, 357 F.3d at 67-68 (quotation marks omitted); *see also Department of Educ.*, 605 U.S. at 651; *APHA*, 145 S. Ct. at 2659 ("The Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with

35

jurisdiction . . . to order relief designed to enforce any '"obligation to pay money"' pursuant to those [research-related] grants." (first alteration in original)).

That requested relief also demonstrates how this case is entirely unlike *Bowen v. Massachusetts*, 487 U.S. 879 (1988), on which the district court relied. Notably, *Bowen* did not involve a contract claim and did not analyze the question of whether an APA claim challenging agency action that changes contractual terms or terminates a contract is barred by the prohibition on APA suits "expressly or impliedly forbid[den]" by other statutes. 5 U.S.C. § 702. Instead, *Bowen* involved two separate provisions: (i) a part of 5 U.S.C. § 702 precluding APA claims for "money damages," and (ii) a part of 5 U.S.C. § 704 requiring "no other adequate remedy in a court" for an agency action to be subject to APA review. *Bowen* held that a State's APA claim for adjusted reimbursement rates under the Medicaid Act was not a "money damages" claim under 5 U.S.C. § 702 just because it might result in the payment of money. 487 U.S. at 891-901. And *Bowen* added that a Tucker Act suit was not an alternative remedy for the State's Medicaid reimbursement-rate suit so as to preclude review under 5 U.S.C. § 704. *Id.* at 901-08. In so holding, the Court emphasized the statutory nature of the cause of action and unique federalism concerns arising out of the statutory Medicaid reimbursement process that are

36

not present in contract claims. *Id.* at 900 n.31, 904 n.39, 907-08. That aspect of the decision thus has no application to lawsuits—like this one—involving the payment of money under grants. Indeed, the Supreme Court cited *Bowen* in its *Department of Education* stay decision and found no conflict between *Bowen* and its conclusion that the government was likely to succeed in showing that the district court lacked jurisdiction over the grant termination claims at issue.

**c.** Finally, the district court erred in its attempt to distinguish *Department of Education* based on the fact that the Policy Flash affects not just current grants but also "future, unawarded grants." ADD.14. Again, this suggests only that the Tucker Act may not preclude a challenge to the portion of the Policy Flash that announces an indirect cost rate for future grants. It does not change the fact that plaintiffs' challenge to the portion of the Policy Flash that affects *existing* grants is, in essence, contractual. As *APHA* and *Department of Education* demonstrate, that portion of plaintiffs' claim is precluded by the Tucker Act—the APA does not authorize the district court to order relief that effectively requires the government to specifically perform under the terms of existing grants. Plaintiffs cannot "end-run that limit" by melding a precluded claim with a challenge to the portion of the Policy Flash that announces a rate that will apply to future, hypothetical grants. *See APHA*, 145 S. Ct. at 2661-62

37

(Barrett, J., concurring in the partial grant of the application for stay) ("[I]f the [Court of Federal Claims] has exclusive jurisdiction . . . the plaintiffs cannot end-run that limit simply by packaging the[ir claims] with a challenge to agency guidance.").

Instead, any challenge to the portions of the Policy Flash that do not alter the terms of existing grants must be assessed on their own merits, independent of any concerns about the effect on existing grants. That is significant because, as discussed further below, the district court's reasoning on the merits centered substantially on the Policy Flash's effect on existing grants. The district court expressed concern, for example, that the Policy Flash did not adequately account for plaintiffs' reliance interests in the higher rates incorporated into their existing grants, or else that the Policy Flash was impermissibly retroactive. ADD.27-29, ADD.36-38. But plaintiffs can have no legally protectible reliance interests in grants that have not yet been awarded, and the court's concern about retroactivity cannot plausibly apply to the Policy Flash's application to hypothetical, future grants. Because these concerns apply only to plaintiffs' claim that the Policy Flash is unlawful insofar as it announces changes to the terms of existing grants—a claim for which there is no jurisdiction—they supply no basis for the district court to vacating the Policy Flash under the APA.

Despite plaintiffs' "valiant effort to frame the suit as one for declaratory or injunctive relief," this litigation "should be understood for what it is": an effort to compel the government's performance of contractual obligations. *Suburban Mortg. Assocs.*, 480 F.3d at 1118. Because "the Court of Federal Claims can provide an adequate remedy" for breach of contract, these suits "belong[] in that court" instead. *Id.*; *accord, e.g.*, *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (refusing jurisdiction where plaintiffs' APA claims, "[s]tripped of [their] equitable flair," in fact "seek[] one thing: . . . the Court to order the Government to stop withholding the money due" under certain grants).

## II.    The Policy Flash Is Lawful

The district court also erred in concluding that the Policy Flash is unlawful. As already discussed, the district court's reasoning on the merits largely centered on the Policy Flash's effect on existing grants. Because there is no jurisdiction over that portion of plaintiffs' claim, these concerns do not support vacatur of the Policy Flash. In any event, the Policy Flash is lawful in all its applications. Contrary to the district court's reasoning, the Policy Flash is consistent with regulations expressly permitting the Department of Energy to set indirect cost rates for a class of Federal awards. The Department adequately explained the reasons for its changed indirect-cost rate policy, and

that new policy is not impermissibly retroactive, even as applied to existing

grants.

### A.    The Policy Flash Is Authorized By Regulation And Is Reasonably Explained

#### 1.    The Policy Flash Follows 2 C.F.R. § 200.414

**a.** The Policy Flash is consistent with, and indeed was issued expressly

pursuant to, the applicable regulation governing indirect costs.  That regulation

provides that agencies generally will adhere to "negotiated rate[s]" for indirect

costs.  2 C.F.R. § 200.414(c)(1).  But it also provides an express authorization

for agencies to depart from that approach.  *See id.*

Specifically, agencies "may use a rate different from the negotiated rate

for either a class of Federal awards or a single Federal award only when

required by Federal statute or regulation, or when approved by the awarding

Federal agency in accordance with paragraph (c)(3) of this section."  2 C.F.R.

§ 200.414(c)(1).  Subsection (c)(3), in turn, provides that the "Federal agency

must implement, and make publicly available, the policies, procedures and

general decision-making criteria that their programs will follow to seek and

justify deviations from negotiated rates."  *Id.* § 200.414(c)(3).  The regulation

thus expressly contemplates that the Department of Energy may deviate from

negotiated indirect-cost rates for a "class of Federal awards" provided that the

Department publicizes "the policies, procedures and general decision-making

40

criteria" that it will use when approving deviations from the negotiated rates. *Id.* § 200.414(c)(1), (c)(3). Aside from that procedural requirement, the regulation imposes no substantive constraint on the ability of the Department to depart from negotiated rates.

The Department of Energy followed that regulatory path here. The Policy Flash explains that the negotiated indirect cost rate for institutions of higher education "is typically negotiated by either 'the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD).'" ADD.54 (quoting 2 C.F.R. pt. 200, app. III(C)(11)(a)(1)). And through the Policy Flash, the Department set forth the "policies, procedures, and general decision-making criteria" that the Department would use in seeking and justifying deviations from those negotiated rates for that class of awards.

Specifically, the Policy Flash—which is titled "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)"—explains the Department's new policy: that the Department would seek to "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people" by deviating from the negotiated rate for this class of Federal awards. ADD.54. Instead, the Department would use a 15% indirect cost rate, a rate that the Department

underscored was "at the high end of the 'up to 15 percent' *de minimis* rate permitted by government-wide regulation."  ADD.54; *see* 2 C.F.R. § 200.414(f).  The Policy Flash also announced that the Department would undertake action to terminate grant awards to institutions of higher education that do not conform with the updated policy pursuant to 2 C.F.R. § 200.340(a), (b), and that recipients "subject to termination will receive separate notice and guidance."  ADD.54.  In addition, the Policy Flash stated that "[a]ll future Department grant awards to [institutions of higher education] will default to this 15 percent indirect cost rate."  ADD.54.

**b.**  The district court held that the Policy Flash violates 2 C.F.R. § 200.414 because, in the court's view, the Department failed to follow the "step-by-step process for a change to a negotiated indirect cost rate" detailed in the regulation.  ADD.33.  In so holding, the court interpreted the regulation as requiring the agency to "make available the policies, procedures, and decision-making criteria that [it] 'will follow'" at some point before the agency seeks to justify a deviation from the negotiated indirect cost rates.  ADD.33 (alteration in original).  The court thus criticized the Department's effort to implement its policy in "one fell swoop," rather than through a sequential process.  ADD.33.

The district court's criticisms are unfounded.  As an initial matter, nothing in the text of 2 C.F.R. § 200.414(c) requires the agency to approve

42

deviations from negotiated indirect cost rates on a case-by-case basis.  As

noted, the regulation provides that a federal agency "may use a rate different

from the negotiated rate for . . . a class of Federal awards," so long as the

different rate is "approved by the awarding Federal agency in accordance with

paragraph (c)(3)."  2 C.F.R. § 200.414(c)(1).  A "class of Federal awards" is, in

turn, defined to include "a group of Federal awards . . . to a specific type of

recipient or group of recipients."  *Id.* § 200.1.  The regulation thus plainly

contemplates that the agency may approve use of a singular "rate" for a class

of awards to a specific type of recipient.  This permits the Department to

approve a single rate different from the negotiated rate for all grants to

institutions of higher education.

Moreover, nothing in the regulation expressly calls for a multi-stage

adjudicative process.  The regulation's focus is instead on ensuring that any

agency that wishes to approve a rate different from the negotiated rate makes

publicly available any "policies, procedures and general decision-making

criteria that their programs will follow."  2 C.F.R. § 200.414(c)(3).  As

discussed, the Department did so here through the Policy Flash, which

announced a generally applicable policy of paying a standard indirect cost rate

of 15% across all grants to institutions of higher education in lieu of separately

negotiated rates in every grant.  And the reason why the Policy Flash does not

43

set forth further "procedures and general decision-making criteria" that would

apply in any future negotiation—as opposed to the criteria that led to the

policy and the procedure for implementing the new 15% rate—because the

policy does not contemplate any individualized redetermination of indirect-

cost rates. Instead, the Department chose to announce a policy of using a

single, uniform rate for "a class of Federal awards," as the regulation permits it

to do. *Id.* § 200.414(c)(1).

The district court's contrary interpretation hinges almost entirely on

Subsection (c)(3)'s use of the word "will," which the court suggested requires

some temporal distance between the announcement of any new policies,

procedures, or decision-making criteria and actual approval of a non-

negotiated rate. *See* ADD.33-34. The court concluded that interpreting the

regulation to require this temporal distance was also consistent with the

separate requirement in Subsection (c)(2) that federal agencies "notify" the

Office of Management and Budget of any approved deviations from the

negotiated rate. ADD.35-36 (quoting 2 C.F.R. § 200.414(c)(2)). But even

assuming this is true, the Policy Flash likewise contemplates that there will be

future action. It states that the policy announced in that document will be

applied to new grant awards, and with respect to existing awards, that the

Department will take action—under separate notice and guidance—to

44

terminate all existing grant awards to institutions of higher education "that do not conform with this updated policy." ADD.54. Thus, to the extent that the regulation requires some sequential process between the announcement of the agency's policy and any action taken with respect to specific grants, the Policy Flash does not violate that requirement.

The district court also erred in its reliance on Subsection (c)(4). ADD.34. That provision provides that "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). The court suggested that the Policy Flash violated this provision insofar as the new 15% rate policy would apply to existing grants, because that policy was not in effect when the Department of Energy issued a notice of funding opportunity soliciting applications for those grant awards. ADD.34. But by its terms, Subsection (c)(4) simply provides that agencies must include any existing policies in the notice of funding opportunity. It does not prohibit an agency from developing a new policy that applies to existing awards. That question is instead addressed by Subsections (c)(1) and (c)(3)—which together allow the agency to "use a rate different from the negotiated rate," without limitation as to whether that rate may apply to existing grants, 2 C.F.R. § 200.414(c)(1); *see also id.* pt. 200, app. III(C)(7) (noting that an agency may decline to "use the negotiated

45

rates in effect at the time of the initial award throughout the life of the Federal award" so long as it complies with 2 C.F.R. § 200.414(c)(1))—and by the terms of separate regulations governing grant terminations, *id.* § 200.340(a), (b). Subsection (c)(4) does not displace those provisions or otherwise limit an agency's power to terminate an award.

Finally, the district court erroneously held that 2 C.F.R. § 200.414(c) requires the Department to demonstrate a "strong underlying rationale that warrants the [policy] change." ADD.33. The regulation plainly does not impose any such substantive limit. Indeed, the district court itself acknowledged that the regulation does not use these terms. ADD.32.

Instead, the regulation states only that the federal agency must make "the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates" publicly available. 2 C.F.R. § 200.414(c)(3). That is a procedural requirement, not a substantive one. The regulation imposes no guidance or restrictions on the types of goals or priorities that the agency may consider, nor any other substantive constraint on the Department of Energy's ability to depart from negotiated rates—let alone suggest that the Department must satisfy an amorphous standard of a "strong" rationale. And in any event, as discussed further below, the Department provided a reasonable explanation for its

46

changed policy.  That explanation plainly satisfies any alleged regulatory requirements.

### 2. The Policy Flash Is Reasonable And Reasonably Explained

**a.** The Policy Flash also survives review under the APA arbitrary-and-capricious standard.  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Sorreda Transp., LLC v. U.S. Dep't of Transp.*, 980 F.3d 1, 3 (1st Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Indeed, a court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).  At bottom, the APA requires only that agency action be "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Those deferential principles apply even where, as here and as is frequently the case, the agency action reflects a change in policy.  An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *Fox Television Stations*, 556 U.S. at 515.  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to

be better, which the conscious change of course adequately indicates." *Id.* To the extent that the agency's change in course unsettles any "serious reliance interests," the agency need only acknowledge and address those interests and explain why it is nonetheless pursuing its chosen policy. *Id.*

The Department of Energy satisfied that burden here. As discussed (*supra* pp. 41-42), the Policy Flash sets out the reasons for the change in policy. In the Policy Flash, the Department explained how indirect cost rates have "typically" worked at the time of the notice. ADD.54. And the Department acknowledged that there are reliance interests, explaining that it is "cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." ADD.53.

The Policy Flash also identifies the Department's reasons for adopting a new approach despite those reliance interests. First, the Department explained that reducing payment of indirect costs would permit the Department to focus its payments on the direct costs of the research it is funding—a more "appropriate use" in the Department's view. ADD.53 ("[I]ndirect cost payments . . . are not for the Department's direct research funding."). The Department also explained that it wished to "improve efficiency and curtail costs where appropriate" in order to strike a policy-based "balance" between "the financial needs of grant recipients with the Department's obligation to

48

responsibly manage federal funds."  ADD.53.  Although succinctly stated, the

Department's laudable desire to "improve efficiency and curtail costs" as a

responsible steward of taxpayer funds is both reasonable and reasonably

explained.

The Department also provided its rationale for selecting the 15% rate,

which is "at the high end of the 'up to 15 percent' *de minimis* rate permitted by

government-wide regulation" for grantees without a negotiated rate.  ADD.54.

Again, this was a rational choice: having chosen to deviate from negotiated

rates for a class of awards to conserve taxpayer funds, the Department

reasonably looked to preexisting benchmarks and chose the most generous rate

provided in the regulations for use in the absence of a negotiated rate.

**b.** The district court erred in holding the Department's explanation to be

arbitrary and capricious.  Although the court recognized that the Policy Flash

"articulates very reasonable agency goals," including a desire to improve

efficiency and curtail costs, the district court faulted the Department for failing

to address certain matters related to those goals at greater length.  ADD.25.

Critically, however, the substance of the district court's criticism amounts to

little more than a policy disagreement with the Department and a preference

for the status quo.  The district court's decision thus violates the fundamental

49

precept of APA review that "a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

For example, the court criticized the Department for failing to explain how reducing the money spent on indirect costs "would lead to that money being put to more appropriate and efficient uses." ADD.25. But the Policy Flash describes the types of capital, operations and maintenance, and administration costs that comprise "indirect costs" generally; notes that "these payments are not for the Department's direct research funding"; and explains that "the Department must ensure it is putting [funds] to appropriate use on grant programs." ADD.53. Thus, the Policy Flash plainly explains the reason for the changed approach to indirect costs—a desire to curtail costs and improve efficiency of Department-funded grant programs. No further explanation was provided because it is self-evident that reducing the indirect cost rate will achieve these goals. Because the Department has limited funds to spend on grant awards, lowering the amount of money spent on indirect costs permits the Department to spend a greater proportion of its available funds on direct research costs.

The district court also expressed concern that institutions of higher education would likely not be able to continue current operations under the new policy. ADD.26. Again, this simply reflects the district court's policy

50

preference for maintaining the status quo.  That the Department chose not to explain what specific steps institutions would have to take in order to be able to continue to conduct research reflects the Department's understanding that recipient institutions are best positioned to decide how to adjust their budgets or the structure of their research operations in light of changes in federal policy.  Nothing in the APA requires the Department to assume recipients' responsibility for managing their own organizations and identifying alternative funding to support indirect costs that the Department has reasonably sought to limit.

Likewise, the district court improperly substituted its judgment for the agency's when it faulted the Department for not providing a more robust explanation as to why imposing a single uniform rate for all institutions of higher education "is more efficient or appropriate than the current negotiation and audit system."  ADD.26.  As previously explained, 2 C.F.R. § 200.414(c) establishes certain procedural requirements but does not require a robust or compelling explanation before agencies may deviate from using negotiated indirect cost rates for a class of Federal awards.  Under APA review generally, an agency "need not demonstrate that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible, that there are good reasons for it, and that the agency believes it to be better."

51

*Housatonic River Initiative v. U.S. Env't Prot. Agency*, 75 F.4th 248, 270 (1st Cir. 2023) (alterations and quotation marks omitted).  And the district court's concern that the Department did not discuss the existing audit system is particularly misplaced.  Although the use of audits may, in some sense, reduce costs if the audit identifies problems of fraud or abuse at specific institutions, the Department did not base its changed policy on concerns about such fraud or abuse.  Instead, it sought to reduce indirect costs across the board "[t]o improve efficiency," "curtail costs," and prioritize spending on "direct research funding."  ADD.53-54.  The audit system does not serve these goals.  As the district court itself acknowledged, institutions of higher education "make up about two-thirds" of the Department's research expenditures, and that they have varying negotiated indirect cost rates as high as 60% percent.  ADD.26 (quotation marks omitted).  This only underscores that a policy capping indirect cost rates will achieve the Department's stated policy goals better than the existing system.

Finally, the district court erred in concluding that the Policy Flash failed to account for grantees' reliance interests in the higher negotiated indirect-cost rates.  ADD.27-28.  As an initial matter, this aspect of the district court's reasoning does not—and cannot—apply to plaintiffs' challenge to the portion of the Policy Flash that applies to future grants.  The district court appeared to

52

be concerned that institutions have entered into long-term obligations in reliance on an assumption that they would continue to receive grants that reimburse indirect costs at negotiated rates that approximate their actual costs. ADD.28-29.  But plaintiffs can have no legally protectible reliance interests in grants that they have not yet been awarded.  There thus can be no argument that this aspect of the Policy Flash is arbitrary and capricious.  *See National Org. of Veterans' Advocs., Inc. v. Secretary of Veterans Affs.*, 927 F.3d 1263, 1267-69, 1269 n.4 (Fed. Cir. 2019) (holding that amendment to regulations "d[id] not defeat veterans' reliance interests" because the amendment "applied only prospectively").

As to existing grants, the district court's invocation of reliance interests is unavailing because, as stated above, the Policy Flash addresses institutions' reliance interests.  It acknowledges that institutions of higher education have traditionally been paid negotiated rates and explains that the agency will nevertheless change its policy in order to curtail costs and prioritize spending on direct research.  That is all the APA requires.  *See Fox Television Stations*, 556 U.S. at 515; *see also American Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1066 (10th Cir. 2023) ("Though an agency must adequately consider any '"legitimate reliance"' on an existing policy, such reliance is not 'necessarily dispositive' to the agency's decision"; "[a]n agency may conclude, for instance,

53

that reliance interests were 'entitled to no or diminished weight' or outweighed by 'other interests and policy concerns.'" (emphasis omitted) (quoting *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-32 (2020))).

**B.    The Policy Flash Is Not Impermissibly Retroactive**

Finally, the district court's conclusion that the Policy Flash is impermissibly retroactive as to existing grants is in error.  The Policy Flash does not affect substantive rights arising before its enactment.

**1.** Because "[r]etroactivity is not favored in the law," neither statues nor agency regulations are "construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  But not all changes that bear upon existing legal obligations are retroactive.  An enactment "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (citation omitted).  Rather, "the court must ask whether the new provision attaches new legal consequences to *events completed* before its enactment." *Id.* at 269-70 (emphasis added).  A consequence is not "retroactive" unless it "affect[s] substantive rights, liabilities, or duties on the

basis of conduct arising before its enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (alterations and quotation marks omitted).

The Supreme Court's decision in *Martin v. Hadix*, 527 U.S. 343 (1999), provides a useful application of these principles. There, Congress had enacted a statute (the Prison Litigation Reform Act) that placed a new cap "on the fees that may be awarded to attorneys who litigate prisoner lawsuits." *Id.* at 347. Specifically at issue was how the fee cap "applie[d] to cases that were [already] pending" on the statute's effective date in April 1996. *Id.* The Court concluded that, as to fees incurred prior to the statutory effective date, application of the fee cap would be retroactive because it would "attach new legal consequences to completed conduct," specifically, to "work performed before [the statute's] effective date" and undertaken "in reasonable reliance on [the prior] fee schedule." *Id.* at 358 (alteration and quotation marks omitted). By contrast, as to fees incurred for work performed by attorneys in pending cases after the statutory effective date, no such retroactivity problem existed. That is because "[f]rom that point forward," the "plaintiffs' attorneys were on notice that their hourly rate had been adjusted" and they could conform their conduct accordingly. *Id.* at 360. That was true even though the attorneys had decided to file suit and thus assume the duty of representation for ongoing cases before the statute's effective date. *See id.* at 360-61.

55

The Policy Flash is prospective in application and does not retroactively change the terms of any grant.  By its terms, the 15% indirect cost rate applies only "hereinafter" from the date of the Policy Flash.  ADD.54.  The Department explained that "[a]ll future Department grant awards to [institutions of higher education] will default" to this rate.  ADD.54.  Moreover, as the district court acknowledged, ADD.36-37, the Policy Flash does not "claw back" funds drawn prior to its effective date.  Thus, as in *Martin v. Hadix*, there is no "manifest injustice" in telling universities with taxpayer-funded research grants that "going forward, [they] will earn a lower [indirect-cost] rate than [they] had earned in the past."  527 U.S. at 360.

That is true even though grant recipients may well have assumed that negotiated indirect-cost rates would continue indefinitely.  Although retroactivity principles generally prevent an agency from changing the past legal effects of past transactions, "the presumption against retroactivity is not violated by interpreting a statute to alter the *future* legal effect of past transactions."  *Landgraf*, 511 U.S. at 293 n.3 (emphasis added) (Scalia, J., concurring in the judgments).  Such "so-called secondary retroactivity," *id.*, does not present a retroactivity problem.  Rather, it implicates reliance interests to be considered under APA arbitrary-and-capricious standards.

56

**2.** The district court's contrary reasoning reflects its misunderstanding of both retroactivity principles and the governing regulatory regime. Relying on the district court's decision in a related case involving NIH grants, the court concluded that the Policy Flash "'impair[s] the rights that the institutions possessed when accepting the Notice of Award' by 'impos[ing] a new, lower rate, [and] displacing the institutions' right to the previously negotiated—and legally binding—' indirect cost rate upon which they have operated and relied since accepting the award." ADD.38 (second and third alterations in original) (quoting *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 318 (D. Mass. 2025)).

But the governing regulations on which the district court relied make clear that institutions have no entitlement to any particular indirect-cost rate, negotiated or otherwise. On the contrary, the regulation expressly authorizes the Department to "use a rate different from the negotiated rate." 2 C.F.R. § 200.414(c)(1). And the Policy Flash itself does not announce any retroactive change to existing contracts. Rather, it announces an intent to take subsequent action, after "separate notice and guidance," "to terminate all grant awards" that do not conform with the updated policy under 2 C.F.R. § 200.340(a), (b). ADD.54. As plaintiffs noted in their request for preliminary injunctive relief, they received separate notice the following business day informing them that the Department was conditionally terminating their grant awards and that they

57

could "avoid termination of the[ir] grant awards" by confirming agreement to "an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025"—30 days after the date of the notice.  JA287; JA371.  This demonstrates that the Policy Flash applies only on a forward-looking basis; it does not change the indirect-cost rates for funds drawn prior to its effective date.

To the extent that the district court was concerned that the negotiated rate became part of the contract between plaintiffs and the Department of Energy upon acceptance of the grant, that only underscores that there is no jurisdiction over plaintiffs' claim.  As explained above, (*supra* pp. 21-38), district courts lack jurisdiction to order the United States to specifically perform under a contract.  Accordingly, where the agency's implementing action is the prospective modification or termination of a contract, the action cannot be prohibited as impermissibly retroactive.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRIAN C. LEA
  *Deputy Associate Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

COURTNEY L. DIXON
*/s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

September 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,847 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.


*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

**ADDENDUM**

## TABLE OF CONTENTS

Memorandum and Order on Motion for Preliminary Injunction
(May. 15, 2025) (ECF No. 62) .......................................................ADD.1

Final Judgment and Permanent Injunction (June 30, 2025)
(ECF No. 71) ...............................................................................ADD.50

Policy Flash 2025-22 (April 11, 2025) (ECF No. 2-1)..........................ADD.53

2 C.F.R. § 200.414 ............................................................................ ADD.55

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 25-cv-10912-ADB |
| | * | |
| DEPARTMENT OF ENERGY et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs Association of American Universities ("AAU"), Association of Public and Land-Grant Universities ("APLU"), American Council on Education ("ACE," and, with AAU and APLU, the "Organizational Plaintiffs"), and several public and private universities (together with the Organizational Plaintiffs, "Plaintiffs") seek a preliminary injunction halting implementation of a Department of Energy ("DOE" or "the Department") "Policy Flash," which sets a universal cap on indirect funding costs for Institutes of Higher Education ("IHEs") (the "Rate Cap Policy" or the "Policy Flash"). Plaintiffs allege that the Rate Cap Policy is arbitrary and capricious, impermissibly retroactive, and contrary to governing law. For the foregoing reasons, the Plaintiffs' motion for a preliminary injunction is **GRANTED**.

ADD.1

## I.    BACKGROUND

### A.    Factual Background

#### 1.    DOE Funding for Indirect Costs

The federal government awards billions of dollars each year to universities to support research that can effectively further the DOE's goals.  [Compl. ¶ 27].  In fact, the majority of DOE-funded research occurs at outside institutions—and, as relevant here, IHEs—which allows the DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.  [Id. ¶ 29].  During fiscal year 2023, the DOE awarded more than $2.6 billion to nearly 400 different universities.  [Id.].  As such, at any given time, many individual research universities are likely depending on DOE grants to support independent research projects across multiple departments and research centers.  [Id. ¶ 30].  This DOE-funded research at universities has made the United States a world leader in science, resulting in innumerable scientific breakthroughs, all to the benefit of the United States and the rest of the world, as evidenced by the fact that dozens of DOE-supported scientists have earned Nobel Prizes for their groundbreaking work.  [Id. ¶¶ 27, 28].

Universities and other grant recipients generally do not receive lump-sum grants from the DOE.  [Compl. ¶ 34].  Rather, they use cost-based accounting systems whereby the universities first incur expenses and then recover their actual, documented direct and indirect costs for conducting their research.  [Id. ¶¶ 34, 35].  "Direct costs" are those costs which can be readily attributed to a specific research project; for example, the salary of a graduate student assigned to a particular research project or the cost of a specialized piece of equipment purchased for a particular research project.  [Id.].  "Indirect costs," on the other hand, are costs that are necessary

2

ADD.2

for research but support multiple research projects, making them more difficult to trace back to a specific project.  [Id. ¶ 36].

Indirect costs are comprised of "facilities" and "administration" costs (and are often referred to as "F&A costs").  [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))]; see also 2 C.F.R. § 200.1 (noting that, for IHEs, the term "facilities and administrative (F&A) cost is often used to refer to indirect costs").  The "facilities" costs are "defined as depreciation on buildings, equipment, and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."  [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))].  This category includes the costs of the physical infrastructure necessary for carrying out research, such as the construction and maintenance of buildings, including specialized facilities and laboratories.  [Id.].  These costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects.  [Id.].  The "administration" costs are defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" [Id. ¶ 38 (quoting 2 C.F.R. § 200.414(a))].  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security, technical staff, and many others.  [Id.].  These are indirect costs because a single employee or group of employees will typically handle these necessary administrative activities across multiple DOE grants.  [Id.]. Because of caps on administrative costs, universities often contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants in what can be characterized as a mutually beneficial partnership.  [Id.].

The computation and determination of indirect costs are subject to extensive regulation, discussed further infra, and then fixed for a specific period of time in recognition of the institutions' needs for predictability and to allow proper planning.  [Compl. ¶¶ 39–50].  The regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs, with the purpose of ensuring that indirect costs are allocated fairly across supported projects.  [Id. ¶ 39].  Resource-intensive research projects are typically the most expensive and are allocated a larger share of indirect costs.  [Id.].  Plaintiffs provide a simplified example: Suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing costs and the other with $25,000—and that the laboratory's sole indirect cost is electricity, which costs $10,000 per year.  [Id.].  Because the cost of electricity is 10 percent of the overhead-bearing direct costs (or, $100,000), the indirect cost rate would be 10 percent.  [Id.].  Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 would be allocated to the second project.  [Id.].

Because different institutions conduct different types of research, negotiated rates vary significantly from institution to institution.  [Compl. ¶ 48].  Certain facilities, like specialized laboratories, and certain types of research are more expensive than others.  [Id.].  As such, institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research, such as state of the art nuclear and energy research.  [Id. ¶ 49].  Many Plaintiffs in this action have indirect cost rates exceeding 50 or 60 percent.  See, e.g., [ECF No. 2-1 at ¶ 11 ("Many of the AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15 percent, often in the 50-to-60-percent range.")]; [ECF No. 2-4 ¶ 13 (Cornell University has a negotiated indirect cost rate of 64

4

percent)]; [ECF No. 2-5 ¶ 12 (University of Illinois Urbana-Champaign has a negotiated indirect cost rate of 58.6 percent)]; [ECF No. 2-6 ¶ 10 (MIT has a negotiated indirect cost rate of 59 percent)]; [ECF No. 2-7 ¶ 11 (University of Michigan has a negotiated indirect cost rate of 56 percent)].

2.   <u>Regulatory Framework</u>

DOE grants to IHEs are, and have long been, issued pursuant to an elaborate, well-established legislative and regulatory framework that facilitates long range planning by maintaining predictability in funding levels. [Compl. ¶¶ 3–4, 8, 31]. Congress has authorized the DOE to provide grants under various statutes, and it has further permitted agencies to set indirect cost rates in connection with such grants. [<u>Id.</u> ¶ 31(citing 41 U.S.C. § 4708)]; <u>see also</u> [<u>id.</u> ¶ 36 (explaining that, in 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions)]. Congress also instructed the Office of Management and Budget ("OMB") to issue general guidance on fiscal administration issues. [Compl. ¶ 31 (citing 31 U.S.C. § 503(a), (b)(2)(C))]. Pursuant to statutory authority, OMB has in turn established uniform guidance for agencies to administer grants under the agencies' purview, [<u>id.</u> (citing 2 C.F.R. pt. 200)], which the DOE has adopted into its own regulations, [<u>id.</u> (citing 2 C.F.R. § 910.120)].

These regulations prescribe a detailed and well-settled methodology for negotiating indirect cost rates with IHEs, [Compl. ¶ 40], and establish that "negotiation of predetermined rates for indirect (F&A) costs for a period of two to four years should be the norm," 2 C.F.R. pt. 200, app. III(C)(4). The process begins when a single agency (the "cognizant agency") negotiates an indirect cost rate with an institution. <u>Id.</u> at app. III(C)(11). For IHEs, rates are

5

generally negotiated by either the Department of Health and Human Services ("HHS") or the

Department of Defense's Office of Naval Research ("DOD").  [Compl. ¶ 3 (citing 2 C.F.R. pt.

200, app. III(C)(11)(a)(1))].  To facilitate these negotiations, the institutions are required to

conduct and then submit to their federal agency comprehensive cost analyses that follow detailed

federal cost accounting guidelines governing reasonable and allowable indirect costs.  [Id. ¶ 41].

For example, an institution which seeks to recover the cost of building maintenance must

document and allocate the maintenance costs across research and non-research programs.  [Id.].

The federal agency then reviews and verifies these proposals and determines the institution's

indirect cost rate, which reflects actual, verified costs incurred by the institution.  [Id. ¶ 42].

After costs are incurred, federal agencies audit institutions to ensure that the negotiated indirect

cost rate approximates to the actual indirect costs that were incurred, with the understanding that

the rate can be adjusted if the audit establishes that it does not.  [Id. ¶ 44].

Once negotiated with the cognizant agency, the final negotiated indirect cost rate is

memorialized in writing, in a document commonly referred to as a "Negotiated Indirect Cost

Rate Agreement," or "NICRA."  [ECF No. 60 ¶ 4]; see also [ECF No. 2-16 ¶ 11 (explaining

University of Wisconsin-Madison "has a Negotiated Indirect Cost Rate Agreement ('NICRA')

with DHHS, covering all federal agencies"); [ECF No. 2-8 ¶ 10 (same regarding Michigan State

University)].  An authorized representative for both the cognizant agency and the individual IHE

signs the NICRA.  [ECF No. 60 ¶ 4].  The NICRA is then used for all of an IHE's grants across

the entire federal government during the period that the negotiated rate is in effect, which is

typically at least one year, although in some cases that rate can remain in effect for up to four

years.  [Compl. ¶¶ 41, 43].

ADD.6

As such, when the DOE issues a Notice of Funding Opportunity ("NOFO"), which is what begins the DOE's competitive grantmaking process, an IHE applying for that funding will submit its NICRA as part of the application process.  [ECF No. 60 ¶ 5]; see also [Compl. ¶ 32 (citing 2 C.F.R. § 200.204)].  After a formal review process that includes peer review, the DOE issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested from the agency.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(b)(7))]; [ECF No. 60 ¶¶ 5–6].  A NOA is issued for the initial budget period and then each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(c)(1)(iv))].

The negotiated indirect cost rate, memorialized in the NICRA, "must be accepted by all federal agencies" granting awards unless certain exceptions apply.  As relevant here, Section (c)(1) establishes the conditions under which the awarding agency is permitted use a different rate.  2 C.F.R. § 200.414(c)(1) ("Section (c)"); see also [Compl. ¶¶ 3, 8].  Specifically, Section (c)(1) provides that the awarding agency "may use a different rate" from the NICRA "for either a class of Federal awards or a single Federal award" when "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."  2 C.F.R. § 200.414(c)(1).  A "class of Federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply."  2 C.F.R. § 200.1.  Section (c)(3), in turn, requires that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  2 C.F.R. § 200.414(c)(3).  Section (c)(2) requires the agency to notify OMB of any approved deviations, and Section (c)(4) requires the agency to include the

policies relating to indirect cost rate reimbursement in the notice of funding opportunity. 2 C.F.R. §§ 200.414(c)(2), (4).

3.   <u>Rate Cap Policy</u>

On Friday, April 11, 2025, the DOE issued the Rate Cap Policy, titled "Adjusting Department of Energy Grant Policy for Institutes of Higher Education (IHE)." [Compl. ¶ 60]; <u>see also</u> [ECF No. 2 at 2–3]. The Rate Cap Policy announced that "hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs." [ECF No. 2 at 3]. The Rate Cap Policy further provides that "[a]ll future Department grant awards to IHEs will default to this 15 percent indirect cost rate" and that "the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy." [<u>Id.</u>].

The Rate Cap Policy purports to justify this sweeping change by stating 1) "[t]his system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people," and 2) "[t]o improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds." [ECF No. 2 at 3]. By its terms, the Rate Cap Policy applies this supposedly necessary limit on indirect cost rates "only with respect to" IHEs, and not to other recipients of DOE grants. [<u>Id.</u> at 2].

Since the Rate Cap Policy was issued, at least one IHE, Cornell, has received a letter conditionally terminating its awards "in accordance with" the new policy. [ECF No. 33-1]. Specifically, the letter stated that "[p]ursuant to the Department's policy memorandum dated April 11, 2025 . . . the Department has undertaken a review of all Department grant awards to ensure that the awards comply with this updated Department policy," and that "[d]uring this

review, the Department determined that [certain Cornell] grants . . . are not currently in compliance with the policy memorandum." [Id. at 8].  The letter further advised that Cornell could "avoid termination of these awards" by agreeing to "an updated indirect cost rate of 15 percent." [Id.].  Another IHE, Arizona State University, received an email regarding an invoice previously submitted for a DOE funded project, which stated that "[d]ue to the Policy Flash from DOE, and the pending process changes, currently invoices from IHEs are not being processed . . . The option we have at this time is for the invoice to be submitted without any indirect charges and we can pay the direct costs." [ECF No. 53-1 at 7].

### 4.  Prior Attempts to Limit Indirect Cost Funding

This is not the government's—or even this administration's—first attempt to limit indirect funding costs.  [Compl. ¶¶ 5, 6].  In 2017, the then-administration released a budget proposal that would have slashed indirect cost rates for the National Institutes of Health ("NIH") to 10 percent.  [Id. ¶ 51].  The proposal was met with "widespread criticism and alarm," particularly in Congress, which enacted a bipartisan appropriations rider that provided that regulator "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates[] shall continue to apply to [NIH] to the same extent and in the same manner." [Id. ¶¶ 52–53].  Both the House and Senate Report on the rider identified serious problems with the proposal, observing that it would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965," and concluded that the proposal was "misguided and would have a devastating impact on biomedical research across the country." [Id. ¶ 5 (first citing S. Rep. No. 115-150, at 109 (2017); and then citing H.R. Rep. No. 115-244, at 50 (2017))].  The rider that was subsequently enacted has been repeatedly reenacted ever since.  [Id. ¶ 55].

9

ADD.9

Despite Congress' evidenced commitment to the grant funding regime, in February 2025, the current administration tried again, with NIH issuing a notice that stated that it was "imposing a standard indirect cost rate on all grants of 15%" for all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.  [Compl. ¶¶ 6, 57 (quoting NIH, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (or, the "NIH Rate Change Notice"), NOT-OD-25-068 (Feb. 7, 2025))].  Shortly thereafter, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in the present action—filed complaints and motions for temporary restraining orders, arguing that the NIH Rate Change Notice was unlawful under the Administrative Procedure Act ("APA").  [Id. ¶ 58].

Another session of this Court found that the serious consequences of the NIH Rate Change Notice warranted issuance of a nationwide temporary restraining order to maintain the status quo until the matter could be fully addressed, following which the Court also issued a nationwide preliminary injunction.  [Compl. ¶ 59; see also Massachusetts v. Nat'l Insts. of Health, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), judgment entered, No. 25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ("NIH").  The Court found that the administration had not only flouted the appropriations rider that Congress had enacted in the wake of the 2017 NIH episode but also that it had violated the government-wide regulations governing indirect cost rates and the reasoned decision-making requirements of the APA. [Compl ¶ 6].

### B.     Procedural History

On April 14, 2025, Plaintiffs filed their Complaint seeking declaratory and injunctive relief.  See [Compl.].  They also filed a motion for a temporary restraining order ("TRO"), [ECF

ADD.10

No. 3], which the Court granted on April 16, 2025, [ECF No. 34].  Defendants submitted an opposition on April 22, 2025, [ECF No. 47], and Plaintiffs filed a further reply in support of their motion on April 25, 2025, [ECF No. 53].

The Court held a hearing on the motion for injunctive relief on April 28, 2025, at which time it took the motion for injunctive relief under advisement.  [ECF No. 54].

## II.    DISTRICT COURT JURISDICTION

As a threshold matter, Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims because the waiver of sovereign immunity in the APA, 5 U.S.C. § 702, does not extend to actions of contract, which are within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.  [ECF No. 47 at 6–8].  Plaintiffs, who contend they have brought a proper challenge under the APA, disagree that the Tucker Act divests this Court of jurisdiction.  [ECF No. 19 at 24–29]; [ECF No. 53 at 7–10].

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"  Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702).  The APA's waiver of sovereign immunity, however, "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  Dep't of Educ. v. California, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702).  One such statute, the Tucker Act, vests jurisdiction in the United States Court of Federal Claims with respect to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Although "[t]he 'jurisdictional boundary' between the Tucker Act and [APA] is well-traversed by litigants

11

ADD.11

seeking relief against the federal government,. . . the boundary's precise contours remain elusive." NIH, 2025 WL 702163, at *5 (quoting Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007)).

Both parties focus their dispute on a recent per curium decision from the United States Supreme Court, Department of Education v. California ("California"), which granted a stay of a temporary restraining order issued by another session of this Court pending appeal of that order. That suit arose after the Department of Education sent termination letters to almost all awardees of Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED) grants on the grounds that "[t]he grant[s were] . . . inconsistent with, and no longer effectuate[d], Department priorities." California v. U.S. Dep't of Educ., No. 25-cv-10548, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025). Plaintiffs sought an injunction preventing the Department of Education from implementing the grant terminations, asserting that the terminations were arbitrary and capricious and not in accordance with governing law proscribing methods by which agencies can terminate grants. Id. at *2.

The district court granted the application for a temporary restraining order, finding that the terminations were arbitrary and capricious under the APA. California v. U.S. Dep't of Educ., 2025 WL 760825, at *3. In so doing, the district court, accepting NIH's position, held that the action did not fall within the Court of Federal Claims' jurisdiction under the Tucker Act because "the 'essence' of the action was not contractual in nature since the source of the plaintiffs' rights was in federal statute and regulations and because the relief was injunctive in nature." Id. at *1 (quoting NIH, 2025 WL 702163, at *8). Defendants moved for a stay pending appeal, and the First Circuit denied the stay and affirmed the district court on the jurisdictional issue, reasoning that "if the Department breached any contract, it did so by violating the APA. And if the

12

ADD.12

Department did not violate the APA, then it breached no contract." California v. U.S. Dep't of Educ., 132 F.4th 92, 97 (1st Cir. 2025).

Defendants in California then petitioned the Supreme Court for emergency relief. A per curium panel of the court granted the stay, finding that "the District Court's 'basis for issuing the order [is] strongly challenged,' as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." California, 145 S. Ct. at 968 (alteration in original) (quoting Sampson v. Murray, 415 U.S. 61, 87 (1974)). The analysis that followed was brief, providing in full:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." Ibid. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. Bowen v. Massachusetts, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Id. Defendants in this action contend that this language from California is dispositive as to this Court's jurisdiction, contending it "addressed [the jurisdictional] issue in the same context in which Plaintiffs' claims arise, i.e., grant awards" and thus forecloses "Plaintiffs['] attempt to shoehorn their claims into the APA by styling their complaint as one for injunctive relief ." [ECF No. 47 at 7–8].

Although mindful of the fact that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991), this Court is hesitant to conclude that California requires it to cede jurisdiction to the Federal Court of Claims simply because both cases involve federal grant

13

ADD.13

funding and bear a superficial resemblance to one another.  It is true that an injunction in each action would have the effect of requiring the government to continue to pay money pursuant to certain grant agreements.  That said, on a closer look, the two actions are far from identical twins.  For example, contrary to the facts here, the California plaintiffs asserted violations of governing law rooted in regulations about terminating rather than awarding grants.  Thus, the "source of the right[]" to the grant was, in California, arguably, the grant agreements, and the relief contemplated was the money owed under those grants, making the case more akin to a contract action.  Widakuswara v. Lake, No. 25-cv-1015, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) (quoting Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 38 F.4th 1099, 1106 (D.C. Cir. 2022).  Additionally, the plaintiffs in California sued to enjoin terminations on already awarded grants; they did not sue to enjoin any action as to future, unawarded grants.

By contrast to the paucity of relevant regulations in California, as discussed supra, a vast regulatory structure protects Plaintiffs' right to rely on negotiated indirect cost rates with regards to current and future grants.  Although the negotiated rates are ultimately incorporated into written agreements and awards, and an injunction here may impact payments on current and future grants, Plaintiffs are not suing to enforce those rates or to collect those costs.  Rather, Plaintiffs are seeking to protect their right to maintain the memorialized rates absent the DOE meeting the regulatory requirement for a deviation (as to current awards) and to be able to negotiate those rates, institution by institution, based on reimbursable costs and subsequent audits (as to future awards), both of which are rights provided by the regulations, not the NICRAs themselves, and that are alleged to have been usurped by the Rate Cap Policy.  The terms and conditions of each individual NICRA (or the terms of any existing grants) are not at issue, as the DOE's Rate Cap Policy "was not based on individualized assessments of any

14

particular grant terms or conditions or agreements." New York v. Trump, No. 25-cv-00039, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025). Rather, the issue is whether the "broad, categorical" policy itself runs afoul of the APA, warranting forward-looking injunctive relief. Id.

It may well be that these distinctions would not differentiate this case from California in the eyes of the Supreme Court, but this Court cannot read those tea leaves. The brief analysis within the California stay order lacks guideposts as to which facts the Supreme Court viewed as distinguishing that case from the longstanding precedent it cited for the proposition that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." California, 145 S. Ct. at 968 (citing Bowen, 487 U.S. at 910); see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric., No. 25-cv-00097, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) ("The Supreme Court's brief treatment of Bowen and Great-West Life in California and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite the Government's arguments to the contrary."). In light of well-settled precedent and practice, as well as the many facts that distinguish this case from California, the Court declines, on this record, to adopt a categorical rule that would see all federal grant funding disputes go to the Court of Claims. Rather, this Court returns to first principles and asks "[w]hether [the Plaintiffs'] claim is 'at its essence' contractual," which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate),'" and determines that it is not. Crowley, 38 F.4th at 1106 (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).

The Court agrees with the well-reasoned opinion of a sister session of this court in NIH and, for the reasons articulated supra, finds that "the gravamen of Plaintiffs' Complaint[] does

not turn on terms of a contract between the parties[, but rather] on federal statute and regulations put in place by Congress and [DOE].” NIH, 2025 WL 702163, at *6.  “While it is true that the Notice of Award operates as a contract, the claims in this case turn on how the regulations govern the provision of these awards”—a fact which “is further underscored by the [Rate Cap Policy’s] impact not just on current grants, but future ones as well.” Id.  Moreover “Plaintiffs do not bring claims for past pecuniary harms.  Rather, like the petitioners in Bowen, their claims are to preserve their ongoing and prospective agreements with” the DOE and, as discussed further infra, to avoid various irreparable harms unrelated to any monetary relief. Id. at *7.

For the forgoing reasons, the Court finds it has jurisdiction pursuant to the APA.[1]

## III.    STANDING

The Constitution gives the judiciary power to hear only “Cases” and “Controversies.” U.S. Const. art. III, § 2, cl. 1.  The Supreme Court has interpreted this requirement to mean that courts may decide only “cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 102 (1998).  A plaintiff’s standing to sue is “part of the common understanding of what it takes to make a justiciable case.” Id.  Therefore, “the absence of standing sounds the death knell for a case.” Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is “claim-specific,” meaning that an individual plaintiff “must have standing to bring each and every claim that [he or] she asserts.” Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

---

[1] For the reasons the Court determines this is not an action where jurisdiction lies with the Federal Court of Claims pursuant to the Tucker Act, the Court also disagrees with Defendants’ contention that this is an action seeking to compel the government to specifically perform a contract.  [ECF No. 47 at 10–11].

16

ADD.16

Article III standing requires that three conditions be satisfied.  "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'"  Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical."  Whitmore, 495 U.S. at 155 (internal quotations and citations omitted).  Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  Steel Co., 523 U.S. at 103.  Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury."  Id.

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances."  Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  The first two Hunt prongs are constitutional, and the third is prudential.  United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–57 (1996).  Only one member of an organization need have individual standing in order for that organization to satisfy the first Hunt factor.  See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that every member of an association have standing before it can sue on behalf of its members. 'The association must allege that its members, or any

17

ADD.17

one of them, are suffering immediate or threatened injury as a result of the challenged action of

the sort that would make out a justiciable case had the members themselves brought suit.'"

(emphasis omitted) (quoting Warth, 422 U.S. at 511)).

Defendants contest only the third Hunt prong.  Specifically, they contend that, "[a]s

shown by the sheer number of declarations submitted by the Organizational Plaintiffs' member

institutions in an attempt to show irreparable harm, Plaintiffs fail the third requirement:

Individual members must participate to show entitlement to injunctive relief—particularly if this

Court follows the proper practice of limiting any injunction to those institutions that have shown

that the Policy Flash will cause them irreparable harm."  [ECF No. 47 at 17].  Plaintiffs respond

that "if that were the law, no associational plaintiff would ever have standing.  In fact, injunctive

suits like this one are bread-and-butter association standing cases."  [ECF No. 53 at 13].

The Organizational Plaintiffs' argument is ultimately more availing.  The injunctive and

declaratory relief Plaintiffs request need not be tailored to or require any individualized proof

from any particular member.  See Camel Hair, 799 F.2d at 12 ("Actions for declaratory,

injunctive and other forms of prospective relief have generally been held particularly suited to

group representation."); see also Playboy Enters., 906 F.2d at 35 ("[J]ust because a claim may

require proof specific to individual members of an association does not mean the members are

required to participate as parties in the lawsuit." (emphasis omitted)).  "The nub of the

[P]laintiff[s'] claim," that the Rate Cap Policy violates the APA, depends on the text of that

policy and the underlying regulatory structure, "not on evidence that differs from member to

member."  Camel Hair, 799 F.2d at 12.  "In addition, the relief sought, that the [Rate Cap Policy]

be enjoined, will affect all members in the same way . . . [a]nd [D]efendants have adduced no

reason to suggest that the [Organizational Plaintiffs] cannot adequately represent [their]

18

ADD.18

members' interests." Id.  As Defendants do not challenge the other Hunt factors, and because the Court finds that, in any event, they are satisfied, the Organizational Plaintiffs have standing.

## IV.    PRELIMINARY INJUCTION LEGAL STANDARD

When deciding whether to grant a motion for preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Id.  Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10 (citation omitted).  "[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their] quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., 287 F.3d at 9).  Likewise, the balance of hardships and public interest factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  As the moving party, Plaintiffs bear the burden of satisfying each of these four elements. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

Preliminary injunctions function to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  As a result, "findings of fact and conclusions of law made by a court granting a preliminary injunction

are not binding at trial on the merits." Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir. 1968)).  The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).

## V.    DISCUSSION

### A.    Likelihood of Success on the Merits

Plaintiffs contend that Defendants committed substantive violations of the APA by taking agency action that is (1) not in accordance with the governing law, (2) arbitrary and capricious, and (3) impermissibly retroactive.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As a general matter, judicial review of an APA claim is "narrow" as the "APA standard affords great deference to agency decisionmaking . . . because the [agency's] action is presumed valid." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

#### 1.    Final Agency Action

As discussed infra, the APA entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to judicial review.  5 U.S.C. § 702. Such review, however, is limited to final agency actions unless otherwise specified by statute. See id. § 704.

An agency action is final if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or

20

ADD.20

interlocutory nature," and, second, it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 117 (1st Cir. 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

Defendants contend that the Rate Cap Policy "is not a final agency action subject to judicial review under the APA because it does not have a legal effect or consequence." [ECF No. 47 at 12]. Rather, they contend that "[i]t is a mechanism for communicating financial assistance-related information [which] does not itself have the force or effect of law or direct any impact on any existing grant award." [Id.]. They further assert that the Rate Cap Policy itself "removes any doubt on this score: It closes by promising that '[a]dditional information is forthcoming'—making clear that the formal policy marking the end of the agency's decisionmaking process and carrying concrete consequences has not yet arrived." [Id. (alteration in original) (quoting Rate Cap Policy)].

Plaintiffs counter that, as to the first Bennett factor, the text of the Rate Cap Policy "could not be clearer: It says '[f]or the reasons set forth [here], hereinafter, [DOE] will no longer use the negotiated indirect cost rate,'" then establishes a standardized 15 percent rate, and says that the accompanying memorandum "sets forth the Department's policies, procedures, and general decision-making criteria" regarding the change. [ECF No. 53 at 10]. To the extent it promises that "additional information is forthcoming," Plaintiffs contend that this simply "promises more information about a decision already made." [Id. at 10].

21

ADD.21

As to the second prong, Plaintiffs assert that "the Policy's consequences are, in fact, quite clear," as evidenced by "the conditional termination letters DOE rushed out ahead of this Court's TRO ruling" that state that "they were issued 'pursuant to the [Rate Cap] Policy,'" [id. at 11 (quoting ECF No. 33-1 at 8, 10)], as well as the DOE email to Arizona State University communicating that "[d]ue to the Policy Flash from DOE, . . . currently invoices from IHEs are not being processed," [id. (emphasis omitted) (quoting ECF No. 53-1)].

For the purposes of a preliminary injunction, the Court is satisfied that the Rate Cap Policy constitutes final agency action. On the first Bennet prong, the Rate Cap Policy unambiguously states that, for the reasons set forth therein, the DOE "will no longer use the negotiated indirect cost rate for grants awarded to IHEs" and will instead use "a standardized 15 percent indirect cost rate for all grant awards to IHEs." [ECF No. 2 at 3]. This language is not "merely tentative or interlocutory" in nature, Harper, 118 F.4th at 116; rather, it is "mandatory," Union of Concerned Scientists v. Wheeler, 377 F. Supp. 3d 34, 42 (D. Mass. 2019), aff'd in part, rev'd in part and remanded, 954 F.3d 11 (1st Cir. 2020), in that it unequivocally states that the DOE has made a decision and is moving forward with it. Even accepting that IHEs will "receive separate notice and guidance," [ECF No. 2 at 3], there is no suggestion in the text that any such subsequent notice would backtrack on, rather than simply clarify or provide further instructions regarding, the Rate Cap Policy.

With regard to the legal effect, again, the plain text of the Rate Cap Policy communicates that consequences are forthcoming in short order. Specifically, as to current awards, the Rate Cap Policy establishes that the DOE is "undertaking action to terminate all grant awards to IHEs that do not conform with [the update]," [ECF No. 2 at 3], and, as to future awards, it similarly dictates that "[a]ll future [DOE] grant awards to IHEs will default to this 15 percent indirect cost

rate," [id.].  Moreover, if this announcement left any room for doubt as to whether Plaintiffs

would experience any legal effect, the DOE's conduct has removed any such doubt, as it has

begun to send conditional termination letters to IHEs, [ECF No. 33-1], as well as (mistakenly,

given the existence of the TRO at the time of the email) deny invoices based on that Rate Cap

Policy, [ECF No. 53-1].  As such, this Court is satisfied that the decision-making process is

complete, the policy is set, and the result of that process has already or will soon directly affect

the parties.  Brnovich, 630 F. Supp. 3d at 1171.[2]

### 2.    Arbitrary and Capricious

"The task of a court reviewing agency action under the APA's 'arbitrary and capricious'

standard is to determine whether the agency has examined the pertinent evidence, considered the

relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made.'"  Penobscot Air Servs., Ltd. v. FAA,

164 F.3d 713, 719 (1st Cir. 1999) (second-level internal quotation marks omitted) (quoting

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "While

---

[2] Defendants raise a separate challenge regarding the Rate Cap Policy's reviewability under the
APA, contending that the "APA precludes judicial review because the DOE's grant funding
decisions are 'committed to agency discretion by law.'"  [ECF No. 47 at 14–16 (quoting 5
U.S.C. § 701(a)(2))].  The Court disagrees.  Even assuming that this type of grant funding would
be considered an "administrative decision traditionally regarded as committed to agency
discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), and the Court is not convinced that it is,
the exception is typically limited to those "rare circumstances" where "no meaningful standard"
exists by which a reviewing judge could cabin that agency discretion, Dep't of Com. v. New
York, 588 U.S. 752, 772 (2019).  Here, "applicable regulations cabin the Department's discretion
as to when it can" deviate from negotiated indirect costs, which "create meaningful standards by
which to judge the agency's action."  California, 132 F.4th at 97 (cleaned up); see Pol'y & Rsch.,
LLC v. HHS, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's
otherwise-presumptively unreviewable decision to halt funding to an agency program was
reviewable under the APA because applicable regulations cabined its termination authority).

this is a highly deferential standard of review, it is not a rubber stamp." Id. at 720 (quoting

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)).  The Court "may not

supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting

State Farm, 463 U.S. at 43).

In the context of a policy change, "the requirement that an agency provide a reasoned

explanation for its action would ordinarily demand that it display awareness that it is changing

position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis omitted).

"An agency may not, for example, depart from a prior policy sub silentio or simply disregard

rules that are still on the books." Id. (citing United States v. Nixon, 418 U.S. 683, 696 (1974)).

That said, agencies are "free to change their existing policies as long as they provide a reasoned

explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)

(citations omitted).  The agency must further "show that there are good reasons for the new

policy," although it need not demonstrate that "the reasons for the new policy are better than the

reasons for the old one." Fox Television Stations, 556 U.S. at 515 (emphasis omitted).  "[I]t

suffices that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency believes it to be better, which the conscious change of course adequately

indicates." Id. (emphasis omitted).

That said, a "more detailed justification" may be required when 1) the agency's new

position "rests upon factual findings that contradict those which underlay [the] prior" position or

2) when the agency's prior position "has engendered serious reliance interests." Fox Television

Stations, 556 U.S. at 515; see NLRB v. Lily Transp. Corp., 853 F.3d 31, 36 (1st Cir. 2017)

(Souter, J.) ("[A]n about-face . . . owing to facts changed from those underlying the prior view

requires that the new facts be addressed explicitly by reasoned explanation for the change of

24

ADD.24

direction.").  Further, "when an agency rescinds a prior [position,] its reasoned analysis must

consider the 'alternative[s]' that are 'within the ambit of the existing [position].'"  DHS v.

Regents of the Univ. of Cal.,140 S. Ct. 1891, 1913 (2020) (second alteration in original) (quoting

State Farm, 463 U.S. at 51).

　　　Regardless of whether the DOE was required to put forth a "more detailed justification"

for the Rate Cap Policy, the Court cannot discern any "reasoned explanation" for the change.

The whole of the purported explanation seems to be:

> While the Department is cognizant that many grant recipients use indirect cost
> payments to effectuate research funded by the Department's grant awards, these
> payments are not for the Department's direct research funding. See 89 Fed. Reg.
> 30046–30093. As these funds are entrusted to the Department by the American
> people, the Department must ensure it is putting them to appropriate use on grant
> programs. To improve efficiency and curtail costs where appropriate, the
> Department seeks to better balance the financial needs of grant recipients with the
> Department's obligation to responsibly manage federal funds.

[ECF No. 2 at 2]; see also [ECF No. 47 at 25–26 (discussing justifications within the Rate Cap

Policy)].  To be sure, this excerpt articulates very reasonable agency goals, namely, to allocate

"funds . . . entrusted to [DOE] by the American people . . . to appropriate use on grant programs"

and [t]o "improve efficiency and curtail costs where appropriate."  [ECF No. 2 at 2].  Statements

of aspirational goals, however, are not the same as reasoned explanations for why an action is

chosen or how the chosen action will effectuate the stated goals.

　　　Here, the Rate Cap Policy falls short.  It provides no reasoned explanation for how or

why the DOE concluded that indirect cost rates exceeding 15 percent do not constitute an

appropriate or efficient use of DOE funds, nor does it explain how limiting funding for indirect

costs would lead to that money being put to more appropriate and efficient uses.  For instance,

the Rate Cap Policy does not, as Defendants contend, explain that the money spent on indirect

costs will be redirected to direct costs; it simply says that indirect costs are not direct.  [ECF No.

2 at 2]. That said, even if the DOE had stated an intent to reinvest indirect costs in direct research funding, that explanation would not be particularly well-reasoned, given the amount of support in the record for the notion that Plaintiffs would not be able to accept further direct research funding (or, indeed, even utilize their current direct research funding) absent an indirect cost rate that continues to approximate actual expenditures. See, e.g., [ECF No. 2-4 at ¶ 18 ("[W]ithout continuing indirect cost reimbursement at Cornell's negotiated rates, Cornell would no longer be able to carry out all of the sponsored activities and properly maintain the facilities and equipment currently in use, jeopardizing the current and future conduct of the DOE-supported projects.")]. Nor does the Rate Cap Policy provide any rationale for concluding that subjecting all IHEs to the 15 percent de minimis rate, typically reserved for IHEs without negotiated rates, is more efficient or appropriate than the current negotiation and audit system. Uniformity is not necessarily efficient or appropriate, particularly when the record is clear that IHEs constitute a sizeable portion of the DOE's budget across distinct institutions, each with unique awards governed by individualized indirect cost rates. See, e.g., [ECF No. 2-1 ¶ 4 ("Together, [AAU member universities] receive a total of roughly $1.8 billion in DOE research and development expenditures . . . To give a sense of scale: DOE's research and development ('R&D') expenditures nationwide total approximately $2.7 billion, meaning that funding to AAU's members makes up about two-thirds of all such expenditures.")]; [ECF No. 2-5 ¶¶ 4, 12 (University of Illinois Urbana-Champaign's DOE portfolio includes 123 active awards at a 58.6% indirect cost rate)]; [ECF No. [ECF No. 2-18 ¶¶ 3, 11 (University of Nevada, Reno's DOE portfolio includes 48 active awards at a 47% indirect cost rate); [ECF No. 2-19 ¶ 4 (Tufts DOE portfolio has 29 active awards at a 58% indirect cost rate)].

26

ADD.26

These examples, and there are others, illustrate the overarching problem: Although the DOE need not demonstrate that "the reasons for the new policy are better than the reasons for the old one," Fox Television Stations, 556 U.S. at 515 (emphasis omitted), it must, at base, offer "good reasons for the new policy," Encino, 579 U.S. at 223 (quoting Fox Television Stations, 556 U.S. at 515), not the mere conclusion that the Rate Cap Policy is more efficient or appropriate, Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("At bottom, an agency must explain 'why it chose to do what it did.'" (quoting Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001)). Because the Rate Cap Policy does not offer more than conclusory policy goals, the Court need go no further: Plaintiffs have demonstrated a likelihood of success in demonstrating that the Rate Cap Policy is arbitrary and capricious and therefore runs afoul of the APA. See Encino, 579 U.S. at 224 ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all.").

That said, the Court would be remiss if it did not note that the Rate Cap Policy's lack of reasoned explanation is particularly troubling in light "of decades of industry reliance on [DOE's] prior policy" of accepting individually negotiated indirect cost rates for IHEs. Encino, 579 U.S. at 222 (noting that "[a] summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy— the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position"). The well-established, decades-long relationship between IHEs and the DOE prior to the Rate Cap Policy afforded Plaintiffs several reasonable assumptions about the DOE's position on indirect costs, all of which were consistent with DOE goals of advancing science through cutting edge research in partnership with America's foremost research institutions, including that: 1) "negotiation of predetermined rates for indirect (F&A) costs for a

27

ADD.27

period of two to four years should be the norm," 2 C.F.R. pt. 200, app. III(C)(4); 2) the

negotiated indirect cost rate, when finalized with Plaintiffs' cognizant agency, would be based on

"an informed judgment as to the probable level of indirect (F&A) costs during the ensuing

accounting periods," id.; 3) that rate would then, as it "must[,] be accepted by all Federal

agencies," 2 C.F.R. § 200.414(c)(1); and, 4) the agreed-upon rate could only be changed after the

DOE met certain regulatory requirements, id. § 200.414(c)(1)–(4).  Pursuant to these reasonable

expectations, Plaintiffs have, among other things, formulated their overall operating budgets;

staffed departments; accepted undergraduate students, graduate, and post-doctoral candidates;

and built and improved infrastructure to support both current and future research.  See, e.g.,

[ECF No. 2-7 ¶ 14 ("The University of Michigan has for decades relied on the payment of

indirect costs.  And until now, we have been able to rely on the well-established process for

negotiating indirect cost rates with the government to inform our budgeting and planning.

Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for

annual staffing needs (e.g., post-docs, PhD students, and other research staff), infrastructure

support (e.g., IT networks, regulatory compliance, and grant management support), and facility

and equipment purchases.  And in some cases, the University of Michigan has long-term

obligations—for example, long-term equipment maintenance contracts and service agreements,

specialized technical staff positions in facilities supporting DOE research, debt service on

research infrastructure investments and laboratory renovations; and it relies on budgeted grant

funding, including associated indirect cost recovery, to fulfill these commitments.")]; see also

[ECF Nos. 2-5 ¶ 15; 2-8 ¶ 15; 2-9 ¶ 28; 2-10 ¶ 14; 2-11 ¶ 15; 2-12 ¶ 16; 2-13 ¶ 13; 2-16 ¶ 14; 2-

18 ¶ 15].

ADD.28

In the face of this longstanding course of conduct and the reliance it has engendered, the Rate Policy Flash offers only that "the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." [ECF No. 2 at 2]. It then notes that, despite this fact, "these payments are not for the Department's direct research funding." [Id.] This is both obvious and ultimately unhelpful. The distinction between direct and indirect costs has been recognized and embedded in the regulatory structure since OMB undertook to fund research at IHEs. The Rate Cap Policy wholly disregards the prior mutually understood reality that these indirect cost payments, while perhaps not sufficient for direct research to occur, are necessary to that research. They are, in fact, a crucial part of the funding structure which must be managed and protected to ensure our nation's ability to advance scientific innovation to meet very real energy, environmental, and nuclear challenges. Missing from the Rate Cap Policy's purported recognition of the indisputable reliance interest is a "reasoned explanation . . . for disregarding [that understanding, which was] engendered by the prior policy," and, notably, any acknowledgement of the potential consequences of the policy change. Encino, 579 U.S. at 222 (quoting Fox Television Stations, 556 U.S. at 515). As such, the Rate Cap Policy "f[alls] short of [DOE's] duty to explain why it deemed it necessary to overrule its previous position," id., and Plaintiffs are likely to succeed in establishing that the Rate Cap Policy is arbitrary and capricious for this reason as well.

### 3.    2 C.F.R. § 200.414

As discussed supra, one of the key regulatory provisions governing indirect cost rates is 2 C.F.R. § 200.414. In particular, Section (c), entitled "Federal Agency Acceptance of Negotiated

29

Indirect Cost Rates," proscribes the process by which OMB, and by extension DOE, can

"deviate" from previously negotiated indirect cost funding rates.[3]  2 C.F.R. § 200.414(c).

      Plaintiffs contend that the Rate Cap Policy violates the requirements for utilizing an

indirect cost rate different from the rate memorialized in the NICRA.  [ECF No. 19 at 31–34].  In

particular, they contend that the requirements of Section (c), taken together, "at most authorize

the agencies to announce policies and procedure governing <u>subsequent</u> decisions to make

<u>individualized</u> deviations from the baseline negotiated rate.  They do not license agencies to, by

fiat, wipe out all negotiated rates for institutions of higher education."  [<u>Id.</u> at 32].  They urge the

Court to read Section (c) as mandating a sequential process by which "agencies 'must' accept[]

negotiated rates unless [the] agency publicizes 'policies, procedures and general decision-making

criteria' and <u>then</u> 'follow[s]' them "to seek and justify deviations from negotiated rates."  [ECF

No. 53 at 16 (emphasis added)].  They contend that, pursuant to this sequencing, the Rate Cap

Policy fails because "[w]hile the Rate Cap Policy insists that it 'sets forth [DOE's] policies,

---

[3] For ease of reference, Section (c) provides:

    (1) Negotiated indirect cost rates must be accepted by all Federal agencies.  A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section.

    (2) The Federal agency must notify OMB of any approved deviations.  The recipient or subrecipient may notify OMB of any disputes with Federal agencies regarding the application of a federally negotiated indirect cost rate.

    (3) The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates.

    (4) The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e).  As appropriate, the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity.  See § 200.204.

procedures, and general-decision making criteria,' it does no such thing [because] a categorical dictate of a 15% rate is not a 'procedure' and does not set forth 'general decision-making criteria' under the plain meaning of those terms." [ECF No. 19 at 32].

Defendants counter that "Plaintiffs improperly seek to read into Subsection (c)(3) a requirement that any 'deviation' from negotiated indirect cost rates occur on a case-by-case basis," which is not supported by Subsection (c)(1) as it "specifically authorizes the use of [a] non-negotiated rate for a 'class of Federal awards,' without limiting the size of that class." [ECF No. 47 at 19]. They further assert that to the extent Plaintiffs suggest that Subsection (c)(3) requires "some temporal distance between announcement of new 'policies, procedures, and general decision making criteria' and actual determination of a non-negotiated rate," that will occur here through "[a]pplication of the non-negotiated rates to new grant awards, and (in this case) future action to terminate existing grant awards." [Id. at 20–21]. Defendants' position is that, in issuing the Rate Cap Policy, "DOE publicized the policy and decision-making criteria that it may later use in seeking and justifying deviations from negotiated rates" and "announced the procedure it would use for applying the new policy—application of a 15% rate for the IHEs." [Id. at 18–19]. As such, Defendants contend that the Rate Cap Policy "rests on a straightforward application of Section 200.414(c)(3), and therefore satisfies Section 200.414(c)(1)." [Id. at 19].

Even assuming that all awards to all IHE's can properly be construed as a "class of Federal awards" under Section (c)(1) such that a rate change is permissible, [4] the Court disagrees

---

[4] Given the purported size of this "class," this is far from clear to the Court. As noted elsewhere, a "class of federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1. Although Defendants' reading of that definition as permitting the DOE to classify all IHEs as a "type of recipient" is

with Defendants' contention that the Rate Cap Policy clears Section (c)(1) by virtue of its (purported) compliance with Section (c)(3).  By its plain terms, Section (c)(1) requires more than just compliance with Section (c)(3):  It requires the awarding agency to "approve[]" the change. 2 C.F.R. § 200.414(c)(1).  The Federal Register notice discussing 2 C.F.R. § 200.414(c) is instructive as to what this approval requires, explaining that the text of Section (c) contemplates "approval of the Federal awarding agency head . . . based on documented justification." Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013).  It continues on to discuss that it was important to the provision's drafters that a well-reasoned approval underlie Section (c)(1), explaining that "[s]ome commenters recommended that for even greater consistency decisions about the use of rates be subject to OMB approval rather than Federal agency approval," but this proposal was ultimately rejected on the basis "that the conditions set by OMB for these determinations are stringent enough to ensure that they do not occur <u>without strong justification</u>." <u>Id.</u> (emphasis added).  Thus, although the term "documented justification" does not appear in Section (c)(1),[5] the provision clearly contemplates that agency approval of a departure from a

---

not inherently antithetical to the English language, the Court is skeptical that such a broad-based classification is what the regulations intended.  IHEs, as discussed elsewhere in this order, account for a substantial percentage of the DOE's research and development budget, and they are awarded hundreds (if not thousands) of individualized grants to further distinct research goals. To permit an exception to the negotiated indirect cost rates for all these institutions and all their grant awards in the same missive strikes this Court as lacking the specificity that the definition contemplates.

[5] The term "documented justification" does appear in the substantially similar regulations governing permissible exceptions to NIH indirect cost rates.  <u>See</u> 45 C.F.R. § 75.414(c)(1) ("An HHS awarding agency may use a rate different from the negotiated rate for a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by a Federal awarding agency head or delegate based on <u>documented justification</u> as described in paragraph (c)(3) of this section.") (emphasis added).

32

negotiated rate must be based on the careful consideration of a strong underlying rationale that warrants the change.

On the present record, there is nothing to indicate that the DOE approved the change to IHE indirect cost rates based on a "strong" or "documented" justification. As discussed supra, the Rate Cap Policy, even read generously, offers very little by way of explanation or justification for the decision to so suddenly and drastically limit reimbursement for indirect costs. The Court is mindful that the DOE is privy to information that could, in theory, have supported the policy change. If such data exists, however, it was not made public or otherwise articulated, and Plaintiffs are, at this stage, more likely than not to prevail on their argument that the Rate Cap Policy did not receive the "approv[al]" contemplated by Section (c)(1). Moreover, Plaintiffs are more likely than not to prevail on their argument that the Rate Cap Policy violates Section (c)(3) to the extent that the cross-reference to that provision within Section (c)(1) requires the documented justification underlying agency approval to be made publicly available, which did not happen here.

Additionally, the Court agrees with Plaintiffs that the Rate Cap Policy more likely than not violates Section (c) because the regulation contemplates a step-by-step process for a change to a negotiated indirect cost rate, rather than a one fell swoop approach invalidating all pre-existing NICRAs and changing the well-established procedure for all future grants. The plain terms of Section (c)(3), which outline the requirements for deviating from the negotiated indirect cost rate pursuant to Section (c)(1), appear to require sequencing. The provision states that the awarding agency seeking a deviation "'must'—present tense—make available the policies, procedures, and decision-making criteria that [it] 'will follow'—future tense—to seek and justify the deviation." NIH, 2025 WL 702163, at *10. To read the provision to permit the DOE to

33

make the 15 percent rate cap policy public at the same time as it seeks to enforce it would read

these verb tenses, as well as the requirement that the DOE "justify" the deviation, out of the

provision.  On this, the Federal Register is again instructive, as it describes Section (c) as

functioning through a sequential process, stating:

> Language in paragraph (c) provides for the consistent application of negotiated
> indirect cost rates, and articulates the conditions under which a Federal awarding
> agency may use a different rate.  These conditions include approval of the Federal
> awarding agency head (as delegated per standard delegations of authority) based
> on documented justification, the public availability of established policies for
> determinations to use other than negotiated rates, the inclusion of notice of such a
> decision in the announcement of funding opportunity, as well as in any pre-
> announcement outreach, and notification to OMB of the decision.

78 Fed. Reg. at 78,600.

Additionally, reading Section (c)(3) to require a sequence of events has the benefit of

affording meaning to Section (c)(4), which otherwise would seem to have little relevance as it,

again on its plain terms, is aimed at providing notice to IHEs of the DOE's indirect cost

reimbursement policies before the IHEs even decide to bid on the grant opportunity.  Section

(c)(4) requires the awarding agency to "include, in the notice of funding opportunity, the policies

relating to indirect cost rate reimbursement."  2 C.F.R. § 200.414(c)(4).  As discussed supra,

NOFOs are the precursors to federal awards, which are followed by IHE applications for the

funding which must include the IHE's current NICRA.  The awards, once granted, are required

by Appendix III to use the NICRAs in effect at the time of the award, unless that award is

exempt under Section (c)(1).  2 C.F.R. pt. 200, app. III(C)(7) ("Except as provided in paragraph

(c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the

initial award throughout the life of the Federal award." ).  In other words, in the normal course,

all agencies are subject to the same consistent policy, publicly mandated by Appendix III, which

requires that the NOA use the current NICRA, and all IHEs responding to that NOFO would be

aware of that policy.  Thus, unless the policies underlying an exception were expected to precede

a deviation to the NICRA, it is difficult to imagine why the drafters of Section (c)(4) would have

thought it necessary to provide a specific safeguard requiring the awarding agency to include

"policies relating to indirect cost rate reimbursement" in a NOFO.

A concrete hypothetical is instructive.  MIT negotiates its indirect cost rate with DOD,

specifically the Office of Naval Research ("ONR"), its cognizant agency.  [ECF No. 2-6 ¶ 10].

For fiscal year 2025, that rate is 59 percent, which would have been memorialized in a NICRA.

[Id.]; [ECF No. 60 ¶ 4].  MIT conducts research under 286 direct and indirect funding awards

from the DOE that are currently active for Fiscal Year 2025.  [ECF No. 2-6 ¶ 9].  It would have

received those grants by responding to DOE NOFOs, and each application would have included

its NICRA.  At the time those NOFOs were posted, the Rate Cap Policy was not in effect and the

DOE grant award would have provided for a 59 percent indirect cost reimbursement rate to MIT

pursuant to its NICRA with ONR.  On this basis, MIT was granted and accepted awards.  Enter

the Rate Cap Policy.  As to the awards that existed at its inception, there was no opportunity for

the DOE to include that policy in the NOFO, as that part of the process is already done, and

Section (c)(4) would be rendered irrelevant.  For future awards, that is awards granted after the

Rate Cap policy became effective, the DOE can include the 15 percent rate cap in the NOFO

when it solicits an application from MIT, but the policy will have preceded the opportunity—

supporting Plaintiffs' contention that Section (c) contemplates a sequence.

Further, a sequenced reading of Section (c) is also consistent with the spirit of Section

(c)(2), which also appears aimed at building procedural safeguards around indirect cost rate

changes.  Specifically, it requires that, following approval of a deviation pursuant to Section

(c)(1), the awarding agency "must notify OMB" of such deviations such that the "recipient or

subrecipient may notify OMB of any disputes." 2 C.F.R. § 200.414(c)(2). The ability to dispute the approval with OMB would ring hollow were the deviation permitted to take effect immediately.

In sum, the Court is inclined to agree with Plaintiffs' reading of the regulation as mandating a proscribed process for changing procedures about indirect cost reimbursement. Defendants' reading of the regulations to permit a blanket approach to negotiated indirect cost rate deviations would read disorder, rather than order, into this structure by conflating or otherwise reading out numerous procedural safeguards contemplated by the regulations' plain text. McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 168 (1st Cir. 1987) ("In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions."). In light of the above, the Rate Cap Policy directly conflicts with the plain language of 2 C.F.R. § 200.414, by wholly disregarding existing regulations and the attendant regulatory structure. Fox Television Stations, 556 U.S. at 515 ("An agency may not . . . simply disregard rules that are still on the books."). As a result, the Plaintiffs are likely to succeed in claiming that the Rate Cap Policy conflicts with existing regulation.

### 4. Impermissible Retroactivity

Plaintiffs contend that the Rate Cap Policy exceeds the DOE's statutory authority because it is impermissibly retroactive. [ECF No. 19 at 45–46]. Specifically, they contend that "there is no indication whatsoever that DOE has the authority to make the Rate Cap Policy retroactive" and that, as to existing grants, "the reduced rate necessarily undermines project budgets that were previously approved and upsets the institutions' commitments made in reliance upon those budgets." [Id. at 46]. Defendants do not argue that the enabling statute authorizes the DOE to

36

retroactively modify indirect cost rates; rather, they counter that this case "is unlike the cases cited by Plaintiffs, in which an agency attempted to claw back money that had already been paid out" because the Rate Cap Policy "proposes no such thing; it simply announces an intent to take subsequent actions that will terminate certain grants moving forward.  That is a prospective action."  [ECF No. 47 at 33].

Defendants' argument is unavailing.  While the DOE might not be attempting to claw back money, this is not necessary to bring the Rate Cap Policy within "the ban on retrospective legislation[, which] embrace[s] all statutes [that] though operating only from their passage, affect vested rights and past transactions."  Landgraf v. USI Film Prods., 511 U.S. 244, 268–69 (1994) (quotation omitted).  The relevant inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment," and courts regularly "appl[y] the presumption against statutory retroactivity [in cases] involv[ing] new provisions affecting contractual and property rights."  Id. at 271; see also id. at 269 (noting "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective" (quoting Society for Propagation of the Gospel v. Wheeler, 22 F.Cas. 756 (No. 13,156) (CCNH 1814) (Story, J.))).

Plaintiffs are recipients of grant awards which "are both legally binding and have many of the key hallmarks of a contract," including a negotiated indirect cost rate.  2 C.F.R. § 200.1 (defining "federal award" as "[t]he instrument setting forth the terms and conditions").  For many Plaintiffs, this indirect cost rate far exceeds the proposed 15 percent cap.  See, e.g., [ECF No. 2-7 ¶ 12 (University of Michigan has an indirect cost rate of 56 percent)]; [ECF No. 2-18 ¶ 12 (University of Nevada, Reno has an indirect cost rate of 47 percent)]; [ECF No. 2-19 ¶ 4

37

ADD.37

(Tufts University has an indirect cost rate of 58 percent)]. Thus, if the Rate Cap Policy were to take effect, it "would impair the rights that the institution possessed when accepting the Notice of Award" by "impos[ing] a new, lower rate, [and] displacing the institutions' right to the previously negotiated—and legally binding—" indirect cost rate upon which they have operated and relied since accepting the award. NIH, 2025 WL 702163, at *27; see also Landgraf, 511 U.S. at 270 (in assessing retroactivity, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance").

Thus, at least as to current grants, Plaintiffs are likely to succeed on the merits of their claim that the Rate Cap Policy is impermissibly retroactive.

### 5. Other Claims

Plaintiffs make a series of additional statutory and regulatory claims, including that the Rate Cap Policy violates the authorizing statute (42 U.S.C. § 4708) and runs afoul of regulations governing termination of existing grants and cost recovery. [Compl. ¶¶ 75–81 (alleging violations of regulations governing grant termination); ¶¶ 82–89 (alleging violation of regulations governing cost recovery); ¶¶ 1–6[6] (alleging violation of authorizing statute)]. Without commenting on the substance, the Court finds its unnecessary to address those claims at this stage of the litigation, as the likelihood of success on the merits on each claim addressed above is independently sufficient to support the issuance of a preliminary injunction. The parties are free to re-raise these claims and any opposition thereto at a later stage.

---

[6] These allegations are misnumbered. The Court is referencing the factual allegations which appear in "Count V."

B.    **Irreparable Harm**

"Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm," Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991), rather than mere "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). That said, a movant "need not demonstrate that the denial of injunctive relief will be fatal to its business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996); see also P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005) ("These injuries are not irreparable because later-issued damages can properly compensate any wrong committed."). The alleged harm must be "to the movant[,] rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted).

Additionally, courts in the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown.'" Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42–43 (1st Cir. 2010) (cleaned up).

Defendants make three main arguments regarding indirect harm. First, they contend that Plaintiffs' "primary claimed injury . . . is that they will not receive the full amount of money to

which they claim to be entitled under negotiated indirect cost rates," which "can easily be redressed if Plaintiffs succeed in this litigation." [ECF No. 47 at 35]. Second, Defendants assert that "many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm" because they are not harms to Plaintiff; rather, they are generalized concerns, such as "that a reduction in indirect cost rates will harm the economy and the United States' competitiveness on a global scale," which "properly belong to the democratically elected President and his Administration." [Id. at 36]. Third, they contend that Plaintiffs' allegations of irreparable harm are speculative and remote. [Id. at 36–37].

The Court agrees with Defendants that if this case concerned only indirect cost reimbursements, Plaintiffs would be unable to show irreparable harm given that the lost reimbursement could be made up. But a temporary loss of funding is not the only harm Plaintiffs have alleged and might in fact be the least of it. Rather, Plaintiffs have alleged that, without the predetermined indirect cost reimbursements to support their DOE direct grants, the research they are conducting pursuant to those grants will be inordinately delayed in some instances and entirely abandoned in others. [ECF No. 2-1 ¶¶ 9,13–14, 18]; [ECF No. 2-2 ¶¶ 9, 10]; [ECF No. 2-3 ¶¶ 11–12, 15–17, 24]; [ECF No. 2-4 ¶¶ 17–18]; [ECF No. 2-5 ¶¶ 7–8, 14]; [ECF No. 2-6 ¶¶ 17–21]; [ECF No. 2-7 ¶¶ 6, 8]; [ECF No. 2-8 ¶¶ 7, 13–14]; [ECF No. 2-9 ¶¶ 13–16, 18, 26]; [ECF No. 2-10 ¶¶ 6, 13]; [ECF No. 2-11 ¶ 14]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 8, 11]; [ECF No. 2-14 ¶¶ 17–18]; [ECF No. 2-15 ¶¶ 6, 8, 14]; [ECF No. 2-16 ¶¶ 5–6, 13]; [ECF No. 2-17 ¶¶ 5, 8, 13]; [ECF No. 2-18 ¶ 6–8, 14]; [ECF No. 2-19 ¶¶ 7–8, 12]; [ECF No. 25 ¶ 11, 13, 15]. Without those studies, and in absence of other funding to support staff, the universities run a likely and imminent risk that they will, at best, struggle to reallocate and train the next generation of scientists in their programs and, at worst, need to lay off or otherwise be unable to

40

ADD.40

hire the brilliant minds that make up their world-renowned programs, including the undergraduate, doctoral, and post-graduate researchers, administrative professionals, and faculty members.  [ECF No. 2-1 ¶¶ 10, 13]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 15]; [ECF No. 2-4 ¶¶ 18–19]; [ECF No. 2-5 ¶¶ 8, 14]; [ECF No. 2-6 ¶¶ 16, 20]; [ECF No. 2-8 ¶ 14]; [ECF No. 2-9 ¶¶ 21, 26]; [ECF No. 2-10 ¶ 13]; [ECF No. 2-12 ¶ 14]; [ECF No. 2-14 ¶¶ 11, 17]; [ECF No. 2-15 ¶ 14]; [ECF No. 2-16 ¶ 13]; [ECF No.2-17 ¶ 14]; [ECF No. 2-18 ¶14].  As the people go, so do the Nobel Prizes, the universities' acclaim, their pipelines to students and postdoctoral researchers, and their ability to build and maintain unique facilities that, in some instances, exist nowhere else in the world.  [ECF No. 2-1 ¶ 13]; [ECF No. 2-6 ¶¶ 17, 22]; [ECF No. 2-7 ¶ 15]; [ECF No. 2-9 ¶ 27]; [ECF No. 2-12 ¶¶ 14, 17]; [ECF No. 2-13 ¶11]; [ECF No. 2-14 ¶ 21]; [ECF No. 2-15 ¶¶ 8, 16]; [ECF No. 2-16 ¶ 8]; [ECF No. 2-17 ¶¶ 8, 14]; [ECF No. 2-18 ¶ 16]; [ECF No. 25 ¶ 12].  In other words, the harm is the massive disruption and its collateral effects, rather than issues around reimbursement.  While Plaintiffs may someday be able to obtain reimbursement for those indirect costs, the harm will have been long done, as the reimbursements would be earmarked for studies and programs already irreparably compromised and that perhaps no longer exist or involve researchers and research no longer based in the United States.

The Court also disagrees that these harms are downstream or speculative.  Absent the injunction, the Rate Cap Policy would have gone into effect, as evidenced by both the conditional termination letter in the record and the text of the Rate Cap Policy, which clearly states that "the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy."  [ECF No. 2 at 3].  Faced with the 15 percent rate cap,

Plaintiffs will immediately have to make the difficult choices, described in their affidavits, including whether and how to curtail research, freeze hiring, and lay off staff.

Defendants further contend that the harms identified exist only as to current grants, rather than future grants, and thus any injunction should be appropriately limited to current grants. [ECF No. 47 at 38].  Specifically, Defendants assert that that to hold otherwise would lead to a slippery slope as "there is no stopping point to this argument: If a plaintiff's desire for a future government grant or contract, or a future government grant or contract with more advantageous terms, qualifies as irreparable harm, the irreparable harm element would be automatically met in every case involving a potential future government grant or contract."  [Id.]  In essence, they contend that Plaintiffs cannot establish irreparable harm in speculative future grants.

This argument has some initial intuitive appeal.  If future grants are speculative, so too must be the harm that could befall Plaintiffs if those grants include a 15 percent indirect cost rate cap.  On further examination, however, the underlying premise that IHEs have nothing but a speculative interest in future DOE grants that would incorporate indirect costs is divorced from reality.  The DOE and IHEs co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the DOE's need for cutting edge research and the IHEs' ability to provide it.  As a result of this relationship, each IHE has a reasonable, non-speculative assumption that it will obtain future grants because, through the past grants and its own investment, it has built the highly technical, often one-of-a-kind infrastructure needed to conduct the research with the assistance of those future grants, as well as assembled a team of specially trained, uniquely qualified researchers and support staff needed to operate and maintain that equipment.  These grants are forthcoming to IHEs because, unless the DOE intends to stop funding this type of research, they must be.  The Rate Cap Policy itself manifests an intent on the

42

ADD.42

DOE's part to continue funding IHEs; all that has changed is that the DOE now wants IHEs to foot more of the bill, without regard to the individual circumstances and overhead costs of each IHE, which Plaintiffs have adequately established they cannot do. [ECF No. 2-1 ¶¶ 19–21]; [ECF No. 2-2 ¶¶ 15–17]; [ECF No. 2-3 ¶¶ 20–23]; [ECF No. 2-4 ¶¶ 22–24]; [ECF No. 2-5 ¶¶ 18–19]; [ECF No. 2-6 ¶¶ 29–31]; [ECF No. 2-8 ¶¶ 19–20[7]]; [ECF No. 2-9 ¶¶ 32–33]; [ECF No. 2-10 ¶ 18]; [ECF No. 2-11 ¶ 16]; [ECF No. 2-12 ¶ 20]; [ECF No. 2-13 ¶¶ 17–18]; [ECF No. 2-14 ¶¶ 12–16]; [ECF No. 2-15 ¶¶ 19–20].

Further, Plaintiffs have sufficiently alleged not only that the Rate Cap Policy will result in immediate harms but also that its "long-term impacts . . . are both cumulative and cascading." [ECF No. 2-7 ¶ 15]; [ECF No. 2-8 ¶ 16]; [ECF No. 2-9 ¶ 29]; [ECF No. 2-12 ¶ 17]; [ECF No. 2-13 ¶ 14]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶ 16]; [ECF No. 2-19 ¶ 14]; see also [ECF No. 2-2 ¶ 9]. These projects, once stopped, cannot simply be restarted later: The loss of human capital, cumulative knowledge and sometimes the degradation of physical infrastructure, is simply too great. [ECF No. 2-1 ¶ 10]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 12]; [ECF No. 2-4 ¶ 18]; [ECF No. 2-5 ¶¶ 8, 9]; [ECF No. 2-6 ¶¶ 17, 21]; [ECF No. 2-7 ¶¶ 8, 15]; [ECF No. 2-8 ¶¶ 6, 16]; [ECF No. 2-9 ¶¶ 19, 21, 27]; [ECF No. 2-10 ¶¶ 6–7]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 11]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶¶ 8, 14, 16].

Plaintiffs have demonstrated that because their collective harm "is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Ross-Simons, 102 F.3d at 19. "Even though, as established above, the likelihood of success on

---

[7] The final two paragraphs of Exhibit 2-8 are both enumerated as paragraph 19. The Court assumes the second paragraph 19 was inadvertent and refers to it as paragraph 20.

the merits is great, which would allow a movant to show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." NIH, 2025 WL 702163, at *31 (cleaned up).  The Court is more than convinced that the harms to Plaintiffs' programs cannot be remedied by a later monetary award and may well be irreparable in the truest sense of the word.

## C.    Balance of Equities and Public Interest

The Court also finds that the balance of the equities and the public interest favor granting Plaintiffs their requested relief.  Plaintiffs have sufficiently established that the Rate Cap Policy's impact on their programs will have a swift and deleterious effect on the public interest.  Perhaps most concerning, several Plaintiffs have noted that "[f]unding disruptions would compromise crucial safety protocols for handling hazardous materials, high-voltage equipment, and radiation sources, potentially leading to accidents."  [ECF No. 2-7 ¶ 15]; see also [ECF No. 2-8 ¶ 13 ("This reduction will have deeply damaging effects on MSU's ability to conduct DOE-funded research from day one, leaving unfunded . . . [l]ow-level radioactive waste removal[ and] [c]ritical environmental health and safety oversight."); [ECF No. 2-19 ¶ 14 ("These cuts not only endanger the health and well-being of researchers, staff, and students, but also increase the risk of regulatory noncompliance, accidents, and hazardous material exposure—threatening both the continuity and credibility of the institution's research enterprise.")].  Beyond the obvious danger of unattended radioactive materials and other byproducts of nuclear research, Plaintiffs' programs also have a profound impact on their local economies, both by employing the local community and through the power of innovation that sparks further development and spending, which would be impacted by interruption to those programs.  See, e.g., [ECF No. 2-5 ¶ 16 ("The University [of Illinois Urbana-Champaign] employs thousands of Illinois residents and

44

ADD.44

collaborates with state and local partners to help solve regional challenges through joint research and innovation.  The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.")]; [ECF No. 2-6 ¶ 6 ("MIT's research also translates into innovation that helps drive the U.S. economy."); id. ¶ 24 ("MIT employs nearly 14,000 Massachusetts residents, including more than 2,300 Cambridge residents.  Spending from students, staff, and faculty support the local economy.")]; [ECF No. 2-16 ¶ 15 ("For example, as recently reported by Northstar Analytics, LLC, UW-Madison affiliated organizations and startups collectively contribute $30.8B per year to the Wisconsin economy, this economic activity supports more than 232,000 jobs and generates $1 billion in state and local taxes.")].

Fundamentally, the Rate Cap Policy will harm the public interest by significantly compromising the ability of the DOE and IHEs to continue their federal research partnerships, which, by their nature, seek to advance the country's energy, economic, and national security interests, as well as impacting basic quality of life considerations, as the affidavits in this case amply reflect.  Cornell alone, in partnership with the DOE, performs work "on: plasma physics research to control fusion and maintain safety and security of nuclear weapons; conversion of cheap carbon dioxide or methane to produce chemical fuels for economic competitiveness in the United States chemical industry; circuit design for artificial intelligence, high performance computing, and quantum technology; better materials for stealth and camouflage technologies; recovery/extraction of rare earth minerals; development of biodegradable plastics that disappear from the environment; simulation tools to make fusion energy a practical reality; clarifying drought risks impacting agriculture in the Western United States; and the contribution of urban land-use development and changes to flood risks in Philadelphia, and the extent to which zoning

45

ADD.45

or other urban development policies can exacerbate or ameliorate these risks." [ECF No. 2-4 ¶ 10]. And Cornell is just one of nine Plaintiffs in this action and one of the many IHEs that partner with the DOE, all of whom perform vital research in similarly cutting-edge arenas. It is beyond dispute that the advancements these universities make can and often do benefit the public in critically important ways, and any setback to that progress is to the detriment of the country as a whole.

### D.    Scope of the Injunction

Having concluded that Plaintiffs have met their burden under the preliminary injunction standard, the Court must determine the scope of that injunction. Plaintiffs urge the Court to preliminarily enjoin Defendants from taking any further steps to implement the Rate Cap Policy in its entirety as to all grant recipients. [ECF No. 53 at 25]. Defendants urge that the Court instead "limit any remedy to those plaintiff institutions, or institutions represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief." [ECF No. 47 at 40]. They contend that "universal injunctive relief is an improper exercise of judicial authority." [ECF No. 47 at 39].

On this front and under the facts of this case, the Court agrees with its sister session in NIH that, despite awareness that some members of the Supreme Court have expressed concerns about the use of nationwide or "universal" injunctions, as the law currently stands, a nationwide injunction is a reasonable and appropriate remedy in this action. Such an injunction is necessary "to protect similarly situated nonparties, [and] to avoid the 'chaos and confusion' of a patchwork of injunctions . . . where the plaintiffs are dispersed throughout the United States." NIH, 2025 WL 702163, at *33 (quoting Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281–82 (11th Cir. 2021)). This is further supported by the nature of the action, given that "[t]he normal

46

remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." Id. at *34. "It would be anathema to reasonable jurisprudence that only the named Plaintiffs should be protected from the irreparable harms of an unlawful regulation." Id.

### E.    Stay Pending Appeal/Bond

Defendants additionally request a stay pending appeal and ask that this Court order Plaintiffs to post bond.

Regarding the stay, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433–34 (2009). The decision is "an exercise of judicial discretion," which involves "consideration of four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" Id. (first quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672, (1926); and then quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). Defendants offer no argument as to their basis for the stay, nor do they articulate what irreparable harm will result from this Court's refusal to grant one. Per the analysis supra, the Court finds it unlikely that Defendants will succeed on the merits of their appeal, and the substantial public interests involved warrant maintaining the status quo. As such, Defendants' request for a stay pending appeal is **<u>DENIED</u>**.

As to bond, pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  That said, Rule 65(c) "has been read

to vest broad discretion in the district court to determine the appropriate amount of an injunction

bond," DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to

require no bond at all," P.J.E.S. ex rel. Escobar Francisco v. Wolf, 502 F. Supp. 3d 492, 520

(D.D.C. 2020) (quoting Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)).

Further, a number of cases have found that a bond is "is not necessary where requiring [one]

would have the effect of denying the plaintiffs their right to judicial review of administrative

action."  Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting

cases).  Plaintiffs here are seeking an injunction against the Rate Cap Policy because of the

irreparable harm that would result if they cannot access or use funds beyond the 15 percent cap

to support ongoing and future research.  Requiring them to post that difference as bond would

necessarily have the same financial effect and thus lead to the same harms.  As such, the Court

declines to require bond.  Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 25-cv-

00239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the government is

alleged to have unlawfully withheld trillions of dollars of previously committed funds to

countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold

Plaintiffs hostage for the resulting harm.  That is especially so when Defendants—OMB and its

director—will personally face no monetary injury from the injunction.").

## VI.    CONCLUSION

Accordingly, for the reasons sets forth above, Plaintiffs' motion for a preliminary

injunction is **GRANTED**.  Defendants and their officers, employees, servants, agents,

appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or

giving effect to the Rate Cap Policy in any form with respect to IHEs nationwide until a further

order is issued by this Court.

**SO ORDERED.**

May 15, 2025                                                        */s/ Allison D. Burroughs*
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE

ADD.49

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10912-ADB |
| DEPARTMENT OF ENERGY, *et al*., | ) ) | |
| Defendants. | ) ) | |

## <u>FINAL JUDGMENT</u>

Pending before the Court is the Defendants' Unopposed Motion for Entry of Final Judgment, in which Defendants seek entry of final judgment, while fully reserving their right to appeal. After reviewing the motion, the record, and the applicable law, the Court is of the opinion that the motion should be **GRANTED**.

For reasons stated in this Court's Memorandum and Order on Plaintiffs' motion for a preliminary injunction, <u>Doc. No. 62</u>, the Court finds that this Court has jurisdiction over Plaintiffs' claims, and that the Court of Federal Claims does not have exclusive jurisdiction over Plaintiffs' claims under the Tucker Act, <u>28 U.S.C. § 1491(a)(1)</u>. The Court also concludes that Plaintiffs have demonstrated success on the merits of their Administrative Procedure Act claims that the Department of Energy's issuance of Policy Flash 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education[1] ("Policy Flash 2025-22") on April 11, 2025: (1) departed from negotiated cost rates in violation of <u>2 C.F.R. § 200.414</u>; <u>(2)</u> was arbitrary and capricious; and (3) was impermissibly retroactive. Compl. Counts I, IV, and VI, <u>Doc. No. 1</u>.

---

[1] *See* Decl. of Berta Schreiber, Exh. A, <u>Doc. No. 48-1</u>.

The Court further concludes, as stated in its Memorandum and Order, that nationwide relief is appropriate and that the remedy is "vacatur of the rule and its applicability to all who would have been subject to it." Doc. No. 62 at 47. Accordingly, the Court concludes that entry of final judgment is appropriate.

Therefore, it is hereby **ORDERED**:

1.    The Court has subject matter and personal jurisdiction over this action and the Parties.

2.    Venue is proper before this District.

3.    For the reasons stated in this Court's Memorandum and Order on Plaintiffs' motion for preliminary injunction, Doc. No. 62, judgment is entered in favor of the Plaintiffs on Count I (illegal departure from negotiated cost rates in violation of 2 C.F.R. 200.414), Count IV (arbitrary and capricious), and Count VI (retroactivity) of their Complaint against the Department of Energy and Chris Wright, in his official capacity as Secretary of the Department of Energy.

4.    Pursuant to 5 U.S.C. § 706(2), the Court VACATES, in its entirety, Policy Flash 2025-22. The Court DECLARES that Policy Flash 2025-22 (1) departed from negotiated cost rates in violation of 2 C.F.R. § 200.414; (2) was arbitrary and capricious; and (3) was impermissibly retroactive.

5.    As vacating Policy Flash 2025-22 moots Plaintiffs' remaining claims, Counts II, III, and V of Plaintiffs' Complaint are dismissed without prejudice.

This is an appealable Final Judgment. It is **SO ORDERED**.

ADD.51

Signed this <u>30th</u> of June, 2025.


/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

ADD.52

# POLICY FLASH 2025-22

**DATE**:       April 11, 2025

**TO**:         HCAs/Procurement Directors/Contracting Officers/Grants Officers

**FROM**:     Director
              Office of Acquisition Management

**SUBJECT:**  **Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)**

**BACKGROUND:** Pursuant to 5 U.S.C. 553(a)(2), the Department of Energy ("Department") is updating its policy with respect to Department grants awarded to institutions of higher education (IHEs).

Through its grant programs, the Department funds Department-sanctioned research. A portion of the funding goes to "indirect costs", which include both facilities and administration costs. *See* 2 C.F.R. 200.414(a). "Facilities costs" comprise "depreciation on buildings, equipment and capital improvements, and operations and maintenance expenses," while "administration costs" are "general administration and [other] general expenses," like funding for "the director's office, accounting, [and] personnel." *Id.*

While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. *See* 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds.

This memorandum accordingly sets forth the Department's updated policies, procedures, and general decision-making criteria for establishing indirect cost rates when awarding grants to IHEs; these policies, procedures, and criteria are intended to better balance the Department's dual responsibilities to grant recipients and the American people.

The Department is initially taking this action only with respect to IHEs. *See* 2 C.F.R. 200.414(c)(1); *id.* 200.1.

**ESTABLISHING APPROPRIATE INDIRECT COST RATES:**

At present, the Department's indirect cost rate for IHE grants is typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). Though the Department generally must accept this negotiated rate, *see* 2 C.F.R. 200.414(c)(1), it may deviate therefrom for "a class of Federal awards" after implementing and making publicly available "the policies, procedures and general decision-making criteria" it will follow when seeking and justifying deviations. *Id.* 200.414(c)(1), (3). A "class of Federal awards" is defined to include "a group of Federal awards . . . to a specific type of recipient or group of recipients," such as grants to IHEs—the class relevant to this policy update. *Id.* 200.1.

For the reasons set forth in this memorandum, hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs. This is at the high end of the "up to 15 percent" *de minimis* rate permitted by government-wide regulation. *See, e.g.*, 2 C.F.R. 200.414(f). Consistent with this memorandum, the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy. *See* 2 C.F.R. 200.340(a), (b). Recipients subject to termination will receive separate notice and guidance.

All future Department grant awards to IHEs will default to this 15 percent indirect cost rate. This system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people.

Additional information is forthcoming.

This flash will be available online at the following website: http://energy.gov/management/listings/policy-flashes

For DOE questions concerning this policy flash, please email: ihe-icr-response@hq.doe.gov

the recipient or subrecipient). See also §200.432.

(5) Maintenance, protection, and investment of special funds not used in the recipient's or subrecipient's operation. See also §200.442.

(6) Administration of group benefits on behalf of members or clients, including life and hospital insurance, annuity or retirement plans, and financial aid. See also §200.431.

### § 200.414  Indirect costs.

(a) *Facilities and administration classification.* For major Institutions of Higher Education (IHE) and major nonprofit organizations, indirect costs must be classified within two broad categories: ''Facilities'' and ''Administration.'' ''Facilities'' is defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses. ''Administration'' is defined as general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of ''Facilities'' (including cross allocations from other pools, where applicable). For nonprofit organizations, library expenses are included in the ''Administration'' category; for IHEs, they are included in the ''Facilities'' category. Major IHEs are defined as those required to use the Standard Format for Submission as noted in Appendix III. Major nonprofit organizations are those which receive more than $10 million in direct Federal funding.

(b) *Diversity of nonprofit organizations.* It is not always possible to specify the types of costs that may be classified as indirect costs for nonprofit organizations due to the diversity of their accounting practices. The association of a cost with a Federal award is the determining factor in distinguishing direct from indirect costs. However, typical examples of indirect cost for many nonprofit organizations may include depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

(c) *Federal Agency Acceptance of Negotiated Indirect Cost Rates.* (See §200.306.)

(1) Negotiated indirect cost rates must be accepted by all Federal agencies. A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section.

(2) The Federal agency must notify OMB of any approved deviations. The recipient or subrecipient may notify OMB of any disputes with Federal agencies regarding the application of a federally negotiated indirect cost rate.

(3) The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates.

(4) The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e). As appropriate, the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity. See §200.204.

(d) *Pass-through entities.* Pass-through entities are subject to the requirements in §200.332(b)(4) and must accept all federally negotiated indirect costs rates for subrecipients.

(e) *Appendices.* Requirements for development and submission of indirect cost rate proposals and cost allocation plans are contained in the following Appendices:

(1) Appendix III to Part 200—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs);

(2) Appendix IV to Part 200—Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Nonprofit Organizations;

(3) Appendix V to Part 200—State/Local Government-wide Central Service Cost Allocation Plans;

(4) Appendix VI to Part 200—Public Assistance Cost Allocation Plans;

151

(5) Appendix VII to Part 200—States and Local Government and Indian Tribe Indirect Cost Proposals; and

(6) Appendix IX to Part 200—Hospital Cost Principles.

(f) *De minimis rate.* Recipients and subrecipients that do not have a current Federal negotiated indirect cost rate (including provisional rate) may elect to charge a de minimis rate of up to 15 percent of modified total direct costs (MTDC). The recipient or subrecipient is authorized to determine the appropriate rate up to this limit. Federal agencies and pass-through entities may not require recipients and subrecipients to use a de minimis rate lower than the negotiated indirect cost rate or the rate elected pursuant to this subsection unless required by Federal statute or regulation. The de minimis rate must not be applied to cost reimbursement contracts issued directly by the Federal Government in accordance with the FAR. Recipients and subrecipients are not required to use the de minimis rate. When applying the de minimis rate, costs must be consistently charged as either direct or indirect costs and may not be double charged or inconsistently charged as both. The de minimis rate does not require documentation to justify its use and may be used indefinitely. Once elected, the recipient or subrecipient must use the de minimis rate for all Federal awards until the recipient or subrecipient chooses to receive a negotiated rate.

(g) *One-time extension of indirect rates.* A recipient or subrecipient with a current Federal negotiated indirect cost rate may apply for a one-time extension of that agreement for up to four years. This extension will be subject to review and approval by the cognizant agency for indirect costs. If this extension is granted, the recipient or subrecipient may not request a rate review until the extension period ends. The recipient or subrecipient must re-apply to negotiate a new rate when the extension ends. After a new rate has been negotiated, the recipient or subrecipient may again apply for a one-time extension of the new rate in accordance with this paragraph.

## § 200.415  Required certifications.

(a) Financial reports must include a certification, signed by an official who is authorized to legally bind the recipient, which reads as follows: ''By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729–3730 and 3801–3812).''

(b) Subrecipients under the Federal award must certify to the pass-through entity whenever applying for funds, requesting payment, and submitting financial reports: ''I certify to the best of my knowledge and belief that the information provided herein is true, complete, and accurate. I am aware that the provision of false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil, or administrative consequences including, but not limited to violations of U.S. Code Title 18, Sections 2, 1001, 1343 and Title 31, Sections 3729–3730 and 3801–3812.'' Each such certification must be maintained pursuant to the requirements of §200.334. This paragraph applies to all tiers of subrecipients.

(c) Certification of cost allocation plan or indirect cost rate proposal. Each cost allocation plan or indirect cost rate proposal must comply with the following:

(1) A proposal to establish a cost allocation plan or an indirect cost rate, whether submitted to a Federal cognizant agency for indirect costs or maintained on file by the recipient, must be certified by the recipient using the *Certificate of Cost Allocation Plan* or *Certificate of Indirect Costs* as set forth in appendices III through VII, and IX of this part. The certificate must be signed on behalf of the recipient by an individual at a level no lower than the vice president or chief financial officer