## No. 25-1727

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIRST CIRCUIT

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL
ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT
UNIVERSITIES; BROWN UNIVERSITY; CALIFORNIA INSTITUTE OF
TECHNOLOGY; CORNELL UNIVERSITY; BOARD OF TRUSTEES OF
THE UNIVERSITY OF ILLINOIS; MASSACHUSETTS INSTITUTE OF
TECHNOLOGY; REGENTS OF THE UNIVERSITY OF MICHIGAN;
BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; TRUSTEES
OF PRINCETON UNIVERSITY; UNIVERSITY OF ROCHESTER,
*Plaintiffs-Appellees*,

v.

DEPARTMENT OF ENERGY; CHRIS WRIGHT, in the official capacity as
Secretary of the Department of Energy,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts

### JOINT APPENDIX

Paul D. Clement
James Y. Xi
Kyle R. Eiswald
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

Ishan K. Bhabha
Lindsay C. Harrison
Lauren J. Hartz
Elizabeth Henthorne
Shoba Pillay
Zachary C. Schauf
JENNER & BLOCK LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 639-6000

Courtney L. Dixon
Jennifer L. Utrecht
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE
  STAFF
950 Pennsylvania Avenue NW,
  Room 7710
Washington, DC 20530
(202) 353-9039

# JOINT APPENDIX CONTENTS

Docket sheet, Case No. 1:25-cv-10912 (D. Mass.).....................................JA1

Complaint, ECF No. 1 (Apr. 14, 2025)................................................. JA21

Complaint Exhibits, ECF No. 2 (Apr. 14, 2025)

    Exhibit 1: Policy Flash 2025-22 (Apr. 11, 2025) ................................ JA62

    Exhibit 2: Declaration of Barbara R. Snyder, President of the Association of American Universities.................................................. JA65

    Exhibit 3: Declaration of Peter McDonough, General Counsel for the American Council on Education ............................................. JA78

    Exhibit 4: Declaration of Mark Becker, President of the Association of Public & Land-grant Universities ................................. JA85

    Exhibit 5: Declaration of Kavita Bala, of Cornell University............... JA95

    Exhibit 6: Declaration of Robert J. Jones, of the University of Illinois Urbana-Champaign .................................................... J107

    Exhibit 7: Declaration of Ian A. Waitz, of Massachusetts Institute of Technology.................................................... JA117

    Exhibit 8: Declaration of Arthur Lupia, of the University of Michigan........................................................................ JA131

    Exhibit 9: Declaration of Douglas A. Gage, of Michigan State University........................................................................ JA145

    Exhibit 10: Declaration of Stephen Dewhurst, of University of Rochester ........................................................................ JA153

    Exhibit 11: Declaration of Elizabeth Peloso, of University of Pennsylvania .................................................................. JA171

    Exhibit 12: Declaration of Thomas Bifano, of Boston University........................................................................ JA179

    Exhibit 13: Declaration of David A. Tirrell, of California Institute of Technology.................................................... JA185

    Exhibit 14: Declaration of Justin Schwartz, of the University of Colorado Boulder........................................................... JA193

    Exhibit 15: Declaration of Dr. Greg Hirth, of Brown University........................................................................ JA205

    Exhibit 16: Declaration of Cassandra Moseley, of Colorado State University .............................................................. JA214

Exhibit 17: Declaration of Dorota Grejner-Brzezinska, of the University of Wisconsin-Madison ................................................. JA223

Exhibit 18: Declaration of Jennifer Lodge, of Duke University........................................................................................ JA236

Exhibit 19: Declaration of Katie Tracy, of University of Nevado, Reno................................................................................ JA247

Exhibit 20: Declaration of Bernard Arulanandam, of Tufts University........................................................................................ JA257

Additional Exhibits to Complaint, ECF No. 25 (Apr. 14, 2025),

Exhibit 21: Declaration of Sally Morton, of Arizona State University........................................................................................ JA265

Notice Regarding Motion for Temporary Restraining Order, ECF No. 33 (Apr. 15, 2025) ........................................................JA275

Declaration of Kavita Bala, of Cornell University ............................. JA280

Exhibit A: Email from Department of Energy (Apr. 14, 2025)… ........................................................................................JA283

Declaration of Douglas A. Gage, Ph.D, of Michigan State University ........................................................................................JA291

Order Granting Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 34 (Apr. 16, 2025) ........................................................JA293

Response to Court Order by Department of Energy, ECF No. 46 (Apr. 18, 2025) ........................................................................................JA295

Declaration of Berta Schreiber, ECF No. 48 (Apr. 22, 2025) .................JA298

Exhibit B: April 11, 2025 Statement of the Department of Energy........................................................................................JA304

Exhibit C: Assistance Agreement for the University of Washington in St. Louis................................................................JA310

Exhibit D: Rate Agreement for the University of Washington in Saint Louis ........................................................................................JA313

Exhibit E: Terms and Conditions for the University of Washington in Sant Louis ........................................................................JA318

Exhibit F: Assistance Agreement for the University of Iowa ...............JA346

Exhibit G: Rate Agreement for the University of Iowa .......................JA349

Exhibit H: Terms and Conditions for the University of Iowa ..............JA356

Exhibit I: Notification Letter to the University of Iowa (Apr. 14, 2025) ........................................................................................JA371

Declaration of Sally Morton, of Arizona State University, ECF No. 53-1 (Apr. 25, 2025)..........................................................JA373

    Exhibit A: Email from Department of Energy Dated April 18, 2025 ..............................................................................JA375

Status Report, ECF No. 58 (May 2, 2025).............................................JA380

Second Declaration of Berta Schreiber, ECF No. 60 (May 2, 2025) .................................................................JA382

    Exhibit B: Rate Agreement for the University of Wisconsin-Madison.......................................................................JA386

    Exhibit C: Rate Agreement for Massachusetts Institute of Technology...................................................................JA391

Memorandum and Order Granting Plaintiffs' Motion for a Preliminary Injunction, ECF No. 62 (May 15, 2025) ............................JA394

Final Judgment, ECF No. 71 (June 30, 2025) .......................................JA443

Notice of Appeal, ECF No. 72 (July 31, 2025) .....................................JA446

Case: 25-1727      Document: 00118344606      Page: 5      Date Filed: 09/24/2025      Entry ID: 6753258

Query    Reports    Utilities    Help    Log Out

APPEAL

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:25-cv-10912-ADB

| | |
|---|---|
| Association of American Universities et al v. Department of Energy et al | Date Filed: 04/14/2025 |
| Assigned to: Judge Allison D. Burroughs | Date Terminated: 06/30/2025 |
| Case in other court: USCA - First Circuit, 25-01727 | Jury Demand: None |
| Cause: 05:702 Administrative Procedure Act | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Association of American Universities**                 represented by   **Anjali Motgi**
Jenner & Block
1099 New York Ave, NW
Ste 900
Washington, DC 20001
202-639-6087
Email: amotgi@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
Jenner & Block LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202-637-6367
Fax: 202-847-4005
Email: BHenthorne@Jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
Jenner & Block, LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639- 6000
Email: ibhabha@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Xi**
Clement & Murphy, PLLC
706 Duke Street

**JA1**

Alexandria, VA 22314
202-742-8900
Email: james.xi@clementmurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Raymond Eiswald**
Clement & Murphy, PLLC
706 Duke St
Alexandria, VA 22314
202-742-8900
Email: kyle.eiswald@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
Jenner & Block, LLP
1099 New York Avenue NW, Suite 900
Suite 900
Washington, DC 20001
202-637-6363
Email: lhartz@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6865
Email: LHarrison@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul D Clement**
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
202-742-8900
Email: paul.clement@clementmurphy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
Jenner & Block LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001-4412
202-639-6025
Email: zschauf@jenner.com

**JA2**

Case: 25-1727    Document: 00118344606    Page: 7    Date Filed: 09/24/2025    Entry ID: 6753258

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60604
312-923-2605
Email: spillay@jenner.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Council on Education**        represented by    **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Xi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Raymond Eiswald**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul D Clement**
(See above for address)
*LEAD ATTORNEY*

**JA3**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **Association of Public and Land-Grant Universities** | represented by | **Anjali Motgi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Xi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Raymond Eiswald**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul D Clement**
(See above for address)

**JA4**

Case: 25-1727    Document: 00118344606    Page: 9    Date Filed: 09/24/2025    Entry ID: 6753258

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Brown University**                    represented by    **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**California Institute of Technology**                    represented by    **Anjali Motgi**
(See above for address)

**JA5**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cornell University**                 represented by   **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)

**JA6**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Board of Trustees of the University of Illinois**     represented by   **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**

**JA7**

           (See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Massachusetts Institute of Technology**        represented by   **Anjali Motgi**
           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

           **Elizabeth Henthorne**
           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

           **Ishan Bhabha**
           (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

           **Lauren J. Hartz**
           (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

           **Lindsay C. Harrison**
           (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

           **Zachary C. Schauf**
           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

           **Shoba Pillay**
           (See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Regents of the University of Michigan**        represented by   **Anjali Motgi**
           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

           **Elizabeth Henthorne**
           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

           **Ishan Bhabha**
           (See above for address)

**JA8**

Case: 25-1727     Document: 00118344606     Page: 13     Date Filed: 09/24/2025     Entry ID: 6753258

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Board of Trustees of Michigan State University**          represented by          **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA9**

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Trustees of Princeton University**                    represented by    **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**University of Rochester**                    represented by    **Anjali Motgi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Henthorne**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary C. Schauf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shoba Pillay**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Department of Energy**                    represented by   **Brian Lea**
                                                             DOJ-OASG
                                                             950 Pennylvania Avenue NW
                                                             Washington, DC 22101
                                                             202-445-8823
                                                             Email: brian.lea@usdoj.gov
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Nicole M. O'Connor**
                                                             DOJ-USAO
                                                             1 Courthouse Way
                                                             Suite 9200
                                                             Boston, MA 02210
                                                             617-748-3266
                                                             Email: Nicole.O'Connor@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Chris Wright**                            represented by   **Brian Lea**
*in his official capacity as Secretary of the*               (See above for address)

**JA11**

*Department of Energy*                                    *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Nicole M. O'Connor**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/14/2025 | 1 | COMPLAINT against Department of Energy, Chris Wright Filing fee: $ 405, receipt number AMADC-10948906 (Fee Status: Filing Fee paid), filed by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form, # 3 Summons, # 4 Summons)(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 2 | EXHIBIT re 1 Complaint,, by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 16, # 16 Exhibit 17, # 17 Exhibit 18, # 18 Exhibit 19, # 19 Exhibit 20)(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 3 | MOTION for Temporary Restraining Order by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Attachments: # 1 Proposed Order) (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 4 | MOTION for Leave to File Excess Pages / *Motion for Leave to File Memorandum Exceeding Twenty Pages* by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Attachments: # 1 Proposed Order)(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 5 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (NMC) (Entered: 04/14/2025) |
| 04/14/2025 | 6 | Summons Issued as to Department of Energy, Chris Wright. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to** |

**JA12**

| | | | |
|---|---|---|---|
| | | | **plaintiff(s) not receiving notice electronically for completion of service.** (NMC) (Entered: 04/14/2025) |
| 04/14/2025 | 7 | | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 4 Motion for Leave to File Memorandum Exceeding Twenty Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KF) (Entered: 04/14/2025) |
| 04/14/2025 | 8 | | CORPORATE DISCLOSURE STATEMENT by Association of American Universities. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 9 | | CORPORATE DISCLOSURE STATEMENT by American Council on Education. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 10 | | CORPORATE DISCLOSURE STATEMENT by Association of Public and Land-Grant Universities. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 11 | | CORPORATE DISCLOSURE STATEMENT by Brown University. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 12 | | CORPORATE DISCLOSURE STATEMENT by California Institute of Technology. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 13 | | CORPORATE DISCLOSURE STATEMENT by Board of Trustees of the University of Illinois. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 14 | | CORPORATE DISCLOSURE STATEMENT by Massachusetts Institute of Technology. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 15 | | CORPORATE DISCLOSURE STATEMENT by Board of Trustees of Michigan State University. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 16 | | CORPORATE DISCLOSURE STATEMENT by Trustees of Princeton University. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 17 | | CORPORATE DISCLOSURE STATEMENT by University of Rochester. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 18 | | CORPORATE DISCLOSURE STATEMENT by Regents of the University of Michigan. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 19 | | MEMORANDUM in Support re 3 MOTION for Temporary Restraining Order filed by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 20 | | MOTION for Leave to Appear Pro Hac Vice for admission of Anjali Motgi Filing fee: $ 125, receipt number AMADC-10949809 by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan.(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 21 | | MOTION for Leave to Appear Pro Hac Vice for admission of Ishan K. Bhabha Filing fee: $ 125, receipt number AMADC-10949813 by Board of Trustees of Michigan State |

**JA13**

| | | University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan.(Pillay, Shoba) (Entered: 04/14/2025) |
|---|---|---|
| 04/14/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice for admission of Lindsay Harrison Filing fee: $ 125, receipt number AMADC-10949818 by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan.(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice for admission of Lauren J. Hartz Filing fee: $ 125, receipt number AMADC-10949838 by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan.(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice for admission of Zachary C. Schauf Filing fee: $ 125, receipt number AMADC-10949850 by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan.(Pillay, Shoba) (Entered: 04/14/2025) |
| 04/14/2025 | 25 | EXHIBIT re 1 Complaint,, by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Pillay, Shoba) (Entered: 04/14/2025) |
| 04/15/2025 | 26 | NOTICE of Appearance by Nicole M. O'Connor on behalf of Department of Energy, Chris Wright (O'Connor, Nicole) (Entered: 04/15/2025) |
| 04/15/2025 | 27 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 20 , 21 , 22 , 23 , and 24 Motions for Leave to Appear Pro Hac Vice. Added Anjali Motgi, Ishan K. Bhabha, Lindsay Harrison, Lauren J. Hartz, and Zachary C. Schauf. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 04/15/2025) |

**JA14**

| | | |
|---|---|---|
| 04/15/2025 | 28 | NOTICE of Appearance by Ishan Bhabha on behalf of Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan (Bhabha, Ishan) (Entered: 04/15/2025) |
| 04/15/2025 | 29 | NOTICE of Appearance by Lindsay C. Harrison on behalf of Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan (Harrison, Lindsay) (Entered: 04/15/2025) |
| 04/15/2025 | 30 | NOTICE of Appearance by Lauren J. Hartz on behalf of Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan (Hartz, Lauren) (Entered: 04/15/2025) |
| 04/15/2025 | 31 | NOTICE of Appearance by Zachary C. Schauf on behalf of Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan (Schauf, Zachary) (Entered: 04/15/2025) |
| 04/15/2025 | 32 | NOTICE of Appearance by Shoba Pillay on behalf of Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan (Pillay, Shoba) (Entered: 04/15/2025) |
| 04/15/2025 | 33 | NOTICE by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan re 3 MOTION for Temporary Restraining Order , 19 Memorandum in Support of Motion,, (Attachments: # 1 Declaration of Kavita Bala, Ph.D., # 2 Declaration of Douglas A. Gage)(Harrison, Lindsay) (Entered: 04/15/2025) |
| 04/16/2025 | 34 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Plaintiffs' motion for a temporary restraining order, [ECF No. 3 ], is **GRANTED**. Defendants' opposition to the Motion is due by <u>Tuesday, April 22, 2025</u>. Plaintiffs may file a reply brief, limited to ten pages in length, by <u>Friday, April 25, 2025</u>. Counsel shall appear in-person for a hearing on the Motion at <u>11:00 AM</u> on <u>Monday, April 28, 2025</u> in <u>Courtroom 17</u>. (CAM) (Entered: 04/16/2025) |
| 04/16/2025 | 35 | MOTION for Leave to Appear Pro Hac Vice for admission of James Y. Xi Filing fee: $ 125, receipt number AMADC-10956680 by Association of American Universities, |

**JA15**

| | | American Council on Education, Association of Public and Land-Grant Universities. (Pillay, Shoba) (Entered: 04/16/2025) |
|---|---|---|
| 04/16/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice for admission of Kyle R. Eiswald Filing fee: $ 125, receipt number AMADC-10956694 by Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities. (Pillay, Shoba) (Entered: 04/16/2025) |
| 04/16/2025 | 37 | MOTION for Leave to Appear Pro Hac Vice for admission of Paul D. Clement Filing fee: $ 125, receipt number AMADC-10956706 by Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities. (Pillay, Shoba) (Entered: 04/16/2025) |
| 04/17/2025 | 38 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 35 Motion for Leave to Appear Pro Hac Vice Added James Y. Xi. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 04/17/2025) |
| 04/17/2025 | 39 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 36 Motion for Leave to Appear Pro Hac Vice Added Kyle R. Eiswald. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 04/17/2025) |

**JA16**

| | | |
|---|---|---|
| 04/17/2025 | 40 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>37</u> Motion for Leave to Appear Pro Hac Vice Added Paul D. Clement.<br><br>**<span style="color:red">Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.</span>** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at <u>https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account</u>.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 04/17/2025) |
| 04/17/2025 | <u>41</u> | NOTICE of Appearance by Paul D Clement on behalf of Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities (Clement, Paul) (Entered: 04/17/2025) |
| 04/17/2025 | <u>42</u> | NOTICE of Appearance by James Xi on behalf of Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities (Xi, James) (Entered: 04/17/2025) |
| 04/17/2025 | <u>43</u> | NOTICE of Appearance by Kyle Raymond Eiswald on behalf of Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities (Eiswald, Kyle) (Entered: 04/17/2025) |
| 04/17/2025 | <u>44</u> | MOTION for Leave to File Excess Pages by Department of Energy, Chris Wright. (O'Connor, Nicole) (Entered: 04/17/2025) |
| 04/18/2025 | 45 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>44</u> Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KF) (Entered: 04/18/2025) |
| 04/18/2025 | <u>46</u> | RESPONSE TO COURT ORDER by Department of Energy, Chris Wright re <u>34</u> Order,, Set Motion and R&R Deadlines/Hearings,, Terminate Motions,, Set Hearings, . (O'Connor, Nicole) (Entered: 04/18/2025) |
| 04/22/2025 | <u>47</u> | Opposition re <u>3</u> MOTION for Temporary Restraining Order filed by Department of Energy, Chris Wright. (O'Connor, Nicole) (Main Document 47 replaced on 4/23/2025) (KF). (Entered: 04/22/2025) |
| 04/22/2025 | <u>48</u> | DECLARATION re <u>47</u> Opposition to Motion by Department of Energy, Chris Wright. (Attachments: # <u>1</u> Exhibit A (Policy Flash), # <u>2</u> Exhibit B (April 11, 2025 Statement), # <u>3</u> Exhibit C (Assistance Agreement - WUSL), # <u>4</u> Exhibit D (Rate Agreement - WUSL), # <u>5</u> Exhibit E (Terms and Conditions - WUSL), # <u>6</u> Exhibit F (Assistance Agreement - Iowa), # <u>7</u> Exhibit G (Rate Agreement - Iowa), # <u>8</u> Exhibit H (Terms and Conditions - Iowa), # <u>9</u> Exhibit I (Notification Letter))(O'Connor, Nicole) (Entered: 04/22/2025) |
| 04/23/2025 | 49 | Notice of correction to docket made by Court staff. Correction: docket entry 47 corrected to replace with correct document. (KF) (Entered: 04/23/2025) |
| 04/24/2025 | <u>50</u> | MOTION for Leave to File Excess Pages *Reply Memorandum Exceeding Ten Pages* by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, |

**JA17**

| | | |
|---|---|---|
| | | California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Harrison, Lindsay) Filing event, docket text modified on 4/24/2025 (CAM). (Entered: 04/24/2025) |
| 04/24/2025 | 51 | NOTICE of Appearance by Brian Lea on behalf of Department of Energy, Chris Wright (Lea, Brian) (Entered: 04/24/2025) |
| 04/24/2025 | 52 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 50 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 04/24/2025) |
| 04/25/2025 | 53 | REPLY to Response to 3 MOTION for Temporary Restraining Order filed by Board of Trustees of Michigan State University, Trustees of Princeton University, University of Rochester, Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities, Brown University, California Institute of Technology, Cornell University, Board of Trustees of the University of Illinois, Massachusetts Institute of Technology, Regents of the University of Michigan. (Attachments: # 1 Exhibit 1 - Declaration of Sally Morton)(Harrison, Lindsay) (Entered: 04/25/2025) |
| 04/28/2025 | 54 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Hearing on Motion held on 4/28/2025. Oral argument by the parties. Court takes matter under advisement. TRO will stay in effect while motion is under advisement. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Bhabha, Clement, Xi, Pillay, Lea, O'Connor) (KF) (Entered: 04/28/2025) |
| 04/29/2025 | 55 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. On April 16, 2025, this Court granted Plaintiffs' motion for a temporary restraining order. [ECF No. 34 ]. That temporary restraining order is set to expire on April 30, 2025. Fed. R. Civ. P. 65(b)(2). Based on the April 28, 2025 motion hearing, the Court finds that good cause exists to extend the temporary restraining order, which will remain in effect until a further order is issued resolving the request for a preliminary injunction. (CAM) (Entered: 04/29/2025) |
| 04/29/2025 | 56 | Transcript of Hearing held on April 28, 2025, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 5/20/2025. Redacted Transcript Deadline set for 5/30/2025. Release of Transcript Restriction set for 7/28/2025. (DRK) (Entered: 04/29/2025) |
| 04/29/2025 | 57 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/29/2025) |
| 05/02/2025 | 58 | STATUS REPORT by Department of Energy, Chris Wright. (O'Connor, Nicole) (Entered: 05/02/2025) |
| 05/02/2025 | 59 | NOTICE by Department of Energy, Chris Wright *of Filing Supplemental Declaration* (O'Connor, Nicole) (Entered: 05/02/2025) |
| 05/02/2025 | 60 | DECLARATION re 59 Notice (Other) by Department of Energy, Chris Wright. (Attachments: # 1 Exhibit Washington Univ at St Louis NICRA, # 2 Exhibit Univ Wisconsin Madison NICRA, # 3 Exhibit MIT NICRA)(O'Connor, Nicole) (Entered: 05/02/2025) |

**JA18**

| 05/05/2025 | 61 | Response by American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, Board of Trustees of Michigan State University, Board of Trustees of the University of Illinois, Brown University, California Institute of Technology, Cornell University, Massachusetts Institute of Technology, Regents of the University of Michigan, Trustees of Princeton University, University of Rochester to 60 Declaration of Berta Schreiber. (Harrison, Lindsay) (Entered: 05/05/2025) |
|---|---|---|
| 05/15/2025 | 62 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. For the reasons sets forth (herein), Plaintiffs' motion for a preliminary injunction is GRANTED. Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form with respect to IHEs nationwide until a further order is issued by this Court.<br><br>**SO ORDERED.**<br><br>(CAM) (Entered: 05/15/2025) |
| 06/12/2025 | 63 | MOTION for Extension of Time to July 1, 2025 to File Answer *or otherwise respond to Plaintiffs' Complaint* by Department of Energy.(O'Connor, Nicole) (Entered: 06/12/2025) |
| 06/13/2025 | 64 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 63 Motion for Extension of Time to Answer. Department of Energy answer due 7/1/2025. (KF) (Entered: 06/13/2025) |
| 06/25/2025 | 65 | MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth Henthorne Filing fee: $ 125, receipt number AMADC-11086776 by American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, Board of Trustees of Michigan State University, Board of Trustees of the University of Illinois, Brown University, California Institute of Technology, Cornell University, Massachusetts Institute of Technology, Regents of the University of Michigan, Trustees of Princeton University, University of Rochester.(Pillay, Shoba) (Entered: 06/25/2025) |
| 06/26/2025 | 66 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 65 Motion for Leave to Appear Pro Hac Vice Added Elizabeth Henthorne.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/26/2025) |
| 06/26/2025 | 67 | NOTICE of Appearance by Elizabeth Henthorne on behalf of American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, Board of Trustees of Michigan State University, Board of Trustees of the University of Illinois, Brown University, California Institute of Technology, Cornell University, Massachusetts Institute of Technology, Regents of the University of Michigan, Trustees of Princeton University, University of Rochester (Henthorne, Elizabeth) (Entered: 06/26/2025) |

**JA19**

| 06/27/2025 | 68 | MOTION Entry of Final Judgment *(unopposed)* by Department of Energy, Chris Wright. (Attachments: # 1 Text of Proposed Order Proposed Order)(O'Connor, Nicole) (Entered: 06/27/2025) |
| 06/27/2025 | 69 | Joint MOTION to Stay *All Deadlines* by Department of Energy, Chris Wright. (Attachments: # 1 Text of Proposed Order Order to Stay All Deadlines)(O'Connor, Nicole) (Entered: 06/27/2025) |
| 06/30/2025 | 70 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 68 Unopposed Motion for Entry of Final Judgment ; finding as moot 69 Motion to Stay. (CAM) (Entered: 06/30/2025) |
| 06/30/2025 | 71 | Judge Allison D. Burroughs: ORDER entered. FINAL JUDGMENT. (CAM) (Entered: 06/30/2025) |
| 07/31/2025 | 72 | NOTICE OF APPEAL as to 71 Judgment, 62 Memorandum & ORDER,, by Department of Energy, Chris Wright. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/20/2025. (O'Connor, Nicole) (Entered: 07/31/2025)** |
| 07/31/2025 | 73 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 72 Notice of Appeal. (MAP) (Entered: 07/31/2025) |
| 07/31/2025 | 74 | USCA Case Number 25-1727 for 72 Notice of Appeal, filed by Department of Energy, Chris Wright. (MAP) (Entered: 07/31/2025) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 09/22/2025 12:07:12 | | |
| **PACER Login:** | jenn.utrecht | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10912-ADB |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |

**JA20**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASSOCIATION OF AMERICAN
UNIVERSITIES,

AMERICAN COUNCIL ON EDUCATION,

ASSOCIATION OF PUBLIC AND LAND-
GRANT UNIVERSITIES,

BROWN UNIVERSITY,

CALIFORNIA INSTITUTE OF
TECHNOLOGY,

CORNELL UNIVERSITY,

BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS,

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

REGENTS OF THE UNIVERSITY OF
MICHIGAN,

BOARD OF TRUSTEES OF MICHIGAN
STATE UNIVERSITY,

TRUSTEES OF PRINCETON UNIVERSITY,
and

UNIVERSITY OF ROCHESTER,

       Plaintiffs,

    v.

DEPARTMENT OF ENERGY, and

CHRIS WRIGHT, in his official capacity as
Secretary of the Department of Energy,

       Defendants.

Case No. _____

**COMPLAINT**

**JA21**

1.     This suit challenges a flagrantly unlawful action by the Department of Energy ("DOE")—slashing "indirect cost rates" for government-funded research—that is a virtual carbon copy of the National Institutes of Health ("NIH") policy that a district court has permanently enjoined, after previously granting a prompt temporary restraining order and preliminary injunction. *Massachusetts v. Nat'l Institutes of Health ("NIH")*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), *judgment entered* (D. Mass. Apr. 4, 2025), *appeal filed* (D. Mass. Apr. 8, 2025). DOE's action is unlawful for most of the same reasons and, indeed, it is especially egregious because DOE has not even attempted to address many of the flaws the district court found with NIH's unlawful policy. Here, as there, if DOE's policy is allowed to stand, it will devastate scientific research at America's universities and badly undermine our Nation's enviable status as a global leader in scientific research and innovation.

2.     For decades, universities have built their research institutions on the government's commitment to fund the costs of the research it supports. Some of those costs are "direct;" that is, they are readily attributable to specific projects. Others are "indirect;" that is, they are necessary for the research to occur but harder to attribute to individual projects. Specialized nuclear-rated facilities; computer systems to analyze enormous volumes of data; information-technology and utility systems providing the backbone for those efforts; and researchers and administrative staff who keep the systems running—all are critical to cutting-edge research, but their costs typically cannot be allocated to any single project. Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

3.     Congress understood that agencies would "provide for payment of reimbursable indirect costs on the basis of predetermined fixed-percentage rates" via a bespoke process

accounting for each institution's unique cost structures and grants. 41 U.S.C. § 4708. That is why Congress gave the Executive Branch the quintessentially administrative task of identifying institution-specific metrics and did not itself set across-the-board metrics. Hence, the Office of Management and Budget ("OMB") exercised its authority to promulgate regulations requiring agencies to negotiate indirect cost rates with individual financial assistance recipients through a carefully regulated process, based on each institution's unique needs and cost structure. *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]"). For universities, the indirect cost rates are typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds directly to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). By regulation, this negotiation yields a rate that is intended to reflect the actual, verified indirect costs incurred by the institution. Then, "[n]egotiated indirect cost rates must be accepted by all Federal agencies," unless one of the narrow exceptions applies. 2 C.F.R. § 200.414(c)(1).

4.    The purpose of this process is to ensure that the negotiated rate correctly captures the actual indirect costs incurred in the conduct of research. Differences in indirect cost rates do not reflect undeserved government subsidies; rather, institutions have different indirect cost rates because they engage in different types of research and have unique mixes of fixed and variable institutional costs that are appropriately allocated across multiple research projects or other cost objectives. Government funding agencies may deviate from the negotiated rates only in limited circumstances, and only via procedures that provide ample notice and protections to ensure that the basic terms of engagement are not changed precipitously. The regulatory framework thus

recognizes that there is no one-size-fits-all approach and that participating institutions have profound reliance interests in the negotiated rates—rates that are tailored to their circumstances and that facilitate the work that makes the United States a world leader in cutting-edge research.

5.     This is not the first time an administration has considered limiting indirect cost rates and superimposing a one-size-fits-all regime on what has long been a tailored, negotiated process. In 2017, the Administration proposed slashing the indirect cost rate to 10% for all NIH grants. The reaction in Congress was swift and bipartisan. Congress identified serious problems immediately—observing that the proposal would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965," emphasizing that Congress had "not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray," S. Rep. No. 115-150, at 109 (2017), and concluding that this proposal was "misguided and would have a devastating impact on biomedical research across the country," H.R. Rep. No. 115-244, at 50 (2017).

6.     In February 2025, the Administration nonetheless tried the same maneuver again, and NIH issued a notice stating that it was "imposing a standard indirect cost rate on all grants of 15%." NIH, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates, NOT-OD-25-068 (Feb. 7, 2025), https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html. A federal district court quickly enjoined that policy, finding that the Administration had not only flouted an appropriations rider that Congress had enacted in the wake of the 2017 NIH episode, but also had violated the government-wide regulations governing indirect cost rates and the reasoned decisionmaking requirements of the Administrative Procedure Act ("APA"). *NIH*, 2025 WL 702163, at *1.

7.     Now the Administration has brought a similar policy to DOE, issuing late on April 11, 2025 a new policy stating that "hereinafter, the Department will no longer use the negotiated indirect cost rate" for universities; "setting a standardized 15 percent indirect cost rate for all grant awards to" universities; and announcing that DOE "is undertaking action to terminate all grant awards to [universities] that do not conform with this updated policy."  DOE, *Policy Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)* (Apr. 11, 2025) (attached as Ex. A) ("Rate Cap Policy").  The announcement acknowledges that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards," but then states without explanation that a categorical limit on indirect cost rates of 15% is necessary to ensure DOE "is putting [funds] to appropriate use" and to "improve efficiency and curtail costs where appropriate."  The Rate Cap Policy applies this supposedly necessary limit on indirect cost rates "only with respect to" universities, not to other recipients of DOE grants.

8.     As with the NIH's similar maneuver, DOE's Rate Cap Policy is unlawful, and obviously so.  It violates the indirect-cost regulations that OMB promulgated precisely to provide needed stability, protect reliance interests, and ensure that recipients can cover the *actual costs* of conducting the research that the government has selected them to undertake.  Those regulations provide, in no uncertain terms, that the "[n]egotiated indirect cost rates must be accepted by all Federal agencies." 2 C.F.R. § 200.414(c)(1).  DOE's reading of the narrow exceptions from that mandate would render that command meaningless and effectively replace the word "must" with "may," allowing any agency to toss those negotiated rates simply by *announcing* a different across-the-board policy.  Nothing in the regulations' text remotely supports that bizarre reading.  Indeed, the Rate Cap Policy separately violates the regulations' requirement that any departure from the negotiated rate appear upfront in the notice of funding *opportunity*—a requirement that DOE

cannot evade by purporting to cancel the grants of recipients that decline to agree to its unlawful 15% rates.

9. The Rate Cap Policy also defies the APA's reasoned-decisionmaking requirements. Although the Rate Cap Policy strings together a few sentences describing its change, absent is any genuine attempt at an *explanation*—one that would "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The Rate Cap Policy ignores that indirect costs are necessary for critical research to proceed and are distinguished from direct costs only in that they are not attributable to *just one* grant. The Policy ignores the devastating consequences of jettisoning an approach dating back to 1965—consequences that Congress itself emphasized the only other time something like this was proposed. It ignores how its across-the-board policy thwarts the very goal that DOE purports to pursue: "continuing to expand American innovation and scientific research." It ignores, as well, the reliance interests of the universities receiving federal funding—reliance interests that DOE casually destroys. *Cf. FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (if a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests" an agency's failure to consider such factors "would be arbitrary or capricious"). The Policy likewise ignores the guidance this Court provided in striking down the NIH's virtually identical effort. Finally, the Rate Change Policy inexplicably imposes its new requirement only on universities, not other DOE grant recipients. If this approach were a sound policy necessary to protect the public fisc (it is not), DOE would have applied it more broadly—or at least explained why it targeted only universities. The contours of DOE's decision

thus "cannot be adequately explained in terms of" the explanation it provided." *Dep't of Commerce*, 588 U.S. at 784.

10.     The effects, moreover, will be immediate and devastating. The Rate Cap Policy states unequivocally that "the Department *is undertaking* action to terminate all grant awards to IHEs that do not conform with this updated policy" (emphasis added). That is, DOE is poised to put recipients to a choice: Either accept reductions in indirect cost rates, or face terminations. And as soon as recipients face that choice, the harm will be immediate and irreparable. Because universities cannot sustain DOE-funded programs at the 15% indirect cost rate that DOE will now inflict, myriad critical projects—often the product of years or decades of effort—are in jeopardy of being stopped in their tracks. These include the development of advanced nuclear and cybersecurity technologies, arms control verification mechanisms designed to reduce the risk of nuclear war, novel radioactive drugs to diagnose and treat cancer, and upgrades for the electrical grids that keep the lights on in rural communities, among many others. Meanwhile, the human cost will be immense, as universities will have to immediately reduce staff and training programs—irreversibly damaging their academic communities, the careers of these young researchers, and the national interest in training the next generation of scientists. Nor can the consequences of grinding vital scientific work to a halt, and stifling training, be unwound. The pace of scientific discoveries in the national interest will be slowed. Progress on a safe and effective nuclear deterrent, novel energy sources, and cures for debilitating and life-threatening illness will be obstructed. America's rivals will celebrate, even as science and industry in the United States suffer.

## JURISDICTION AND VENUE

11.     This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and regulations governing federal grants.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the APA.

12.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and a Plaintiff resides in this district.

## PARTIES

13.     Plaintiff Association of American Universities ("AAU") is an association composed of 71 leading research universities with the goal of transforming lives through education, research, and innovation.  AAU's member organizations are public and private research universities that are world-renowned centers of scientific and technological research and innovation.  Much of their scientific work is supported by DOE grants.

14.     Plaintiff Association of Public and Land-Grant Universities ("APLU") is a membership organization that fosters a community of university leaders collectively working to advance the mission of public research universities.  A core mission of the APLU is fostering research and innovation, specifically by "promoting pathbreaking scientific research."[1] The association's membership consists of over 200 research universities, land-grant institutions, and affiliated organizations across the United States.  Much of their scientific work is supported by DOE grants.

---

[1] Association of Public and Land-Grant Universities, *About Us*, https://www.aplu.org/about-us/.

15. Plaintiff American Council on Education ("ACE") is a nonprofit association composed of more than 1,600 colleges, universities, and higher education-related associations, organizations, and corporations with the goal of enabling higher education institutions to flourish. ACE's member organizations are accredited, degree-granting colleges and universities, as well as related associations, organizations, and corporations that also serve as world-renowned centers of scientific technological research and innovation. Much of their scientific work is supported by DOE grants.

16. Plaintiff Brown University ("Brown") is a private university located in Providence, Rhode Island. Brown conducts fundamental and applied research directed at the forefront of DOE priorities, including research critical to the nation's current and future energy needs and security. DOE's planned cap of 15% for indirect cost expenditures would result in an over two-million-dollar loss annually to Brown's planned research budget.

17. Plaintiff California Institute of Technology ("Caltech") is a private university located in Pasadena, California. Caltech is a world-class science and engineering institute that has long been at the vanguard of technological innovation. Caltech receives substantial annual funding from DOE and currently has 83 active DOE awards and subawards. In fiscal year 2024, Caltech expended more than $25 million in conducting research supported by DOE, with almost $8 million expended as indirect costs. If the indirect cost rate is reduced to 15% of modified total direct costs, that would reduce the Caltech's annual indirect cost recovery by nearly $6 million.

18. Plaintiff Cornell University ("Cornell") is a private university located in Ithaca, New York. Cornell is a leading research institution that has been selected by the federal government to conduct a wide variety of vital forms of research on behalf of United States citizens, funded in part by agency awards, cooperative agreements, and contracts from across the

federal government, including DOE. In fiscal year 2024, Cornell expended approximately $30 million on more than 110 awards from DOE. Cornell's indirect cost rate, as negotiated with the federal government, allowed Cornell to recover approximately $8.5 million in reimbursement for those costs from DOE. Cornell's ability to conduct DOE-sponsored research during fiscal year 2025 would be significantly impaired by the reduction in the indirect cost reimbursement, estimated as a shortfall of roughly $8 million in a typical fiscal year.

19.    Plaintiff Board of Trustees of the University of Illinois ("Illinois") is a public university with its flagship campus in Urbana-Champaign, Illinois. Illinois is a leading land-grant research university and one of the largest recipients of DOE funding, having received over $122 million in fiscal year 2024. Since Illinois's negotiated indirect cost rate is 58.6%, Illinois would lose substantial dollars if its predetermined indirect cost rate were reduced to 15%.

20.    Plaintiff Massachusetts Institute of Technology ("MIT") is a private university located in Cambridge, Massachusetts. Founded to accelerate the nation's industrial revolution, MIT faculty, researchers, and graduates have invented fundamental technologies, launched new industries, and advanced human understanding of science, technology, and other areas of scholarship. MIT received $93 million from the DOE in MIT's fiscal year 2024 for performing sponsored research. MIT conducts research under 286 direct and indirect funding awards from DOE that are currently active for its fiscal year 2025. If DOE reduces the indirect costs rate to 15%, then MIT forecasts it will lose approximately $15 million to $16 million in reimbursement for costs that support DOE research over the next 12 months alone.

21.    Plaintiff Regents of the University of Michigan ("Michigan") is a public university located in Ann Arbor, Michigan. It receives substantial annual funding from DOE, which supports critical and cutting-edge research, including Michigan's nuclear research program,

advanced battery technologies, and next-generation engine and fuel technologies. Of the $81.8 million in DOE funding that the University received in fiscal year 2024, approximately $56.1 million was allocated for direct costs and $25.7 million for indirect costs. Similarly, in fiscal year 2025, the University expects to receive $61.8 million in DOE funding for direct costs, while $28.3 million is allocated for indirect costs. And over the next five years, the University anticipates receiving an average of $75.8 million from the DOE for annual direct costs. Based on the predetermined indirect cost rate of 56%, which was agreed upon by the federal government as of July 1, 2024, the University thus expects to receive approximately $42.4 million in indirect cost recovery on an annual basis. If—contrary to what the University of Michigan has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by $31.1 million, to $11.4 million.

22.    Plaintiff Board of Trustees of Michigan State University ("MSU") is a public university located in East Lansing, Michigan. MSU was the first land-grant university established under the Morrill Act and today is a leading global public research university. Of the $161 million in DOE funding that MSU received for fiscal year 2024, approximately $116 million was for direct costs and about $45 million was for indirect costs reimbursements. Based on the predetermined indirect cost rate of 57%, which was agreed upon by the federal government, MSU expects to receive approximately $45 million in indirect cost recovery on an annual basis from DOE. If the indirect cost rate is reduced to 15%, that would reduce MSU's anticipated annual indirect cost recovery by approximately $32 million.

23.    Plaintiff Trustees of Princeton University ("Princeton") is a private university located in Princeton, New Jersey. Princeton is a world-class research institution that aims to unite people, resources, and opportunities for the creation, preservation, and transmission of knowledge

for the benefit of the nation and humanity. Princeton has 112 DOE awards and subawards and intends to apply for additional research funding this year. In fiscal year 2024, Princeton expended approximately $32.6 million in conducting such research supported by DOE. Of this total, approximately $10 million were expended as indirect costs to support needs such as the infrastructure, research administration, compliance, and security expenses required to conduct the funded research. Princeton's negotiated on-campus indirect cost rate for fiscal year 2024 is 62%. Princeton would therefore lose substantial dollars if Princeton's predetermined indirect cost rate were reduced to 15%.

24.     Plaintiff University of Rochester ("Rochester") is a private university located in Rochester, New York. Rochester conducts groundbreaking research in a wide variety of fields, including fusion energy, quantum computer, and theoretical and experimental elementary particle physics. The University's Laboratory for Laser Energetics ("LLE") is the nation's leading university-based research center in fusion, laser science and technology, and high-energy-density science research, and operates two of the largest and most-capable government-owned lasers at any academic institution in the world. Rochester's negotiated indirect cost rate through fiscal year 2026-2027 is 51%. DOE's planned cap of 15% for indirect cost expenditures would result in an indirect cost recovery loss to Rochester of greater than $25 million.

25.     Defendant Department of Energy ("DOE") is an executive department of the federal government that is responsible for coordinating national energy policy and supporting energy research and development to advance American energy, economic, and national security.

26.     Defendant Chris Wright is Secretary of DOE. He is sued in his official capacity.

## FACTUAL BACKGROUND

### A. Indirect Cost System Structure

27.    For decades, DOE-funded research at universities has made the United States a world leader in science.  The federal government awards billions of dollars to research universities that can most effectively further DOE's goals.  In fiscal year 2023, DOE awarded more than $2.6 billion to nearly 400 different universities.

28.    DOE grants have funded scientific research that has led to innumerable scientific breakthroughs, including the discovery of the Higgs particle.  Dozens of DOE-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.[2]

29.    Most DOE-funded research occurs at outside institutions, including universities. This approach allows DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.

30.    DOE pursues its research goals by funding the critical scientific research of the organizational Plaintiffs' member universities and the university Plaintiffs.  At any given time, individual research universities often depend on myriad of DOE grants that support independent research projects across multiple university departments and centers.

31.    These DOE grants are issued pursuant to a well-established legislative and regulatory framework.  Congress has authorized DOE to provide for grants under various statutes, and it has directed agencies to use indirect cost rates.  *See* 41 U.S.C. § 4708.  Congress also instructed OMB to issue general guidance on fiscal administration issues.  *See* 31 U.S.C. § 503(a), (b)(2)(C) (empowering OMB to "establish governmentwide financial management policies for executive agencies," including as to "grant[s]").  In turn, OMB has established uniform guidance

---

[2] DOE, *DOE Nobel Laureates*, https://science.osti.gov/About/Honors-and-Awards/DOE-Nobel-Laureates (last visited Apr. 14, 2025).

for agencies to administer grants under the agencies' purview. *See* 2 C.F.R. pt. 200 (setting forth "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). DOE has expressly adopted OMB's guidance into its own regulations. *See* 2 C.F.R. § 910.120 (adopting OMB guidance in 2 C.F.R. pt. 200).

32. As provided by regulation, DOE's competitive grantmaking process begins with a notice of funding opportunities for a specific topic followed by new application submissions. *See* 2 C.F.R. § 200.204.

33. After a formal review process that includes peer review, the DOE issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested (*i.e.*, drawn down) from the agency. *See* 2 C.F.R. § 200.211(b)(7) (establishing that the award must include the "[a]mount of [f]ederal [f]unds [o]bligated by this action"). An NOA is issued for the initial budget period and each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project. *See* 2 C.F.R. § 200.211(c)(1)(iv).

34. Federal grant recipients generally do not receive lump-sum grants. Instead, they use cost-based accounting systems under which they first incur expenses and then recover their actual, documented costs for conducting research.

35. The costs of conducting DOE-funded research come in two types. The first is "direct costs"—costs that can be attributed to a specific research project. For example, the salary of a graduate student assigned to a particular research project, or the cost of a specialized piece of equipment purchased for a research project is a direct cost.

36. The second is "indirect costs"—costs that are necessary for research but that support multiple research projects. These costs have long been reimbursed as part of federal grant funding: in 1962, Congress authorized the use of "predetermined fixed-percentage rates"

for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions.  Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

37.     "[I]ndirect costs" are comprised of "[f]acilities" and "[a]dministration" costs.  2 C.F.R.  §  200.414(a).   The "[f]acilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." *Id*.  This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of buildings, including specialized facilities and laboratories.  Those costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects.

38.     The "[a]dministration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" *Id*.  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security, technical staff, and many others.  These are indirect costs because a single employee or group of employees will handle these necessary administrative activities across multiple DOE grants.  Because of caps on administrative costs, moreover, universities contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants.

39.     Federal regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs.  *See* Appendix III to Part 200—Indirect (F & A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs).   This

methodology ensures that indirect costs are allocated fairly across supported projects, with the more expensive and resource-intensive research projects being allocated a larger share of indirect costs. As a simplified example, suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing direct costs and one with $25,000 of annual overhead-bearing direct costs. Suppose, too, that the laboratory's sole indirect cost is the cost of electricity, which costs $10,000 per year. Because the cost of electricity ($10,000) is 10% of the overhead-bearing direct costs ($100,000), the indirect cost rate would be 10%. Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 of electricity costs would be allocated to the second project.

40. Federal regulations prescribe a detailed methodology for negotiating indirect cost rates. *See* Appendix III to Part 200. Typically, a single agency negotiates an indirect cost rate with an institution. For universities, rates are generally negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1).

41. That indirect cost rate then applies to all of that institution's grants across the entire federal government. Federal regulations require institutions to conduct and submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs. For example, if an institution seeks to recover the cost of building maintenance, it must document those costs and then allocate those maintenance costs across research and non-research programs.

42.     The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate.  Again, this rate reflects actual, verified costs incurred by the institution.

43.     Once the federal agency agrees to an indirect cost rate, it binds the entire federal government during the period that the negotiated rate is in effect.  Typically, the negotiated rates remain in effect for one year, although in some cases they remain in effect for up to four years.

44.     After the costs are incurred, federal agencies conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that were incurred.  The indirect cost rate can be adjusted if the audit establishes that the institution has recovered excess costs.

45.     DOE is required to use that negotiated indirect cost rate unless a deviation therefrom "for either a class of Federal awards or a single Federal award" is "required by Federal statute or regulation" or is "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."  2 C.F.R. § 200.414(c)(1).

46.     The cross-referenced provision, 2 C.F.R. § 200.414(c)(3), in turn makes clear that the negotiated rates remain the baseline and that it authorizes only specific "deviations" for individual awards or classes of awards when specified criteria are met.  In particular, that provision specifies that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  2 C.F.R. § 200.414(c)(3).

47.     The policies, procedures, and general decision-making criteria justifying deviations apply prospectively.  Pursuant to 2 C.F.R. § 200.414(c)(4), "[t]he Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved."  Moreover, "the Federal agency should incorporate

discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity." *Id.*

48. Negotiated rates vary significantly from institution to institution. The primary reason for this variation is that different institutions conduct different types of research. Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings. As such, an institution engaging in cutting-edge nuclear will likely have a higher indirect cost rate than an institution primarily engaged in social science research. Even in the context of scientific research, some types of research are more expensive than others. If a particular institution invests in an expensive piece of advanced lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive lab equipment or uses such equipment for only one research project.

49. Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research. State of the art nuclear and energy research, for example, often requires higher indirect cost rates.

50. Past studies show that indirect cost rates for university research are slightly less than those for other research performers, *i.e.*, that universities had the lowest percentage of total research costs classified as indirect costs as compared to federal laboratories and industrial laboratories.[3]

___

[3] Association of American Universities, *Frequently Asked Questions About Facilities And Administrative (F&A) Costs of Federally Sponsored University Research* (Feb. 10, 2025), https://www.aau.edu/key-issues/frequently-asked-questions-about-facilities-and-administrative-costs.

**B. Prior Attempts to Limit Indirect Cost Rates.**

51.    In 2017, the Administration released a budget proposal that would have slashed the indirect cost rate for NIH grants to 10%. *See* Office of Management & Budget, Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018, at 43 (2017).

52.    The proposal spurred widespread criticism and alarm. The House Subcommittee on Labor, Health and Human Services, and Education of the Committee on Appropriations held a two-hour long hearing discussing concerns, on a bipartisan basis, relating to the proposed cap on indirect costs. Hearing on the Role of Facilities and Administrative Costs in Supporting NIH-Funded Research Before the Subcomm. on Labor, Health and Human Services, Education, and Related Agencies of the H. Comm. On Appropriations, 115th Con. (2017), available at: https://www.youtube.com/watch?v=R3Eb7CjsjRE.

53.    Congress then enacted, on a bipartisan basis, an appropriations rider providing that regulatory "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740. The appropriations rider also prohibits spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates," or to "intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter." *Id.*

54.    Both the House and Senate Appropriations Committees specifically addressed the need for the rider in direct response to the Administration's proposal in their respective reports.

The House Report noted that, "[w]hile the Committee appreciates the Secretary's efforts to find efficiencies in NIH research spending, the Administration's proposal to dramatically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country." H.R. Rep. No. 115-244, at 50 (2017). The Senate Report noted, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable across NIH grantees for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide. The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray." S. Rep. No. 115-150, at 109 (2017).

55. Congress not only adopted the rider in 2017; it has repeatedly reenacted the rider ever since. *See* Department of Health and Human Services Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84. And this rider remains in effect to this day, in the now-operative statute. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677.

56. The appropriations riders were co-extensive with the proposed rate cap. To Plaintiffs' knowledge, no Administration has proposed a budget that would cap the indirect cost

rate for DOE grants at a fixed percentage, like 10 or 15%. Congress therefore has yet to adopt an analogous appropriations rider for DOE grants.

57.     In light of both the applicable regulations and the rider, the negotiated NIH indirect cost rates remained undisturbed until late on Friday, February 7, 2025, when NIH issued a Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates ("NIH Rate Change Notice"). NIH purported to slash and cap previously negotiated indirect cost rates on all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.

58.     Given the dire consequences of the NIH Rate Change Notice, which would have dramatically disrupted the development of innovative medical research and treatment, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in this case—filed complaints and motions for temporary restraining orders. All three plaintiff groups argued that the NIH Rate Change Notice was unlawful under the APA.

59.     The Court found that the serious consequences of the NIH Rate Change Notice warranted issuance of a nationwide temporary restraining order to maintain the status quo until the matter could be fully addressed by the Court. Following briefing, on March 5, 2025, the Court issued a nationwide preliminary injunction. *NIH*, 2025 WL 702163, at *1. After finding jurisdiction appropriate because the parties sought to vindicate rights rooted in federal statutes and regulations and sought relief that was injunctive in nature, the Court found the plaintiffs likely to succeed on the merits. *See id.* at *4–8. First, the Court found that the NIH Rate Change Notice violated applicable regulations, which barred deviation from negotiated rates without a documented justification, and more generally barred wholesale deviation from negotiated rates

in the fashion attempted by NIH. *See id.* at *10–11. The Court also found that plaintiffs were likely to succeed on their statutory claims that the NIH Rate Change Notice violated the appropriations rider and the APA. *See id.* at *11–16. In particular, the Court found that the NIH Rate Change Notice was arbitrary and capricious because the explanations provided for the rate change were "conclusory" and its "proffered 'reasons' fail[ed] to grapple with the relevant factors or pertinent aspects of the problem." *Id.* at *17–18. Furthermore, it found that the NIH Rate Change Notice failed to "recognize or consider the substantial reliance interests at issue." *Id.* at *19; *see id.* at *20 ("The Notice fails to contemplate the budgets of these institutions, formulated months and years before this Notice's sudden implementation. It fails to contemplate the risk to human life as research and clinical trials are suspended in response to the shortfall. It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed."). The Court also found the plaintiffs were likely to succeed on their claims that NIH failed to follow notice-and-comment rulemaking procedures and enacted a policy that was impermissibly retroactive as to existing grants. *See id.* at *22–27. The Court then found that that the plaintiffs demonstrated irreparable harm and that the balance of the equities and public interest favored an injunction. *See id.* at *27–32. The Court enjoined the NIH Rate Change Notice on a nationwide basis. *See id.* at *35. The parties then jointly moved to convert the preliminary injunction to a permanent injunction. *See NIH*, No. 25-CV-10338 (D. Mass. Apr. 4, 2025), ECF No. 96. The government has not filed a motion to stay the injunction pending an appeal.

## C. DOE's Rate Cap Policy

60. On Friday, April 11, 2025, the DOE issued the Rate Cap Policy, titled "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)." The Rate Cap

Policy announces that the "hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs." The Rate Cap Policy provides that "[a]ll future Department grant awards to IHEs will default to this 15 percent indirect cost rate." The Rate Cap Policy further announces that, "[c]onsistent with [the Rate Cap Policy], the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy" (citing 2 C.F.R. § 200.340(a), (b)).

61. The Rate Cap Policy justifies this sweeping change by stating that "[t]his system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." It also states the following as putative justification: "To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds." It further states that indirect costs payments are "not for the Department's direct research funding" (citing 89 Fed. Reg. 30046-30093), while acknowledging that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards."

62. The Rate Cap Policy purports to rely on the authority of 2 C.F.R. § 200.414(c)(1) for its setting of a single, uniform indirect cost rate of 15 percent for all institutions of higher education. But that provision authorizes deviations from the negotiated indirect cost rates *only* for "either a class of Federal awards or a single Federal award" and "*only* when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with [2 C.F.R. § 414(c)(3)]." 2 C.F.R. § 200.414(c)(1) (emphasis added). It does not authorize DOE to entirely eliminate the negotiated rate for all federal awards for institutions of higher

education. Moreover, to deviate from a negotiated rate—absent a statutory or regulatory requirement to do so—DOE must comply with the requirement that the agency "implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3). In addition, pursuant to the regulatory provision that immediately follows, DOE "must include" such "policies relating to indirect cost rate reimbursement" "in the notice of funding opportunity." 2 C.F.R. § 200.414(c)(4).

63. The Rate Cap Policy is final agency action under the APA. *See* 5 U.S.C. § 704. The Rate Cap Policy (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). In particular, the Rate Cap Policy marks the consummation of DOE's decision-making process because it announces DOE's decision to immediately impose a 15% across-the-board indirect cost rate to institutions of higher education and to terminate grants that use a different rate. And the Rate Cap Policy is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to limit the percent of indirect costs for which a grant recipient can be reimbursed under the grant.

**D. Plaintiffs' Prior Indirect Cost Funding and Plaintiffs' Injuries**

64. Plaintiffs are attaching as exhibits to this Complaint declarations describing universities' DOE grants and the harms they face, which Plaintiffs incorporate here by reference.

## CLAIMS FOR RELIEF

### Count I

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Negotiated Cost Rates in Violation of 2 C.F.R. 200.414)

65. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

66. The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

67. 2 C.F.R. § 200.414(c)(1) states that negotiated indirect cost rates "must be accepted by all Federal agencies. A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."

68. In turn, 2 C.F.R. § 200.414(c)(3) states: "The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."

69. By pronouncing a single, uniform "policy" setting indirect cost rates for universities at 15% regardless of the otherwise applicable negotiated rate, DOE violated 2 C.F.R. § 200.414(c)(1) and (c)(3).

70. These provisions authorize agencies to announce *procedures* governing *subsequent* decisions to make *individualized* deviations from the baseline negotiated rate. They do not authorize DOE to make a unilateral decision to wipe out all negotiated rates for all universities. The plain text of 2 C.F.R. § 200.414(c)(3) requires agencies to enact three different

things—"policies, procedures, *and* general decision-making criteria," and then requires agencies to "follow" these tripartite requirements "to seek and justify deviations from negotiated rights."

71.    Here, while the Rate Cap Policy states that it "sets forth [DOE's] policies, procedures, and general decision-making criteria," the Rate Cap Policy establishes no "procedures." A "procedure" is a "series of steps followed in a regular definite order." *Procedure*, M-W.com, https://www.merriam-webster.com/dictionary/procedure (last visited Apr. 14, 2025). A categorical 15% dictate is not a procedure. Nor does the Rate Cap Policy establish "general decision-making criteria." Criteria are "standard[s] on which a judgment or decision may be based." *Criterion*, M-W.com, https://www.merriam-webster.com/dictionary/criterion (last visited Apr. 14, 2025). Again, a categorical 15% dictate is not "general . . . criteria."

72.    Moreover, the plain text of this provision states that DOE *will* follow those policies, procedures, and criteria *to seek and justify* deviations. In other words: first the policies, procedures, and criteria will be enacted, and then DOE will use them to seek and justify deviations from the negotiated baseline. DOE skipped the first step: it never enacted any policies, procedures, or criteria that it would subsequently rely upon to "seek" or "justify" changes to the baseline. It just set rates at 15% for all universities.

73.    Reinforcing the point, Section 200.414(c)(3) authorizes "deviations" from negotiated rates. A "deviation" is a "departure from a standard or norm." *Deviation*, Dictionary.com, https://www.dictionary.com/browse/deviation (last visited Apr. 14, 2025). And authority to provide for "deviations" does not empower DOE to eliminate the standard use of negotiated rates across broad swathes of institutions; rather, negotiated rates must remain the norm, with deviations just narrow exceptions. *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,

512 U.S. 218, 228–29 (1994) (holding that statutory authority to "modify" a requirement "does not contemplate fundamental changes"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (similar).

74.     The Rate Cap Policy also violates Section 200.414(f).  That provision states that recipients that do not have a negotiated indirect cost rate "may elect to charge a de minimis rate of up to 15 percent."  The provision then states that "[r]ecipients and subrecipients are not required to use the de minimis rate."  The Rate Cap Policy violates this provision by "setting a standardized 15 percent indirect cost rate for all grant awards to IHEs."  *Accord* 89 Fed. Reg. 30,046 (April 22, 2024) ("Other sections of the guidance adequately explain that recipients and subrecipients have a right to negotiate a rate, rather than using the de minimis rate.").

### Count II

### Violation of Administrative Procedure Act—Contrary to Law

### (Unlawful Termination of Existing Grants in Violation of 2 C.F.R. 200.340, 200.414(c), and Appendix III)

75.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

76.     The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law.  5 U.S.C. § 706(2)(A).

77.     Under 2 C.F.R. § 200.340(a), agencies may terminate grants on enumerated grounds: "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award," *id.* § 200.340(a)(1); "with the consent of the recipient," *id.* § 200.340(a)(2); or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," *id.* § 200.340(a)(4).

78.     Citing this regulation, the Rate Cap Policy states that DOE will "terminate all grant awards to IHEs that do not conform with" its 15% cap.

79.     None of the enumerated grounds, however, permit agencies to terminate grants on the ground that the agencies would prefer to use a different indirect cost rates.  In particular, while the regulation in some circumstances permits terminations "if an award no longer effectuates the program goals or agency priorities," the Rate Cap Policy does not conclude that any "award[s]" no longer effectuate DOE's priorities.  A desire to use a different indirect cost rate does not mean that the "award" no longer effectuates DOE priorities.

80.     Terminating existing grants based on the Rate Cap Policy would also violate 2 C.F.R. § 200.414(c)(4), which states: "The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e)."  The Federal Register notice promulgating this provision makes clear that any attempt to depart from negotiated rates must first be "established" and then "inclu[ded] . . . in the announcement of funding opportunity."  78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). Moreover, this provision underscores why Section 200.340(a) cannot provide the authority that the Rate Cap Policy claims: On the Rate Cap Policy's reading, this provision's limits would be meaningless.   Agencies could simply terminate existing grants and thereby evade the requirements of Section 200.414(c)(4).

81.     Section C.7.a of Appendix III to Part 200, which provides rules for calculating indirect cost rates, confirms the unlawfulness of the Rate Cap Policy's termination directive.  That provision states in relevant part: "Except as provided in paragraph (c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award.   Award levels for Federal awards may not be adjusted in future years as a

result of changes in negotiated rates." As this language reflects, the general rule is that the government-wide negotiated rate for a particular grantee that is in effect at the beginning of an award applies throughout the life of the award, even if that government-wide negotiated rate is renegotiated by a cognizant agency during the life of the award. The "except[ion]" is when a different rate from the government-wide negotiated rate is set via the procedures in § 200.414(c)(1). Moreover, under Section 200.414(c), a change to the policies, procedures, and criteria governing the justification for deviations—which is what the Rate Cap Policy purports to do—must occur when the grant is being negotiated, not in the middle of an existing grant. Section C.7.a does not authorize a change for awards that DOE has already approved and upon which a grantee has already relied. And Section 200.340(a)'s termination authority cannot be read to render a nullity the protections of Section C.7.a of Appendix III to Part 200.

### Count III

### Violation of Administrative Procedure Act—Contrary to Law

### (Illegal Departure from Cost Recovery Regulations)

82.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

83.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

84.    Federal regulations and decades of Executive Branch practice establish substantive and procedural guidelines governing the recovery of indirect costs, which DOE's Rate Cap Policy blatantly violates.

85.    Substantively, the governing regulations dictate that grantees will recover the actual indirect costs that are reasonable and allocable to federal projects.

a. The bedrock principle is: "The total cost of a Federal award is the sum of the allowable direct and allocable indirect costs minus any applicable credits." 2 C.F.R. § 200.402.

b. The regulations establish detailed guidelines designed to ensure that grantees recover their actual allocable indirect costs. *See generally* 2 C.F.R. § 200.414; *accord* Appendix III.A ("Indirect (F&A) costs are those that are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project, an instructional activity, or any other institutional activity"); *id.* Appendix III.A.2.e.1 ("Indirect (F&A) costs are the broad categories of costs discussed in Section B.1.").

86. By slashing indirect cost rates to 15%, DOE will prevent grantees from recovering their indirect costs.

87. DOE's Rate Cap Policy does not even purport to adhere to the principle that grantees should recover their indirect costs. Instead, it assigns an arbitrary 15% indirect cost recovery rate across all universities simply because DOE has unilaterally decided that universities should be getting less money.

88. Procedurally, federal regulations prescribe a complex process for negotiating an indirect cost recovery rate.

a. Institutions must document and submit costs in painstaking detail to support that process. Subpart E of part 200 of Title 2 "establishes principles for determining allowable costs incurred by recipients and subrecipients under Federal awards." 2 C.F.R. § 200.100(c). 2 C.F.R. § 200.414(e) stipulates that a set of appendices will set forth in detail "[r]equirements for development and submission of indirect cost

rate proposals and cost allocation plans." Those appendices contain "the documentation prepared by a recipient to substantiate its request to establish an indirect cost rate." 2 C.F.R. § 200.1 (definition of "Indirect cost rate proposal"). For universities, Appendix III to Part 200 establishes the criteria for identifying and computing indirect facilities and administration costs for Institutions of Higher Education (IHEs). *Id.* § 200.414(e)(1). The Appendix details the processes for a grant recipient to document a significant range of costs and how those costs should be allocated among multiple government projects.

b. Audits are the mechanism then used to determine what is charged to a federal award. 2 C.F.R. § 200.501(b) requires that a "non-Federal entity that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted in accordance with § 200.514," except if it elects to have a program-specific audit. This audit is performed annually, and it must be conducted in accordance with articulated standards. *See* 2 C.F.R. §§ 200.504, 200.514. An auditor may identify any "questioned cost," which is defined as "an amount, expended or received from a Federal award, that in the auditor's judgment:" (1) "[i]s noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award;" (2) "[a]t the time of the audit, lacked adequate documentation to support compliance;" or (3) "[a]ppeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1 (definition of "Questioned cost"). The results of the audit and any questioned costs are factored into negotiation of indirect cost rates. *See* Appendix III to Part 200.

89.     DOE ignored that detailed process.  Instead, it arbitrarily determined that all universities would recover at a 15% rate, violating the regulations' substantive commands and rendering that entire regulatory process meaningless.

### Count IV

### Violation of the Administrative Procedure Act – Arbitrary and Capricious

90.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

91.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92.     The Rate Cap Policy is arbitrary and capricious for many reasons.

93.     DOE's justification consists of the following: "While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. See 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."

94.     First, this justification is entirely conclusory and violates DOE's obligation "to examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43).  DOE denigrates "indirect cost

payments" as "not for the Department's direct research funding." But DOE ignores that indirect costs are often necessary for DOE's own research to continue: Cutting-edge research, for example, requires physical infrastructure and equipment, ethics review boards, and many other costs that are not traceable to specific grants but are nonetheless essential for the work. DOE also ignores that indirect costs often differ from direct costs only in that they fund *multiple* research projects: For example, if an administrative employee supports three DOE grants, one NIH grant, and one private grant, their salary might be an indirect cost—but it would be essential for the work on DOE's grant, underscoring the irrationality of DOE's suggestion that indirect cost payments are less valuable than direct research funding. Then, DOE avers that it "must ensure it is putting [the American people's funds] to appropriate use on grant programs," without explaining why indirect costs are *not* an appropriate use. Next, DOE states that the Rate Cap Policy will "improve efficiency and curtail costs where appropriate," without explaining how slashing indirect funding will improve efficiency and ignoring that the Rate Cap Policy will cut funding across the board, not just "curtail[ing] costs *where appropriate*." Finally, DOE says that the Rate Cap Policy "seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds," without explaining why maintaining its decades-long approach to indirect costs is inconsistent with its obligation to responsibly manage federal funds.

95. Second, the Rate Cap Policy is arbitrary and capricious because it reflects a new policy resting upon factual findings that contradict those which underlay the prior policy of OMB and DOE and that are also wrong. The prior policy rested on the view that a uniform indirect cost rate was not appropriate, and that negotiated rates should be both institution-specific and—

in most cases—substantially higher.  The Rate Cap Policy provides no explanation for this reversal in course.

96.     Moreover, DOE ignores what Congress itself said about a nearly identical proposal to cap NIH indirect cost rates.  According to the House of Representatives, "[t]he Administration's proposal to drastically reduce and cap reimbursement of facilities and administrative (F&A) costs to research institutions is misguided and would have a devastating impact on biomedical research across the country."  H.R. Rep. No. 115-244, at 50 (2017).  And according to the Senate, "[t]he methodology for negotiating indirect costs has been in place since 1965, and rates have remained largely stable . . . for decades. The Administration's proposal would radically change the nature of the Federal Government's relationship with the research community, abandoning the Government's long-established responsibility for underwriting much of the Nation's research infrastructure, and jeopardizing biomedical research nationwide.  The Committee has not seen any details of the proposal that might explain how it could be accomplished without throwing research programs across the country into disarray."  S. Rep. No. 115-150, at 109 (2017).  What was true of biomedical research is just as true of the research funded by DOE.  And while the appropriations rider was co-extensive with the specific proposal before it (cutting indirect cost rates for NIH grantees), DOE did not so much as consider the *reasons why* Congress concluded that a virtually identical proposed categorical cap would be devasting to research.  Nor did those concerns merely lurk in the Congressional Record: Just a month before the Rate Cap Policy issued, the *NIH* court had described those concerns at length.

97.     Third, the Rate Cap Policy is arbitrary and capricious because it ignores obvious problems with its categorical 15% cap, including how that cap will thwart DOE's stated goals. The press release accompanying Rate Cap Policy says that it "aim[s] at . . . continuing to expand

American innovation and scientific research." But DOE ignores, again, that indirect costs are critical to supporting and maintaining world-class research. Nor does it consider that the across-the-board 15% rate amounts to a decision to fund only part of the costs of research DOE supports, and ultimately amounts simply to a decision to fund less research of particular types—including research that relies heavily on expensive overhead, as cutting-edge research often does. DOE does not explain how the Rate Cap Policy is consistent with its own stated goal of continuing to promote American innovation and cutting edge research.

98.    Fourth, Rate Cap Policy is arbitrary and capricious because DOE fails to explain why its own audits of indirect costs would not accomplish the task of "improv[ing] efficiency and curtail[ing] costs where appropriate." To the contrary, because audits look at specific costs, they can accomplish what DOE's blunderbuss policy cannot—identifying specific costs that can be appropriately curtailed.

99.    Fifth, the Rate Cap Policy is arbitrary and capricious because it ignores the reliance interests of the research institutions receiving federal funding and does not provide an explanation that accounts for those reliance interests. As the press release accompanying the Rate Cap Policy says, "the average rate of indirect costs incurred by grant recipients at colleges and universities is more than 30%." The Rate Cap Policy thus purports to slash indirect cost recovery by at least half—and often much more. With regard to existing grants, the reliance interests are obvious: budgets have already been determined and research benefitting from the funding has already started. But even with respect to new grants, universities have structured their budgetary affairs on the understanding that federal agencies will follow through by paying their legally required cost reimbursement using the longstanding practice of using negotiated indirect costs and rates. Universities have accordingly made costly decisions about long-term investments,

such as what physical infrastructure should be built, in reliance on negotiated rates with federal agencies allowing for the recovery of some such costs via depreciation, as well as the OMB regulations generally requiring agencies to use a negotiated indirect cost rate and permitting deviations from that rate only in narrowly limited circumstances.

100.    Sixth, the Rate Cap Policy is arbitrary and capricious because, without explanation, it imposes its new categorical 15% cap only on universities, and not other DOE grant recipients.  If (counterfactually) this categorical cap improved efficiency or reflected responsible stewardship of federal funds, DOE does not explain why it imposed that policy on only universities.  The press release accompanying the policy states that the average indirect cost rate for universities is "a significantly higher rate than other for profit, non-profit and state and local government grant awardees."  But DOE does not account for the possibility that universities' rates are higher because they engage in a larger proportion of cutting-edge research, which typically has higher indirect costs.  Nor does DOE say what average indirect cost rates are for "for profit, non-profit and state and local government grant awardees" or explain why, whatever those percentages are, those institutions should not be subject to the same 15% cap.

101.    Seventh, the Rate Cap Policy does not explain why the appropriate rate for all university recipients is 15%.  The governing regulations identify this amount as the "de minimis rate."  2 C.F.R. 200.414(f).  A "de minimis rate" does not fit every university recipient.

### Count V

### Violation of Administrative Procedure Act—Contrary to Law

### (Violation of Authorizing Statutes)

1.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

2.      The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A).

3.      DOE awards research grants pursuant to various statutes, and Congress has authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions. Act of Sept. 5, 1962, Pub. L. No. 87-638, 76 Stat. 437, *codified at* 41 U.S.C. § 4708.

4.      The Rate Cap Policy violates these statutes because it does not set a rate for "payment of reimbursable indirect costs" within the meaning of the statute. It simply adopts an arbitrary 15% figure.

5.      As alleged above, moreover, the Rate Cap Policy is likely to have devastating effects across the country, not only on the research institutions themselves but also the many people who depend on the research that will be crippled by the Rate Cap Policy. The Supreme Court has underscored that agencies may not enact sweeping rules of this sort without express congressional authorization. In considering whether agency action is authorized by statute, courts consider whether the "history and breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" counsel in favor of "hesitat[ing] before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). Here, no Act of Congress expressly authorizes DOE to devastate research by enacting a radical change from institution-specific negotiated rates to a single across-the-board rate for all universities. Thus, under the major questions doctrine, DOE cannot impose such a change unilaterally.

6.    Because Congress did not expressly authorize DOE to obliterate the cutting-edge research it has long funded, the Rate Cap Policy is invalid.

**Count VI**

**Violation of Administrative Procedure Act—In Excess of Statutory Authority**

**(Retroactivity)**

102.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

103.    The APA directs courts to hold unlawful and set aside agency actions that are in excess of statutory authority.  5 U.S.C. § 706(2)(C).

104.    "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

105.    The Rate Cap Policy is a retroactive action because it "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with respect to transactions already completed."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

106.    Congress did not authorize DOE to retroactively modify indirect cost rates when it enacted DOE's grantmaking authority, or in any other statute.  Nor can DOE evade this problem by purporting to apply the 15% cap only to new grants while terminating all existing grants with higher caps.  The reduced rate necessarily undermines project budgets that were previously approved and upsets institutions' commitments made in reliance upon those budgets.

107.    Because DOE's retroactive action is in excess of its statutory authority, the Rate Cap Notice is invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.  Vacatur of the Rate Cap Policy;

b.  Declaratory judgment finding the Rate Cap Policy invalid, arbitrary and capricious, and contrary to law;

c.  An injunction preliminarily and permanently prohibiting Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Rate Cap Policy in any form; from otherwise modifying negotiated indirect cost rates except as permitted by statute and by the regulations of OMB; and from terminating any grants pursuant to the Rate Cap Policy or based on a grantee's refusal to accept a indirect cost rate less than their negotiated rate;

d.  An order awarding Plaintiff's costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

e.  Any such further relief as the Court deems equitable, just, and proper.

Dated: April 14, 2025

Respectfully submitted,

JENNER & BLOCK LLP

CLEMENT & MURPHY, PLLC

By: /s/ Shoba Pillay

By: /s/ Paul D. Clement

Shoba Pillay, BBO No. 659739
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Paul D. Clement (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Lauren J. Hartz (*pro hac vice forthcoming*)
Anjali Motgi (*pro hac vice forthcoming*)
Zachary C. Schauf (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
LHartz@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com
*Attorneys for All Plaintiffs*

paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American Universities, Association of Public and Land-grant Universities, and American Council on Education*

---

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ Shoba Pillay
Shoba Pillay, BBO No. 659739
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

# EXHIBIT 1

# POLICY FLASH 2025-22

**DATE**:  April 11, 2025

**TO**:  HCAs/Procurement Directors/Contracting Officers/Grants Officers

**FROM**:  Director
Office of Acquisition Management

**SUBJECT**:  **Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)**

**BACKGROUND:** Pursuant to 5 U.S.C. 553(a)(2), the Department of Energy ("Department") is updating its policy with respect to Department grants awarded to institutions of higher education (IHEs).

Through its grant programs, the Department funds Department-sanctioned research. A portion of the funding goes to "indirect costs", which include both facilities and administration costs. *See* 2 C.F.R. 200.414(a). "Facilities costs" comprise "depreciation on buildings, equipment and capital improvements, and operations and maintenance expenses," while "administration costs" are "general administration and [other] general expenses," like funding for "the director's office, accounting, [and] personnel." *Id.*

While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. *See* 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds.

This memorandum accordingly sets forth the Department's updated policies, procedures, and general decision-making criteria for establishing indirect cost rates when awarding grants to IHEs; these policies, procedures, and criteria are intended to better balance the Department's dual responsibilities to grant recipients and the American people.

The Department is initially taking this action only with respect to IHEs. *See* 2 C.F.R. 200.414(c)(1); *id.* 200.1.

**ESTABLISHING APPROPRIATE INDIRECT COST RATES:**

At present, the Department's indirect cost rate for IHE grants is typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). Though the Department generally must accept this negotiated rate, *see* 2 C.F.R. 200.414(c)(1), it may deviate therefrom for "a class of Federal awards" after implementing and making publicly available "the policies, procedures and general decision-making criteria" it will follow when seeking and justifying deviations. *Id.* 200.414(c)(1), (3). A "class of Federal awards" is defined to include "a group of Federal awards . . . to a specific type of recipient or group of recipients," such as grants to IHEs—the class relevant to this policy update. *Id.* 200.1.

For the reasons set forth in this memorandum, hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs. This is at the high end of the "up to 15 percent" *de minimis* rate permitted by government-wide regulation. *See, e.g.*, 2 C.F.R. 200.414(f). Consistent with this memorandum, the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy. *See* 2 C.F.R. 200.340(a), (b). Recipients subject to termination will receive separate notice and guidance.

All future Department grant awards to IHEs will default to this 15 percent indirect cost rate. This system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people.

Additional information is forthcoming.

This flash will be available online at the following website: http://energy.gov/management/listings/policy-flashes

For DOE questions concerning this policy flash, please email: ihe-icr-response@hq.doe.gov

# EXHIBIT 2

## DECLARATION OF AAU PRESIDENT BARBARA R. SNYDER

I, Barbara R. Snyder, declare as follows:

1.      I am President of the American Association of Universities ("AAU"). I have held that position since October 1, 2020. I make this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order.

2.      I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by AAU personnel and personnel from our member universities and could testify thereto.

3.      Founded in 1900, the AAU is composed of America's leading research universities. AAU's 69 U.S. research universities transform lives through education, research, and innovation. Our member universities earn the majority of competitively awarded federal funding for energy and climate research, which seeks to address national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's leaders and innovators. AAU member universities collectively help shape policy for higher education, science, and innovation; promote best practices in undergraduate and graduate education; and strengthen the contributions of leading research universities to American society. AAU's primary goal is to provide a forum for the development and implementation of institutional and national policies promoting strong programs of academic research and scholarship and undergraduate, graduate, and professional education.

4.      The federal government has selected AAU member universities to conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards from across the federal government, including but not limited to the Department of Energy ("DOE"). AAU member universities each receive significant research funding from DOE grants. Together,

they receive a total of roughly $1.8 billion in DOE research and development expenditures stretching across various fields, from computer and information sciences to engineering, from geosciences to mathematics and statistics. AAU is dedicated to protecting its member universities' ability to conduct research that is supported by DOE grants. To give a sense of scale: DOE's research and development ("R&D") expenditures nationwide total approximately $2.7 billion, meaning that funding to AAU's members makes up about two-thirds of all such expenditures. Relying on awards issued by DOE, AAU member universities work on fundamental research that targets some of the most difficult and pressing scientific problems related to energy, climate, and a host of other fields.

5. AAU member universities include, among others, Cornell University, the University of Illinois Urbana-Champaign, the Massachusetts Institute of Technology, the University of Michigan, Michigan State University, the University of Pennsylvania, Boston University, the California Institute of Technology, the University of Colorado Boulder, Brown University, the University of Wisconsin-Madison, and Duke University. I understand that these AAU members and several others are submitting declarations in this litigation, which provide institution-specific detail on the matters described here.

6. On a typical grant, the funding amounts must cover both direct costs (expenses directly related to the specific grant activity) and indirect costs. Indirect costs cover essential expenses such as facilities, utilities, financial administration, and operations that enable research to flourish safely and responsibly, such as research compliance and safety programs, human and animal research protections, and hazardous waste disposal. *See* Office of Management and Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. §§ 200, *et seq.* (the "Uniform Guidance").

Historically, the federal government has used a narrower definition of direct costs than is typical in foundation-funded research, mostly to streamline budgeting and minimize administrative burdens on the agencies. Significantly reducing the allowable indirect cost percentage without altering the way in which costs are classified as direct or indirect significantly disrupts the financial model that has supported needed research and innovation across the United States for decades.

7.      Although the federal government's portion of funds needed for university research has been declining over time, indirect cost reimbursements are vital to the operation of the nation's federal research system, which includes the sponsored activities aimed at improving energy solutions as well as educating our country's future scientists and innovators, at AAU member universities. Direct costs on DOE awards simply fall short of covering the real, comprehensive cost of sponsored activities, and do not reflect the full facilities and administration costs that AAU member universities must incur in order to be able to perform the research, training, and education that has made our nation the leader in energy and climate research.

8.      On April 11, 2025, DOE issued the guidance "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)" ("DOE Guidance"). The DOE Guidance provides that indirect costs allowed on all future awards to institutions of higher education shall be limited to 15 percent. Further, it provides that DOE will terminate all grant awards to institutions of higher education that "do not conform with this updated policy," indicating an intent to terminate any grant award currently funded at an indirect cost rate higher than 15 percent.

9.      If the DOE Guidance is permitted to remain in effect, it will irreparably harm the energy and climate research ecosystem and research at AAU member universities that drives

economic activity across the country and American competitiveness in improving energy solutions. Such a drastic decrease in allowable indirect costs—especially regarding currently funded awards on which sponsored research activities are in process and for indirect costs that AAU member universities have already budgeted for in the current fiscal year—will immediately impair AAU member universities' ability to conduct sponsored research in compliance with the underlying award agreements and applicable laws. This is not to mention the irreparable harm that *termination* of DOE grant awards to AAU member universities would have.

10.     For example, without continuing indirect cost reimbursement at AAU member universities' negotiated rates, AAU member universities will no longer be able to carry out all the sponsored activities, including supporting the next generation of scientists and properly maintaining facilities and equipment currently in use. AAU member universities do not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for existing awards on an ongoing basis, and will be required to implement layoffs, both for researchers, staff scientists, post-doctoral trainees, research administration officers and other employees of the universities who perform critical but indirect work in support of sponsored activity (such as custodians, security guards, and so forth); and reductions in administrative costs necessary for research services, as well as consider the implications for institutional capacity to enroll current and future doctoral student and support their progression to degree completion. This harm is not limited to monetary damages that can be rectified with a compensatory award. For example, even if the indirect cost rate is increased at a later date, if a research facility must be closed in the interim because its operation and maintenance cannot be funded without interruption, it is often difficult, if not impossible, to reopen such facilities.

11.     AAU member universities necessarily rely on both the direct cost and the

indirect cost portions of funding provided with each specific DOE award in formulating their overall operating budgets in any given year. Many of the AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15 percent, often in the 50-to-60-percent range. Operating budgets rely upon estimates of direct and indirect sponsored funding to plan for annual staffing needs, infrastructure support (*e.g.*, IT networks, regulatory compliance, safety and grant management support), facility building and renovation, and equipment purchases to support a broad range of research activities.

12.     I understand several AAU member universities will explain at greater length in their own declarations the devastating impact the DOE Guidance will have on their programs.

13.     In addition, we have heard from numerous other member universities whose programs will face significant disruption as a result of the DOE Guidance.

    a.  Current DOE funding for Rutgers University, an AAU member university located in New Brunswick, New Jersey, includes 29 active subawards totaling $16.5 million and 22 active awards totaling $15.7 million through February 2026, for a total of $32.2 million. Rutgers currently receives indirect costs at a rate of 57 percent and therefore stands to lose all of this funding if that rate is not reduced to 15 percent. If its rate were reduced to 15 percent, Rutgers would suffer a projected loss of $12.2 million in research funds over the next two years.

    b.  In the last fiscal year, DOE awards to Brandeis University, an AAU member university located in Waltham, Massachusetts, totaled $2.84 million, $728,000 of which were indirect costs, spread across 12 different awards.

Brandeis's indirect cost rate for the fiscal year are 59 percent. If this rate were reduced to 15 percent, Brandeis's indirect cost recovery for the fiscal year would decrease by approximately $480,000. This money goes to fund critical and cutting-edge physics research, such as research on active matter that may lead to new categories of devices mimicking living cells; high-energy physics experiments in collaboration with CERN that may be critical to future competitiveness in the energy economy; and quantum physics research relevant to quantum computing applications. Indirect costs include, for example, the costs of servers and networking equipment in its High Performance Computing Cluster ("HPCC"), used by researchers supported by DOE grants. The funding reduction contemplated by the DOE Guidance would cause Brandeis to have to either close HPCC or operate it at reduced schedules with fewer personnel, seriously hindering the critical work done there related to research computing and computational studies.

c. Washington University, an AAU member university located in St. Louis, Missouri, recently purchased a JEOL JEM-ARM300F2 Atomic Resolution Electron Microscope. This is a uniquely powerful microscope which will enable the study of materials at the atomic scale, including under challenging conditions approximating real-life service. The experiments using this microscope will be invaluable to the design of next-generation energy production and storage systems such as catalysts and batteries, quantum materials and devices necessary to power the future of computing and AI, and sensors for point-of-care medical diagnostics. This highly complex piece of

equipment cost approximately $4 million. Washington University invested in significant renovations of a laboratory to accommodate the needs of this very sensitive instrument. The annual fee for service and maintenance of this microscope costs approximately $200,000 per year and funding required for a research scientist to oversee its operations is approximately $100,000 per year. Washington University relied upon continued DOE funding at the negotiated indirect cost rate in making this commitment and the proposed rate reduction will significantly compromise our ability to support this microscope and the fundamental, ground-breaking research it enables.

d.  At Dartmouth College, an AAU member institution located in Hanover, New Hampshire, approximately $25.5 million in funding is attributable to active awards from DOE received either directly or as a sub-awardee to support critically important research. For example, at Dartmouth's Thayer School of Engineering, DOE funding supports work in areas such as anaerobic biomass ethanol production and photovoltaic cells to increase U.S. energy independence, cost-effective and high-energy density battery systems that would support various industries with less dependence on foreign raw materials, and engineers working to improve energy efficiency in microchips to maintain U.S. competitiveness in this critical area. Dartmouth has already made major investments, and has committed to making similarly significant future investments, to purchase, construct, operate, and maintain purpose-built facilities and highly advanced research equipment in relation to this work. None of this investment would be possible without the ability to recover

a significant portion of these investments from federal agencies like DOE through Dartmouth's specifically negotiated indirect cost rate. For example, in 2022, Dartmouth opened two new research-intensive buildings, including a new Engineering and Computer Science Complex, which houses nearly all of Dartmouth's laboratories with Department of Energy funding and includes a $10 million bioprocessing facility that was specifically fitted for this research. If DOE's proposed 15 percent indirect costs rate cap were allowed to go into effect, Dartmouth would be unable to recover real expenses for the operation and maintenance of these facilities. Dartmouth constructed these facilities specifically to support nationally-important research relevant to the goals of DOE—with the expectation that the long-established and mutually agreed indirect cost rates would apply to current and future grants and contracts from DOE. More specifically, the proposed 15 percent indirect cost rate would reduce Dartmouth's negotiated indirect cost rate by up to three quarters. This reduction would mean fewer resources to support DOE-sponsored research. Dartmouth has also invested significant resources in "start-up" packages for two recent hires who are both engaged in DOE research. These packages represent Dartmouth's commitment of $2.65 million in "start-up" costs, without which the critical and cutting-edge power systems and grid security research conducted by these new faculty members and their laboratories could not be done. These investments, like the others noted, were made in reliance on Dartmouth's understanding that it would receive the full benefit of the indirect cost rate that it negotiated with the

federal government and which DOE now seeks to change suddenly and unilaterally.

14.     One AAU member university which receives about $10 million each year from DOE for indirect costs noted that these costs are used for critical personnel and facilities in support of its DOE mission and would likely not be able to continue this work with a rate cut. For example, it has significant nuclear energy and nonproliferation activities that require significantly higher indirect costs to maintain than would be possible with a 15 percent rate. On the facilities side, it has specialized nuclear-rated facilities, such as glove boxes and manufacturing facilities. On the administration side, it has an Office of Radiological Safety and dedicated and trained personnel to ensure safety and compliance. Both these specialized facilities and dedicated personnel are used to educate the nuclear workforce for the country, and perform critical R&D work, which could not be funded from the university's own budget. The university can currently sustain those programs because their cost is supported by DOE in service of the national interest.  If DOE does not cover those costs, the programs will be unsustainable and they will almost certainly be shut down.

15.     The harmful impact of the new DOE Guidance is not limited to AAU member universities. Many AAU member universities are the largest employers in their local areas. If the lower indirect cost reimbursement rate—or, worse, termination of grant awards— requires layoffs, that loss of employment will be harmful not only to the affected employees and their families, but to the overall economic stability of AAU member universities' hometowns as a whole. An AAU member university may have to reduce the quantity of equipment and labor used to maintain its facilities, lowering the economic activity of the local area and impairing the funding that flows to essential local government services arising

out of that activity.

16.     In addition, the DOE Guidance will undermine the feasibility of many kinds of specialized research that results in scientific breakthroughs that provide significant social and economic value to the country, sometimes opening up entirely new areas of commercial development. The United States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally sponsored research. Additionally, the next generation of scientists, physicians, engineers, and other skilled workers develop their vitally important expertise while learning and working at research institutions such as AAU member universities. The DOE Guidance would drastically reduce the positive impact of this work and the pipeline of educated professionals that United States industry requires to be internationally competitive. Slowdowns or halts in research by AAU member universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening our nation's national security and its economic dominance.

17.     In addition, the DOE Guidance came without appropriate notice of how AAU member universities should implement the new rate requirement. Further, it only noted that recipients who have grant awards "subject to termination will receive separate notice and guidance." Our members have no way of knowing when a termination may come if they fail to reduce their indirect cost rates to 15 percent. It could be in a week; it could be tomorrow. It is impossible to know for how much longer our members will continue receiving funding for indirect costs at current rates, and as a result, it is impossible for them to make financial plans for the coming days, weeks, and months.

18.     If AAU member universities are required to choose between termination and a 15%

indirect cost rate that covers even less of their true costs than their negotiated rates, they will often have to choose termination—as many of these universities will not be able to sustain this research at that rate.

19.     Temporary injunctive relief is vital to protect against these devastating consequences. Even if the DOE Guidance is ultimately rescinded or held invalid, AAU member universities do not have the ability to cover such radical reductions in indirect cost reimbursement during the course of protracted litigation. AAU member universities' existing endowments cannot simply be redirected to pick up these losses. The vast majority of endowed funds are restricted by the terms on which the funds were donated to the AAU member university and cannot legally be used to cover research infrastructure costs. Moreover, an AAU member university may only draw down the portion of the endowment that is unrestricted at a rate that complies with applicable law.

20.     As non-profit institutions, AAU member universities reinvest nearly all of their revenues into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, AAU member universities do not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

21.     Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on AAU member universities, which would in turn force reductions in key investments supporting AAU member universities' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain AAU member universities' academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Washington, DC.

_Barbara R. Snyder_

BARBARA R. SNYDER

# EXHIBIT 3

## DECLARATION OF PETER MCDONOUGH

I, Peter McDonough, declare as follows:

1.       I am Vice President and General Counsel for the American Council on Education ("ACE"), having joined ACE in January 2015.

2.       I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by ACE personnel and personnel from our member universities, and could testify thereto.

3.       Founded in 1918, ACE is a membership organization composed of more than 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S. accredited, degree-granting colleges and universities. Its members educate two out of every three students in all accredited, degree-granting U.S. institutions.

4.       ACE's mission includes collaborating across the higher education sector to design solutions for today's challenges and shape effective public policy. A core reason for the organization's existence is to advocate for public policies that support its members' interests, including their interests in obtaining support for academic research.

5.       ACE has members in all 50 states and the District of Columbia.

6.       Among ACE's more than 1,600 member institutions are the University of Arizona, Boston University, Brandeis, Brown, Cal Tech, Colorado State, Cornell, Duke, the University of Illinois, MIT, the University of Michigan, Michigan State, the University of Nevada-Reno, Princeton, the University of Pennsylvania, the University of Rochester, Rutgers, the University of Utah, and the University of Wisconsin. I understand that some or all of these ACE members may be submitting declarations in this litigation, which provide institution-specific

JA79

detail on the matters described below.

7.      The federal government has selected ACE member colleges and universities to conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards from across the federal government, including the Department of Energy ("DOE").  ACE member colleges and universities receive significant research funding from DOE grants. ACE member institutions rely on these funds to support research that targets some of the most difficult and pressing scientific problems related to energy, nuclear security, artificial intelligence, physics, climate, and many other fields.   This research contributes to critical scientific discovery, improves lives, and adds immeasurably to our national security, welfare and economy.

8.      On April 11, 2025, DOE issued the guidance "Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)" ("DOE Guidance"). The DOE guidance provides that indirect costs allowed on all future awards to institutions of higher education shall be limited to fifteen percent. Further, it provides that DOE "is undertaking action to terminate all grant awards to [institutions of higher education] that do not conform with this updated policy."

9.      If the DOE Guidance is permitted to remain in effect, it will irreparably harm research at ACE member institutions, Americans' interests in the outcomes of that research, and local economic activity.  This research is important.  It includes projects that further America's national security, advance defense technologies, support domestic industries, and promote energy independence. This research drives economic activity across the country and advances American competitiveness by improving energy solutions. The facilities, infrastructure and staff supporting this research that are paid for as indirect costs are essential to the continuation of this

research. The drastic decrease in indirect cost reimbursement announced in the DOE Guidance will immediately impair ACE members' ability to conduct research in compliance with the underlying award agreements and applicable laws, and it will create cascading and longer-term harms as well. This is not to mention the irreparable harm that *termination* of DOE grant awards to ACE member institutions would have.

10.     Without continuing indirect cost reimbursement at ACE member institutions' negotiated rates, ACE member schools will no longer be able to carry out all their sponsored activities, including supporting the next generation of research scientists and properly maintaining facilities and equipment currently in use. At least some work will have to stop. ACE member institutions do not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for a large number of existing awards on an ongoing basis. They will have to implement layoffs, both for researchers, staff scientists, post-doctoral trainees, research administration officers and other employees of the institutions who perform critical but indirect work in support of sponsored activity (such as custodians, security guards, and so forth); and implement reductions in administrative costs that are necessary for research services. Further, the DOE Guidance will have drastic implications for institutional capacity to enroll current and future doctoral students and support their progression to degree completion. This harm is not limited to monetary damages that can be rectified with a compensatory award. For example, even if the indirect cost rate was increased at a later date, if a research facility must be closed in the interim because there is no money to support its operation and maintenance, that harm cannot be undone.

11.     ACE member institutions necessarily rely on both the direct cost and the indirect cost portions of funding provided with each specific DOE award in formulating

their overall operating budgets in any given year. Many ACE members have negotiated an indirect cost rate that is significantly higher than fifteen percent. Operating budgets rely upon estimates of direct and indirect sponsored funding to plan for annual staffing needs, infrastructure support (*e.g.*, IT networks, regulatory compliance, safety and grant management support), facility building and renovation, and equipment purchases to support a broad range of research activities

12.     The declarations submitted by ACE members in this litigation will vividly illustrate the types of harms felt by all ACE members with DOE grant funding.  It bears noting that ACE has many members receiving DOE grant funding and will be harmed if the DOE Guidance goes into effect that are not members of the Association of American Universities ("AAU") or the Association of Public and Land-Grant Universities ("APLU"). For example, Bucknell, Bowie State, BYU, Catholic University, DePaul, and Texas Christian fall into this category.

13.     Moreover, the harmful impact of the DOE Guidance is not limited to colleges and universities. Many of ACE's members  are the largest employers in their local areas. Where the lower indirect cost reimbursement rate requires layoffs, that loss of employment will be harmful not only to the affected employees and their families, but to the overall economic stability of the ACE member institutions' hometowns as a whole.

14.     The DOE Guidance will make it economically unfeasible to carry out much of the sponsored activity that results in scientific breakthroughs that provide significant social and economic value to the country, sometimes opening up entirely new areas of commercial development. The United States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally

sponsored research. Additionally, the next generation of scientists, physicians, engineers, and other skilled workers develop their vitally important expertise while engaging in and learning from research they conduct at ACE member institutions. The DOE Guidance would drastically reduce the positive impact of this work and the pipeline of educated professionals that United States industry requires to be internationally competitive. Slowdowns or halts in research by ACE member colleges and universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening our nation's national security and its economic dominance

15. Temporary injunctive relief is vital to protect against these devastating consequences. Even if the DOE Guidance is ultimately rescinded or held invalid, nothing known to me or my colleagues at ACE suggests that our affected members will have the ability to cover such radical reductions in indirect cost reimbursement during the course of protracted litigation. Even ACE members with significant endowments do not have the ability simply to use those funds to make up these losses. For example, my long and deep experience regarding endowed funds informs my certainty that the vast majority of our members' endowed funds are restricted by the terms on which the funds were donated, and they cannot legally be redirected to cover research infrastructure costs. Moreover, an ACE member institution may only draw down the portion of the endowment that is unrestricted at a rate that complies with applicable law.

16. As non-profit institutions, ACE member institutions reinvest nearly all of their revenues into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, ACE member institutions do not generate significant surpluses that could be redirected without impacting core academic

priorities such as educational programs and financial aid support for students.

17.    Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on ACE member institutions, which would in turn force reductions in key investments supporting ACE members' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain ACE member institutions' academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 13, 2025                                        _____
                                                            Peter G. McDonough

# EXHIBIT 4

## DECLARATION OF MARK BECKER

I, Mark Becker, declare as follows:

1.      I am the President of the Association of Public & Land-grant Universities ("APLU"). I have held that position since September 2022. I previously served as a member of APLU's Board of Directors and as Chair of the Board for the Coalition of Urban Serving Universities. Prior to leading APLU, I spent more than three decades at the different types of universities that comprise APLU's membership, including as a post-doctoral fellow, professor, dean, provost, and university president. I make this declaration in support of Plaintiffs' Complaint in this matter and the forthcoming Emergency Motion for a Temporary Restraining Order.

2.      As President of APLU, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by APLU personnel or personnel of our members, and could testify thereto.

3.      Founded in 1887, APLU is a membership organization that fosters a community of university leaders collectively working to advance the mission of public research universities. Its U.S. membership consists of more than 230 public research universities, land-grant institutions, state university systems, and affiliated organizations spanning across all 50 U.S. states, the District of Columbia, and six U.S. territories. Our members include universities ranging from rural to urban institutions, and from emerging research institutions to the most highly intensive centers of academic research. APLU and its members collectively focus on increasing student success and workforce readiness, promoting pathbreaking scientific research, and bolstering economic and community engagement.

4.      In particular, APLU supports a community of public research university leaders to address the challenges facing their communities, states, country, and world. APLU advocates for "public impact research," a broad label used to describe how university research positively impacts

1

society, and it strives to help university leaders emphasize the value of collaborative research with communities. APLU's member institutions, in turn, are on the front lines seeking solutions to the challenges and threats facing society.

5.      The federal government has selected APLU member institutions to conduct a wide variety of vital research projects on behalf of American citizens, funded in part by agency awards from across the federal government, including but not limited to the U.S. Department of Energy (DOE). For example, in fiscal year 2022, 188 APLU member institutions received more than $1.9 billion in research grant funding from DOE. In working with universities, the federal government has an efficient and cost-effective partner for conducting the research it funds on behalf of the American people.

6.      APLU member institutions rely on federal support from DOE, the federal government's largest funder of the physical sciences research, to enhance groundbreaking scientific discoveries; advance key emerging technologies such as quantum science, artificial intelligence (AI), and biotechnology; advance energy technologies required for the United States to achieve scientific dominance; and maintain the highly skilled science and technology workforce that is essential for the United States to compete globally. DOE supported researchers have been integral to the development of countless innovative technologies, including imaging technologies like MRI machines and PET scans; material sciences like nanotechnology and composite materials for military hardware and motor vehicles; energy sources and storage like biofuels, newer and safer nuclear reactor designs, electric vehicle battery technology; and advances in biotechnology like improved genome sequencing. As competition with China heightens in these critical and emerging technology sectors, the United States will be ill-equipped to compete if university researchers are sidelined due to the indirect cost cuts.

2

7.     APLU member universities include, among many others, the University of Nevada Reno ("UNR"), the University of Colorado Boulder ("CU Boulder"), and Cornell University. I understand that these APLU members are submitting declarations in this litigation, which provide institution-specific detail on the matters described here.

8.     Research funded by DOE at APLU member universities has a direct impact on critical research that supports the United States' energy independence, global competitiveness, national security, public safety, and industrial capacity.

9.     On a typical DOE grant, the funding amount must cover both "direct costs," which are expenses directly related to the specific grant activity, and "indirect costs," which cover essential overhead expenses such as facilities, equipment, utilities, support staff, and financial administration. Indirect costs also include operations that allow research to proceed safely and responsibly, such as proper hazardous waste disposal and compliance with government regulations regarding animal and human subject safety. Indirect cost reimbursements are vital to the operation of the federally funded research system, which includes the DOE-sponsored activities conducted at APLU member institutions. Direct allocable costs on DOE awards fall well short of covering the real, comprehensive cost of sponsored research, as they do not reflect the full facilities and administration costs that APLU member institutions must incur in order to be able to perform the work.

3

11.    The DOE policy creates an immediate financial emergency for many APLU member institutions that rely on DOE funding, impacting institutions both small and large. If the policy is permitted to remain in effect, it will irreparably harm research at APLU member institutions—research that directly benefits society and American competitiveness. Such a dramatic reduction in allowable indirect costs on three days' notice— especially for ongoing research activities that APLU member institutions have already budgeted for in their current fiscal year—will immediately impair the universities' ability to conduct sponsored research in compliance with the underlying award agreements and all applicable laws.

12.    Specifically, a dramatically reduced indirect cost rate will lead to cuts in the operating budget for personnel who support the research enterprise both directly and indirectly, including research staff, research administration officers, security, technical maintenance, financial staff, and janitorial staff. It will also have harmful impacts on lab maintenance, library operations, IT operations, the purchase and renovation of specialized facilities, and utilities. Moreover, this harm is not limited to monetary damages that can be rectified with a compensatory award later on. Even if the indirect cost rate were increased at a later date, if a research facility must be closed in the interim because its operation and maintenance can no longer be supported, or if key personnel or materials are lost, then the APLU member institution would immediately lose its ongoing investment in that research infrastructure and likely have a diminished ability to restart or undertake that research in the future.

13.    Reliance interests are also at stake. For each DOE award, APLU member institutions necessarily rely on both the direct cost and indirect cost allocations in formulating their overall operating budgets for any given year. These allocations are used to plan for annual staffing needs, infrastructure support (e.g., IT networks, regulatory compliance, and grant management

4

support), facility building and renovation. and equipment purchases to support a broad range of overlapping research activities.

14.     I understand several APLU member universities will explain in their own declarations the devastating harm the reduction in indirect cost funding will cause them. But I offer a few examples to illustrate the crisis our members are facing.

15.     As set forth more fully in its own declaration, UNR's active DOE grants total approximately $43 million, including over $9 million in indirect costs. These funds support critical energy and environmental research with important benefits for national security and public safety, including research to ensure safe nuclear storage, ready access to domestically secure clean energy sources, and effective nuclear stockpile management. The facilities at which this research takes place and the equipment used require significant expenditures that will not be possible at an indirect cost rate of 15 percent—less than half UNR's current indirect cost rate of 47 percent—which would reduce UNR's anticipated annual indirect cost recovery by $1.8 million. As a result, UNR would suffer support staffing reductions across the board from day one. Due to the nature of UNR's DOE-funded research, especially its nuclear research, the loss of technical support staff will pose serious regulatory, environmental, and safety concerns that cannot be remedied after the fact. UNR cannot solve this funding problem itself in the interim, because it lacks a ready source of sufficient funding that is not already committed to other mission-critical purposes.

16.     In addition, as set forth more fully in its own declaration, CU Boulder receives significant annual funding from DOE, with such funding projected at over $40 million in direct costs and over $14 million in indirect costs annually for the next five years. These funds support renewable energy research critical to the United States' energy security; quantum research with applications in computing, energy conversion, space science, and national security; and research

5

about how to secure the national electric grid, among others. The facilities at which this research takes place and the equipment used require significant expenditures that will not be possible at an indirect cost rate of 15 percent—less than one-third CU Boulder's current indirect cost rate of 56.5 percent—which would reduce CU Boulder's projected indirect cost recovery by over $8 million. As a result, CU Boulder would have to eliminate approximately 25 critical staff positions. This and other operational challenges will cause disruptions to research that, even if only temporary, will contribute to the United States falling behind foreign adversaries and hinder our energy, national, and economic security. CU Boulder cannot solve this funding problem itself in the interim, because it lacks a ready source of sufficient funding that is not already committed to other mission-critical purposes.

17.         As set forth more fully in its own declaration, Cornell University also receives significant funding from DOE, with such funding for Fiscal Year 2024 totaling approximately $30 million, including about $8.5 million in indirect costs, across more than 110 awards. These funds go to critical energy research projects (including by faculty who have won awards from DOE itself), such as alkaline-based energy research that will reduce reliance on precious metals whose supply is controlled by foreign powers; research on alternative materials for batteries that are more readily available domestically; and research on more material- and energy-efficient manufacturing technologies for heavy industry, among **others.** The facilities at which this research takes place and the equipment used require significant expenditures that will not be possible at an indirect cost rate of 15 percent—less than a quarter of Cornell's current indirect cost rate of 64 percent—which would reduce Cornell's indirect cost recovery by approximately $8 million in a typical fiscal year. Cornell would have to consider laying off not only support staff, but also research staff, to bridge the gap. A sudden loss in funding would increase the time for students to complete their degrees

6

and in some instances, discourage them from completing their research altogether. Cornell cannot solve this funding problem itself in the interim because it lacks a ready source of sufficient funding that is not already committed to other mission-critical purposes, and New York state law limits the extent to which universities may draw down on their endowments.

18. The devastating impact of the DOE policy is not limited to APLU member institutions. Many APLU member institutions are the largest employers in their states and local regions. If the reduction in the indirect cost rate requires personnel cuts, that loss of employment will not only harm the affected employees and their families, but also the overall economic stability of APLU member institutions' local communities. The APLU member institution may also have to reduce the amount of equipment, labor, and local services used to maintain its facilities, lowering the overall economic activity in the local area.

19. More broadly, the DOE policy will undermine the continuity and feasibility of sponsored research that results in breakthroughs sought by DOE, which provide significant social and economic value to the nation. The United States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally sponsored research. In addition, the next generation of scientists, engineers, and other skilled workers develop their critical expertise while learning and working at research universities such as APLU member institutions. The DOE policy would drastically reduce the positive impact of this work, as well as the pipeline of educated professionals that U.S. industry relies on to be internationally competitive. Slowdowns or halts in DOE funded research by APLU member institutions will allow competitor nations, who are properly maintaining their investments in research, to surpass the United States on this front, threatening American national security and economic dominance.

7

20.     Temporary injunctive relief is needed to protect against these disastrous consequences. Even if the DOE policy is ultimately rescinded or held to be invalid, APLU member institutions do not have the ability to cover such a dramatic reduction in indirect cost recovery during the course of protracted litigation. Nor can APLU member institutions' endowments be simply redirected to make up for these losses. Endowments are an important institutional asset that provide universities with stability over time, allowing campus leaders to think long-term about how best to meet the needs of their communities. Endowments are also complex assets with many legal requirements stipulating ho'w they can be used. And not all universities have large endowments, or any endowment at all—in fact, of the public institutions that have endowments, nearly half are valued at less than $50 million. Even for the public universities with the largest endowments, they are still relatively modest after taking into account the student populations of those institutions. It is important to consider an institution's endowment size relative to the number of students that institution serves—individual public universities can serve tens of thousands of students, and the largest public university systems serve hundreds of thousands of students.

21.     While there is some variation among states and institutions, public universities typically receive substantial operational funding from their states for education, but they rely largely on the federal government for support for scientific research. Public universities cannot expect states will fill the substantial financial gaps created by DOE's reductions. Further, many public universities foresee substantial financial challenges ahead given the potential for an economic downturn combined with national demographic trends that create substantial enrollment challenges for many state institutions.

22.     As non-profit institutions, APLU member institutions reinvest nearly all of their revenues into mission-critical activities, leaving little margin to absorb unexpected funding gaps.

8

In other words, unlike for-profit organizations, APLU member institutions do not generate significant financial surpluses that can be redirected without impacting core academic priorities such as education programs and financial aid support for students.

23.  Absorbing the cost of a lower indirect cost rate, even if it were possible, would also create long-term budget pressures on APLU member institutions—which would in turn force reductions in key investments supporting APLU member institutions' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain APLU member universities' academic excellence.

24.  If APLU member institutions must choose between award termination and maintaining an award at a 15% indirect cost rate that does not cover their true costs, they will often have to choose termination—as many institutions will not be able to sustain the research discussed here at that rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Washington, D.C.

_____

Mark Becker, Ph.D.

9

# EXHIBIT 5

## <u>DECLARATION OF KAVITA BALA, PH.D.</u>

I, Kavita Bala, Ph.D., declare as follows:

1.　　I have been the Provost of Cornell University ("Cornell" or the "University") since January 1, 2025. I previously served as the inaugural Dean of the Cornell Ann S. Bowers College of Computing and Information Science. I am a computer scientist specializing in research on artificial intelligence, computer vision, and computer graphics. I am a Fellow of the Association for Computing Machinery (ACM), a Fellow of the Special Interest Group on Computer Graphics (SIGGRAPH) Academy, a recipient of the SIGGRAPH Computer Graphics Achievement Award, and a former Editor-in-Chief of the journal ACM Transactions on Computer Graphics. I am the author of more than 100 peer-reviewed publications. I make this declaration in support of the Plaintiffs' Complaint in this matter and the forthcoming Emergency Motion for a Temporary Restraining Order.

2.　　I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Cornell personnel, and could testify thereto.

3.　　In my role, I am the University's chief academic officer and chief budget officer and serve as the Cornell President's first deputy officer. I oversee all academic programs and units of the University, other than those reporting to the Provost for Medical Affairs.

4.　　The federal government has selected Cornell to conduct a wide variety of vital research on behalf of United States citizens, funded in part by agency awards, cooperative agreements, and contracts from across the federal government, including but not limited to the Department of Energy ("DOE"). For Cornell's fiscal year 2024 (July 1, 2023 to June 30, 2024), Cornell expended approximately $30,000,000 on more than 110 awards from DOE. On those

1

agreements, the University's indirect cost rate was as published and negotiated with the federal government, allowing Cornell to recover approximately $8,500,000 in reimbursement for those costs from DOE. This cost recovery is key to the successful conduct of the research described below. Decreasing this cost recovery would delay progress for all awards and may result in failure to meet milestones for many. For Cornell's fiscal year 2025 (July 1, 2024 to June 30, 2025), Cornell holds more than 130 awards from DOE. The DOE awards cover activities across Cornell's different locations, including at its primary campus in Ithaca, New York.

5.      Cornell's work in fundamental research on sponsored awards, cooperative agreements, and contracts issued by DOE adds immeasurably to our economy and scientific understanding, including discoveries that support manufacturing and industrial efforts vital to national security, American manufacturing, economic competitiveness, and progress toward energy independence.

6.      Cornell has produced award-winning work as a result of the vital research efforts that DOE selected the University to perform. For example, in 2024 DOE itself named Héctor D. Abruña, Ph.D., the Émile M. Chamot Professor in the Department of Chemistry and Chemical Biology at Cornell, an Enrico Fermi Presidential Award Laureate for "revolutionizing the fundamental understanding of electroanalytical chemistry and innovating characterization for development of batteries, fuel cells, and energy materials that have led to advancements for the electrical power grid and energy transformation and creation" (https://science.osti.gov/fermi/Award-Laureates/2020s/2024). Dr. Abruña currently holds a roughly $21,000,000 multiyear DOE grant for his Center for Alkaline-Based Energy Solutions (CABES). CABES is a DOE-supported Energy Frontier Research Center that seeks to advance the scientific understanding of the fundamental factors governing electrocatalysis and electrochemical

2

JA97

energy conversion in alkaline media. It is establishing the knowledge base that will enable the use and deployment of cost-effective and high-performance materials in energy conversion technologies, based on "first row" transition metals while eliminating the use of expensive "precious metals," whose supply is controlled by foreign countries that have a contentious relationship to the United States. These studies have the potential to advance numerous technologies of national interest including defense, transportation, synthetic fuels, upgrading of oil and biomass, metals production, ammonia generation, distributed power, gas infrastructure, and numerous other sectors of the economy. This work for DOE is dependent on access to state-of-the-art instrumentation technology supported in part by indirect costs received through Dr. Abruña's DOE award, including: (i) scanning electron microscopes (SEMs) with energy dispersive spectroscopy (EDS); (ii) scanning transmission electron microscopes (STEMs) with EELS (electron energy loss spectroscopy) and 4-D STEM capabilities; (iii) x-ray synchrotrons, including the Cornell High Energy Synchrotron Source, APS (advanced photon source), NSLS (National Synchrotron Light Source), and ALS (Advanced Light Source); and (iv) advanced characterization techniques including X-ray diffraction, ICP-MS (inductively coupled plasma – mass spectrometry), NMR (nuclear magnetic resonance), TGA (thermogravimetric analysis), DSC (differential scanning calorimetry) and others. The proposed reduction in the indirect cost recovery rate to 15% would result in extraordinary, irreversible, and irrecoverable damage to DOE's and CABES' mutual efforts and objectives. The DOE award provides funding for the efforts of numerous staff and students on this project, and the work funded by the award has already provided critical insights into energy storage, advancing national goals towards energy independence.

7. Dr. Lynden A. Archer, the Joseph Silbert Dean of Engineering and the James A. Friend Family Distinguished Progressor of Engineering, has two active DOE awards. One is to

develop novel metal alloys and a process for coating them uniformly on the interior wall of steel vessels to dramatically reduce the cost of nuclear fusion reactors and as a result increase the potential for United States energy independence. The second seeks to develop rechargeable batteries based on abundant metals such as aluminum and zinc, which will simultaneously eliminate United States dependence on lithium-ion batteries produced in other countries for a range of uses, and reduce the cost of battery storage for power back-up and transportation. Reimbursement for indirect costs associated with Dean Archer's DOE grants are crucial to the success of these projects, as they support the operation of the Cornell Center for Materials Research, which operates shared facilities that are necessary for this research to move forward.

8.    DOE also supports the Sustainable Energy and Resource Recovery Group at Cornell, led by Greeshma Gadikota, Ph.D., Associate Professor and Croll Sesquicentennial Fellow. This group develops novel technologies for the recovery of energy critical and relevant metals and materials, material- and energy-efficient production of iron and steel, cement with inherent management and use of emissions, and a wide range of energy carriers (e.g., hydrogen, ammonia) for the manufacturing, energy and environmental security of the United States. These efforts are crucial for enabling energy and resource independence of the United States and for training the next generation workforce for advancing domestic energy independence and security. On this project, Cornell works with more than 30 industrial partners in heavy industry (e.g., cement, iron and steel, mining, and energy) to advance energy, resource, and environmental security of the United States. This work requires access to extensive laboratory capabilities with advanced characterization, and sophisticated reactor systems which can be used to demonstrate the feasibility of implementing technologies at the scale needed for domestic energy and resource independence.

JA99

9.    DOE currently funds three different research projects by Dr. Anna Scaglione, the Stephen M. Ross/Related Companies Professor Chair in the Electrical and Computer Engineering Department at Cornell Tech. Her work focuses on enhancing grid resilience through advanced analytics and artificial intelligence: reducing outages by predicting and mitigating weather-driven outages induced by vegetation; detecting and responding to cyberattacks on distributed energy resources through reinforcement learning agents; and enabling privacy-preserving data sharing to support collective cybersecurity defense without compromising confidentiality. These projects require AI algorithms training and validation that must rely on a shared computing resource developed and maintained by Cornell's Information Technology Service Group, which is supported by the indirect costs on this funded research work. The G2 cluster supports both a general-purpose (public) queue and a preemptible private queue. The latter is dedicated to research groups that have allocated budget toward specific partitions of the cluster, which include access to both GPU and CPU resources.

10.    Just a handful of the other awards that DOE has selected Cornell to perform work on include research on: plasma physics research to control fusion and maintain safety and security of nuclear weapons; conversion of cheap carbon dioxide or methane to produce chemical fuels for economic competitiveness in the United States chemical industry; circuit design for artificial intelligence, high performance computing, and quantum technology; better materials for stealth and camouflage technologies; recovery/extraction of rare earth minerals; development of biodegradable plastics that disappear from the environment; simulation tools to make fusion energy a practical reality; clarifying drought risks impacting agriculture in the Western United States; and the contribution of urban land-use development and changes to flood risks in Philadelphia, and the extent to which zoning or other urban development policies can exacerbate

**JA100**

or ameliorate these risks. All of these research projects rely on resources and services that are only available because they are supported, in part, by the indirect cost portions of the DOE awards.

11.     In a typical award, the funding amounts must cover both direct costs (expenses directly related to the specific grant activity) and indirect costs. Indirect costs cover essential expenses such as facilities, utilities, financial administration, and operations that enable research to flourish safely and responsibly, such as research compliance and safety programs, and hazardous waste disposal. *See* Office of Management and Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. §§ 200, *et seq.* (the "Uniform Guidance"). Particularly for the scientific, energy-related, and highly technological work sponsored by the DOE, the need to pay for large computer and science lab start-up and maintenance costs and equipment purchases, information technology and other computer-related services, and research compliance and safety programs, such as hazardous waste disposal and ensuring safety in the use of ionizing radiation and radioactive isotopes, mean that these indirect costs are both considerable and essential for work to continue. Historically, the federal government has used a narrower definition of direct costs than is typical in foundation-funded research, mostly to streamline budgeting and minimize administrative burdens on the agencies. Significantly reducing the allowable indirect cost percentage without altering the way in which costs are classified as direct or indirect significantly disrupts the financial model that has supported needed research and innovation across the United States for decades. As detailed below, changing the funding model would jeopardize the work that Cornell is carrying out for DOE that is having a major, positive impact on the security of the United States and on how the country can best use available resources for energy independence.

6

**JA101**

12.     One example of the type of specialized equipment required for several of the research projects supported by DOE is the Cornell Laboratory for Accelerator-based ScienceS and Education (CLASSE), part of the Cornell High Energy Synchrotron Source. CLASSE operates at the forefront of scientific research, using cutting-edge technologies and techniques involving X-rays and high energy electrons and proton beams to explore the frontiers of physics, chemistry, and material science.

13.     As required by the Uniform Guidance, Cornell has negotiated an indirect cost rate with the federal government of up to 64% of modified total direct costs for its Ithaca campus.

14.     Although the federal government's portion of funds needed for university research has been declining over time, indirect cost reimbursements are vital to the operation of the nation's federal research system, which includes the sponsored activities conducted at Cornell. Direct costs on DOE awards simply fall well short of covering the real, comprehensive cost of sponsored activities including research, and do not reflect the full facilities and administration costs that Cornell must incur in order to be able to perform the work.

15.     As noted above, for Cornell's fiscal year 2024 (July 1, 2023 to June 30, 2024), Cornell expended approximately $30,000,000 on more than 110 awards from DOE. On those grants, Cornell recovered approximately $8,500,000 in reimbursement for indirect costs from DOE. Accordingly, the reimbursement of these indirect and vital costs for safe and responsible DOE-sponsored activities represented approximately 29% of the total cost of those DOE-sponsored activities. Cornell's ability to conduct DOE-sponsored research during its fiscal year 2025 (July 1, 2024 to June 30, 2025) under its more than 130 awards from DOE would be irreparably harmed by an immediate reduction in the committed indirect cost reimbursement by DOE, estimated as a shortfall of approximately $8,000,000 in a typical fiscal year.

16.     On April 11, 2025, DOE issued Policy Flash 2025-22, "Adjusting Department of Energy Grant Policy for Institutions of Higher Education ('IHE')" ("DOE Policy Flash"). The DOE Policy Flash provides that effective April 11, 2025, indirect costs allowed on all future awards to IHEs will be limited to fifteen percent, and that DOE will also seek "to terminate all grant awards to IHEs that do not conform with this updated policy."

17.     If DOE's Policy Flash is permitted to remain in effect, it will irreparably harm research at Cornell that directly benefits American scientific supremacy, competitiveness, and our progress towards energy independence. Such a significant decrease in allowable indirect costs on minimal notice—especially with regard to the threat of termination of currently funded awards on which sponsored research activities are in process and for indirect costs that Cornell has already budgeted for in its current and upcoming fiscal years—will immediately impair the University's ability to conduct sponsored research in compliance with the underlying award agreements and applicable laws regarding research safety and compliance.

18.     For example, without continuing indirect cost reimbursement at Cornell's negotiated rates, Cornell would no longer be able to carry out all of the sponsored activities and properly maintain the facilities and equipment currently in use, jeopardizing the current and future conduct of the DOE-supported projects. The University does not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for existing awards on an ongoing basis, and would be required to consider layoffs, both for research staff and research administration officers and other employees of the university who perform critical but indirect work in support of sponsored activity, and reductions in administrative costs necessary for research services. This harm is not limited to monetary damages that can be rectified with a compensatory award. The infrastructure harm that would be associated with a sudden loss of support would

8

**JA103**

negatively impact the training environment for the University's students and post-graduate trainees who are the future scientists for the United States. Loss of support would at a minimum increase time for them to complete their degrees, and for some, would require that they find new research mentors and abandon their projects. For example, even if the indirect cost rate is increased at a later date, if a research facility must be closed in the interim because its operation and maintenance can no longer be supported, Cornell will immediately lose its investment in that infrastructure and have a diminished ability to undertake that research in the future, even if the DOE Policy Flash were rescinded or invalidated. Further, Cornell may no longer have the key personnel or materials needed to restart or carry out certain sponsored activities.

19.     It will also adversely, and irreversibly, affect the training of the next generation of energy scientists and technologists, critical to national needs and energy security. In particular, we train scientists to work in collaborative, team-based environments which mirror how organizations function beyond academia. These programs increase productivity and flexibility of the nation's workforce, enabling them to excel in private industry across multiple sectors of the economy.

20.     Cornell necessarily relies on both the direct cost and the indirect cost portions of funding provided with each specific DOE award in formulating its overall operating budget in any given year. Operating budgets rely upon estimates of direct and indirect sponsored funding to plan for annual staffing needs, infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), facility building and renovation, and equipment purchases to support a broad range of overlapping research activities.

21.     In addition, the DOE Policy Flash will undermine the feasibility of sponsored activity that results in scientific breakthroughs that provide significant social and economic value to the country, sometimes opening up entirely new areas of commercial development. The United

States is a stronger, more secure, and more economically vibrant country as a result of the collective benefits arising from federally sponsored research. Additionally, the next generation of scientists, physicians, engineers, and other skilled workers develop their vitally important expertise while learning and working at research institutions such as Cornell. The DOE Policy Flash would significantly reduce the positive impact of this work and the pipeline of educated professionals that United States industry requires to be internationally competitive. Slowdowns or halts in research by Cornell and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening our nation's national security and its economic dominance.

22.     Temporary injunctive relief is vital to protect against these harmful consequences. Even if the DOE Policy Flash is ultimately rescinded or held invalid, Cornell does not have the ability to cover this reduction in indirect cost reimbursement during the course of protracted litigation. Cornell's existing endowment cannot simply be redirected to pick up these losses. The vast majority of endowed funds are restricted by the terms on which the funds were donated to the University and cannot legally be used to cover research infrastructure costs. Moreover, Cornell may only draw down the portion of the endowment that is unrestricted at a rate that complies with New York State law.

23.     As a non-profit institution, Cornell reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, Cornell does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

24.    Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on Cornell—which would in turn force reductions in key investments supporting Cornell's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Cornell's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: Ithaca, New York
   April 13, 2025       KAVITA BALA, PH.D.

11

**JA106**

# EXHIBIT 6

## DECLARATION OF ROBERT J. JONES

I, Dr. Robert J. Jones, declare as follows:

1.     I am the Chancellor at the University of Illinois Urbana-Champaign (the "University") in Urbana-Champaign, Illinois. I have held that position since September 26, 2016. I am also a vice president of the University of Illinois System. Before joining the University, I served as president of the State University of New York at Albany for approximately three years and nine months from 2013 to 2016.

2.     As Chancellor at the University, I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by University personnel, and could testify thereto.

3.     The University of Illinois Urbana-Champaign is a university within the University of Illinois System, which is overseen by the Board of Trustees of the University of Illinois. The Board of Trustees is a body corporate and politic established by the Illinois General Assembly (110 ILCS 305).

4.     The University receives substantial annual funding from the Department of Energy ("DOE"). In Fiscal Year 2024 (July 1, 2023 – June 30, 2024), the University had 200 unique Principal Investigators ("PIs") involved in DOE funding. The University has 123 active awards with DOE.

5.     The funding the University receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on. For example:

a.  The University's Materials Research Laboratory engages in research activities of critical importance to the United States, including its national security, clean energy, and technological advancements. For example, the University's

Materials Research Laboratory conducts research on radiation-resistant materials, nuclear and hydrogen energy, pathways to convert coal and iron ore to high-value materials, critical minerals, materials for quantum computing, quantum information science and technology, materials separation, and advanced sensors.

b. The University's Center for Exascale-enabled Scramjet Design develops new ways to numerically simulate the extreme conditions of complex multi-physics systems by leveraging the most advanced supercomputers in the world. The research helps facilitate physics-based predictions of advanced weapons to keep Americans more secure and trains engineers and computer scientists on methods to design advanced systems, including advanced chips and computer systems.

c. The University's project "Multi-Metalloporphyrin Synthetic Polymers for Long-Range Charge Transport" is in its final phase of completing critical experiments and disseminating findings on materials for soft electronics used in robotics, energy storage, and solar energy. The research trains the next generation in synthesis, computation, and nanoscale characterization of soft electronics—an area vital to national priorities in robotics, energy storage, and light harvesting.

d. The University's Center for Advanced Bioenergy and Bioproducts Innovation ("CABBI") is developing the scientific knowledge and technological innovations needed for growth and resilience of the United States bioeconomy. By re-designing crops, microbes, and agricultural production systems, CABBI

is equipping farmers and industry to provide domestic sources of liquid biofuels, platform chemicals, and diverse bioproducts that can reduce reliance on imported goods and materials. For example, CABBI scientists recently developed technology to more cheaply convert Midwest crops into 3-hydroxypropionate, a chemical with a $15 billion market value that can contribute to manufacture of household goods, medical devices, packaging, textiles, adhesives, and paints. CABBI is one of four DOE-funded Bioenergy Research Centers, which together have produced more than 5,000 research publications and more than 1,000 invention disclosures.

e.  The Energy Frontier Research Center for Regenerative Manufacturing of Thermoset Polymers develops transformative manufacturing strategies for thermoset polymers and composites, which are critical for applications in energy production, transportation, national defense, and space structures. This research tracks stability and performance of materials over multiple manufacturing cycles.

f.  The Prairie Research Institute ("PRI") Illinois Sustainable Technology Center is engaged in critical research efforts for improved electrical transmission capabilities for electricity in Montana and North Dakota. It has also worked with Public Utilities Commissions and Tribal Nations to implement technologies that will unleash new electrical generating capabilities in the region that will enable the location of data centers.

g.  The project "Immersed Boundary Methods for Modeling of Complex Geometry: A Leap Forward in Multiscale Modeling using NekRS" in the

Department of Nuclear, Plasma, and Radiological Engineering capitalizes on the merger of two advanced technologies—high-end scanning and massive parallel computing—to develop numerical method, integration algorithm, and computer code for immersed boundary analysis. This work seeks to significantly reduce the overhead associated with mesh generation around complex geometric shapes typically encountered in nuclear reactor applications. This work is conducted in collaboration with researchers at Argonne National Laboratory.

6.  Indirect costs are essential for supporting this research. DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize each of the research projects described in Paragraph 5.

7.  Indirect costs include constructing and maintaining state-of-the-art facilities required to meet the current technical requirements of advanced research, as well as the procurement and maintenance of equipment necessary to conduct such research. Without this equipment, the research cannot be conducted.

8.  For example, with respect to some of the research initiatives described in Paragraph 5:

> a.  The University's Materials Research Laboratory utilizes world-class facilities that include supercomputers, sophisticated instrumentation such as electron microscopes and an ion beam accelerator, and research laboratories with tight environmental and safety controls.

> b.  The project "Multi-Metalloporphyrin Synthetic Polymers for Long-Range Charge Transport" leverages shared instrumentation and expert staff across the

School of Chemical Sciences and the Materials Research Laboratory. Loss of this infrastructure would immediately interrupt experiments, terminate student and postdoctoral work, and dismantle collaborations with critical partners like Argonne National Laboratory.

c.  The University's Energy Frontier Research Center for Regenerative Manufacturing of Thermoset Polymers includes a unique robotic laboratory to generate a comprehensive database that supports AI-driven discovery of new materials. Loss of funding and overhead would make it impossible to maintain this unique facility, resulting in halting of the database for future endeavors and causing significant loss of competitiveness for U.S. manufacturing.

9.  Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at the University. Planned construction, facility maintenance, and other infrastructure activities supporting the critical research and innovation described herein would be at risk.

10.  In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These mandates serve many important functions, including facilitating research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing technologies or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

11.     Recovery of the University's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

12.     The impact of a reduction in the indirect cost rate would be devastating.  In Fiscal Year 2024 (July 1, 2023 – June 30, 2024), the University had $122,705,221 in total expenditures, with $101,369,053 as direct costs and $21,336,168 as facilities and administrative costs. If the facilities and administrative cost rate was limited to 15%, the impact would have been an estimated loss of $15,759,116 compared to Fiscal Year 2024 actuals. In Fiscal Year 2025, the University expects to receive similar DOE funding for direct costs, with corresponding similarities allocated for indirect costs.  And over the next five years, the University anticipates receiving an average of $500 million from DOE for annual direct costs.  Based on the predetermined indirect cost rate of 58.6% modified total direct costs, which was agreed upon by the federal government for more than a decade, the University thus expects to receive approximately $110 million in indirect cost recovery on an annual basis.

13.     For example, if—contrary to what the University negotiated with the federal government—the indirect cost rate for Fiscal Year 2024 had been reduced to 15%, the University's anticipated annual indirect cost recovery would have been reduced from approximately $21 million to approximately $5.6 million. A comparable adverse fiscal impact will occur in Fiscal Year 2025 if the indirect cost rate is reduced to 15%.

14.     This reduction will have deeply damaging effects on the University's ability to conduct research from day one. Most critically, it will necessarily and immediately result in staffing reductions across the board.  For example, without appropriate funding for indirect costs:

a.     The Energy Frontier Research Center for Regenerative Manufacturing of Thermoset Polymers would have to reduce administrative staffing that helps

JA113

run the center and oversee data management, as well as lab and computing support for the postdoctoral researchers, PhD graduate student research assistants, and undergraduate researchers associated with the center. Loss of critical support and infrastructure for postdoctoral researchers and students will ultimately lead to reduction in scientific workforce in this area.

   b.   Many technical staff members who conduct essential components of research at the Center for Exascale-enabled Scramjet Design would lose employment.

   c.   Other programs described herein may face similar challenges and be jeopardized.

15.    The University has for decades relied on the payment of indirect costs. And until now, it has been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-doctoral scholars, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases.

16.    Disruptions to the University's research will also have negative effects in the Urbana-Champaign area, the state of Illinois, and the broader region. The University employs thousands of Illinois residents and collaborates with state and local partners to help solve regional challenges through joint research and innovation. The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. A massive reduction in the University's research budget would immediately and seriously jeopardize these contributions to the local region and the overall economy.

17.     Finally, slowdowns or halts in research by the University and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

18.     Nor can the University cover the funding gap itself. While the University maintains an endowment, it is neither feasible nor sustainable for the University to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

   a.  Much of the University's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. The University is not legally permitted to use those funds to cover research infrastructure costs.

   b.  Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout to ensure long-term financial stability for the institution.

   c.  The University reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. The University does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

19.     Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on the University—which would in turn force reductions in key investments supporting the University's faculty, students, staff, research, and teaching

infrastructure, as well as other critical activities needed to maintain the University's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Champaign, Illinois.

_____

Dr. Robert J. Jones

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF ENERGY, *et al.*, <br><br> Defendants. | Case No. |

## DECLARATION OF IAN A. WAITZ

I, Ian A. Waitz, hereby state under the penalty of perjury that the following statements are true and accurate to the best of my knowledge, and that I could testify to these matters if called to do so:

1. I am the Vice President for Research of Massachusetts Institute of Technology ("MIT" or the "Institute"), a position I have held since May 2024. The matters addressed herein are based on my personal knowledge or upon information I learned in the course of my duties at MIT, including from others involved in MIT's institutional research, technology transfer, and finance operations.

2. I have been a member of MIT's faculty since 1991. In addition to serving as Vice President for Research, I am currently the Jerome C. Hunsaker Professor of Aeronautics and Astronautics. I previously served MIT as the department head of Aeronautics and Astronautics, Dean of the School of Engineering, and Vice Chancellor for Undergraduate and Graduate Education.

3. In my role as Vice President for Research, I am MIT's senior research officer and have overall responsibility for research administration and policy at the Institute. I oversee MIT's Research Administration Services and Research Compliance units. I also oversee more than a dozen interdisciplinary research laboratories and centers at MIT, including the Nuclear Reactor Laboratory,

the Plasma Science and Fusion Center, the MIT Energy Initiative, and the Materials Research Laboratory.  I report directly to the President of MIT.

4.      Research conducted at MIT contributes to innovation in areas critical to economic competitiveness, national security, and the quality of life enjoyed by all Americans.  Some of MIT's main areas of research focus include energy, advanced manufacturing, biotech, artificial intelligence, health, cybersecurity, and quantum computing.  In recent years, MIT has typically spent as much from its own resources on research as it has received from external sponsors.  For example, in Fiscal Year 2024, MIT conducted approximately $800 million of research sponsored by government, industry, and foundations on its campus.  Approximately $480 million of this research was sponsored by the federal government.  MIT itself spent roughly an additional $800 million on research from its own resources, including its endowment.  This internal investment in research by MIT benefits and complements much of the federally-funded sponsored research on campus, and also decreases the cost of this research to the federal government.

5.      MIT's research translates into critical and novel inventions.  For ten consecutive years, MIT has produced more patents than any other campus in the nation.  In 2024, 323 utility patents were issued to MIT by the U.S. Patent and Trademark Office.  MIT holds approximately 4,000 active U.S. patents.  To date, MIT has employed or educated 104 Nobel Prize laureates.

6.      MIT's research also translates into innovation that helps drive the U.S. economy.  A 2015 study[1] identified more than 30,000 active companies founded by MIT alumni, employing 4.6 million people and generating annual global revenues of $1.9 trillion. That study's authors noted that these figures were "roughly equivalent to the GDP of the world's 10th largest economy as of 2014."

---

[1] "Entrepreneurship and Innovation at MIT: Continuing Global Growth and Impact," MIT (Dec. 2015), https://entrepreneurship.mit.edu/wp-content/uploads/MIT-Entrepreneurship-Innovation-Impact-Report-2015.pdf.

- 2 -

7.     The Department of Energy ("DOE") has funded MIT research in many areas that have produced groundbreaking innovations that helped lead to the creation of a vibrant, private U.S. fusion industry, which demonstrates how consistent federal investment directly fuels American economic growth, global technological leadership, and enhances our national security—assuring a safer, cleaner, and more prosperous future for the United States.  One particularly impactful MIT energy-related spin-out arose from MIT's Plasma Science and Fusion Center ("PSFC") in 2018.  For decades, the Department of Energy's stable support for MIT's Alcator C-Mod tokamak (a reactor device that magnetically confines plasma) enabled groundbreaking advancements in fusion plasma research, diagnostics, and integrated modeling.  These scientific discoveries and technological innovations ultimately led MIT researchers to help found Commonwealth Fusion Systems ("CFS") and license from MIT the patents and other intellectual property related to these breakthroughs in the development of fusion energy.  CFS has already developed the world's strongest high-temperature superconducting magnet[2] and recently announced that it is building the world's first commercial fusion power plant in Virginia.[3]  Fusion has the potential to create an inexhaustible, carbon-free source of energy.

8.     Many other start-ups and companies have licensed intellectual property owned by MIT that arose from support by DOE.  These include technology focused on electrolyte materials for advanced batteries; technology directed to energy storage materials and systems; technology for energy efficient, wireless power charging, including for electric vehicles; and technology for a sulfide chemical process for decarbonizing metal production.

---

[2] "Commonwealth Fusion Systems creates viable path to commercial fusion power with world's strongest magnet", CFS (Sep. 8, 2021), https://cfs.energy/news-and-media/cfs-commercial-fusion-power-with-hts-magnet.

[3] "Commonwealth Fusion Systems to Build World's First Commercial Fusion Power Plant in Virginia," CFS (Dec. 17, 2024), https://cfs.energy/news-and-media/commonwealth-fusion-systems-to-build-worlds-first-commercial-fusion-power-plant-in-virginia.

9.      MIT received $93 million from the DOE in Fiscal Year 2024 (July 1, 2023 – June 30, 2024) for performing sponsored research.  MIT conducts research under 286 direct and indirect funding awards from DOE that are currently active for Fiscal Year 2025.  This includes 132 grants, 86 contracts, 63 cooperative agreements, and 5 fellowships.  These awards involve 176 unique principal investigators at MIT.

10.     Each year, MIT negotiates Facilities and Administrative ("F&A") cost reimbursement rates with the Office of Naval Research ("ONR"), its cognizant federal agency for such purpose.  The on-campus F&A rate for MIT's Fiscal Year 2025 (July 1, 2024 – June 30, 2025) applicable to Department of Energy sponsored awards, as negotiated with ONR in accordance with and under the authority set forth in 2 CFR Part 200, is 59.0%.

11.     If DOE were to reduce the F&A rate on its grants and cooperative agreements to 15.0%, then MIT forecasts it will lose approximately $15 million to $16 million in reimbursement for costs that support DOE research over the next 12 months alone, assuming that MIT performs a similar level of research activity on DOE grants and cooperative agreements as it did in Fiscal Year 2024.  The forecast for DOE-funded grants only, separate from cooperative agreements, is approximately $10 million to $11 million.  If all federal agencies were to cap F&A reimbursements at 15.0% (for grants, cooperative agreements and contracts), MIT forecasts it will lose approximately $110 million over the next 12 months in reimbursements for costs that support that research enterprise.

12.     MIT currently has approximately $347 million in active DOE grant awards, against which MIT has spent approximately $131 million through March 31, 2025.  To the extent that DOE were to terminate all grant awards to MIT, then MIT would lose an estimated $216 million in unexpended grant funds over the remaining lifetime of those awards.

13.     MIT forecasts direct sponsored research activity in its annual operating budget, and it budgets the associated F&A cost reimbursement to pay for maintaining the buildings in which the

- 4 -

research occurs and supporting the infrastructure and business functions necessary to conduct the research. Examples of the costs supported by F&A reimbursement include the costs of building, maintaining, operating and renewing research buildings, laboratories and equipment; hazardous materials management; data storage; radiation safety; insurance; administrative systems and services; and compliance with federal, state, and local regulations.

14.     Each principal investigator at MIT conducting research uses the agreed-upon project budget, as awarded by DOE and other federal granting agencies, to develop a financial plan for performing each supported research project, many of which span multiple years. This budget typically includes supporting graduate student researchers, postdoctoral researchers, other research staff, equipment, and other research costs.  It is on the basis of these project-level budgets in hundreds of individual labs across MIT's campus that individual principal investigators make commitments to hire graduate students, researchers and staff.  Those people then derive their education and their livelihoods from this funding.  At MIT, there are 992 individuals who were partially or fully supported by DOE awards during the first three quarters of MIT's current fiscal year (from July 1, 2024 through March 31, 2025), including 91 faculty, 445 graduate students, 56 undergraduate students, 196 postdoctoral researchers, 183 research staff, and 21 other staff.

15.     The costs being reimbursed partially through the F&A rate are real costs.  The final rate is not speculative, but rather established each year after audit by the federal government of actual costs incurred.  These costs still exist and must be covered, even if the F&A reimbursement rate is unilaterally reduced.  Approximately two-thirds of F&A costs at MIT are facilities-related, and MIT cannot realistically take immediate action to eliminate utilities, maintenance and other activities required to operate buildings and laboratories that conduct federally funded research.

16.     As a direct result of real and threatened federal cost-cutting in fundamental research and potential increased levies on universities, including this attempted reduction in F&A cost

reimbursement rate by DOE and other agencies, MIT is being forced to take immediate and contemporaneous action to reduce its financial exposure. The Institute is implementing operating budget reductions and curtailing its capital investments. At the Institute level, MIT is deferring capital projects, notably including research infrastructure and space renewals, lab equipment installations, ventilation air capacity improvements, and energy efficiency upgrades. MIT has also been forced to implement a hiring freeze across the Institute on almost all staff positions. In addition, MIT mandated internal units to cut their budgets between 5 to 10 percent for this fiscal year. Among the possible ways these budget cuts will be implemented by internal units include: layoffs; limiting or deferring investment in research facilities; and scaling back other investments into the Institute. In light of this reduction in federal support for research funding, MIT has also admitted 22% fewer graduate students to its research doctoral programs for the coming academic year—these students are an engine of MIT's research activity and the future of U.S. science and innovation.

17.     The threatened rate reduction will also have a direct impact on the DOE-funded research being conducted at the Institute. The DOE's proposal to terminate and reissue existing grants under a 15% indirect cost cap would result in immediate and severe disruption to active research. MIT will face serious challenges in maintaining the laboratories, computing resources, technical teams, and administrative support required for world-leading research. MIT would immediately be forced to consider which projects would need to be canceled or scaled back, with resulting reductions in work force. Inevitably, some projects would be halted midstream; equipment construction timelines would be delayed; and key technical personnel—many with irreplaceable expertise—would be lost. The resulting damage, from disrupted data analysis to fractured collaborations, from reductions in research output to diminished opportunities for early-career scientists, could be irrecoverable, and would significantly undermine U.S. scientific priorities and international leadership. Critically, it would also disrupt the pipeline of students and postdoctoral researchers whose training in these programs equips

- 6 -

them for leadership roles in high-tech industry, national labs, and academia—weakening the nation's capacity to innovate and undercutting U.S. economic and technological leadership for years to come.

18.    The PSFC, described above, is the world's premier university-based research center dedicated to developing the science and technology of fusion energy—an area of research that is central to America's energy security, economic prosperity, and technological superiority. Fusion research is extremely broad in scope; success requires solving complex problems in areas ranging from material science to high-temperature superconducting magnets, high-power radio-frequency wave generation, nonlinear plasma physics, and state-of-the-art computational simulation, among others. Advances in these areas directly and indirectly benefit many other fields of science and technology. For example, promising new drilling techniques for geothermal energy stem directly from advances in radio-frequency wave generation; and quantum computing algorithms to accelerate fusion plasma simulation are just as useful to the financial industry.  The PSFC's efforts would be severely disrupted, causing detrimental impacts to innovation.

19.    As another example, MIT's world-renowned Department of Nuclear Science and Engineering ("NSE") plays a vital role in advancing U.S. interests by driving innovation in clean and reliable energy production, strengthening nuclear security, and supporting national defense initiatives. Through cutting-edge research, workforce development, and collaboration with government and industry, the department contributes to the safe and efficient use of nuclear technologies.  NSE is committed to advancing scientific understanding, expanding the frontiers of nuclear knowledge, and reducing uncertainties in reactor design, radiation transport, and nuclear materials behavior.  The following describe just a few examples of ongoing NSE projects that rely on DOE funding and would be severely disrupted or stopped altogether by major cuts to DOE research funding:

    a.    One project aims to develop a next-generation research reactor, MITR-3, featuring high neutron fluxes and large irradiation volumes.  This reactor would

greatly augment the U.S. irradiation capabilities in support of the development of advanced nuclear reactor technologies.

b.  Other projects support the development of state-of-the-art radiation transport computational models and software that can leverage modern computing architectures as well as improved capabilities for fast transient analysis, while also developing novel techniques for evaluating the impact of uncertainties for the safe and efficient operation of nuclear systems.

c.  Another project aims to develop technologies for nuclear security arms control treaty verification.  These technologies will help to reduce the risk of nuclear war, deter nuclear terrorism, and thus keep America safe.

20.     As a third example, the MIT Laboratory for Nuclear Science ("LNS") advances fundamental discoveries in nuclear and particle physics—from the quantum structure of matter to the dynamics of the universe—and holds leadership roles in flagship projects funded by the DOE.  This includes leadership roles at DOE National Laboratories and international projects, as well as leading the Alpha Magnetic Spectrometer mission upgrade aboard the International Space Station, which is central to U.S. scientific leadership at the ISS and in space-based fundamental research. LNS also conducts world-class theoretical research in the field of quantum technology and AI research, which plays a critical role in guiding experimental discovery and advancing the understanding of the physical universe.  LNS faculty, researchers, and students are embedded in leading the day-to-day operations of DOE-supported physics experiments at National Laboratories across the U.S. and internationally. These include Jefferson Lab's CEBAF accelerator, Brookhaven's RHIC collider, Fermilab's neutrino program, the Facility for Rare Isotope Beams (FRIB) at Michigan State, Los Alamos National Laboratory, the LHC experiments at CERN, and the development of the Electron-Ion Collider (EIC). MIT researchers are recognized as world experts in the design, development, and operation of some

- 8 -

of the most sophisticated experimental apparatus in nuclear and particle physics, and MIT students are trained through direct involvement in these experiments — a form of scientific engagement that cannot be replicated in the classroom.

21.     A fourth example is MIT's Nuclear Reactor Laboratory ("NRL"). The NRL is a unique national resource that plays a key role in irradiation testing of components and instrumentation vital to the development of advanced nuclear fission and fusion reactors, and to maintaining safe and efficient operation of existing reactors. Deployment and operation of these new and existing resources is, in turn, necessary to maintain U.S. energy security, to support AI expansion, and to expand the desirability of U.S. nuclear exports. Some examples of ongoing NRL projects are:

    a.   One DOE-funded award is focused on helping companies that are working to develop advanced reactors using molten salt as a coolant. This will permit operation at high temperature but low pressure, resulting in enhanced safety, high efficiency, and the potential to provide industrial process heat and hydrogen as well as electricity. The NRL is constructing a large volume irradiation facility to test and demonstrate materials and technologies to accelerate the licensing and application of these reactors. Ending support of this effort would disrupt not only the current work on molten salt reactors, but future planned work in the new facility in support of fusion reactor development and other advanced reactor concepts.

    b.   A second DOE-funded award is focused on developing Accident Tolerant Fuels for existing light water nuclear power reactors and requires specialized testing capabilities that only a few nuclear research and test reactors can provide. The NRL is one such site and is supporting industry efforts to test new reactor fuels that will increase the competitiveness of U.S. reactors by improving safety,

- 9 -

**JA126**

increasing the length of operating cycles, and reducing fuel costs. This work cannot be continued if DOE grants are terminated or funding severely reduced.

22.     Over time, the DOE cuts would also degrade MIT's advanced research capacity as a whole, because they would limit the Institute's ability to invest in its core research enterprise at a time when the United States wants its scientific and technology research at its strongest to compete globally. Especially with regard to DOE-funded research, MIT pursues difficult and expensive research pushing the boundaries of scientific knowledge and technology that requires laboratories and infrastructure that is costly to create and to maintain. Many of MIT's facilities exist nowhere else in the world. Much of MIT's energy-related research is carried out on unique equipment maintained by highly trained staff. Indirect costs allow MIT to support a research environment that is the envy of other nations and which continuously delivers groundbreaking results. A reduction in the indirect cost rate would irreparably harm MIT's ability to deliver science and technology essential to U.S. competitiveness and security.

23.     Research universities like MIT are critical components of innovation economies in their local geographies. MIT is at the center of Kendall Square in Cambridge, Massachusetts. Kendall Square houses an array of life sciences and energy technology firms, start-ups, industry, and venture capital firms. MIT and Kendall Square are also closely linked to area universities and hospitals, part of a thriving regional ecosystem of discovery, invention, and economic impact which materially contributes to the improvement of economic prosperity, national security, human health and scientific discoveries.

24.     MIT employs nearly 14,000 Massachusetts residents, including more than 2,300 Cambridge residents. Spending from students, staff, and faculty support the local economy. Tourism dollars tied to MIT flow to the Cambridge and Massachusetts economies. MIT is also the longtime top taxpayer in the City of Cambridge because the Institute has historically chosen to invest in its home

municipality. 2024 tax payments related to MIT real estate holdings totaled $96.7 million, which represents 16.8% of the Cambridge tax levy.

25. Relatedly, MIT's federally funded research also includes important research connections with the Commonwealth of Massachusetts. For example, MIT has a subaward to University of Massachusetts – Lowell under a grant from DOE involving research around the processing of radioactive materials used in fission nuclear reactors.

26. A loss of federal funding would significantly constrain MIT's ability to invest in the people and facilities that make up its research enterprise. Over time, this would lead to less investment in Massachusetts; have negative cascading impacts for MIT's research partners in academia, medicine, and industry; and undermine economic growth across both Massachusetts and the country.

27. Research universities like MIT contribute significantly to innovation and the strength of the U.S. economy, and federal research funding is the key to these benefits. According to the DOE itself,[4] "[o]ver the decades, [the U.S. Department of Energy Office of Science] investments and accomplishments in basic research and enabling research capabilities have provided the foundations for new technologies, businesses, and industries, making significant contributions to our nation's economy, national security, and quality of life." According to a September 2020 report by Breakthrough Energy,[5] the "federal government's R&D investment in the energy sector directly contributed 31,500 jobs, $3.6 billion in labor income, $5.0 billion in value added, and $0.9 billion in tax payments to the national economy in 2018. Including direct, indirect, and induced effects, federal

---

[4] "Office of Science Funding," U.S. Department of Energy, https://www.energy.gov/science/office-science-funding.

[5] "Impacts of Federal R&D Investment on the US Economy," Breakthrough Energy, LLC (Sept. 2020), https://www.breakthroughenergy.org/wp-content/uploads/2022/10/BEPwCReport09162020.pdf.

- 11 -

R&D investment in the energy sector supported 112,100 jobs, $8.9 billion of labor income, $13.9 billion in value added, and $2.8 billion in tax payments."

28.     Scaling back the research capacity of U.S. universities, including MIT, would slow scientific progress and have significant economic consequences.  Not only would the global community lose ground toward cures, new technologies, and other innovation, but less research in the United States would also threaten to impede progress on American energy independence, security, scientific, technical, and economic priorities; result in fewer jobs and slower economic growth; cede to other nations American companies' competitive advantage as a catalyst of new industries; and weaken long-term U.S. competitiveness against global adversaries, particularly as countries like China continue to boost their research funding and research infrastructure.

29.     MIT cannot simply make up an increased gap in annual federal research funding by withdrawing monies from its institutional endowment.  As noted above, MIT already matches sponsored research funding nearly dollar-for-dollar with research spending from its endowment, other charitable funds, and discretionary resources.

30.     MIT's endowment is principally made up of individual donations made for restricted, specific purposes and invested for lasting impact.  MIT is legally required to use endowment returns consistent with the donors' wishes and the purposes for which each endowment fund was established.  Currently, approximately 80% of MIT's endowment is subject to such restrictions.  MIT cannot reallocate these funds to cover a loss of federal reimbursements for research costs.  Moreover, MIT's endowment is a resource intended to provide support for the Institute's costs in perpetuity.  The Institute cannot responsibly liquidate the endowment without jeopardizing that function, draining the Institute of resources needed to sustain cutting-edge research capacity for future generations.

31.     In addition, MIT's endowment supports approximately 50% of the total cost of undergraduate tuition: MIT's financial aid to undergraduates totaled $159 million last year, including

- 12 -

$136 million to cover tuition and $23 million toward students' living expenses. As a result of MIT's financial aid policies, last year, almost 40% of undergraduates attended MIT tuition-free and 87% of undergraduates graduated debt-free. Similarly, MIT funds 62% of the tuition for the roughly 7,000 graduate students at the Institute through fellowships, subsidies, and other resources. DOE's attempted reduction in F&A rate will make such financial aid levels more difficult to maintain in the long-term and lead to increased financial burden for students and families.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 13, 2025, at Cambridge, Massachusetts.

_/s/ Ian A. Waitz_
Ian A. Waitz

# EXHIBIT 8

## DECLARATION OF ARTHUR LUPIA

I, Arthur Lupia, declare as follows:

1.      I am the Interim Vice President for Research and Innovation at the University of Michigan.  I have held that position since April 2024. Prior to that I served as an Assistant Director of the National Science Foundation from 2018-2022 and as co-chair of the White House Office of Science and Technology Policy's Subcommittee on Open Science from 2019-2021.

2.      As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by the University of Michigan personnel, and could testify thereto.

3.      The University of Michigan receives substantial annual funding from the Department of Energy ("DOE").

4.      The funding the University of Michigan receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example:

    a.  The University's nuclear research program, encompassing over 50 specialized researchers across four major multi-institutional projects, advances American leadership in critical nuclear technologies. This work develops next-generation fission and fusion reactors that strengthen energy independence; creates specialized detection and monitoring systems for national defense; and pioneers advanced manufacturing and artificial intelligence applications that maintain U.S. technological superiority in the global nuclear sector against growing competition from China and Russia.

    b.  Michigan's nuclear security research directly supports the National Nuclear Security Administration's mission through specialized facilities that advance

nuclear non-proliferation, safeguards, and defense applications. This work combines radiation detection, plasma physics, and high-performance computing to strengthen America's nuclear deterrent capabilities and develop the specialized workforce needed to maintain U.S. strategic advantages in national defense and energy security. Through partnerships with Los Alamos National Laboratory (LANL) and Sandia National Laboratories, this research creates direct pathways for Michigan graduates to contribute to critical national security missions.

c.  The University's research on advanced battery technologies, including the MUSIC Center, develops domestic energy storage solutions that reduce America's dependence on foreign supply chains. This work strengthens national security, supports American automotive manufacturing, and helps maintain U.S. technological leadership against international competitors like China, Japan, and the European Union. The application of machine learning and artificial intelligence to battery materials discovery is accelerating innovation and creating a pipeline of highly trained engineers for U.S. manufacturing.

d.  Michigan's development of next-generation engine and fuel technologies includes work on dimethyl ether fuel injection systems for diesel engines, which would allow agricultural equipment to operate on locally produced fuels. This innovation expands domestic fuel options and creates new market opportunities for American farmers and manufacturers.

e.  The PRISMS Center provides critical resources for designing stronger, lighter materials essential for national defense and industrial applications. With over 9,000 users of its software tools, this center develops advanced magnesium alloys that improve performance in automotive, aerospace, and defense sectors while reducing reliance on foreign materials. The center's open-source software and public data repository directly support the U.S. Materials Genome Initiative and enables AI-powered materials discovery critical to maintaining American manufacturing competitiveness.

f.  The University's high-precision modeling research enhances America's strategic capabilities in the Arctic region, where Russia and China are expanding their military and economic presence. This work supports U.S. naval access, secures American interests in untapped oil and gas reserves (estimated at 13% of global undiscovered oil and 30% of natural gas), and protects critical mineral resources.

g.  Michigan's research on solid-state lighting technologies advances American competitiveness in a market currently dominated by foreign manufacturers. Without continued support, innovations in energy-efficient lighting technology would likely be developed offshore, resulting in higher costs to American consumers and reduced national technological independence.

h.  The University's catalysis and electrochemical systems research develops cost-effective alternatives to precious metal-based materials critical for American chemical manufacturing and energy production. This work advances low-temperature plasma technology vital to U.S. semiconductor

**JA134**

              manufacturing and domestic supply chains, strengthening America's self-

              sufficiency in critical materials and reducing dependence on foreign resources.

5.      Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4.

6.      Indirect costs include constructing and maintaining state-of-the-art facilities required to meet the current technical requirements of advanced research, as well as the procurement and maintenance of specialized laboratory equipment necessary to conduct such research. These costs cover essential infrastructure like clean rooms, specialized testing environments, precision instrumentation, laboratory safety systems, calibration services, and technical support staff. Without these critical components, we simply cannot conduct the cutting-edge research that maintains American technological leadership and national security capabilities. Without this equipment, we cannot conduct the research.

7.      For example, with respect to the areas of research described in Paragraph 4:

      a.  The University's nuclear technology research leverages the Michigan Ion Beam Facility, a Department of Energy Office of Nuclear Energy designated National User Facility that supports approximately 85 research projects annually across the nation. This specialized facility houses multiple ion accelerators that enable researchers to simulate nuclear reactor environments, test materials under extreme conditions, and develop radiation-resistant components essential for America's nuclear energy independence and national security infrastructure.

**JA135**

b. Michigan's nuclear security research relies on two complementary facilities: the Plasma, Pulsed Power, and Microwave Laboratory, which produces momentary bursts of hundreds of billions of watts to study high-power electromagnetic phenomena for defense applications; and the Michigan LINAC Laboratory, which develops specialized detection techniques for uranium, plutonium, and other materials critical to national security. Together, these facilities support major multi-institutional consortia funded by the DOE National Nuclear Security Administration to maintain America's nuclear defense capabilities.

c. The University's research on advanced battery technologies at the MUSIC Center relies on the University of Michigan Battery Lab, a state-of-the-art 10,000-square-foot facility equipped with specialized testing chambers, prototype manufacturing equipment, and precision measurement instruments. This lab enables researchers to develop and test new solid-ion conductors, fabricate battery prototypes at various scales, and analyze performance under real-world conditions, supporting critical work to maintain American leadership in energy storage technologies against global competitors.

d. The State of Michigan's development of next-generation engine and fuel technologies depends on the University of Michigan Auto Lab, which houses specialized engine test cells, fuel injection system development platforms, and combustion analysis equipment. This facility allows researchers to design, test, and optimize new fuel systems for diesel engines, measure performance metrics under various operating conditions, and develop technologies that

JA136

expand domestic fuel options for agricultural and transportation sectors, strengthening American energy independence and industrial competitiveness.

e.  (For e and h). The PRISMS Center's materials research utilizes the University of Michigan Materials Characterization Center, featuring advanced metallography equipment, electron microscopes, X-ray diffraction instruments, and mechanical testing apparatus. This comprehensive facility enables the detailed analysis of magnesium alloy microstructures, properties, and performance characteristics needed to develop stronger, lighter materials for defense and industrial applications, ensuring American leadership in critical materials science and reducing dependence on foreign supply chains.

f.  The University's high-precision Arctic modeling research leverages the University of Michigan Advanced Research Computing Center, which provides the massive computational power required for processing complex climate and environmental simulations. This supercomputing facility enables researchers to run the Energy Exascale Earth System Model at high resolution, analyze vast datasets from satellite observations, and generate strategic insights about Arctic resources and access, directly supporting American national security interests in this increasingly contested region.

g.  Michigan's advanced solid-state lighting research relies on the University of Michigan Lurie Nanofabrication Facility, a 13,500-square-foot cleanroom complex with specialized equipment for thin-film deposition, photolithography, and device fabrication. This facility allows researchers to create prototype lighting devices, test novel materials at the nanoscale, and develop

manufacturing processes that can be scaled for commercial production, ensuring innovations in energy-efficient lighting remain domestically developed rather than ceded to international competitors.

8.  Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at the University of Michigan. Without appropriate indirect cost recovery, the immediate impacts would be severe:

a.  The Michigan Ion Beam Facility, Plasma Laboratory, and LINAC Laboratory would be forced to operate at severely reduced capacity or face complete shutdown, eliminating critical national user facilities that serve dozens of research groups across the country annually.

b.  The Battery Lab would be unable to maintain specialized testing equipment and environmental controls necessary for developing energy storage technologies that reduce American dependence on foreign supply chains.

c.  The University's Materials Characterization Center would face limitations in supporting defense-critical materials research, directly impacting national security projects developing next-generation alloys and composites.

d.  Indirect costs that support facilities maintenance and renovation are crucial to the operation of the Walter E. Lay Automotive Laboratory. This building, opened in 1957, requires regular maintenance of essential systems from freight elevators to HVAC equipment. The Auto Lab's 13 engine test stands, with complex instrumentation requiring electric power, chilled water, and compressed air, generate millions of dollars of research annually across military vehicle autonomy, batteries for electric vehicles, and engine research spanning

passenger cars to heavy-duty machinery. Without proper facilities support, temperature fluctuations would put equipment at risk and limit laboratory operability, severely impacting this defense and transportation research.

e. The Auto Lab's engine testing facilities would be unable to maintain the specialized ventilation, safety systems, and equipment calibration needed for developing American-made fuel technologies.

f. The Advanced Research Computing Center would be unable to upgrade to support the latest AI computing capabilities required by most DOE researchers on campus, leaving American researchers at a competitive disadvantage against foreign institutions.

g. The Advanced Manufacturing laboratories would face serious constraints, preventing expansion of capabilities critical to numerous DOE materials development and testing efforts that support domestic manufacturing initiatives.

h. Planned investments in quantum computing research facilities would be halted, ceding leadership in this strategically vital technology to international competitors including China.

i. The Lurie Nanofabrication Facility would be forced to reduce cleanroom operations, directly impacting research to develop American alternatives to Chinese-dominated semiconductor and electronics supply chains.

j. Specialized laboratory space required for nuclear materials handling and testing would face maintenance challenges, potentially compromising safety standards and forcing the termination of defense-critical research projects.

k. The University would be unable to properly maintain existing research facilities or construct new ones, directly reducing America's capacity to train the specialized technical workforce required for national security and energy independence initiatives.

9. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data. Ensuring compliance with specialized nuclear materials handling, security protocols, and safety standards, managing specialized procurement and security clearance processes for sensitive energy and defense research, maintaining facility accreditation and equipment calibration to meet DOE research quality and security standards.

10. Recovery of the University of Michigan's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

11. Through fiscal year 2025, the University of Michigan's predetermined indirect cost rate for research is 56%.

12. The impact of a reduction in the indirect cost rate would be devastating. Of the $81.8 million in DOE funding that the University of Michigan received in Fiscal Year 2024, approximately $56.1 million was allocated for direct costs and $25.7 million for indirect costs. Similarly, in fiscal year 2025, the University of Michigan expects to receive $61.8 million in DOE

funding for direct costs, while $28.3 million is allocated for indirect costs.  And over the next five years, the University of Michigan anticipates receiving an average of $75.8 million from the DOE for annual direct costs.  Based on the predetermined indirect cost rate of 56%, which was agreed upon by the federal government as of July 1, 2024, the University thus expects to receive approximately $42.4 million in indirect cost recovery on an annual basis.

13.     If—contrary to what the University of Michigan has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by $31.1 million, to $11.4 million.

14.     The University of Michigan has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning.  Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. And in some cases, the University of Michigan has long-term obligations—for example, long-term equipment maintenance contracts and service agreements, specialized technical staff positions in facilities supporting DOE research, debt service on research infrastructure investments and laboratory renovations; and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

15.     In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading. These impacts include:

> a.  Talent and Educational Pipeline Disruption: The loss of specialized researchers, technical staff, and graduate students would create capability

gaps that persist for years. This disruption would break the critical pipeline of training the specialized workforce needed for defense, energy security, and technological innovation.

b. Laboratory Safety and Infrastructure Risks: Facilities like the Lurie Nanofabrication Facility, Battery Lab, and Michigan Ion Beam Laboratory require consistent maintenance and qualified personnel for safe operation. Funding disruptions would compromise crucial safety protocols for handling hazardous materials, high-voltage equipment, and radiation sources, potentially leading to accidents and regulatory shutdowns.

c. Infrastructure Deterioration: High-precision research equipment and specialized facilities would face accelerated deterioration without proper maintenance, making future restart costs prohibitively expensive and potentially rendering unique national research capabilities permanently lost.

d. Competitive Positioning and National Security Erosion: Research interruptions would create openings for international competitors (particularly China and Russia) to gain technological advantages in critical areas. This would gradually erode America's specialized capabilities, increase dependence on foreign supply chains, and diminish the nation's strategic position in defense and energy domains.

16.    Disruptions to the University of Michigan's research will also have negative effects in the State of Michigan. Nearly 56,000 people are directly employed by the University of Michigan. The University works with and supports thousands of businesses, including many small businesses, to help solve regional challenges through joint research and innovation. The

University of Michigan's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. A massive reduction in the University of Michigan's research budget would immediately and seriously jeopardize these contributions to the local region.

17. Finally, slowdowns or halts in research by the University of Michigan and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance. Our nuclear research program, which advances critical fission and fusion technologies against growing competition from China and Russia, would lose momentum, endangering American energy independence. The MUSIC Center's work developing domestic battery technologies would stall, increasing dependence on foreign supply chains at a time when China is rapidly expanding its energy storage capabilities. The PRISMS Center's development of advanced magnesium alloys for defense applications would be undermined, compromising national security interests. Our high-precision Arctic modeling research would falter precisely when China and Russia are expanding their military and economic presence in this strategically vital region. Without sustained support for these specific research initiatives, the United States risks surrendering technological leadership in energy security, advanced materials, and defense capabilities to foreign competitors who continue to strategically invest in these critical domains.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025 at Ann Arbor, Michigan.

Arthur Lupia

# EXHIBIT 9

# DDECLARATION OF DOUGLAS A. GAGE

I, Douglas A. Gage, Ph.D., declare as follows:

1.      I am the Vice President for Research and Innovation at Michigan State University ("MSU"), a position I have held since 2020.  As Vice President for Research and Innovation, I oversee strategic initiatives and support for MSU's research enterprise and approximately $932 million in annual research expenditures.  Prior to holding this position, I was an Assistant Vice President in MSU's Office for Research and Innovation.  I am also a professor in the Department of Biochemistry and Molecular Biology, and I have been a researcher for more than 30 years.

2.      As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or I have knowledge of the matters based on my review of information and records gathered by MSU personnel and my staff, and could testify thereto.

3.      MSU receives substantial funding from the Department of Energy ("DOE") and has annual DOE expenditures of approximately $161 million.

4.      The funding MSU receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example:

   a.   Through its Office of Science and through the National Nuclear Security Administration ("NNSA"), DOE funds MSU research initiatives that include nuclear science research, isotope research, accelerator research, plant research, and other basic research to enable American national security and prosperity, as well as enable the advance of health diagnostics and therapies using rare isotopes for cancer.

   b.   Indeed, MSU designed and operates the Facility for Rare Isotope Beams ("FRIB") as a DOE Office of Science user facility for the DOE, which affords

research opportunities to researchers from U.S. National Laboratories, American industry, and universities. At FRIB, MSU operates the world's most powerful heavy-ion accelerator. FRIB is one of 28 DOE-SC national user facilities and represents a $1.5 billion investment of public funds over the past 15 years, including $94.5 million from the State of Michigan.

c.  FRIB affords 1,800 scientific users – representing 246 U.S. institutions and 13 U.S. National Laboratories – discovery opportunities in basic research with heavy ions and rare isotopes in nuclear science for applications that are critical to the Nation's needs, including: (i) national security, (ii) medicine, including the use of nuclear isotopes in cancer diagnostics and treatment, (iii) cryogenic engineering, (iv) chip testing for next-generation semiconductor devices that will help meet the current national shortfall of testing capacity for advanced microelectronics, including those used for commercial spaceflight, 5/6G wireless technology, and autonomous vehicles, and (v) workforce development.

5.  Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize the research projects described in paragraph 4.

6.  Indirect costs include equipment depreciation, which supports long-term investment in laboratories and research facilities that are essential for housing federally funded research. Indirect costs also include operations and maintenance costs such as utilities, HVAC, security, and routine maintenance that are critical for ensuring federally sponsored research environments remain functional, compliant, and safe. Without sufficient indirect costs, the long-

term capacity for MSU to support research in a manner that protects the federal investments will not be possible.

7.    Physical space costs, including building depreciation, utilities, and operations and maintenance ("O&M"), are not only a critical but also are one of the largest components of indirect, significant, and necessary costs with a direct and obvious impact on the amount of research that can be done at MSU.  For example, the FRIB described in Paragraph 4 requires highly specialized laboratory space including clean rooms, radiation-shielded environments, high-voltage and high-temperature control labs, as well as secure space for handling sensitive equipment and data.  Space costs also include air handling systems, HVAC, and lab ventilation to meet Occupational Safety and Health Administration ("OSHA"), Environmental Protection Agency ("EPA"), and other biosafety standards.  These costs are legal and regulatory requirements tied directly to the DOE mission of safety and compliance.  The building depreciation costs are not just accounting costs; depreciation of research facilities represents the capital costs invested by MSU to conduct DOE-funded research, including constructing research buildings, renovating space to meet federal research standards, and purchasing large-scale infrastructure. Without reimbursing these costs through the indirect costs, MSU suffers an unsustainable financial risk that will limit its ability to continue DOE funded work.

8.    In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.  These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the

high level of cybersecurity, data storage, and computing environments mandated for regulated data. At MSU, indirect costs fund compliance and oversight of federal requirements related to two Nuclear Regulatory Commission licenses, conventional and radioactive waste removal, and critical environmental health and safety.

9.     Recovery of MSU's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

10.    MSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with the federal government, effective as of July 1, 2023. Per the Indirect Cost ("IDC") Rate, MSU's NICRA is 57%.

11.    The impact to MSU of a reduction in the indirect cost rate would be devastating. Of the $161 million in DOE funding that MSU received for fiscal year 2024, approximately $116 million was for direct costs ($84 million of which was for modified total direct costs ("MTDC")), and about $45 million was for indirect costs reimbursements. Similarly, in fiscal year 2025, MSU expects to receive $114 million in DOE funding for direct costs, while approximately $45 million would be reimbursed for indirect costs. And over the next five years, MSU anticipates receiving an average of $115 million from the DOE for annual direct costs (about $84 million of that amount is for MTDC). Based on the predetermined indirect cost rate of 57%, which was agreed upon by the federal government as of April 17, 2023, MSU expects to receive approximately $45 million in indirect cost recovery on an annual basis from DOE. MSU's predetermined rate is effective through June 30, 2027, with a provisional rate at 57% after that time period.

12.    If—contrary to what MSU has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce MSU's anticipated annual indirect cost recovery by approximately $32 million.

13. This reduction will have deeply damaging effects on MSU's ability to conduct DOE-funded research from day one, leaving unfunded the following:

    a. Salaries and benefits for staff benefitting the research;

    b. Low-level radioactive waste removal;

    c. Critical environmental health and safety oversight;

    d. U.S. Nuclear Regulatory Commission license management; and

    e. Compliance with and oversight of federal requirements.

14. The DOE's proposal to terminate and reissue existing grants under a 15% indirect cost cap would result in immediate and severe disruption to active research. MSU will face serious challenges in maintaining the laboratories, equipment, technical teams, and administrative support required for world-leading research. MSU would immediately be forced to consider which projects would need to be canceled or scaled back, with resulting reductions in work force. Inevitably, some projects would be halted midstream; equipment construction timelines would be delayed; and key technical personnel—many with irreplaceable expertise—would be lost.

15. MSU has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the federal government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. And in some cases, MSU has long-term obligations—for example, multi-year salary commitments for tenured and non-tenured track faculty hired to support federally funded research, multi-year funding opportunities to admitted PhD students, multi-year capital financing obligations for specialized

laboratory space and major scientific equipment—and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

16.     In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.  These include decrease of research infrastructure, loss of researchers and students without stable funding to support areas of research, and deferred maintenance of lab space that could compromise lab safety and reduce MSU's ability to provide appropriate compliance oversight.  Over time, these effects reduce MSU's ability to support high-quality federally compliant research and make it difficult to restart, even if funding is later restored.

17.     Disruptions to MSU's research will also have negative effects in the greater East Lansing area, the State of Michigan, the broader region, and in the United States as a whole.  As noted above, FRIB affords 1,800 scientific users discovery opportunities, and the 1,800 users represent 246 U.S. institutions and 13 U.S. National Laboratories.  MSU collaborates with state and local partners to help solve regional challenges through joint research and innovation.  MSU's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.  A massive reduction in MSU's research budget would immediately and seriously jeopardize these contributions to the local region.

18.     Finally, slowdowns or halts in research by MSU and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.  A recent example is the utilization of the unique capabilities of FRIB to test semiconductor chips for their ability to tolerate extreme conditions for deep space missions and in

future military conflicts. Understanding semiconductor chips' performance *before* they face extreme environments is a critical advantage for U.S. technology dominance. A number of aerospace companies, as well as the U.S. Department of Defense's Missile Defense Agency, are currently supporting and using FRIB's capabilities for this purpose.

19. Nor can MSU cover the funding gap itself. Any development of a way to fill this gap would necessarily include diverting funding from people (students, faculty, and staff) or educational programs. While MSU maintains an endowment, it is neither feasible nor sustainable for MSU to use endowment funds – which are often restricted – or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons.

19. Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on MSU—which would in turn force reductions in key investments supporting MSU's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain MSU's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April 2025, in East Lansing, Michigan

Douglas A. Gage

# EXHIBIT 10

### DECLARATION OF STEPHEN DEWHURST, Ph.D

I, Stephen Dewhurst, PhD, declare as follows:

1.     I am the Vice President for Research at University of Rochester ("Rochester" or "University") in Rochester, New York. I have held that position since 2023, after serving as Interim Vice President for Research from 2021 - 2023. I am also Vice Dean for Research at the University's School of Medicine and Dentistry ("SMD"), and since 1990 have been a faculty member in the University of Rochester Medical Center ("Medical Center"), an operating unit of the University.

2.     As Vice President for Research, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Rochester personnel, and could testify thereto.

### *The University's Economic, Medical and Scientific Impact*

3.     The University, as an academic research institution, is our region's largest private employer, and seventh-largest private employer in New York State. The University currently employs approximately 38,565 individuals, and received approximately $486 million in sponsored program funding in fiscal year 2024.

4.     The University's Hajim School of Engineering and Applied Sciences ("Hajim") and its School of Arts and Sciences ("SAS") received a total of approximately $90 million in external research funding in fiscal year 2024. In the 2024–25 academic year, Arts and Sciences & Hajim Engineering enrolled 6,917 students, including 5,444 full-time undergraduates, 1,350 graduate students and 123 part-time students.

5.     Hajim, which includes the Institute of Optics, is a significant driver of scientific innovation and economic development in the local and regional space. Hajim currently employs

approximately 200 faculty and staff, and operates a global Industrial Associates program that partners with more than 60 private sector members to provide educational training and networking benefits to participating companies, including new course development and student research projects, and exposes faculty and students to a wide range of optics and semiconductor industry interests. Members range from core semiconductor equipment manufacturers, such as ASML and KLA-Tencor, to regional optics manufacturers, such as Corning and Optimax, who are critical to the supply chain for lithographic printing and inspection.

6.      SAS is the University's largest school, consisting of 19 departments, numerous centers and programs, and 274 faculty members. SAS closely integrates advanced research with its educational mission to prepare the next generations of innovators and scientists. The Department of Chemistry and the Department of Physics and Astronomy lead critical research in quantum science, particle physics, materials science, and new energy sources. SAS collaborates closely with Hajim, the Laboratory for Laser Energetics ("LLE"), and the University of Rochester Medical Center ("URMC"), with many joint programs and faculty affiliations.

7.      The University and URMC, together with affiliate and partner hospitals and medical centers across the region, provide medical services to over 3 million people across 27 counties in underserved rural and urban settings—an area with the second highest incidence of cancer in the nation—along with ailments such as Alzheimer's disease and Parkinson's disease, musculoskeletal illnesses and an array of rare and complex diseases such as neuromuscular diseases, Huntington's disease, cystic fibrosis, Lou Gehrig's disease, autoimmune disorders and more.

8.      The University's Laboratory for Laser Energetics ("LLE") is the nation's leading university-based research center in fusion, laser science and technology, and high-energy-density

(HED) science research, and operates two of the largest and most-capable government-owned lasers at any academic institution in the world. LLE employs more than 450 full-time employees, and its economic activity supports an additional 550 spillover jobs for a total impact of about 1,000 jobs, $66 million in income and $3.7 million in revenue to state and local governments. Since FY 2015, LLE has made approximately $57.6 million in purchases from over 1,000 New York State vendors. LLE provides a strong stimulus to the local economy by helping attract and develop new investors and companies, such as Sydor Technologies, whose portfolio of products support customers in defense, energy, light sources, research, and other scientific fields.

### *The University's Vital Research for the Department of Energy*

9.    Rochester receives substantial annual funding from the Department of Energy ("DOE"). As of April 2025, the University has a total of approximately $112 million in active funding from the DOE, including $99.4 million towards the Cooperative Agreement that supports the University's LLE.

10.    The University also receives adjacent funding from other federal agencies, including the Department of Defense (DOD), that rely on DOE-funded infrastructure and resources, including approximately $16 million at the LLE annually for various active projects.

11.    Stated simply, any loss of Rochester's DOE funding, either by grant termination or reduced indirect costs, would have a catastrophic impact.

12.    The funding Rochester receives from DOE supports critical and cutting-edge scientific research, which millions of Americans benefit from and depend on.  For example:

> a.    <u>Theoretical and experimental elementary particle physics.</u> Rochester has a rich tradition in studies of elementary particle physics. That tradition continues today as University faculty were members of the collaboration recognized by

the 2025 Breakthrough Prize in Fundamental Physics. The Rochester group studies quarks and bosons using the Large Hadron Collider (CERN) and neutrinos using the Deep Underground Neutrino Experiment (Fermilab). The group is also studying quantum electrodynamics, where intense electromagnetic fields change the dynamics of electrons and positrons, using facilities under development at LLE.

b.  <u>Fundamental chemistry research on novel energy production.</u> University researchers are developing novel processes to tap the potential of new fuels to meet a national strategic need. Hydrogen is especially attractive because of its high energy density and clean by-products. Supported by DOE, faculty are developing artificial enzymes to catalyze the production of hydrogen from water, opening the potential of this energy source. Researchers are also developing catalysts to perform the transformations needed for the production of energy from other chemical fuels.

c.  <u>High energy density physics.</u> High energy density physics (HEDP) explores the realm where new states of matter arise when applied external forces exceed intrinsic chemical or atomic forces. It includes applying extreme external forces that can initiate nuclear fusion in the laboratory, opening the potential of harnessing this energy source for society. Rochester is at the forefront of this research, with comprehensive programs spanning theory, computation and experiments. The University also is home to the Flash Center for Computational Science, an essential resource in these studies, with a focus on high energy density magnetized plasma turbulence. HEDP Research at Rochester includes

the Institute for Matter at Extreme Energy Density and Center for Matter at Atomic Pressures at the University.

d. <u>Fusion Energy research.</u> DOE has awarded a grant to Focused Energy in collaboration with the LLE, with the goal of accelerating foundational research in fusion energy, and fostering enhanced collaboration between businesses, national laboratories, and universities. The project is part of the Innovation Network for Fusion Energy (INFUSE), a DOE initiative designed to provide technical and financial support to advance fusion technologies in the private sector. DOE also funds the Inertial Fusion Energy (IFE)-Consortium on Laser-Plasma Interaction (LPI) Research (IFE-COLoR), which is a Hub for broadband LPI science focused on inertial fusion energy that brings together experts from the University of Rochester, the University of California at Los Angeles, the University of Nebraska-Lincoln, and the private sector (Ergodic, LLC, and Xcimer Energy, Inc.). DOE has also awarded LLE funding to establish the Inertial Fusion Energy Science and Technology Accelerated Research (IFE-STAR) ecosystem that brings together academia, national laboratories, and the private sector to develop a clean, safe, and virtually limitless energy source, built on US leadership in inertial fusion.

e. <u>Quantum Information Science and Engineering.</u> Rochester faculty have been pioneers in quantum information science and engineering, an area of research that is of high national and strategic importance.[1] This research, based in the

---

[1] A Letter to Michael Kratsios, Director of the White House Office of Science and Technology Policy – The White House.

Hajim School of Engineering and Applied Sciences, the School of Arts and Sciences and LLE, includes:

   i. <u>Quantum computing</u>. Quantum computers, capable of calculations impossible with current technologies, are developing rapidly, and Rochester faculty are leveraging historical strengths in optics and quantum optics to advance this technology with key discoveries in quantum light-matter interfaces.

   ii. <u>Quantum networks</u>. The University, in a partnership with the Rochester Institute of Technology, has established a local quantum communications testbed that will be used to develop new quantum algorithms and technology.

   iii. <u>Quantum chemistry</u>. Scientists at the University are leaders in harnessing quantum light-matter interactions to study new chemical reactions with both computer simulations and novel experimental devices.

   iv. <u>Quantum materials</u>. Rochester faculty are developing new materials for quantum information science and engineering, with a focus on 2-D materials and nanoparticles.

f. <u>National security activities.</u> Rochester performs scientific research vital to our nation's security interests, including the operation of LLE's Omega laser Facilities ("Omega"). LLE is one of the nation's three primary Inertial Confinement Fusion ("ICF") and HED science facilities, along with the National Ignition Facility ("NIF") at Lawrence Livermore National Laboratory

and the Z Pulsed Power Facility at Sandia National Laboratory ("Sandia"). Omega provides five times more experiments ("shots") than NIF at Lawrence Livermore National Laboratory ("LLNL") and the Z Pulsed Power Facility. The significant data generated on the Omega facilities coupled with LLE's and Rochester's computational capabilities makes the University a leader in applying Artificial Intelligence and Machine Learning to fusion research. LLE's expertise in laser design and laser-material science results in more than $10M per year funding from the Department of Defense ("DOD") to pursue directed energy research to solve national challenges and to train a workforce pipeline.

g. <u>Critical expertise.</u> DOE-funded programs support Rochester's unique concentration of individual and departmental expertise supporting scientific, economic and national security achievements. Recent examples include LLE's fusion energy technologies, which received two INFUSE awards to work with XCIMER and Focused Energy, created two start-up companies, and received a FIRE collaboration with Savannah River National Laboratory to pursue tritium research as a critical part of the fusion fuel lifecycle. The DOE has awarded the University one of the three national hubs for fusion energy, acknowledging the University and LLE's unique experimental capabilities, computational science, connections to industry and next generation laser technology. Indeed, two Nobel prize winning University alumni performed DOE-funded research while at Rochester.

***Rochester Will Be Irreparably Harmed by Arbitrary DOE Terminations or Rate Cuts***

13.     Rochester's DOE grants, including current indirect costs, are essential for supporting this research.  The DOE's proposal to cut indirect cost rates to 15% and/or terminate Rochester's grants would end or seriously jeopardize significant research at the University, including the vital projects described above.

14.     Rochester's DOE grants, including indirect costs, support vital infrastructure necessary to perform the fundamental research, including:

    a.  <u>Infrastructure.</u> University of Rochester research and teaching relies on infrastructure to support experiments, computation and device/component fabrication.

    b.  <u>Cleanroom fabrication and metrology.</u> Experimental quantum research and HEDP research rely on the University's cleanroom fabrication and metrology facility, URnano. Equipment and fabrication tools including high-precision lithography, material deposition, etching, thermal processing, whereas metrology includes electron microscopes (scanning and transmission electron microscopes) and other essential instruments.

    c.  <u>Research laboratories (experiments).</u> University of Rochester research relies on faculty research laboratories in its Institute of Optics and Departments of Physics and Astronomy, Electrical and Computer Engineering, Mechanical Engineering, Chemistry, and Chemical Engineering. Major, cutting-edge equipment in these labs includes dilution refrigerators for superconducting q-bits and optics/photonics labs, as well as metrology infrastructure for characterization of materials.

d. <u>Computing research.</u> Faculty engaged in quantum computer simulations rely on infrastructure of the University's Goergen Institute for Data Sciences and Artificial Intelligence and the University's high performance computing facility, CIRC.

e. <u>HEDP research facilities.</u> HEDP research relies on infrastructure at LLE and in research labs in the Departments of Physics and Astronomy and Mechanical Engineering at the University. HEDP faculty in experimental science utilize URnano for device fabrication and characterization, and faculty engaged in numerical simulations use the University's high performance computing infrastructure (CIRC).

f. <u>Workforce development.</u> Rochester has leading education programs in the areas of quantum science, engineering and particle physics—areas of vital national interest for the United States to remain the leader in this critical research area— and plans to expand our offerings to meet this national need:

   i. Rochester plans to further integrate workforce development with our research mission, with students obtaining essential training in quantum science and engineering in active research labs and URnano.

   ii. Rochester's LLE affords a unique opportunity to provide educational training alongside fundamental research in the vital area of inertial fusion energy.

   iii. The University offers comprehensive PhD programs with concentrations in chemistry, high-energy-density physics, plasma physics, and inertial confinement fusion studies. These programs

address the needs for a highly trained workforce to: realize the potential of advances in hydrogen-based fuels, quantum materials, and HEDP; to support DOE NNSA's network of national laboratories; and to develop nuclear fusion as a novel energy source. The LLE is nationally recognized as the only facility that trains graduate students in ICF and thereby serves as a critical pipeline of talent that is vitally important to our national security and economic security.

Without the support of the total grant funding with full indirect costs, which allow the University to operate necessary equipment and infrastructure, we cannot conduct the research, nor will we be able to support fully economic development in the local and regional area.

15. For example, our diverse research in Quantum Information Science and Engineering, HEDP and chemical approaches to developing new energy sources relies on the University's Integrated Nanosystems Center, known as URnano. This facility also supports corporate users, including small companies and startups. The loss of grant funding and overall facilities support will set back Rochester fundamental research and hamper the University's goal of fostering the economic development of the region through advances in critical technologies, new venture creation and technology commercialization (e.g. the University is a member of the EDA NY SMART I-Corridor Tech Hub, which supports economic development across the Buffalo-Rochester-Syracuse region).

16. Physical space costs are one of the largest components of grant award indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at Rochester. For example, URnano is a state-of-the-art nano fabrication facility offering deposition and etch, lithography, and metrology capabilities. URnano is a user

facility serving the University community, industry, and corporations, as well as faculty and students at other institutions as a key regional resource. URnano has approximately 2,000 square feet of class 1000 cleanroom. By housing this specialized equipment at a research university and allowing student access, URnano not only supports research breakthroughs and the development of new technologies, but also plays an important role in training the current and future generations of technologists who will help meet the increasing demands for highly skilled workers.

17.     Security of the physical space and all visiting researchers is also a vital component of the University's work for DOE, including maintenance and operation of a highly secure LLE facility overseen by individuals with high security clearances where approximately $600M in government-owned lasers are safeguarded and operated in support not only of Rochester research, but also DOE NNSA's network of national laboratories—and a loss in funding will jeopardize the fundamental security, integrity and operability of these vital installations.

18.     The grant awards and indirect costs related to physical security address critical services necessary to performing University research, including radiation safety capabilities for handling tritium—a radioactive and flammable gas—and similar materials.  Indirect costs further support radiation and pressure safety officers, satisfaction of DOE Facility Access and Assignment protocols so all foreign national visitors or collaborating scientists may be vetted, and security and climate systems to provide necessary cooling and climate control for sensitive government-owned lasers.

19.     The University also maintains and operates the Conesus supercomputer for DOE's NNSA, one of the 500 most powerful computer systems in the world, and supports high performance computing to simulate high-energy-density physics and inertial confinement fusion experiments that are essential to NNSA's mission.  Conesus is operated in an access-controlled

area within the University's secure Data Center, supported by the University's indirect funding. Loss of funding to LLE will jeopardize the University's ability to operate and maintain this resource.

20.    In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.[2]  These mandates serve many important functions, including: ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data, including compliance with NIST standards, management of CUI and government sensitive information, and maintenance of high-security clearances.

21.    Importantly, these potential injuries would be exponentially worse if the grants themselves were terminated, including most notably the wholesale loss of funding to LLE.  If its DOE funding were to be terminated, LLE would likely close and its uniquely qualified and experienced scientific staff would likely be laid off.  As a result, many or all of these experts would leave for other opportunities domestically where they may still benefit DOE research but at a higher cost, or even find opportunities in other nations where their expertise would benefit the high-tech scientific and energy programs of those countries in areas such as fusion energy, quantum science, and AI/computational science—to the detriment of the interests of the United States.  The government owned lasers housed by LLE would fail to be maintained adequately, and the impact on local businesses that partner with LLE would be devastating. In addition, DOE

---

[2] https://www.ecfr.gov./current/title-2/subtitle-B/chapter-IX/part-910/subpart-B, and
https://www.nsf.gov/awards/terms-conditions/research

NNSA's network of national laboratories would have nowhere to conduct critical experiments at a scale that promotes innovation which are necessary to protect national security and to develop the workforce of the future that functions to protect our nation's security. It is well known that early exposure to scientific opportunities create the networks which result in students being attracted to specific research areas. LLE is the premier facility in academia for both building this connection and training to the level of scale and rigor needed by the national Labs which steward the US nuclear deterrent.

22.     Recovery of Rochester's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

23.     Through fiscal year 2026-2027, the University's predetermined indirect cost rate is 51%.

24.     The impact of a reduction in the indirect cost rate would be devastating.  Of the approximately $112 million in DOE funding at the University, approximately $75 million is allocated for direct costs, and $37 million for indirect costs, and the University has engaged in planning based on these amounts.

25.     If—contrary to what University of Rochester has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by well in excess of approximately $25 million.

26.     This reduction, let alone a wholesale termination of Rochester's DOE grants, will have deeply damaging effects on Rochester's ability to conduct research from day one due to elimination of funding, including the following likely effects:

      a.     Slowing, pausing or hampering active research, including use of the DOE's lasers in research by other national laboratories;

    b.  Inability to properly maintain or operate research laboratories and research equipment;

    c.  Impairing ongoing efforts to recruit top research faculty, as well as top graduate students from around the world;

    d.  Reduction in workforce development, including training the next generation of researchers in areas vital to the United States' economic and security interests;

    e.  Delaying or eliminating construction of planned research facilities, including those partially funded by the University.

27.    The harm to Rochester's relationships with some of the world's most highly skilled researchers will also be undermined by the University's loss of funding, and inability to rely on the DOE's contractual promises, as, for example, LLE's researchers will find superior and reliable funding in other countries, resulting in a catastrophic "brain drain" that will destroy a concentrated community of scientific experts effectively serving as a scientific backbone for high-energy particle physics, quantum science, fusion energy science, and other areas of vital national concern.

28.    Rochester has for decades relied on the payment of full grant amounts, including full indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, utility costs, and grant management support), and facility and equipment purchases.  And in some cases, Rochester has long-term obligations to be satisfied by budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments, such as:

a. Maintaining and modernizing physical and digital infrastructures to support laboratory space and equipment.

b. Supporting long-term experiential learning for admitted PhD students representing the future of the U.S. nuclear energy, particle physics, nanotechnology, quantum computing and other vital scientific research workforce.

c. Developing and maintaining an information infrastructure that supports current cybersecurity frameworks, including NIST 800 standards.

29. In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.

30. As stated above, any disruption to Rochester's research will also have negative effects across Central and Western New York State. Approximately 38,000 New York State residents are employed by the University of Rochester—and it collaborates with state and local partners to help solve regional challenges through joint research and innovation. Rochester's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. A massive reduction in Rochester's research budget would immediately and seriously jeopardize these contributions spanning from New York State across the nation, and would have a negative multiplier effect on the local and regional economy.

31. Finally, slowdowns or halts in research by Rochester and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance. As stated above, Rochester provides vital training for the next generation of

scientists—many of whom will consider pursuing degrees and careers outside the United States should research funding at Rochester slow down or halt.

32.     Nor can Rochester cover the funding gap itself, as the University already invests approximately $137 million annually to its research mission through the School of Medicine and Dentistry—an amount that is already imperiled due to pressures associated with reimbursement of clinical care, large increases in staffing costs, changes in the clinical workforce, and other market realities. The University's School of Arts and Sciences and Hajim School of Engineering also contribute at least approximately $26 million annually to the University's research activities.

33.     While Rochester maintains an endowment, it is neither feasible nor sustainable to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

    a.     A significant portion of Rochester's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. Rochester is not legally permitted to use those funds to cover research infrastructure costs.

    b.     As a non-profit institution, Rochester reinvests any minimal revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, Rochester does not generate significant surpluses that could be redirected to research without impacting core academic priorities such as educational programs and financial aid support for students.

34.     Moreover, absorbing the financial impact of either a lower indirect cost rate or a fully terminated grant, even if it were possible, would create long-term budget pressures on

Rochester—which would in turn force reductions in key investments supporting Rochester's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Rochester's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2025, at Rochester, New York.

_____
Stephen Dewhurst

# EXHIBIT 11

## DECLARATION OF ELIZABETH PELOSO

I, Elizabeth Peloso, declare as follows:

1.      I am the Senior Associate Vice President and Senior Associate Vice Provost for Research at the University of Pennsylvania ("UPENN") in Philadelphia, Pennsylvania.  I have held that position since July 1, 2024.  I previously served as the Associate Vice President and Associate Vice Provost for Research from January 1, 2014 until July 1, 2024.

2.      As Senior Associate Vice President and Senior Associate Vice Provost, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by UPENN personnel, and could testify thereto.

3.      UPENN receives substantial annual funding from the Department of Energy ("DOE").  As of April 10, 2025, our Department of Energy Portfolio include 63 awards with total awarded dollars of $36,799,534.  The current remaining balance on these awards is $23,699,005, with an expected indirect cost recovery of $7,276,290.

4.      The funding UPENN receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on, and which is critical to the United States' technological dominance and national security.  For example:

- Penn researchers are developing next generation scientific machine learning architectures to build digital twins of earth and embedded systems. This research is designed to integrate machine learning into the large legacy simulation systems ubiquitous across DOE, allowing AI to be applied in high-consequence national security settings.

- Another project focuses on developing advanced graph network architectures that preserve physical structure in extreme environments representative of national security problems and weapons design at DOE (plasma physics, detonation, and multiscale materials). This work is actively being adopted within DOE to support classified National Nuclear Security Administration work.

- In the Stelfoundry project, UPENN researchers are constructing a digital twin of a fusion power plant in the stellarator configuration. This is crucial to provide near real time prediction of stellarators for control and design. This work supports American energy independence, as DOE and the government begins the commercialization of fusion power.

- UPENN also has a subcontract with Sandia National Laboratories developing tools for autonomous material discovery for 3D printed nanoparticle inks to be used in flexible electronics. The ability to rapidly characterize and prototype new inks and materials is important for national-security applications involving critical materials for weapons design. This project provides foundational algorithmic advances that the labs are using in their stockpile stewardship program.

- Another DOE funded project is developing techniques to quantify uncertainty in physical subsystems coupled across scales. The project specifically focuses on battery design in hostile environments, collaborating with national laboratories partners to support their national security mission.

- UPENN's quantum computing research, funded by the DOE, contributes to MACH-Q, a project developing a modular, error-aware quantum software stack to support hybrid and distributed quantum computing across diverse hardware platforms. By enabling scalable and reliable quantum computing for DOE science applications, MACH-Q strengthens U.S. leadership in quantum information science, accelerates innovation in energy and materials research, and ensures national competitiveness in the emerging quantum economy."

- UPENN is developing optically-controlled gate drivers and sensor modules to upgrade existing power substations with faster, more intelligent switching and protection capabilities. This research is performed in part at the Singh Center of Nanotechnology, a facility which is supported through indirect cost recovery. Leveraging cutting-edge, U.S.-led advances in photonics, microelectromechanical systems, and semiconductor technology, this work enhances the resilience and response speed of the electric grid—ensuring more reliable power delivery to U.S. households during extreme weather events while supporting the integration of both renewable and conventional energy sources.

- Another UPENN project funded by the DOE aims to enable 3D monolithic on-chip, photonics-electronics integration for low-energy production and operation and co-designing radiation hardness into photonic and electronic circuits. It is also performed at the Singh Center of Nanotechnology, which again is a facility supported through indirect cost recovery.

- UPENN carries out research in building mass-manufacturable sensors for monitoring large areas of the deep ocean. The data produced by these sensors directly benefits the public by improving weather models and climate forecasts as well as aiding Naval submarine communication, detection, and navigation. This research is also performed at the Singh Center of Nanotechnology.

- UPENN's work on quantum materials includes pioneering and ongoing studies into and development of topological insulators. This entirely new class of materials was discovered by UPENN physicists and has applications ranging from low power electronics to topological quantum computing, critical to United States' technological dominance and national security.

- UPENN researchers' work on fundamental quantum physics includes key contributions to and roles in high energy physics and neutrino experiments. These enable the discovery of new physical laws and their associated technological applications and, in the case of neutrinos, contribute to American nuclear non-proliferation efforts.

5.      Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4 of this Declaration.

6.      Indirect costs make it possible for UPENN to obtain highly specialized equipment, such as that housed at the Singh Center for Nanotechnology, which is described above in paragraph 4. The Singh Center for Nanotechnology includes advanced nanofabrication equipment, specialized air handling, and clean rooms, each of which is essential to the performance of a number of research initiatives described above in paragraph 4. Without this equipment, UPENN would not be able to conduct the research.

7.      Physical space costs are one of the largest components of what is covered by indirect costs, and the nature, quality and amount of space available to researchers has a direct and obvious impact on the research that can be done at UPENN.

8.      In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These

mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing technologies or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

9.     Recovery of UPENN's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

10.     Through fiscal year 2027, the predetermined indirect cost rates contractually negotiated between UPENN and the federal government are 62.5% for on-campus research.

11.     The impact of a reduction in the indirect cost rate would be harmful. Of $38 million in DOE funding awarded to UPENN between 2020 and 2025 on still-active projects, the remaining balances of approximately $24 million was allocated with $16.5 million in direct costs and $7.3 million for indirect costs.

12.     If—contrary to what UPENN has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce UPENN's anticipated annual indirect cost recovery on the currently funded Department of Energy from $7,276,290 to $1,900,854.

13.     This reduction will have deeply damaging effects on UPENN's ability to conduct research from day one. Most critically, it will necessarily and immediately result in staffing reductions across the board. For example, UPENN currently has more than 100 researchers funded on DOE projects including undergraduate students, post-doctoral trainees, and more than 50 graduate students. Loss of funding may jeopardize the ability of these young engineers and scientists to complete their training. Ultimately, loss of funding will jeopardize UPENN's ability

to sustain, support, and develop the U.S. workforce needed to remain competitive in emerging technologies critical to U.S. national security.

14.     UPENN has for decades relied on the payment of indirect costs. Furthermore, until now, UPENN has been able to rely on the well-established process for negotiating indirect cost rates with the government, and relying on those predetermined, negotiated rates to remain static so as to inform our budgeting and planning.  Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases.  And in some cases, UPENN has long-term obligations—for example, UPENN commits to funding PhD students in the sciences for the full length of their degree programs and relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

15.     Disruptions to UPENN's research will also have negative effects in the Philadelphia area, the state of Pennsylvania, and the broader region. UPENN directly employs 53,000 people and indirectly supports an additional 53,000 jobs in construction-related industries, professional services, as well as retail and manufacturing industries via UPENN activities.  In FY24 Penn's research investments generated:

- $2.5 billion in total annual output within Philadelphia, supporting 9,400 jobs and $875 million in employee compensation.

- $2.9 billion in total annual output within the Penn Region, supporting 11,200 jobs and $996 million in employee compensation.

- $2.8 billion in total annual output within the Commonwealth of Pennsylvania, supporting 10,800 jobs and $964 million in employee compensation.

16.     UPENN collaborates with state and local partners to help solve regional challenges through joint research and innovation.  UPENN's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.  A massive reduction in UPENN's research budget would immediately and seriously jeopardize these contributions to the local region.

17.     Finally, slowdowns or halts in research by UPENN and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both the national security and economic dominance of the United States. Specific examples of UPENN research funded by the Department of Energy with implications for advanced technology and national security have already been described in paragraph 4 of this Declaration.

18.     Nor can UPENN cover the funding gap itself.  While UPENN maintains an endowment, it is neither feasible nor sustainable for UPENN to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

- 46% of UPENN's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs.  UPENN is not legally permitted to use those funds to cover research infrastructure costs.

- Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 5%, to ensure long-term financial stability for the institution.  Furthermore, UPENN already spends 6% of its consolidated endowment on research.

- As a non-profit institution, UPENN reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other

words, unlike for-profit organizations, UPENN does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

19.     Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on UPENN—which would in turn force reductions in key investments UPENN's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UPENN's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at 3451 Walnut Street, Philadelphia, PA 19104

Elizabeth D Peloso

Digitally signed by Elizabeth D Peloso
Date: 2025.04.13 22:29:26 -04'00'

Elizabeth D. Peloso

Case: 1:25-cv-10912-ADB      Document: 31      Date Filed: 04/23/2025      Page: 1 of 6

# EXHIBIT 12

## DECLARATION OF THOMAS BIFANO

I, Thomas Bifano, declare as follows:

1.      I am the Vice President and Associate Provost *ad interim* for Research at Boston University ("BU" or "Boston University") in Boston, Massachusetts.  I have held this position since July 1, 2024.  I am also the Director of Boston University's Photonics Center, which is a position that I have held since 2006.  I have been a professor at Boston University since 1988.

2.      As Vice President and Associate Provost *ad interim* for Research, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Boston University personnel, and could testify thereto.

3.      Boston University receives significant annual funding from the Department of Energy ("DOE").  In Fiscal Year 2024 (July 1, 2023 – June 30, 2024), Boston University received $7.4 million in funding from DOE, with $5.5 million in direct costs and $1.9 million in facilities and administrative ("F&A") costs.

4.      On May 23, 2024, the U.S. Department of Health and Human Services ("HHS") executed a Colleges and Universities Rate Agreement with Boston University that detailed, among other things, the F&A rates for Boston University's grants, contracts and other agreements with the federal government. DOE accepts BU's negotiated facilities and administration cost rates as established with HHS. This Agreement is in effect through June 30, 2028.

5.      The funding Boston University receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example, Boston University's DOE-funded research includes:

i. Research to create more affordable fuel alternatives like green hydrogen, expanding our understanding of energy in our universe.

ii. Research aimed at better understanding the flow of energy in plasma turbulence, which will help answer questions about solar flares, life on other planets, the history of Mars, and carbon-free fusion energy.

iii. Research to investigate the interacting effects of climate warming and increased frequency of soil freeze/thaw on ecosystem functioning with a goal of improving the understanding of the effects of warming during the growing season and soil freeze/thaw cycles in winter.

iv. Research to measure the community effects of offshore wind energy development in the Northeastern U.S.

6. F&A costs are essential for supporting this research. The DOE's proposal to cut F&A cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 5.

7. F&A cost reimbursement is critical to Boston University's research resources, as it supports the operation, maintenance, and administration of Boston University's research infrastructure. F&A costs include costs for operation and maintenance of BU's research facilities; utility costs (including heat and electricity); the costs of personnel in support of research in areas such as research compliance, sponsored programs, and post-award financial operations; costs for computing infrastructure; and costs for libraries.

8. Facilities-related costs make up nearly 60% of BU's F&A cost rate, which includes the costs of maintenance and repairs, utilities, and depreciation of the cost of acquisition,

construction, and improvement to BU buildings.  The facilities available to researchers have a direct impact on the research that can be done at Boston University.

9.      Administrative costs make up approximately 40% of BU's F&A cost rate.  These administrative costs include three components: departmental administration, general administration, and sponsored programs administration.  These administrative costs include information services, computing, and technology costs related to the support of research. They also include staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.   These mandates serve many  important functions,  including ensuring research integrity; maintaining an effective biosafety program and properly managing research involving biohazardous materials; managing and disposing of chemical and radioactive materials used in research; preventing financial conflicts of interest; managing grant funds; complying with export control laws; developing a research security program to address U.S. national security concerns; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

10.     Recovery of Boston University's F&A costs is  based on predetermined rates that have been contractually negotiated with the federal government.

11.     For Fiscal Year 2024 (and effective through Fiscal Year 2028), Boston University has negotiated different F&A cost recovery rates for different types of grants, which vary from 26% to 63.5%.  The treatment of F&A cost reimbursement under our sub-grants is also different than under our prime grants. For Fiscal Year 2024, BU's effective F&A cost rate under all of its DOE grants was 40.4%, reflecting the mix of different types of awards and activities.

12.     The impact of a reduction in the F&A cost rate would be significant.  Of the $7.4 million in DOE funding that Boston University received in Fiscal Year 2024 (July 1, 2023 through

June 30, 2024), approximately $5.5 million was allocated for direct costs, and approximately $1.9 million for F&A costs. Similarly, in Fiscal Year 2025, Boston University expects to receive approximately $4.7 million in DOE funding for direct costs, while BU expects to receive approximately $1.9 million for F&A costs, based on the predetermined F&A cost rates.

13.     If—contrary to what Boston University has negotiated with the federal government—the F&A cost rate is reduced to 15%, Boston University's anticipated F&A cost recovery for its current DOE awards would be reduced by more than $1.7 million, from more than $1.8 million to approximately $171,000.

14.     This reduction would have a significant impact on Boston University's ability to conduct research. BU's research relies on the maintenance of specialized equipment and facilities. Boston University's researchers also rely on support from a number of different BU departments to safely, ethically, and effectively conduct their research, including Environmental Health & Safety and Research Security. Boston University's Environmental Health & Safety enables health, safety and environmental protection in research by providing training and compliance assistance. BU's Research Security program implements and oversees our research security training and compliance program. Without the appropriate funding for these functions, BU's research activities will be impacted.

15.     Boston University has for decades relied on the payment of F&A costs. Until now, we have been able to rely on the well-established process for negotiating F&A cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and F&A sponsored funding to plan for annual staffing needs, including direct costs for the personnel directly involved in the research (principal investigators, post-docs, PhD students, and other research staff) as well as F&A costs, such as infrastructure support for IT networks, libraries,

maintenance of research labs and other facilities, as well as regulatory compliance and grant management support, and facility and equipment purchases.

16.    Nor can Boston University cover the funding gap itself.  While Boston University maintains an endowment, BU cannot use endowment funds to offset shortfalls in F&A cost recovery, for several reasons.  First, the support from Boston University's endowment funds only provides approximately 4% to 5% of BU's operating revenue. Moreover, most of Boston University's endowment is restricted to specific donor-restricted purposes, such as student scholarships, faculty positions, and specific initiatives, and BU is legally obligated to use the funds for these purposes. Boston University is not authorized to use these donor-restricted funds to cover its administrative and facilities-related costs.

17.    Moreover, absorbing the cost of a lower F&A cost rate, even if it were possible, would create long-term budget pressures on Boston University—which would in turn force reductions in key investments supporting BU's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Boston University's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of April, 2025, at Boston, Massachusetts.

/s/ Thomas Bifano

# EXHIBIT 13

## <u>DECLARATION OF DAVID A. TIRRELL</u>

I, David A. Tirrell, declare as follows:

1.    I am the provost at California Institute of Technology (Caltech) in Pasadena, CA. I have held that position since October 1, 2017.  I have held an appointment as Professor of Chemistry and Chemical Engineering at Caltech since July 1, 1998. I previously held professorial appointments at Carnegie Mellon University and at the University of Massachusetts at Amherst.

2.    As provost, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Caltech personnel, and could testify thereto.

3.    Caltech receives substantial annual funding from the Department of Energy ("DOE").  In fiscal year 2024, we expended $25,846,148 in conducting research supported by DOE.  Of this total, $17,936,394 were expended as direct costs, $7,909,754 as indirect costs.  We have 83 active DOE awards and subawards.

4.    The funding Caltech receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example:

    a.    Caltech research in photo- and electrocatalysis is developing new routes to liquid hydrocarbon fuels via reduction of carbon dioxide.  This research is directed toward increasing U.S. energy independence and reducing our reliance on imported fossil fuels.

    b.    Caltech research in high-energy physics is developing new understanding of neutrinos through the Deep Underground Neutrino Experiment, conducted in collaboration with the Fermi National Accelerator Laboratory.  While neutrinos are far from fully understood, there is good reason to believe that they may

provide us with new ways to monitor nuclear proliferation (for national security) and to explore the earth's crust for minerals of critical technological importance.

c.  Caltech research in quantum science and technology is developing new materials for quantum devices, new algorithms for quantum computing, and new strategies for quantum error correction – the central challenge in engineering a practical quantum computer.

5.  Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4.

6.  Indirect costs include those incurred in the construction and maintenance of state-of-the-art facilities for advanced research, as well as the procurement and maintenance of the equipment necessary to conduct such research. Without this equipment, we cannot conduct the research.

7.  For example, with respect to the areas of research described in Paragraph 4:

a.  Caltech research in photo- and electrocatalysis is performed in the Jorgensen Laboratory, which was renovated with DOE support and is entirely devoted to research on liquid hydrocarbon fuels. Indirect cost recovery is essential to the operation and maintenance of the Jorgensen Laboratory.

b.  Caltech research in high-energy physics is performed in the Downs-Lauritsen Laboratory complex. Lauritsen was constructed with substantial DOE support, and its continued operation and maintenance are critically dependent on indirect cost recovery.

    c. Caltech research in quantum science and technology is to be conducted in the 70,000 square-foot Ginsburg Center for Quantum Precision Measurement, currently under construction and scheduled to open in 2026. Indirect cost recovery will be essential to the maintenance and operation of the Ginsburg Center.

8. Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at Caltech. While construction of the Ginsburg Center is funded through private philanthropy, outfitting the new building with state-of-the art instrumentation, and full occupancy and operation of the Center, would be put at grave risk by reduction in DOE funding for Caltech research.

9. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

10. Recovery of Caltech's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

11.    In fiscal year 2024, the predetermined indirect cost rate corresponded to approximately 30% of total costs. The amount of indirect cost recovered during the year reflects rates negotiated over several years, owing to the multi-year character of federal awards.

12.    The impact of a reduction in the indirect cost rate would cause substantial harm to the Caltech research enterprise. As noted in Paragraph 3, of the $25,846,148 in DOE funds expended in fiscal year 2024, $17,936,394 were expended as direct costs, $7,909,754 as indirect costs. We expect our expenditures in fiscal year 2025 to be similar.

13.    If—contrary to what Caltech has negotiated with the federal government—the indirect cost rate is reduced to 15% of modified total direct costs, that would reduce the University's anticipated annual indirect cost recovery by nearly 6,000,000, to approximately $2,000,000.

14.    This reduction will have deeply damaging effects on Caltech's ability to conduct research from day one. For example:

   a.    DOE-funded research on photo- and electrocatalysis currently supports approximately 60 graduate students, postdoctoral scholars and professional staff members. Continued support of this cohort of talented researchers would become untenable. Fewer graduate students would be admitted to Caltech, fewer postdoctoral scholars would be hired, and professional staff members would have appointments terminated before they could complete their research. Training of early-career investigators would be irreparably damaged and research results critical to America's energy future would be lost.

   b.    Hiring of new faculty members would be curtailed, slowing the development of the workforce that will be essential if we are going to meet the growing energy

needs of the nation, including those created by the growth of artificial intelligence.

c.  Loss of funding would also likely mean a reduction in preventive building maintenance. This would lead to failure of electrical, air-handling and plumbing systems in Caltech's research laboratories, with increased disruption of research activities to accommodate emergency repairs.

15.     Caltech is in the process of preparing many applications for DOE research support. The uncertainty regarding DOE overhead policy makes it impossible to complete submission of these applications, which are intended to support research in fuel technologies, quantum science and technology, and high-energy physics.

16.     Caltech has for decades relied on the payment of indirect costs. Until recently, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning.  Operating budgets rely on estimates of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, Ph.D. students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), facility maintenance and equipment purchases. Furthermore, Caltech has long-term obligations—for example, to graduate students who rely on five-year commitments of support to complete their Ph.D. studies—and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

17.     In addition to the immediate impacts and reliance interests described above, there are longer-term impacts that are both cumulative and cascading.  Perhaps most harmful is the contraction in Caltech's ability to train the energy researchers of the future, which will compound from year to year if the proposed reduction in indirect cost recovery is implemented.

18.     Disruptions to Caltech's energy research will also have negative effects in the Pasadena area and the broader region.  For example, Caltech research in quantum science and technology has seeded a major collaboration with Amazon Web Services that employs more than 100 scientists and engineers in a new building constructed by AWS on the Caltech campus to house an ambitious Center for Quantum Computing. In collaboration with a major real estate development firm, Caltech is planning a 120,000 square foot innovation center to be constructed two blocks north of campus.  Prospective tenants include Caltech partners in energy research and quantum science and technology.  Development of the innovation center faces profound risk if DOE research support at Caltech is reduced.

19.     Finally, slowdowns or halts in research by Caltech and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States in energy technologies, quantum computing and artificial intelligence, threatening both our Nation's national security and its economic dominance.

20.     Nor can Caltech cover the funding gap itself.  While Caltech maintains an endowment, it is neither feasible nor sustainable for Caltech to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

   a.  The majority of Caltech's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs.  Caltech is not legally permitted to use those funds to cover research infrastructure costs.

   b.  Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 5%, to ensure long-term financial stability for the institution.

   c.  As a non-profit institution, Caltech applies all of its revenue to mission-critical activities, leaving little margin to absorb unexpected funding gaps.  Unlike for-profit organizations, Caltech does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

19.    Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on Caltech—which would in turn force reductions in key investments supporting Caltech's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Caltech's academic excellence and its ability to perform research in the national interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Pasadena, CA.

_____
David A. Tirrell

# EXHIBIT 14


University of Colorado
Boulder

## <u>DECLARATION OF THE UNIVERSITY OF COLORADO BOULDER</u>

I, Justin Schwartz, declare as follows:

1.     I am the Chancellor at the University of Colorado Boulder (CU Boulder) in Boulder, Colorado.  I have held that position since July 1, 2024. Prior to that I served as the Executive Vice President and Provost at The Pennsylvania State University (interim then permanent) from 2022-2024, after serving as the Harold and Inge Marcus Dean of Penn State's College of Engineering from 2017 to 2022. I have spent my career as a researcher, educator, entrepreneur and academic leader in large state universities. I hold a bachelor's degree in nuclear engineering from the University of Illinois Urbana-Champaign and a doctorate in nuclear engineering from the Massachusetts Institute of Technology. I am a fellow of the National Academy of Inventors, the American Association for the Advancement of Science, the Institute of Electrical and Electronics Engineers, and ASM International.

2.     As Chancellor, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by the University of Colorado Boulder personnel, and could testify thereto.

3.     The University of Colorado Boulder receives substantial annual funding from the Department of Energy ("DOE") and Department of Energy Labs (Including the National Renewable Energy Laboratory (NREL)).  In Fiscal Year 2024 the university received 147 awards from the DOE totaling $29,816,115 with $10,377,944 in indirect expenses.

Docusign Envelope ID: B3665A3E-4B1E-4B82-891D-05EFD3216AC8

4.    The funding the University of Colorado Boulder receives from DOE supports critical and cutting-edge energy related research, which millions of Americans benefit from and depend on.  The U.S. Department of Energy (DOE) funds a wide array of research initiatives at the University of Colorado Boulder (CU Boulder), spanning renewable energy, materials science, atmospheric studies, and advanced energy systems. These efforts are often conducted in collaboration with national laboratories and interdisciplinary research centers. CU Boulder researchers collaborate with DOE's Office of Science on various projects, including materials science for solar and energy efficient computing and energy resilience systems. These collaborations often involve partnerships with national laboratories and contribute to advancing basic and applied energy research. CU Boulder's fundamental research is enabled by its participation in 6 Energy Frontier Research Centers focusing on fundamental scientific understanding that form the underpinning of next generation technologies and the critical workforce needed to develop these technologies. In this manner, the work supported by CU Boulder, and DOE-sponsored initiatives, directly impacts our nation's economic and national security by reducing our current and future reliance on technologies that are actively being developed outside the United States. It is noteworthy that a significant portion of CU Boulder's research aligns well with the U.S. Secretary of Energy's strategic direction for the Department of Energy, which emphasizes energy affordability, reliability, and national security, as well as a shift from demonstration projects to fundamental research.

CU Boulder plays a crucial role in supporting the DOE National Laboratories. For instance, CU Boulder maintains formal agreements with several DOE national laboratories, including NREL, Los Alamos National Laboratory, and Sandia National

Docusign Envelope ID: B3665A3E-4B15-4B82-891D-05FED3216AC8

Laboratories. These partnerships facilitate collaborative research projects, provide access to specialized facilities, and offer opportunities for faculty and student engagement

5.   For example:

a.   The Department of Energy-funded research led by the University of Colorado Boulder's Renewable and Sustainable Energy Institute (RASEI) encompasses a wide range of projects focused on the development and deployment of technologies critical to the United States' energy security. This research includes foundational work on fusion energy, control systems for wind and marine turbines, and advanced energy storage and grid reliability.

b.   At CU Boulder's JILA institute and within the Department of Physics, Department of Energy-funded research spans a frontier portfolio in quantum science, condensed matter physics, and nuclear and particle theory. Projects include nano-optical imaging and ultrafast spectroscopy of quantum materials, exploration of disordered quantum states and fractons, and development of advanced quantum sensors capable of detecting radiation-induced effects in quantum circuits. Additional initiatives investigate superconductivity, strongly coupled plasmon polaritons for energy applications, and cryogenic spin probe technologies for rapid characterization of quantum defects. Work in experimental heavy ion physics and nuclear theory also contributes to fundamental understanding of matter under extreme conditions. These programs not only drive breakthroughs in quantum computing and next-generation materials, but also support applications in energy conversion, space science, and national security, reinforcing U.S. leadership in fundamental and applied physical sciences.

Docusign Envelope ID: F3665A3F-4B15-4B82-991D-055FD3216AC8

c. The Department of Energy also funds an expansive portfolio of research across CU Boulder's College of Engineering and Applied Science, which includes the departments of Mechanical, Aerospace, Civil, Chemical and Biological, and Materials Engineering, as well as Computer Science. This research includes innovations in water purification, low-carbon cement manufacturing, battery technology, and next-generation photovoltaic and fuel cell materials. Projects also include the application of artificial intelligence to wind energy forecasting, robotic systems for battery recycling, and advanced simulations for grid optimization. By addressing critical challenges in sustainability, infrastructure resilience, and clean energy systems, this work supports public health, national competitiveness, and a sustainable economic future.

d. Critical work at CU Boulder focusses on next generation solar technologies, which are aggressively being pursued in countries such as China. It is critical for the United States not to be reliant on foreign entities for development of technologies such this, rather it is in our national interest to develop these technologies domestically, so industry can further develop them and manufacture U.S.-made products.

e. Another critical area of excellence at CU Boulder pertains to energy storage applications, most notably in the area of next generation batteries. For example, a significant milestone in CU Boulder's battery research is the development of solid-state lithium batteries by CU Boulder professors leading to the creation of Solid Power, a CU Boulder spin-off company. Solid Power has advanced the commercialization of solid-state batteries, which offer enhanced energy density and safety compared to traditional lithium-ion batteries. The company has attracted substantial investment and established manufacturing facilities in Colorado.

Docusign Envelope ID: B3665A3E-4B1E-4B82-991D-055FD3210AC8

f. CU Boulder has forefront research in securing the national electrical grid to address current challenges and increasing demands associated with both Artificial Intelligence and the proliferation of data centers. In particular activities that pertain to building-to-grid optimization, including i) the development of strategies for buildings to interact dynamically with the power grid, enhancing demand response and energy efficiency ii) applications of machine learning techniques to improve power system operations and control; iii) enhancing the resilience and reliability of smart grids through advanced control methods; iv) Designing microgrids that can operate independently or in conjunction with the main grid, improving energy security; iv) implementing advanced control strategies for building energy systems to optimize performance and efficiency

6. Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4. Indirect costs include personnel in support of sponsored projects (security, financial, administrative, technical, maintenance, and janitorial staff), secure data storage, telecommunication, high-speed data processing, utilities (ventilation, heat, air conditioning, water and lighting), library and research facilities, radiation and chemical safety, advanced research lab equipment, costs of federal regulatory compliance, including human and animal safety review boards. For example, with respect to the areas of research described in Paragraph 4:

a. Research relies on state-of-the-art instrumentation facilities that include characterization tools such as transmission electron microscopy, X-ray diffractometers, and laser spectroscopy tools. In many cases, these tools are purchased with

Docusign Envelope ID: B3665A3E-4B15-4B82-881D-055FD3216AC8

instrumentation grants that require significant cost-sharing elements, which are facilitated by reinvestment from indirect cost recovery.

b. Materials development also requires specialized synthesis spaces that include advanced HVAC systems, which are both expensive to install and maintain.

7. Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at the University of Colorado Boulder. The University of Colorado Boulder is planning to construct a new research facility that will accommodate several faculty members engaged in the fields of materials synthesis and characterization for energy applications and quantum applications. However, substantial reductions in indirect costs have prompted the university to consider delaying or even canceling the construction of these facilities, which are crucial to CU Boulder's ability to conduct research that is vital to the development of our next generation workforce. This research is essential for maintaining the United States' technological and scientific leadership in these areas.

8. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.[1] These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing

environments mandated for regulated data. Other costs include utilities (electricity, water, heating/cooling), building maintenance, depreciation of facilities and equipment, the support of shared research infrastructure like core facilities, and training programs for lab safety and research ethics. These costs are critical for maintaining the environment that makes research possible.

9.    Recovery of the University of Colorado Boulder's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government. Through fiscal year 2024, the predetermined indirect cost rates at 56.5%.

10.    The impact of a reduction in the indirect cost rate would be devastating.  In Fiscal Year 2024 CU Boulder received approximately $29,479,000 in direct costs on DOE awards and recovered $10,377,944 in indirect costs. In fiscal year 2025, the University of Colorado Boulder expects to receive approximately $34,490,000 in DOE funding for direct costs, while $12,141,000 is allocated for indirect costs.  And over the next five years, the University of Colorado Boulder anticipates receiving an average of $40,714,000 from the DOE for annual direct costs.  Based on the predetermined indirect cost rate of 56.5%, which was agreed upon by the federal government as of 2022 thus CU Boulder estimates to receive approximately $14,331,000 in indirect cost recovery on an annual basis.

11.    This reduction will have deeply damaging effects on the University of Colorado Boulder's ability to conduct research from day one.  Most critically, it will necessarily and immediately result in staffing reductions across the board.  For example, the University is responsible for ensuring compliance with numerous regulatory requirements from federal sponsors, including DOE. Without adequate funding for indirect costs, the University would need to reduce staff in the Office of Research Integrity and research compliance,

Docusign Envelope ID: B3665A3F-4B15-4B82-891D-055FD3216AC8

which would limit its ability to prevent financial conflicts of interest, manage intellectual property, and protect technologies and national security expertise from inappropriate access by foreign adversaries. Reductions in staffing within the Office of Information Technologies will hinder the University's capacity to provide the high level of cybersecurity, data storage, and computing environments necessary for regulated data. Furthermore, staffing cuts will adversely affect the support of shared research infrastructure, including unique core facilities that may become unusable and obsolete. This situation could result in significant losses related to investments made to acquire instrumentation and the potential to offer these resources to the broader community for essential testing and characterization. Critical instrumentation includes for example, the transmission electron microscopy facility, quantum measurement devices, spectrometers, and laser systems, among others.

12.   It is estimated that cutting overhead rate to 15% will cause a reduction of $8,224,000. Based on current allocation of indirect costs to support administrative units, this will correspond to a loss of approximately 25 positions in units including the Office of Contracts and Grants, Campus Controller Office, Research Compliance and Export Controls as well as unit-level administrative positions within RASEI, JILA, the Institute for Artic and Alpine Research (INSTAAR), the College of Arts and Sciences and the College of Engineering and Applied Science.

13.   The University of Colorado Boulder has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual

Docusign Envelope ID: D3665A2F-4B1E-4B82-891B-0E55B7216AC8

staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, environmental health and safety staff and facilities, and grant management support), and facility and equipment purchases. And in some cases, the University of Colorado Boulder has long-term obligations—for example, indirect costs fund the establishment of laboratories for newly appointed faculty members, and the support of graduate student fellowships. These start-up funds are committed over periods that vary between 3 and 5 years. Thus, reductions in indirect costs will prevent the university to meet such commitments, reducing the success rate for new faculty and students—and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

14.     In addition to the immediate impacts and reliance interests described above, there are longer-term impacts that are both cumulative and cascading. The areas of research where the Department of Energy has invested include those where i) there is extensive foreign competition, ii) the work impacts the safety and reliability of critical energy infrastructure, iii) the work helps develop various capabilities required to meet the increasing demand for artificial intelligence and data centers, each of which has been identified as a critical infrastructure to our national security and economic security.

15.     Disruptions to the University of Colorado Boulder's research will also have negative effects in the Boulder and Denver area, the state of Colorado and the broader region. More than 13,500 Colorado residents were directly employed by the University of Colorado Boulder—and it collaborates with state and local partners to help solve regional challenges through joint research and innovation. The University of Colorado Boulder's research also fuels spending in the regional economy, including by driving discoveries that launch new

ventures, attract private investment, and make a positive social impact. A massive reduction in the University of Colorado Boulder's research budget would immediately and seriously jeopardize these contributions to the local region.

16. Finally, slowdowns or halts in research by the University of Colorado Boulder and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

17. Nor can the University of Colorado Boulder cover the funding gap itself. The University of Colorado Foundation maintains an endowment for the entire system, and not the individual campuses. Additionally, endowment funds are restricted based on the individual donor the donor agreement, meaning it is neither feasible nor allowable for the University of Colorado Boulder to use endowment funds to cover funding gaps created by a reduction to indirect cost rates.

   a. As a non-profit institution, the University of Colorado Boulder reinvests nearly all of its revenue (primarily student tuition revenue) into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, the University of Colorado Boulder does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

18. Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on the University of Colorado Boulder—which would in turn force reductions in key investments supporting the University of Colorado Boulder's faculty, students, staff, research, and teaching infrastructure, as well as other

critical activities needed to maintain the University of Colorado Boulder's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Boulder Colorado.



# EXHIBIT 15

## DECLARATION OF DR. GREG HIRTH

I, Greg Hirth, declare as follows:

1.    I am the Vice President for Research at Brown University ("Brown") in Providence, Rhode Island.  I have held that position since February 4, 2025, after serving as interim Vice President for Research starting in September 2024.  I am also a Professor of Earth, Environmental, and Planetary Science, and a federally funded researcher.  I have been on the faculty at Brown University since 2007.

2.    As Vice President for Research, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Brown University personnel, and could testify thereto.

3.    Brown is a major research institution that receives funding from the Department of Energy ("DoE").   This funding supports cutting-edge, multi-year research projects both in the School of Engineering and in Brown's Departments of Physics, Applied Mathematics, Chemistry, and Earth, Environmental and Planetary Sciences.

4.     Specifically, Brown conducts fundamental and applied research directed at the forefront of priorities of the Department of Energy on a broad range of problems critical to the nation's current and future energy needs and security, as well as the technology and innovation required to maintain global leadership in these categories.  Our projects cover many critical areas that remain priorities of the current administrations, including artificial intelligence, quantum information science, and nuclear technology.

5.     Examples of critical, DoE-funded research projects being conducted by Brown include the following:

a.      Research funded by \$1,257,822 from the DoE Basic Energy Sciences (BES) office supports new fundamental science of interfaces between different semiconductor materials that are ubiquitous in everyday devices such as microelectronics, electronic displays, energy harvesters, and batteries. The knowledge gained from this research will enable the design and creation of improved devices with enhanced durability and reliability.  This has the potential to improve the efficiency of a broad array of technologies for solar energy, sensing, medical imaging, computing, and communication.

b.      Research funded by the DoE Advance Scientific Computing Research (ASCR) program aims to develop the mathematical principles of the next generation of AI systems that will be able to reason and quantify uncertainties, and will consume much less energy than the current generation of AI systems.  This approach will be key to developing AI-enabled technologies in the future, and has the potential to reduce the cost of next-generation manufacturing, advance health-diagnostic technologies, and significantly enhance the state-of-the-art with security systems for banking, personal data, and national security.

c.      Research funded by \$725,181 from DoE supports work at Brown in collaboration with Lawrence Livermore National Laboratory to advance the fundamental theoretical understanding of the interaction between ions and electrons at electrified interfaces, and their influence on reactions, using AI-guided modeling. These interfaces are crucial in a broad range of emerging technologies, including batteries, hydrogen, supercapacitors, and advanced manufacturing technology for products such as next-generation fertilizers and cements. The modeling group at LLNL is relying on Brown researchers' experiments to inform its work. This work has the potential to produce energy

efficient vehicles, reduce the impact of corrosion on materials and structures, and contribute to the development of fast-charging personal electronics such as laptops, tablets, and cell phones.

       d.     Research funded by $749,993 from DoE over 5 years aims to decipher spin and orbital dynamics in quantum materials through neutron scattering. The results of this research will provide essential input to establish theoretical frameworks for predicting the properties of quantum magnets with fluctuating spin and orbital degrees of freedom. In turn, this knowledge will guide the design of materials and devices with novel quantum functionalities.

       e.     Research funded by $20,425,001 from DoE over 5 years leverages expertise in Brown University's High-Energy Physics (HEP) group to explore detailed understanding of the newly discovered Higgs boson and searching for new physics beyond the standard model, uncovering the origin and nature of dark matter and dark energy, understanding the deep connections between physics of the smallest and largest scales via means of quantum field theory. This research harnesses advanced AI technologies and was awarded the 2025 Breakthrough in Fundamental Physics Prize.

       f.     A traineeship program funded by $1,700,000 from DoE over 3 years (January 2022 through December 2026) works to fill critical gaps in the curricula that educates high energy experimentalists and to train students to innovate and build the particle detectors for tomorrow.  This award is aimed at addressing DOE's acknowledged critical shortage of high energy physicists with these fundamental skills, and prepares trainees to join the STEM workforce.

g.     Research funded by $1,807,998 from DoE over 3 years (May 2023 through July 2026) is aimed at understanding the structures and chemical dynamics of molecules in states far from equilibrium, with great importance for basic energy science and applied science. To advance chemistry, there is an urgent need to measure molecular structures during chemical reactions in short lived states, and in geometries that are dramatically different from those of the ground state equilibrium structures. This project also delivers important benchmarks that are valuable to the continued development of computational codes.

h.     Research funded by $1,796,120 from the DoE BES office over 7 years focuses on the properties of polycyclic aromatic hydrocarbon molecules. Some of these molecules, found in the natural environment and our daily life, are air pollutants. Results from this research project will contribute to the understanding of the molecules' chemistry and to finding ways to mitigate their impact.

7.     Brown receives federal research funding in the form of sponsored grants and contracts, which normally provide for the recovery of certain indirect costs at contractually negotiated rates.  Overall, in the 2024 fiscal year, Brown's federally sponsored grants and contracts totaled $253.56 million, or 19% of Brown's operating revenue.  Of that $253.56 million, $69.63 million was in the form of indirect costs.  In the current 2025 fiscal year, Brown's operating budget projects $300 million in sponsored research, which represents 19% of the University's net revenue and anticipates $73 million in indirect costs.

8.     On April 11, 2025, DoE issued "Policy Flash 2025-22" stating that it "is setting a standardized 15 percent indirect cost rate for all grant awards to [Institutions of Higher Education]" and that it would "terminate all grant awards to IHEs that do not conform with this updated policy."

This reduction to the indirect cost rate and the termination of these critical grants will have devastating effects on Brown's research initiatives and the progression of science, not only for the University and for Rhode Island, but for the nation and its citizenry.

9. Setting the overhead rate of sponsored grants and contracts to 15% would disrupt Brown's research initiatives, operating budgets, personnel, core infrastructure, and communities, all of which depend upon the current rate of F&A cost recovery. If the indirect cost reimbursement of Brown's DoE sponsored grants and contracts had been reduced to 15%, the loss for Fiscal Year 2024 would have exceed $2M. We estimate the loss for Fiscal Year 2025 would be similar to Fiscal Year 2024 based on year-to-date expenditures.

10. Grant awards are factored into the University's multi-year financial plan, so any reduction in the F&A rate has a significant impact on Brown's multi-year planning and long-term strategic decision-making. These funds are critical as Brown weighs making capital and other infrastructure investments that support the research mission of the University.

11. Even more immediately, a reduction in the F&A rate to 15% would require Brown to move very quickly to adjust its operations to absorb the loss of millions of dollars of expected revenue. That would include eliminating positions that support the research enterprise and facilities, such as administrators, research coordinators, lab managers, custodial staff, and security officers.

12. Importantly, like all research-intensive universities, Brown cannot make up for the resulting gap in funding because research is already highly subsidized by the University. Brown's full cost of research is significantly more than what is covered by sponsored direct costs and indirect cost recovery. In the 2024 fiscal year, for example, Brown's full cost of research was approximately $395 million, which was about $100 million more than sponsored direct costs

($224M) and indirect costs ($70M) received from the federal government. Because Brown's federal awards cannot exceed 26% for administrative costs, all Brown's administrative costs above 26% go unrecovered and are subsidized by the University.

13. There is currently no other identified source of funds that Brown can utilize to bridge the gap for the current costs of research. The University would have little choice but to significantly scale back the amount of research it conducts.

14. It has been suggested that Brown use its endowment to make up for these lost federal funds. The endowment provides an essential source of support for the University's financial aid, faculty salaries, and academic and co-curricular programs and consists of over 3,800 unique funds that are legal contracts given as charitable gifts by alumni, parents, students, and friends of the University. These are restricted by law and purpose for their designated use, and cannot simply be reallocated.

15. The purpose of Brown's endowment is to support the mission of Brown in perpetuity. It is managed with a dual mandate to balance the competing demands of current operations and preserve purchasing power to support future operations.

16. Brown's annual endowment payout, or the amount distributed from the endowment to support each fund's designated purpose, is between 4.5% and 5.5% of the endowment value's 12-quarter trailing average, as approved by Brown's Corporation. Brown's current endowment payout is set to 5.5%, the highest payout currently allowed. Because all endowments are legally subject to the Uniform Prudent Management of Institutional Funds ACT (UPMIFA), the University's ability to increase this annual payout beyond the Corporation-approved range is limited. In short, Brown's endowment cannot make up for the significant gap in funding a reduction in F&A or total termination of DoE awards would create.

17.     A reduction in F&A or total termination of DoE awards would further threaten Brown's ability to train and retain the next generation of engineers, mathematicians, physicists, and chemists. If these awards are terminated, graduate students will have to stop their work, which would hinder their degree completion.  This would impact Brown's workforce and ability to be competitive in fields such as sensing, AI, materials, and energy.

18.     Conducting critical, cutting edge research requires specific facilities and equipment, as well as experienced support staff who can ensure that projects are conducted safely, within budget, and in compliance with all relevant regulations.  Both a change in the indirect rate and grant termination would force Brown to reduce or close experimental and computational infrastructure facilities necessary to perform this important research, and significantly impact our ability to maintain the equipment necessary to conduct advanced research.

19.     Wholesale termination of these awards would have devastating impacts on Brown and well beyond the University.  The reduced utilization of research supplies, equipment, and services would immediately affect companies that produce lab equipment and other supplies, and have serious ramifications for the supply chain that supports the engineer, mathematics, chemistry, and physics research enterprises.

20.     Stopping or slowing DoE-funded research not only impedes work in specific fields, but also necessarily causes America to lose its global competitive edge in areas such as AI, microelectronics, advanced functional materials, and quantum science—today and in the future. In fact, one of Brown's DoE-funded grants focuses on training PhD students from across the country in innovative skills that prepare them to be a part of the STEM workforce

21.     The American scientific ecosystem would be undermined by any disruptions to and cancellation of federally sponsored, university-conducted research, with immense consequences

for our nation's competitiveness and economy. For example, several ongoing projects at Brown are essential to the interests of the national labs, including key strategic areas for the United States such as advanced manufacturing. Stopping or reducing the work at the university will affect projects of national interest, including those at the following national laboratories: Sandia National Labs, Oak Ridge National Labs, Pacific Northwest National Labs, Lawrence Livermore National Labs, Idaho National Labs, and Fermi National Accelerator Lab.

21. Without the opportunity to conduct this research, skilled faculty will opt to leave Brown, and likely the United States, in pursuit of viable work. This brain-drain will inevitably lead to lost opportunities to develop U.S. intellectual property, advance American science and energy security, create U.S. startup companies, and develop a workforce critical for the science and technical priorities of the current administration.

22. Accordingly, implementation of the Policy Flash will significantly and immediately compromise scientific advancement in numerous areas critical to the public interest and the advancement of key areas for American global competitiveness and security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Providence, Rhode Island.

Greg Hirth, PhD
Vice President for Research
Brown University

JA213

Case 1:25-cv-10912-ADB    Document 2    Filed 04/11/25    Page 1 of 9

# EXHIBIT 16

## DECLARATION OF CASSANDRA MOSELEY

I, Cassandra Moseley, declare as follows:

1.     I am the Vice President for Research at Colorado State University ("CSU") in Fort Collins, Colorado.  I have held that position since January 2024.

2.     As vice president for research, I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by CSU personnel and could testify thereto.

3.     CSU receives substantial annual funding from the Department of Energy ("DOE"). In fiscal year 2024, CSU received $24.9 million in total funding from the DOE. This includes $6.6 million in indirect costs. CSU has 110 active awards with a total obligated amount of $102.3 million of which $21.1 million is indirect cost.

4.     The funding CSU receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example:

   a.  CSU's research on laser-driven fusion energy enables American energy independence and supports the US fusion industry.

   b.  CSU's high-power laser research has produced new sources of high-energy x-rays that improve national defense and aerospace manufacturing.

   c.  CSU's energy research enables American energy independence by developing approaches to lower costs and increase production from diverse sources, including natural gas, waste materials, and photovoltaics.

1

d.  Research on advanced materials at CSU is leading to improved products at lower costs, including for metals in gas turbines, composite materials, and semiconductors in optical devices and computing, all of which are critical for US global competitiveness.

e.  CSU's research on recovery of critical minerals from soils has the potential to provide a pathway for US production of an urgently needed resource.

f.  CSU's research on energy, economics, and policy engineering associated with the integration of advanced technologies benefits crucial industries such as automotive engineering, energy systems, and autonomous transportation.

g.  CSU's techno-economic research applied across a range of energy technologies has been essential for de-risking emerging innovations and guiding them toward commercial viability, accelerating the deployment of solutions that enhance energy security and promoting domestic resilience.

h.  CSU's research on improved prediction of storms and severe weather, including thunderstorms and lake-effect snowstorms, directly enhances safety for tens of millions of people and improves long-term water management, benefitting agriculture.

5.  Indirect costs are essential for supporting this research.  The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all the research projects described in paragraph 4.

6.  Indirect costs include constructing and maintaining state-of-the-art facilities required to meet the current technical requirements of advanced research, as well as the

procurement and maintenance of equipment necessary to conduct such research. Without this infrastructure and equipment, CSU cannot conduct the research itself.

7.      For example, with respect to the areas of research described in Paragraph 4:

a.   High-power laser research that advances development of fusion energy and new sources of high-energy x-rays requires highly specialized optical and electronic equipment, vibration-proof facilities, ultra-clean laboratories, and facilities for nano-scale precision fabrication of materials.

b.   The development of approaches to lower costs and increase production of new energy sources requires biotechnology and materials science laboratories, genomic sequencing instruments, highly sensitive mass spectrometers, electron microscopes, and bioreactors.

c.   Research to develop new, advanced materials requires materials science and chemical synthesis laboratories, nuclear magnetic resonance instruments, advanced microscopes, and optical and electronic test equipment.

d.   Research into new pathways for critical minerals recovery from soils requires biotechnology laboratories, genomic sequencing instruments, and chemical analysis equipment.

e.   The development of new approaches to energy policy engineering and techno-economic analysis requires advanced computing equipment.

f.   Research to improve prediction of storms and severe weather requires high-performance computing systems, including systems designed for AI-enabled computation.

8.     Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at CSU.  Currently, CSU is developing a significant and complex new facility designed specifically to advance research and development in laser fusion energy technology, including vibration-proof foundations, high-level clean rooms, and cutting-edge laboratories. The construction of this state-of-the-art building will be at risk if indirect cost recovery is reduced.

9.     In addition, indirect costs fund the administration of research awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.  These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

10.     Recovery of CSU's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

11.     Through fiscal year 2026, the predetermined indirect cost rates are 54% for on-campus organized research; 26% for off-campus research; 35% for on-campus other sponsored activities; and 24% for off campus other sponsored activities.

12.     The impact of a reduction in the indirect cost rate would be devastating.  Of the $25.9 million in DOE funding that CSU received in Fiscal Year 2024, approximately $15.2 million was allocated for direct costs, $4.1 million for subcontracts (which are not eligible for full overhead recovery), and $6.6 million for indirect costs. Similarly, in fiscal year 2025, CSU expects to receive

$15.2 million in DOE funding for direct costs, while $6.6 million is allocated for indirect costs. And over the next five years, CSU anticipates receiving an average of $15.2 million from the DOE for annual direct costs. Based on the predetermined indirect cost rate of 54% of modified total direct costs for on-campus research projects and other predetermined rates as applicable, which was agreed upon by the federal government as of 4 September 2024, the University thus expects to receive approximately $6.6 million in indirect cost recovery on an annual basis from the DOE.

13.     If—contrary to what CSU has negotiated with the federal government—the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by $4.4 million to $2.0 million.

14.     This reduction will have deeply damaging effects on CSU's ability to conduct research from day one. Most critically, it will necessarily and immediately result in staffing reductions. For example:

      a.   CSU's Office of Sponsored Programs, compliance staff, IT staff, and research administrators staffed within the individual colleges are charged with reviewing and managing all extramurally sponsored research, ensuring the safety and security of this research, and ensuring that all research, research data, and the management of research funding is conducted and managed in compliance with all relevant regulations and requirements. Without appropriate funding for indirect costs from the DOE, CSU would have to reduce staffing in these critical areas by an estimated 5-10 individuals, which would immediately impact its ability to ensure the effective and compliant management of research projects, programs, and funds. That would in turn lead to substantial delays in critical

research that relies on these compliance and administrative functions, including projects funded by DOE.

15.     Like other research institutions in the United States, CSU has relied on the payment of indirect costs for decades.  Until now, CSU has been able to rely on the consistent and well-established process for negotiating indirect cost rates with the government to inform the university's budgeting and planning.  Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, postdoctoral researchers, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases.  And in some cases, CSU has long-term obligations—for example, tenured faculty salaries, admitted PhD students, and postdoctoral researchers—and it relies on budgeted grant funding to fulfill these commitments.

16.     In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.  For example, reductions in indirect cost recovery would, over time, degrade research infrastructure such as buildings and equipment due to reduced funding to invest in maintenance and modernization and create gaps in safety and security due to inadequate staffing.  These disinvestments would challenge CSU's ability to restart projects even if funding were restored.

17.     Disruptions to CSU's research will also have negative effects in the Fort Collins and the Northern Colorado area, the state of Colorado, and the broader region.  Approximately 8,150 Colorado Residents are directly employed by CSU—and it collaborates with state and local partners to help solve regional challenges through joint research and innovation.  CSU's research also fuels spending in the regional economy, including by driving discoveries that launch new

ventures, attract private investment, and make a positive social impact. A significant reduction in CSU's research budget would immediately impact and seriously jeopardize these contributions to the local region.

18.     Slowdowns or halts in research by CSU and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our national security and our Nation's economic dominance. For example, CSU's DOE funded research in laser fusion energy has the potential for breakthrough discoveries that are critical for both national security and global economic competitiveness in the coming decades.

19.     CSU cannot cover the funding gap itself. While CSU maintains an endowment, it is neither feasible nor sustainable for CSU to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

   a.  Nearly all of CSU's endowment—around 96.7%—is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. CSU is not legally permitted to use those funds to cover research infrastructure costs.

   b.  Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 4%, to ensure long-term financial stability for the institution.

   c.  As a public institution of higher education, CSU invests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, unlike for-profit organizations, CSU does not generate

significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

20.    Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on CSU—which would in turn force reductions in key investments supporting CSU's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain CSU's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Fort Collins, Colorado.

_____
Cassandra Moseley

# EXHIBIT 17

## DECLARATION OF DOROTA GREJNER-BRZEZINSKA

I, Dorota A. Grejner-Brzezinska, declare pursuant to 28 U.S.C. 1746 and under the penalty of perjury, that the following is true and correct.

1.      I am the Vice Chancellor for Research at the University of Wisconsin-Madison ("UW-Madison"), a position I have held since 2024. In this role, I have responsibility for overseeing the university's research enterprise with more than $1.7 billion in annual research expenditures. My office also includes administration of 20 cross-campus research and service centers. The mission of the Office of the Vice Chancellor for Research is to advance excellence in research and scholarship, to support our multidisciplinary research centers and institutes, and to provide campus-wide administrative infrastructure to support and advance the research enterprise. Prior to holding this position, I was the Vice President of the Office of Knowledge Enterprise, Associate Dean for Research in the College of Engineering, and a Professor of Civil, Environmental and Geodetic Engineering at The Ohio State University. At Ohio State, I also served as senior vice president for corporate and government partnerships, focusing on growing research talent and helping launch new research institutes and centers. I have mentored 16 doctoral students and secured nearly $39 million in research funding for my own research, which is centered on GPS, the Global Positioning System. My laboratory developed the first fully digital and directly geo-referenced Airborne Integrated Mapping System, combining high-resolution digital, aerial camera images with GPS and inertial technology. I have served on the President's Council of Advisors on Science and Technology (2019-2021) and was appointed to the National Science Board in 2023. I am also a fellow of the American Association for the Advancement of Science, the Institute of Navigation, and the Royal Institute of Navigation and member of the

National Academy of Engineering. Additionally, I serve as principal investigator of the National Science Foundation's Engineering Research Visioning Alliance.

2.      As the Vice Chancellor for Research, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by university staff and could testify thereto.

3.      As Wisconsin's flagship research university, UW-Madison receives a substantial amount of research support from the U.S. Department of Energy ("DOE") each year. DOE-funded research at UW-Madison fuels innovation in areas critical to the nation's future, including energy technologies, nuclear engineering, fusion energy, grid resilience, energy storage, and advanced computing for energy systems. This work also supports the training and development of the next generation of scientists and engineers addressing the country's most pressing energy challenges. As of April 2025, UW–Madison holds 493 active DOE-funded awards (both direct and pass-through), with a total budgeted value of $537.7 million, inclusive of both direct and indirect costs. According to the university's recently published Data Digest (p. 67), $81.9 million in new DOE funding was awarded in FY 2024–25 to support ongoing projects—contributing significantly to the advancement of research and the infrastructure needed to sustain it.

4.      The funding UW-Madison receives from DOE supports critical and cutting-edge energy research, which millions of Americans benefit from and depend on.  For example:

   a.  **Great Lakes Bioenergy Research Center (GLBRC).** The almost 350 scientists and staff of the GLBRC are charting a path for the United States to be a world innovation leader in producing fuels, chemicals, and materials from crops grown on acres that are not suitable for food production. Federal F&A costs are critical to generate cost-competitive products from plants and

microbes adapted for this purpose. These funds are essential to secure the laboratory, field and computational data that will ensure the US position as a leader in producing fuels, chemicals and materials from abundant home-grown agricultural residues. The research breakthroughs enabled by F&A investment will provide economic benefits to farmers, create jobs for rural communities, ensure international leadership in the increasingly competitive field of plant and microbial biotechnology, and provide a trained workforce to support a secure and resilient US bioeconomy.

b. **UW-Madison School of Medicine and Public Health Cyclotron Laboratory.** UW-Madison's School of Medicine and Public Health Cyclotron Laboratory is one of six University members of the DOE Office of Science's University Isotope Network, a collection of accelerator and radiochemistry facilities who work together with the DOE and National Laboratories to provide needed radioactive feedstock materials and expertise to U.S. and international industry, medical centers, and researchers. Unplanned reductions in funding for this work will imperil medical research and industrial partnerships that are the result of years or decades of successful efforts, including those building to clinical trials of novel radioactive cancer drugs. The Cyclotron Laboratory collaborates widely on projects supported by DOE R&D funding, including (1) with the UW Department of Chemistry and Oak Ridge National Laboratory, developing novel radioactive drugs to diagnose and treat cancer and the technology to produced them cost efficiently at scales that facilitate widespread distribution, and (2) with the UW College of Engineering, with whom they are

working in collaboration with TerraPower to develop and test new cladding materials for molten salt nuclear reactors that can power U.S. energy independence for the coming generation of high demand artificial intelligence and machine learning applications.

c. **Renewable Energy Planning and Community Engagement.** In 2024, UW–Madison Extension received a $1 million DOE grant through the Renewable Energy Siting through Technical Engagement and Planning (R-STEP) program. This funding supports the Renewable Energy Siting and Engagement for Tomorrow (RESET) project, which aims to assist Wisconsin communities in planning and permitting large-scale solar and wind projects. The initiative emphasizes inclusive engagement, particularly with rural and tribal communities, to ensure equitable benefits from renewable energy development.

d. **Smart Grid Deployment in Rural Communities.** UW–Madison's College of Engineering is collaborating on the Smart Power Automation in Rural Communities (SPARC) project, backed by up to $50 million from DOE. This initiative focuses on enhancing energy access and grid resilience in 27 disadvantaged and two tribal communities across Wisconsin. The project includes upgrading grid infrastructure, integrating renewable energy sources, and providing workforce training to prepare local workers for smart grid jobs.

e. **Sustainable Bioenergy and Fertilizer Reduction.** In early 2025, a UW–Madison-led research team secured $5.5 million from DOE to explore methods for reducing synthetic nitrogen fertilizer use in bioenergy crops. The

project investigates leveraging plant-microbe interactions to enhance nitrogen fixation, aiming to improve sustainability and reduce environmental impacts in bioenergy production.

f.  **Nuclear Energy Research and Innovation.** DOE awarded $4.6 million to UW–Madison engineers for multiple nuclear energy research projects. These include studies on advanced reactor materials, cybersecurity for microreactors, and systems integrating nuclear energy with desalination and mineral extraction processes. The funding also supports early-career researchers contributing to the future of nuclear technology.

g.  **Concentrated Solar Power Systems.** UW–Madison researchers received approximately $1.9 million from DOE's SunShot Initiative to develop a fixed-bed regenerator system compatible with supercritical carbon dioxide cycles. This technology aims to improve the efficiency and cost-effectiveness of converting solar thermal energy into electricity.

5.    Indirect costs are essential for supporting this research.  The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4.

6.    Indirect costs include the construction and maintenance of state-of-the-art research facilities—such as laboratories, core facilities, and data centers—as well as the procurement and upkeep of the infrastructure needed to support research activities. This includes utilities, HVAC systems, high-speed data networks, secure data storage, and shared administrative services that ensure compliance, safety, and operational continuity. They also support decades long field studies of crops to be used for bioenergy production, maintaining security of imaging, analytical,

fermentation and reactor datasets needed to train AI models Without these foundational investments, the research itself cannot take place.

7.    For example, with respect to the areas of research described in Paragraph 4:

a.    Research in the GLBRC depends on a suite of interconnected field, laboratory, and computational capabilities. This includes agricultural equipment to plant crops, drones to monitor crop productivity, remote sensors to assess the impact of moisture and soil geochemistry on crops, crop harvesting equipment, and specialized equipment to process harvested crops. In addition to typical laboratory equipment, there is routine use of genomic equipment, high throughput robotic platforms, high accuracy and sensitivity NMR imaging, microscopy, chromatography, and mass spectrometry equipment, as well as specialized facilities for biomass deconstruction, fermentation, and downstream product purification. Data from this equipment is captured by a specialized and secure Laboratory Information Management System, so it is available for immediate use by relevant investigators, to provide training sets for AI/ML models at campus, and to be linked via DOE data systems for analysis at off campus high performance computing sites.

b.    University Isotope Network indirect funding supports continued maintenance and readiness of the University of Wisconsin's Cyclotron Laboratory and its associated radiochemistry infrastructure, which include a network of hot cells and automatic radiochemistry synthesizer robots, high performance germanium gamma ray and X-ray spectrometers, inductively coupled optical emissions spectrometers, high performance liquid chromatographic systems, and

autoradiography phosphor imaging systems that ensure radioactive material is accurately characterized and quantified before being used in human patient studies or shipped to over 100 different industrial, pharmaceutical, hospital, biotech, and academic users in the U.S.

8. Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at UW-Madison. Reduced continuity in operational funding, which comes to the Cyclotron Laboratory only from the DOE Office of Science, threatens plans for a needed expansion of the current laboratory, whose construction is scheduled to begin in less than two years. This is a NIH and UW-funded effort that will enable the Midwest to produce a suite of cutting-edge radioactive materials that are being contemplated at only a few other locations in the world.

9. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

10. Recovery of UW-Madison's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

11.     UW-Madison has a Negotiated Indirect Cost Rate Agreement ("NICRA") with DHHS, covering all federal agencies, and effective as of January 17, 2025. The indirect cost rate in UW-Madison's NICRA is 55.5%.  This rate is composed of 26% for administrative costs and 29.5% for facility costs. Administrative costs are the general costs to administer research, such as accounting, payroll, and research oversight and are capped by federal law at 26%. Facility costs include the maintenance and depreciation of the research facilities.

12.     An F&A rate reduced to 15% would eliminate approximately $14 million in annual funding and result in a similar future reduction in resources available to support research. UW-Madison depends on this funding to sustain its research programs and the infrastructure that supports them. The loss of these funds would immediately impact the university's ability to cover critical expenses associated with its energy research enterprise. This includes costs related to maintaining compliance with federal regulations designed to safeguard national energy security, protect intellectual property, and ensure the responsible conduct of research in areas such as nuclear energy, grid modernization, clean energy technologies, and high-performance computing. It would also compromise the university's ability to maintain the specialized facilities, safety protocols, and administrative oversight necessary for conducting advanced research involving hazardous materials, high-voltage systems, and sensitive technologies essential to U.S. energy leadership and innovation.

13.     This reduction will have deeply damaging effects on UW-Madison's ability to conduct research from day one. For example:

a.  Reductions in indirect costs to the Cyclotron Laboratory risk the support necessary to maintain one of the most qualified accelerator operations staffs in the world, which is comprised of accelerator physicists, radiochemists,

nuclear engineers, and nuclear chemists. Four staff scientists in the Cyclotron Group are partially supported by DOE funds, and without this support it is likely that funding would drop below the level needed to maintain at least two of these positions by Spring of 2026.

   b. Loss of F&A could hinder the ability of the GLBRC to conduct the needed number of field trials of next generation bioenergy crop performance in accordance with federal and local guidelines.

14.   UW-Madison has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. And in some cases, UW-Madison has long-term obligations—for example, and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

15.   Disruptions to UW-Madison's research will also have negative effects in the Madison area, the state of Wisconsin, and the broader region. UW-Madison's research fuels spending in the regional economy including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. For example, as recently reported by Northstar Analytics, LLC, UW–Madison affiliated organizations and startups collectively contribute $30.8B per year to the Wisconsin economy, this economic activity supports more than 232,000 jobs and generates $1 billion in state and local taxes. A massive reduction in UW-

Madison's research budget would immediately and seriously jeopardize these contributions to the local region.

16.     Finally, slowdowns or halts in research by UW-Madison and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.  The National Biotechnology Initiative Act of 2025 released by the National Security Commission on Emerging Technology on April 11 2025 calls for multibillion-dollar biotech funding boost. The report points to two objectives: "make America innovate faster, and slow China down," and proposes two "grand research challenges," one focused on "making biotechnology predictably engineerable," and the other focused on "making biomanufacturing scale-up predictable, rapid, and cost-competitive." DOE-funded research performed in units across UW Madison, and the GLBRC in particular, responds directly to these challenges by developing innovative new bio-based technologies to produce chemicals, fuels and materials that meet the needs of society. Reducing F&A of innovative biotechnology research will harm the goals of this federal initiative and delay research that is crucial to national security.

17.     Nor can UW-Madison cover the funding gap itself. While UW-Madison maintains an endowment, through the Wisconsin Foundation and Alumni Association (WFAA) and the State of Wisconsin Investment Board (SWIB), it is neither feasible nor sustainable for UW-Madison to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

     a. The majority of UW-Madison's endowment—over 80%—is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and

academic programs.  UW-Madison is not legally permitted to use those funds to cover research infrastructure costs.

b.  Even the small portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 4.5%, to ensure long-term financial stability for the institution.

c.  As a non-profit institution, UW-Madison reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  Given the importance of research to its institutional mission, the University will provide limited bridge funding to grants on a temporary basis. Providing support beyond that is not possible because, unlike for-profit organizations, UW-Madison does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

18.   Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on UW-Madison - which would in turn force reductions in key investments supporting UW-Madison's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UW-Madison's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025.

_____

Dorota A. Grejner-Brzezinska

Case: 1:25-cv-10814-ADB   Document: 231-6   Filed: 04/14/25   Page: 13 of 13

# EXHIBIT 18

## DECLARATION OF JENNIFER LODGE

I, Jennifer Lodge, declare as follows:

1.      I am the Vice President for Research and Innovation (VPRI) at Duke University (Duke) in Durham, North Carolina  I have held that position since January, 2022.  Before coming to Duke, I served as the Vice Chancellor for Research at Washinton University in St. Louis, and Senior Associate Dean for Research for the School of Medicine at Washington University in St. Louis. My research has been funded continuously by the federal government for more than two decades.

2.      As VPRI at Duke, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Duke personnel, and could testify thereto.

3.      Duke University receives substantial annual funding from the Department of Energy ("DOE").  In FY24 (July 1, 2023 – June 30, 2024), Duke received 68 awards from the DOE, and expended approximately $23M in DOE funds. Of that total, $6.5M was for indirect expenditures.

4.      The funding Duke receives from DOE supports critical and cutting-edge energy and computing research, which millions of Americans benefit from and depend on, and that are priority areas for this Administration as set forth by President Trump in his March 26, 2025 letter to the Director of the Office of Technology and Science Policy, wherein President Trump expressed the need to "accelerate research and development" to "secure [the United States'] position as the unrivaled world leader in critical and emerging technologies — such as artificial intelligence, quantum information science, and nuclear technology." Examples of DOE funded research that aligns with the President's priorities are:

a.   The Triangle Universities Nuclear Physics Lab (TUNL), housed at Duke, is
     funded through a DOE grant and hosts faculty from Duke, The University of
     North Carolina at Chapel Hill, North Carolina State University, and North
     Carolina Central University.  It is one of only three DOE centers of
     excellence.  TUNL produces approximately 10% of nuclear physics PHDs in
     the US, with 18 graduates over the last grant period and 56 graduate students
     as of January 2024. TUNL provides the facilities for groundbreaking research
     in the areas of astrophysics, nuclear structure and reactions, neutrinos and
     applied nuclear physics. TUNL is a unique facility that conducts research that
     cannot be done anywhere else in the United States.  TUNL also provides
     unique capabilities in medical research in collaboration with Duke's School of
     Medicine, developing new cures for aggressive brain cancers.

b.   The Quantum Systems Accelerator (QSA) program is one of the five
     concentrated quantum centers supported through the U.S. National Quantum
     Initiative. The Duke Quantum Center (DQC) is a major pillar of the QSA as a
     unique facility that builds and uses quantum computers needed to deliver
     certified quantum advantage in DOE scientific applications. The first public
     quantum computing company, IONQ, was spun out of this effort at Duke.

c.   The Duke collider physics group is funded by a DOE grant - this group
     contains members of the ATLAS collaboration that participated in the
     discovery of the Higgs boson at the Large Hadron Collider at CERN. The
     ATLAS collaboration was awarded a share of the 2025 Breakthrough Prize in
     Fundamental Physics.

d. The Duke nuclear theory group has multiple DOE grants and has provided mission-critical theory support for a number of signature programs at DOE labs – among them the Relativistic Heavy-Ion Collider at Brookhaven National Laboratory, the Continuous Electron Beam Facility at Thomas Jefferson National Accelerator Facility, and the ALICE experiment at the Large Hadron Collider.

e. Projects funded by DOE through Sandia National Labs include "Normal is not normal: Resolving severe mechanical environments" which contributes to the modeling of failure processes in metals under extreme loading conditions and "ACRR Fuel Performance Modeling" which is helping to assess the long-term viability of the Annular Core Research Reactor (ACRR) at Sandia National Laboratories, in Albuquerque. The ACRR is a nuclear reactor that allows researchers to subject various test objects to a mixed photon and neutron irradiation environment featuring either a very rapid pulse rate or a long-term, steady-state rate. This work at ACRR impacts radioisotope production, radiation effects, and neutron research.

5. Indirect costs are essential for supporting this research. The DOE's proposal to cancel awards with indirect rates higher than 15% and to limit indirect cost recovery to 15% in all future awards only to Institutions of Higher Education would end or seriously jeopardize all of the research projects described in paragraph 4. Duke faithfully accounts to the Department of Health and Human Services ("HHS"), the cognitive agency for these F&A expenses, and only costs that are directly allocable to sponsored research facilities and administration are

included. Duke's F&A rate is generally renewed with HHS every four years and the proposed rate is carefully examined and audited by the Federal government. Duke relies on its longstanding partnership with the Federal government, including DOE, to support the actual costs that are recovered through Duke's F&A rate to complete funded research and meet the associated federal requirements.

6. Indirect costs include costs such as:

a. operating and maintaining research facilities with specialized heat, lighting, vacuum, and purified water systems, as well as hazardous waste disposal and security to ensure that radioactivity and hazardous chemicals are securely used, stored and disposed;

b. upgrading existing lab facilities where DOE sponsored research occurs, to accommodate the needs for the specialized research and ensure that the plumbing, electric, HVAC, and safety facilities in our laboratories are up to code and safe for Duke researchers and support staff;

c. information technology ("IT") networks, high performance computing facilities, and data storage facilities, that enable researchers to analyze large amounts of data, store data in a secure environment when required by the DOE;

d. core service facilities, which include high-end equipment, clean rooms and other facilities that no single investigator or project could afford to purchase and maintain, and provide efficiencies across DOE-funded projects; and

e.  compliance offices that have been put in place to fulfill federally mandated requirements, such as laboratory safety, conflict of interest, data security, scientific integrity, financial accounting and auditing, and export controls.

7.  With respect to the areas of research described in Paragraph 4:

a.  The TUNL facility requires a significant amount of electrical power, chilled water for its cooling systems, and extensive radiation shielding in the form of modular concrete walls (about a foot in thickness) to facilitate the operation of its accelerators and experiments. Indirect costs cover a significant portion of the expenses associated with providing radiation safety and a controlled environment for TUNL experiments.

b.  The ATLAS group at Duke University relies on high-capacity computer networking to transfer massive amounts of data from the ATLAS data centers to researchers at Duke for their analysis. Providing state of the art IT infrastructure and fiber networking that allows ATLAS scientists to conduct their analysis is part of Duke's F&A expenditures.

c.  The nuclear theory group relies on fast fiber networking as well as teleconferencing facilities for its work on computational modeling relevant to the analysis and interpretation of results from experiments at BNL, TJNAF and CERN. This IT and collaborative infrastructure is covered by indirect costs.

8.  Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at Duke University. A loss of the awards and/or the indirect cost recovery to support the Duke Quantum Center (DQC) and

the Triangle University Nuclear Laboratory (TUNL) facility would have significant impacts. Duke is one of only universities in the world building and using programable quantum computers, and the DQC is in specialized space that was specifically renovated and maintained for quantum computers. A substantial reduction in the indirect costs, would mean that Duke may no longer be able to maintain the space, resulting in relocation and consolidation of research space, and a decrease in research productivity as well as the loss of the $15+M that was expended on renovations to the current space. The TUNL facility is a consortium of four universities that focuses on nuclear physics which is another high priority research area for the federal government. Due to the high amounts of radioactivity used in this facility, the security and facilities are expensive to build and maintain, and Duke's ability to maintain this facility long term may be jeopardized by this reduction.

9.      In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE.[1] These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf

10. Recovery of Duke University's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government. Duke University has for decades worked closely with the Federal government on research budgeting and planning in our shared goal of producing world-class research. Operating budgets are built on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), equipment purchases, and facility operation and maintenance. And in some cases, Duke has long-term obligations—for example, funding admitted PhD students, paying the depreciation and interest on research facilities where federally funded research is performed —and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

11. Through fiscal year 2028, the predetermined indirect cost rates are 61.5% for Duke University. The impact of a reduction in the indirect cost rate would be significant. Of the $23M in DOE funding that Duke University received in FY24, approximately $16.5 million was expended on direct costs and $6.5 million on indirect costs. Because the "administrative" portion of the F&A. is capped at 26%, Duke currently spends 5% of its own funds on unreimbursed, but allowable, administrative expenditures associated with DOE grants. In fiscal year 2025, Duke expects to a similar amount as FY24.

12. If—contrary to what Duke has negotiated with the federal government—the indirect cost rate is reduced to 15% for DOE, that would reduce the University's anticipated annual indirect cost recovery by at least $4M. While $4M may be smaller than some of our peer universities, the change would nonetheless have serious consequences now. The University budgets very carefully and the DOE policy does not just apply in 2025 but, if not enjoined, to

future years as well. This means Duke must adjust not just in the near term, but also for the next several years. This means deciding *now* to cease projects, reduce head count, and continue to operate facilities.

13.     This reduction will have deeply damaging effects on Duke's ability to conduct DOE funded research.

14.     In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading. If Duke can no longer afford to maintain and secure buildings, the safety of the faculty, staff and trainees in those building will be jeopardized. When a project is cancelled, personnel funded on that project are let go and their expertise goes with them. The project cannot be restarted without significant loss of time in hiring and training new personnel. In addition, any long-term project may have a data collection interruption, reducing the validity of the result.

15.     Disruptions to Duke's research will negatively affect the Durham area, the Research Triangle region, the State of North Carolina, and the South. Duke is the largest employer in Durham County and the second largest private employer in North Carolina. Approximately 47,000 North Carolina residents are directly employed by Duke University and Duke University Health System—and both entities collaborate with state and local partners, including North Carolina state universities and nonprofit research enterprises such as the Research Triangle Institute, to help solve regional challenges through joint research and innovation. Duke's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact. Duke personnel and inventions have launched 126 active start-ups which raised over $2.4B in funding in the past five years. Over 65% of Duke start-ups in the past five years have been located in North Carolina and

a massive reduction in Duke's research budget would immediately and seriously jeopardize these contributions to the local region.

16.     Finally, slowdowns or halts in research by Duke and other American universities creates a serious risk that competitor nations that are maintaining their investments in research will surpass the United States on this front, threatening both our Nation's national security and its economic dominance. Offers of employment to our NIH-funded investigators from institutions in other countries will be highly attractive, and we will lose our best and brightest scientists to other nations.

17.     Nor can Duke cover the funding gap itself.  While Duke maintains an endowment, it is neither feasible nor sustainable for Duke to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

a.     The majority of Duke's endowment—around 72%—is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. Duke is not legally permitted to use those funds to cover research infrastructure costs.

b.     Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 5%, to ensure long-term financial stability for the institution.

c.     As a non-profit institution, Duke reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.

18.     Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on Duke, which would in turn force reductions in key investments supporting Duke's faculty, students, staff, research,

and teaching infrastructure, as well as other critical activities needed to maintain Duke's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at Durham, North Carolina.

*/s/ Jennifer Lodge*
Jennifer Lodge

# EXHIBIT 19

## DECLARATION OF KATIE TRACY

I, Katie Tracy, declare as follows:

1.      I am the Executive Director, Sponsored Projects at University of Nevada, Reno ("UNR" or "University") in Reno, Nevada.   I have held that position since 2023.

2.      As Executive Director, I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by UNR personnel, and could testify thereto.

3.      UNR receives substantial annual funding from the United States Department of Energy ("DOE").  The current Department of Energy portfolio includes 48 active awards, with a total authorized award amount of approximately $41.3 million. Of this total, over $9 million represents authorized indirect costs.

4.      The funding UNR receives from DOE supports critical and cutting-edge research, which millions of Americans benefit from and depend on.  For example:

   a.  The University's research in nuclear materials and national security includes projects such as: thermal response prediction at the Nevada National Security Site; wirelessly-powered sensors for spent fuel canisters; and seismic risk assessment for nuclear storage. These efforts aim to improve the safety, monitoring, and resilience of nuclear infrastructure, directly supporting public safety and national preparedness.

   b.  From developing low-impact lithium extraction methods to accelerating rare earth separation and enhancing recovery from mine tailings, University researchers are innovating critical mineral technologies essential for clean energy. These projects ensure more sustainable and domestically-secure

sources of materials used in everything from electric vehicles to national defense systems.

c. DOE-funded environmental research at the University includes *geothermal exploration*, *phytoremediation of coal-impacted soils*, and *optimization of excess solar and battery storage*. This work supports the development of low-carbon technologies, restoration of contaminated ecosystems, and improved grid reliability — ultimately contributing to a more sustainable and resilient future for communities.

d. The University's DOE portfolio includes cutting-edge work in quantum dynamics and high-energy density (HED) plasmas, such as *optical-gating of spin-based quantum states*, *quantum molecular systems*, and *electron-ion equilibration in dense plasmas*. These foundational physics and chemistry studies advance national capabilities in quantum information science and fusion research, with future applications in energy, computing, and defense.

e. Several projects investigate how materials behave in extreme environments, including *opacity experiments at Z-machine*, and *magnetohydrodynamic instabilities under intense currents*. These studies inform the design and safety of critical infrastructure, experiments that inform nuclear stockpile management, to advanced materials for energy systems. Ultimately, these research projects will benefit both national security, and national infrastructure resiliency.

5.    Indirect costs are essential for supporting this research.  The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects described in paragraph 4.

6.    Indirect costs include uses to construct and maintain state-of-the-art facilities necessary to meet the technical demands of advanced scientific work, such as laboratories for nuclear materials research or user facilities like ZNetUS. They also cover the procurement, calibration, and maintenance of specialized equipment — including systems like easyXAFS and plasma diagnostics — and support essential infrastructure, such as secure IT systems, utilities, safety compliance, and technical staff, who keep research environments operational. Together, these investments ensure that faculty and students have the robust institutional backbone needed to deliver impactful, compliant, and forward-looking research. Without this equipment, we cannot conduct the research.

7.    For example, with respect to the areas of research described in Paragraph 4:

a.    The University's research in nuclear materials and national security includes projects such as *thermal response prediction at the Nevada National Security Site*, *wirelessly-powered sensors for spent fuel canisters*, and *seismic risk assessment for nuclear storage*. This work requires specialized equipment, such as high-temperature furnaces, dry storage monitoring systems, and geotechnical shaking tables capable of simulating seismic events to assess material and facility performance under extreme conditions.

b.    From developing low-impact lithium extraction methods to accelerating rare earth separation and enhancing recovery from mine tailings, University researchers are innovating critical mineral technologies essential for clean

energy. This research relies on access to high-pressure autoclaves, X-ray diffraction (XRD) instruments, electron microscopes, and laboratory-scale reactors used to simulate industrial separation and recovery processes under controlled conditions.

c.  DOE-funded environmental research includes *geothermal exploration*, *phytoremediation of coal-impacted soils*, and *optimization of solar and battery storage*. These projects require the use of deep-earth imaging systems, soil analysis instrumentation, and battery performance testing platforms, as well as access to field-scale test beds and remote sensing technology to evaluate real-world environmental performance and energy storage integration.

d.  Projects such as *optical-gating of spin-based quantum states* and *electron-ion equilibration in dense plasmas* advance frontier research in quantum sensing and high-energy density physics. This work demands cryogenic systems, ultrafast lasers, superconducting magnets, and access to large-scale plasma diagnostics facilities to analyze quantum-level behaviors and fusion-relevant phenomena under intense conditions.

e.  Investigations into material response under high current, opacity measurements at the Z-machine aim to understand nature at its most fundamental level while also helping train the next generation of scientists and engineers. These research projects use high-energy pulse generators, spectrometers, and computational modeling clusters. In addition, projects in UNR's Earthquake Engineering Laboratory are studying and helping develop the next generation of resilient infrastructure. These research projects use advanced servo-controlled shaking

tables, which replicate dynamic environmental conditions to test material limits and validate predictive models.

8. Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research that can be done at UNR. At the University, DOE-funded projects are supported by existing research facilities, such as the Fleischmann Planetarium (home to astrophysics outreach and modeling tools), the Nevada Terawatt Facility (used for high-energy-density physics and plasma research), the Mackay Mines Building and Lab Complex (supporting critical minerals and geothermal resource investigations), and the Davidson Mathematics and Science Center, which hosts computational modeling and spectroscopy labs. While no new research buildings are currently under construction, the sustained operation of these existing facilities is essential. Without indirect cost recovery, UNR risks facing higher deferred maintenance costs, equipment obsolescence, and limitations on lab access – all of which could stall cutting-edge DOE research, reduce hands-on opportunities for students, and weaken the university's ability to compete for future federal awards.

9. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. These mandates serve many important functions, including: ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

10.     Recovery of UNR's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.

11.     Through fiscal year June 30, 2025, the predetermined indirect cost rates are 47% for on-campus research projects.

12.     The impact of a reduction in the indirect cost rate would be devastating. Of the $41.3 million in DOE funding that UNR received in the past few years, approximately $22.9 million was allocated for direct costs, $9.3 million for subcontracts (which are not eligible for overhead recovery), and over $9.0 million for indirect costs. Similarly, in fiscal year 2025, UNR expects to receive $5.7 million in DOE funding for direct costs, while $2.1 million is allocated for indirect costs. And over the next five years, UNR anticipates receiving an average of $8.1 million per year from the DOE for direct costs. Based on the predetermined indirect cost rate of 47%, which was negotiated with and approved by the federal government as of 2020, the University expects to receive approximately $2.7 million per year in indirect cost recovery.

13.     If, contrary to what UNR has negotiated with the federal government, the indirect cost rate is reduced to 15%, that would reduce the University's anticipated annual indirect cost recovery by $1.8 million to $900,000, a 50% drop.

14.     This reduction will have deeply damaging effects on UNR's ability to conduct research from day one. Most critically, it will necessarily and immediately result in staffing reductions across the board. For example:

     a.     The Office of Sponsored Projects and Grants and Contracts Accounting teams provides financial oversight, audit documentation, and conduct reporting required by the Department of Energy. Reductions in these areas would delay award setup, invoicing, and compliance submissions.

b. In addition, technical staff who support facilities like the Nevada Terawatt Facility or the Mackay Mines labs, such as safety officers, lab technicians, and equipment specialists, would likely have their positions reduced or eliminated. This would compromise safe operations and slow experimental progress. These impacts would not only delay current projects but also lead to loss of funding, missed deadlines, or disqualification from future awards due to noncompliance or lack of institutional capacity.

15.  UNR has, for decades, relied upon the payment of indirect costs. And, until now, has been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning.  Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases.  In some cases, UNR has long-term obligations— for example, multi-year support packages for admitted PhD students, tenure-track faculty salary coverage, and faculty startup packages that rely on planned reimbursements from grant-funded indirect costs—that rely on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

16.  In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.  As staff and technical personnel positions are lost, key functions, such as laboratory safety monitoring, radioactive material handling, cybersecurity, and compliance enforcement, will be compromised. This raises serious concerns about regulatory violations, environmental hazards, and risks to personnel working in high-energy and nuclear-research environments. In addition, if research programs were forced to

pause due to lack of operational support, many could not be easily restarted, even if funding were later restored. Complex DOE projects involving specialized instrumentation, hazardous materials protocols, or long-term student and faculty commitments often require months of preparation and coordination; restarting them from a non-operational state would mean re-certifying labs, rehiring or retraining staff, reestablishing security clearances, and navigating sponsor re-approval processes. These barriers could lead to permanent program closures, loss of research talent, and reputational damage that undermines UNR's ability to compete nationally for future funding.

17.     Disruptions to UNR's research will also have negative effects in the Reno area, the state of Nevada, and the broader region. Nearly 11,000 of Nevada residents worked at UNR, which collaborates with state and local partners to help solve regional challenges through joint research projects and innovation to make people's lives better.  UNR's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.  A massive reduction in UNR's research budget would immediately and seriously jeopardize these contributions to the local region.

18.     Finally, slowdowns or halts in research by UNR and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

19.     Nor can UNR cover the funding gap itself.  While UNR maintains an endowment, it is neither feasible nor sustainable for UNR to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

a.   The majority of UNR's endowment, approximately 95%, is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and

       academic programs.  UNR is not legally permitted to use those funds to cover research infrastructure costs.

    b.   Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout, typically around 4.5%, to ensure long-term financial stability for the institution.

    c.   As a non-profit institution, UNR reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps.  In other words, unlike for-profit organizations, UNR does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

20.    Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on UNR—which would, in turn, force reductions in key investments supporting UNR's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UNR's academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Sunday, April 13, 2025, at Reno, NV.

_K Tracy_

_____

Katie Tracy
Executive Director, Sponsored Projects
University of Nevada, Reno

# EXHIBIT 20

## DECLARATION OF BERNARD ARULANANDAM

I, Bernard Arulanandam, declare as follows:

1.    I am the Vice Provost for Research at the Trustees of Tufts College ("Tufts University" or "Tufts") in Boston, Massachusetts.

2.    I have held that position since July 2022. Before that, I oversaw research, economic development and knowledge enterprise work within the University of Texas System, at the University of Texas San Antonio. As a federally funded researcher for over 25 years, I can attest to the crucial role of indirect funds in supporting the infrastructure and systems at universities, which go beyond the direct costs associated with research itself.

3.    As the Vice Provost for Research, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Tufts University personnel and could testify thereto.

4.    Tufts University receives substantial annual funding from the Department of Energy (DOE), with 29 active DOE-funded projects as of April 13, 2025. These active projects represent a total awarded amount of $23.7 million, comprising $17.6 million in direct costs and $6.1 million in indirect costs. In connection with the 29 active awards, the DOE has $7.7 million in outstanding funding obligations to Tufts, including $6 million in direct costs and $1.7 million in indirect costs, calculated based on Tufts' federally negotiated indirect cost rate of 58% for its Medford/Somerville, MA campus, which was established on December 16, 2022.

5.    Tufts University unites the resources and expertise of its Schools of Engineering, Arts and Sciences, and the Tisch College of Civic Life to support the national mission of the Department of Energy. These nationally recognized research entities rely on federal support to advance vital, cutting-edge research that benefits millions of Americans. For example:

a. Tufts University leads a dynamic range of research efforts spanning materials science, quantum computing, and resilient infrastructure, emphasizing innovation from the molecular to the macro scale. From atomically precise catalyst development and nanostructured membranes for energy applications to pioneering roles in quantum systems like the Quantum Systems Accelerator, Tufts is advancing both fundamental science and real-world technologies. The university also integrates artificial intelligence into uncertainty modeling and supports energy initiatives that enable American energy independence.

b. In the realm of quantum science and computing, Tufts is actively engaged in Quantum research, including the Quantum Systems Accelerator and the QSCOUT open user testbed, contributing to next-generation computing capabilities. Research in topological insulators, superconductors, and the modeling of quantum systems also contributes to the U.S. position at the forefront of quantum device information, a line of research supporting national security and defense. Tufts' work on exascale simulations for hybrid rocket motors, applying quantum principles and high-performance computing, supports both fundamental science and applied engineering challenges.

6. Indirect costs are essential for supporting this research. The DOE's proposal to cut indirect cost rates to 15% would end or seriously jeopardize all of the research projects and programs described in paragraph 5.

7. Indirect costs are leveraged to construct and maintain state-of-the-art facilities required to meet the current technical requirements for advanced research, as well as the

procurement of equipment necessary to conduct basic and applied research. Without this equipment, we cannot conduct the research.

8.  For example, with respect to the areas of research described in Paragraph 5 and the infrastructure described in Paragraph 7:

   a.  Tufts University hosts a robust and interdisciplinary infrastructure for energy research, spanning multiple departments and cutting-edge laboratories. The Renewable Energy and Applied Photonics (REAP) Labs in Electrical and Computer Engineering lead advancements in thermophotovoltaics, nanophotonics, and waste heat harvesting.

   b.  The Green Energy and Novel Electrolytes (GENE) Lab focuses on developing innovative electrolytes for efficient energy storage, while researchers in Chemical and Biological Engineering designs next-generation electrochemical systems.

   c.  In Civil and Environmental Engineering, research addresses energy systems in the context of energy resilience. Additional labs such as the Smart Polymers, Membranes, and Separations Laboratory and the Eagan Sustainable Catalysis Laboratory further enhance Tufts' leadership in advanced materials for energy innovation.

   d.  Each of these laboratories support the DOE's agenda to unleash American energy at home and abroad to restore U.S. energy dominance.

9.  If indirect costs were cut on federally funded energy research, several tangible impacts could occur across Tufts University, laboratories, and research infrastructure. Key consequences include underutilized or abandoned laboratories and facilities, delayed or canceled infrastructure upgrades, and the loss of collaborative spaces essential for research, education and

training. More concerningly, cuts to indirect support could reduce equipment maintenance capabilities, potentially leading to safety risks in high-tech or hazardous research environments.

10.   In addition, indirect costs fund the administration and oversight of awards, including staff who ensure compliance with a vast number of regulatory mandates from agencies such as DOE. Cutting indirect cost support presents several compliance risks that could impact the integrity, sustainability, and legality of research programs. These mandates serve many important functions, including ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property or technology theft or mismanagement, or preventing national security expertise from being inappropriately accessed by foreign adversaries; and providing the high-level cybersecurity, data storage, and computing environments mandated for regulated data.

11. Tufts University's recovery of indirect costs is governed by predetermined rates that are contractually negotiated with the federal government. For fiscal year 2025, these rates are set at 58% for schools on the Medford/Somerville campus and 65% for the health sciences campuses. Any reduction to these rates—such as a shift to a 15% indirect cost rate, which is inconsistent with Tufts' federally negotiated agreement—would significantly reduce the university's anticipated indirect cost recovery and have a lasting negative impact on the strength and sustainability of our research enterprise.

12.   This reduction will have deeply damaging effects on Tufts' ability to conduct research from day one. Most critically, it will necessarily and immediately result in staffing reductions in both research laboratories and research administration. For example: Tufts University's Institutional Review Board (IRB) is responsible for the oversight of all research involving human subjects, ensuring both ethical standards and the protection of participants'

privacy. Without sufficient support through indirect cost recovery, the University may be forced to reduce IRB staffing. Such reductions would have an immediate effect on the IRB's capacity to review and approve research protocols in a timely manner, resulting in significant delays to critical research—potentially including DOE-funded projects involving human subjects.

13.   Tufts University has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. Tufts University carries long-term institutional commitments—such as support for tenured faculty, laboratory and technical staff, equipment, and facility maintenance contracts—that represent fixed, non-negotiable costs. Tufts University relies on budgeted grant funding, including indirect cost recovery, to meet these obligations and sustain its research infrastructure.

14.   In addition to the immediate impacts and reliance interests described above, there are longer-term impacts that are both cumulative and cascading. Critical safety functions are often among the first areas impacted when faced with fiscal constraints, leading to significant risks. Reductions in indirect costs can compromise environmental health and safety staffing, delay mandatory inspections, limit access to proper training for laboratory personnel, and hinder maintenance of essential safety equipment such as fume hoods, chemical safety infrastructure, and emergency response systems. These cuts not only endanger the health and well-being of researchers, staff, and students, but also increase the risk of regulatory noncompliance, accidents,

and hazardous material exposure—threatening both the continuity and credibility of the institution's research enterprise.

15.  According to the Tufts University 2024 Economic and Community Impact Report, Tufts generated $112.1 million in tax revenue and supported 12,904 jobs in New England in 2023. Disruptions to Tufts University's research funding, such as an indirect cost rate reduction to 15%, would directly result in reduced tax revenue and employment opportunities at the local and state level, with downstream impacts on the number of scientists and engineers that are trained and deployed into the U.S. innovation ecosystem.

16.  Finally, slowdowns or halts in research by Tufts University and other American universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national and energy security and its economic dominance.

17.  Tufts cannot cover the funding gap itself. While Tufts maintains an endowment, it is neither feasible nor sustainable for Tufts to use endowment funds or other revenue sources to offset shortfalls in indirect cost recovery, for several reasons:

    a.  Much of the University's endowment is restricted to specific donor-designated purposes, such as scholarships, faculty chairs, and academic programs. Tufts is not legally permitted to use those funds to cover research infrastructure costs.

    b.  Even the portion of the endowment that is unrestricted is subject to a carefully managed annual payout to ensure long-term financial stability for the institution.

    c.  As a non-profit institution, Tufts reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In

other words, unlike for-profit organizations, Tufts does not generate significant surpluses that could be redirected without impacting core academic priorities such as educational programs and financial aid support for students.

d.  Moreover, absorbing the cost of a lower indirect cost rate, even if it were possible, would create long-term budget pressures on Tufts University—which would in turn force reductions in key investments supporting Tufts' faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain Tufts' academic excellence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2025, at 75 Kneeland Street, Boston, Massachusetts.

_____

Bernard Arulanandam
Vice Provost for Research
Tufts University

# EXHIBIT 21

<u>**DECLARATION OF SALLY MORTON**</u>

I, Sally Morton, hereby declare:

1. I am a resident of the State of Arizona. I am currently employed by Arizona State University as Executive Vice President of the ASU Knowledge Enterprise and as a Professor in the College of Mathematical and Statistical Sciences and the College of Health Solutions. In my capacity as Executive Vice President, I lead the university's research and economic development portfolio to advance research priorities, oversee ASU's research institutes and initiatives, and drive corporate engagement, strategic partnerships, intellectual property, and technology transfer.

2. As Executive Vice President of the ASU Knowledge Enterprise, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by ASU employees and believe that information to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3. I am providing this declaration to explain certain impacts of the Department of Energy (DOE)'s announced plan to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15% for both ongoing and future grants.

4. ASU is a comprehensive public research university committed to advancing research and discovery of public value. ASU is one of the fastest-growing research enterprises in the United States, with total research expenditures of $904 Million in its fiscal year ending June 30, 2023 as reported on the NSF HERD survey.

5. Sponsored funding from federal agencies constitutes a significant portion of ASU's annual research expenditures. In its fiscal year ending June 30, 2024, ASU expended

$508 Million received from federal agencies to conduct research work under approved agreements (grants, contracts, and cooperative agreements).

6. ASU receives sponsored funding from at least 23 different federal agencies, including DOE.

7. ASU has a Negotiated Indirect Cost Rate Agreement with the federal government applicable to all of its federal awards. Ex. A.

8. The indirect cost rate in ASU's Negotiated Indirect Cost Rate Agreement is 57% for on-campus research. Because certain direct cost categories are exempted from calculating indirect costs, ASU's overall effective indirect cost rate across all sponsors is approximately 35%.

9. In federal fiscal year 2024, ASU received over 55 awards from DOE, totaling over $98 million in anticipated funding.

10. One such award is the Ultra-Wide Bandgap (UWBG) Semiconductor EFRC project, advancing a "substation in a suitcase" concept by making power conversion and control devices dramatically smaller, more efficient, and more reliable – key steps for U.S. competitiveness. This breakthrough ASU research supports national security by strengthening grid resilience and ensures economic prosperity through job creation and reduced energy costs for businesses and consumers.

11. Having completed roughly one-third of its four-year plan, the project has made critical progress toward understanding high-field transport, defect control, and thermal management in UWBG materials. Losing the remaining funds would severely jeopardize these advancements, risking important benefits for the nation's energy infrastructure, grid security, and global leadership in power electronics.

12. This kind of cutting-edge research relies on specialized laboratories, equipment, and expertise that are typically found only at advanced research institutions like Arizona State University. For instance, large-scale cleanroom facilities are essential for fabricating and testing UWBG semiconductor devices, and they must meet stringent environmental conditions to minimize contamination. Similarly, sophisticated growth equipment such as molecular beam epitaxy (MBE) and metal-organic chemical vapor deposition (MOCVD) systems require expertly trained personnel to maintain, operate, and interpret data. Moreover, high-resolution characterization methods—like advanced electron microscopy, X-ray diffraction, and scanning probe techniques—are housed in well-equipped, interdisciplinary facilities that can support multiple projects simultaneously. These institutions also have extensive computational infrastructure and software resources, enabling accurate simulation of material properties and guiding experimental design. Altogether, this comprehensive ecosystem of state-of-the-art equipment, specialized facilities, and technical support, coupled with an active community of researchers, is critical for pushing the boundaries of UWBG semiconductor research and delivering transformative breakthroughs.

13. Recovering indirect costs of research is essential to sustaining the university's research infrastructure generally, including the specific infrastructure needed to perform the university's current grant agreements with DOE. Indirect cost funding pays for critical expenses that keep research programs operational. These include the costs of operating physical research facilities, such as electricity, water, and utilities; the acquisition and maintenance of specialized research equipment utilized for multiple projects; and personnel costs for employees who directly support research operations, such as those

who are engaged in environmental health and safety, animal care, data management, and grant compliance. Many of these compliance tasks relate to regulatory mandates from DOE, including ensuring research integrity, properly managing and disposing of chemical and biological agents used in research, providing the secure computing environments mandated for regulated data, and preventing intellectual property and national security expertise from being inappropriately accessed by foreign adversaries.

14. For example, the Ultra-Wide Bandgap (UWBG) Semiconductor EFRC project discussed above relies on specialized equipment for both synthesizing UWBG semiconductors and analyzing their properties at the microscopic and atomic levels. High-end growth reactors like molecular beam epitaxy (MBE) or metal-organic chemical vapor deposition (MOCVD) systems are crucial to precisely control material composition and quality. Advanced imaging and analytical tools – such as transmission electron microscopes (TEMs), scanning electron microscopes (SEMs), and various spectroscopic systems – enable researchers to visualize defects and interfaces, as well as quantify doping and impurities. State-of-the-art electrical and thermal characterization equipment is also necessary to measure how these materials perform under extreme voltages, currents, and temperatures. Finally, powerful computational resources and software platforms assist in simulating and interpreting the fundamental properties of UWBG materials, helping to guide experiments and optimize device designs.

15. The DOE announcement, if implemented, immediately reduces millions of dollars in indirect cost recovery that ASU believed would be available to it when it entered into its grant agreements with DOE. The university made personnel and operational plans and decisions, and entered into employment and other contracts, in reliance on that

understanding. The reduction of DOE indirect cost recovery by more than half jeopardizes the university's ability to conduct not only the research work contemplated by its agreement with DOE but other research work that the shared facilities and personnel paid for through indirect cost funds support.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of April, 2025, in Phoenix, Arizona.

_____

Sally Morton
Executive Vice President of the Arizona
State University Knowledge Enterprise

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN:                                             Date: 07/30/2024
ORGANIZATION:                                    FILING REF.: The preceding
Arizona State University                         agreement was dated
Fulton Center 410, Rm. 4478                      05/24/2023
P.O. Box 87705
Tempe, AZ 85287-7605

The rates approved in this agreement are for use on grants, contracts and other agreements
with the Federal Government, subject to the conditions in Section III.

---

## SECTION I: INDIRECT COST RATES

RATE TYPES:        FIXED    FINAL    PROV. (PROVISIONAL)        PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD | | RATE(%) | LOCATION | APPLICABLE TO |
| | FROM | TO | | | |
|------|------|------|---------|----------|---------------|
| PRED. | 07/01/2020 | 06/30/2023 | 57.00 | On-Campus | Organized Research |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off-Campus | Organized Research |
| PRED. | 07/01/2020 | 06/30/2023 | 48.00 | On-Campus | Instruction |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off-Campus | Instruction |
| PRED. | 07/01/2020 | 06/30/2023 | 44.40 | On-Campus | Other Sponsored Activities |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off-Campus | Other Sponsored Activities |
| PROV. | 07/01/2023 | Until Amended | (1) | | |

*BASE

Modified total direct costs, consisting of all salaries and wages, fringe benefits, materials, supplies,
services, travel and subgrants and subcontracts up to the first $25,000 of each subgrant or subcontract
(regardless of the period covered by the subgrant or subcontract). Modified total direct costs shall
exclude equipment, capital expenditures, charges for patient care, participant support costs, student
tuition remission, rental costs of off-site facilities, scholarships, and fellowships as well as the portion of
each subgrant and subcontract in excess of $25,000.

(1) Use same rates and conditions as those cited for fiscal year ending June 30, 2023.

---

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|---------|----------|---------------|
| FIXED | 7/1/2024 | 6/30/2025 | 30.40 | All (A) | Faculty |
| FIXED | 7/1/2024 | 6/30/2025 | 36.80 | All (A) | Staff |
| FIXED | 7/1/2024 | 6/30/2025 | 10.90 | All (A) | Part Time |
| FIXED | 7/1/2024 | 6/30/2025 | 1.20 | All (A) | Students |
| FIXED | 7/1/2024 | 6/30/2025 | 8.50 | All (A) | RA/TA |
| FIXED | 7/1/2024 | 6/30/2025 | 25.30 | All (A) | Post Doc |
| PROV. | 7/1/2025 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2025. |

## ** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

(A) Salaries and wages including vacation, holiday, sick leave pay and other paid absences.

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement.
The fringe benefits included in the rate(s) are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal costs for salaries and wages. Separate claims for the costs of these paid absences are not made except for paid absences that have been earned but not taken when an individual separates from the university prior to the completion of the grant, contract or other agreement.

OFF-CAMPUS DEFINITION
An off-campus rate is applicable to those projects conducted in facilities not owned or operated by the University, which include charges for facility rental as a direct expenditure, and for which more than 50% of the project salaries and wages are for effort conducted in the rental facility.

DEFINITION OF EQUIPMENT
Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds $5,000.

The following fringe benefits are included in the fringe benefit rate(s):
FICA, WORKERS COMPENSATION, HEALTH/DENTAL/LIFE INSURANCE, UNEMPLOYMENT INSURANCE, DISABILITY INSURANCE, ACCIDENTAL DEATH, RETIREMENT PLANS (STATE RETIREMENT PROGRAMS AND TIAA/CREF), FLEXIBLE SPENDING PLAN, RETIREE ACCUMULATIVE SICK LEAVE, AND EMPLOYEE TUITION REMISSION, EMPLOYEE WELLNESS, SABBATICAL PAYMENTS, EMPLOYEE ASSISTANCE, AND TERMINAL LEAVE.

This agreement updates fringe benefits only.

NEXT PROPOSAL DUE DATE
Your next indirect cost based on actual costs for 06/30/22 is in-house for review, and fringe benefits proposal based on actual costs for FYE 06/30/24 is due by 12/31/24.

RU1353

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

---

# SECTION III: GENERAL

A. <u>LIMITATIONS:</u>

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B. <u>ACCOUNTING CHANGES:</u>

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C. <u>FIXED RATES:</u>

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D. <u>USE BY OTHER FEDERAL AGENCIES:</u>

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E. <u>OTHER:</u>

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

## BY THE INSTITUTION:

Arizona State University

(INSTITUTION)

*Matthew Smith*

(SIGNATURE)

Matthew J. Smith

(NAME)

VP for Budget Planning & Management

(TITLE)

08/15/2024

(DATE)

## ON BEHALF OF THE GOVERNMENT:

<u>DEPARTMENT OF HEALTH AND HUMAN SERVICES</u>
(AGENCY)

Arif M. Karim -S   Digitally signed by Arif M. Karim -S
Date: 2024.08.01 09:25:04 -05'00'

(SIGNATURE)

Arif Karim

(NAME)

Director, Cost Allocation Services

(TITLE)

07/30/2024

(DATE)

HHS REPRESENTATIVE: Jeanette Lu

TELEPHONE: (415) 437-7820

RU1353

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ASSOCIATION OF AMERICAN UNIVERSITIES,
*et al.*,

       *Plaintiffs*,

        v.

DEPARTMENT OF ENERGY *et al.*,

       *Defendants*.

Case No. 25-cv-10912

<u>NOTICE</u>

Plaintiffs provide this update on recent developments that underscore the need for prompt action on Plaintiffs' Motion for a Temporary Restraining Order. Yesterday at 9:40 am, Plaintiffs filed a complaint challenging a new policy of the Department of Energy (DOE), issued on Friday, April 11, 2025, at close of business, that unlawfully caps the indirect cost rate for DOE grants at 15% ("the Rate Cap Policy"). ECF No. 1. Shortly thereafter, Plaintiffs filed a Motion for a Temporary Restraining Order. ECF Nos. 3, 19. That motion explained, in part, that relief was urgently needed because the policy stated that "the Department *is undertaking* action to terminate all grant awards to IHEs that do not conform with this updated policy," ECF No. 2, and thus could, at any time, begin implementing its policy by putting universities to an unlawful choice: either accept reductions in indirect cost rates, or face terminations, ECF No. 19 at 5.

In the wake of Plaintiffs' filing, and in the absence of action on Plaintiffs' motion, Defendants are proceeding with their implementation of this unlawful policy. At 10:23 pm last night, Plaintiff Cornell University ("Cornell") received a letter stating that "[p]ursuant to the Department's policy memorandum dated April 11, 2025," DOE was "conditionally terminating [Cornell's DOE] grant award[s], effective thirty (30) days from the date of th[e] notice"—but that

**JA275**

this termination would become effective only if Cornell declined to "agree[] … to an updated indirect cost rate of 15 percent for each of your awards."  Declaration of Kavita Bala ("Cornell Supp. Decl.") ¶ 3 & Ex. A.  The letter indicates that it was digitally signed yesterday at 4:28 pm. Plaintiff Michigan State University ("MSU") received an identical letter yesterday at 6:00 pm, also stating that it was digitally signed yesterday at 4:28 pm.  *See* Declaration of Douglas Gage ("MSU Supp. Decl.") ¶ 3.  Plaintiff Massachusetts Institute of Technology ("MIT") received this same letter (with the same digital signature timestamp) at 8:41 pm yesterday, identifying 86 DOE grants affected by the new policy.  At the time of filing this memorandum, Plaintiffs are aware of similar letters directed to over 30 universities that are either Plaintiffs here or are members of Plaintiffs Association of American Universities ("AAU"), Association of Public and Land-Grant Universities ("APLU"), and American Council on Education ("ACE").

These letters underscore the need for a prompt ruling on Plaintiffs' motion.  Via these letters, Defendants are continuing—indeed, accelerating—their implementation of the unlawful Rate Cap Policy, apparently attempting to send out as many letters as possible before this Court acts.  Right now, these letters are putting Plaintiffs and their members to an unlawful choice between accepting a 15% indirect cost rate or accepting termination.  And right now, the effects of these letters are reverberating across America's universities.

If this Court does not intercede to prevent Defendants from enforcing this 15%-or-terminate policy, universities will have to promptly take steps to consider cutting the many functions and personnel that will be unsustainable to carry at that unlawful rate.  *See* Cornell Supp. Decl. ¶¶ 7-9.  Staff and researchers whose jobs and funding are tied to the grants noticed for termination will be in limbo.  Research projects will face uncertainty about the continued scope of their work and their ability to maintain sensitive and highly specialized equipment.  And Cornell

and other Plaintiffs who have received these notices now know that decisions will need to be made about these cost-cutting measures within thirty days—potentially well in advance of thirty days—and that they will need to be made regardless of which "option" the institution chooses. *See id.* ¶ 8; ¶ 6 (noting that Cornell will either lose $5.5 million in coverage of indirect costs or $26 million in unspent funds from existing DOE awards). MSU, for instance, conservatively estimates that it may need to lay off as many as 70 individuals as a result of this policy—and that it will need to start making decisions this week. *See* MSU Supp. Decl. ¶ 6. Because many of the cost-cutting measures are difficult, if not impossible, to reverse, *see* Cornell Supp. Decl. ¶ 8, it is imperative that this Court take action now.

In short, the government is brazenly attempting to change the facts on the ground before the Court can rule on Plaintiffs' Motion for a Temporary Restraining Order, and the only way to avoid these harms is via the relief that another court in this District entered against a near-identical policy to prevent its enforcement. *Massachusetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025) (finding that the "imminent risk of halting" Plaintiffs' research activities dependent on government funding, and thus "disrupting the development of innovative . . . research" and causing the "shuttering of research facilities," "warranted the issuance of a nationwide temporary restraining order").

Plaintiffs respectfully request that the Court grant their Motion for a Temporary Restraining Order.

Dated: April 15, 2025

JENNER & BLOCK LLP

By: */s/ Lindsay C. Harrison*

Lindsay C. Harrison
Ishan K. Bhabha
Lauren J. Hartz
Anjali Motgi
Zachary C. Schauf
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LHarrison@jenner.com
IBhabha@jenner.com
LHartz@jenner.com
AMotgi@jenner.com
ZSchauf@jenner.com

Shoba Pillay, Ill. Bar No. 6295353
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

*Attorneys for All Plaintiffs*

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By: */s/ Paul D. Clement*

Paul D. Clement (*pro hac vice forthcoming*)
James Y. Xi (*pro hac vice forthcoming*)
Kyle R. Eiswald (*pro hac vice forthcoming*)
706 Duke Street
Alexandria, VA 22314
Tel: (202) 742-8900
paul.clement@clementmurphy.com
james.xi@clementmurphy.com
kyle.eiswald@clementmurphy.com
*Attorneys for Association of American
Universities, Association of Public and Land-
grant Universities, and American Council on
Education*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of April, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ <i>Lindsay C. Harrison</i>
Lindsay C. Harrison
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
LHarrison@jenner.com

## DECLARATION OF KAVITA BALA, PH.D.

I, Kavita Bala, Ph.D., declare as follows:

1.      I have been the Provost of Cornell University ("Cornell" or the "University") since January 1, 2025. I previously served as the inaugural Dean of the Cornell Ann S. Bowers College of Computing and Information Science. I make this declaration in further support of the Plaintiffs' Emergency Motion for a Temporary Restraining Order.

2.      I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Cornell personnel, and could testify thereto.

3.      On April 14, 2025 at 10:23 PM, Cornell received an email from a Grants Management Specialist in the Department of Energy's ("DOE") Office of Science Consolidated Service Center. The email contained three attachments: a copy of DOE's Policy Flash 2025-22; a letter purporting to "conditionally terminat[e]" twenty-three DOE awards to Cornell on thirty days' notice; and a second letter purporting to "conditionally terminat[e]" an additional twenty-three DOE awards to Cornell, also on thirty days' notice.  A copy of the email and its attachments is attached to this declaration as Exhibit A.

4.      The stated reason for the letters is that these existing awards (all issued prior to April 11, 2025) allow for indirect cost recovery at Cornell's federally negotiated rate, instead of the fifteen percent cap on higher education indirect cost recovery that DOE announced in Policy Flash 2025-22 on April 11, 2025. The termination letters state that Cornell "may avoid termination of these awards by . . . confirming your agreement to an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025." (Exh. A.)

5.      These forty-six awards had a total lifetime project value of approximately $99,500,000. Of that amount, approximately $26,000,000 remains to be spent. Using Cornell's average indirect cost recovery rate on these DOE awards, approximately $7,275,488 of that amount would be for indirect costs. If Cornell were to agree to the fifteen percent cap, DOE funding on these existing awards would be reduced by approximately $5,500,000 over the remaining lifetime of the awards.

6.      Cornell has already budgeted for indirect cost recovery in its current and upcoming fiscal years for these awards based on the indirect cost rate previously negotiated with the federal government. While the University is continuing to evaluate the impact of the letters, DOE is presenting Cornell with a Hobson's choice: agree to the unlawful fifteen percent cap announced in the DOE Policy Flash and lose $5,500,000 on these forty-six awards alone, or insist that DOE honor Cornell's existing negotiated cost recovery rate, and be punished by losing the awards altogether.

7.      Either option would result in immediate and significant consequences for Cornell. The University does not have sufficient budgeted operational funds to cover a sudden structural decrease in indirect cost recovery for existing awards on an ongoing basis, and would be required to consider layoffs, both for research staff and research administration officers and other employees of the university who perform critical but indirect work in support of sponsored activity, and reductions in administrative costs necessary for research services.  For example, Cornell would be required to examine each grant to determine whether layoffs would be required as a result of the partial or total loss of funding for an award, and also to determine which resources currently supported by the indirect cost recovery on that award would need to be reduced or eliminated altogether. The University may be required to close research facilities, postpone equipment and

2

material investments, and limit the number of graduate students admitted in DOE-supported fields, all of which will diminish Cornell's ability to undertake this type of research in the future, even if the DOE Policy Flash were rescinded or invalidated.

8.      Even being put to this choice is already causing Cornell harm. The process of identifying the potential need for layoffs, facility closures, investment delays, and other cost-cutting measures must begin very soon, and be completed well before thirty days have elapsed. And, many of these kinds of decisions are difficult, if not impossible, to reverse.

9.      Even if the University could locate institutional funding to temporarily support these staff, equipment, and maintenance costs—and that is not a certainty—that would reduce the availability of those funds for other significant University needs that are not currently supported by federal awards. This would also impact the other federally sponsored research activities Cornell has been selected to undertake by other agencies that rely on the same facilities and administration costs that the DOE awards help to support.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Ithaca, New York
          April 15, 2025

_____
KAVITA BALA, PH.D.

3

**JA282**

# Exhibit A

| From: | Johnson, Gwendolyn |
|---|---|
| To: | Cornell Research Awards |
| Subject: | Notification of Revised Indirect Rate Notification for Institutes of Higher Education |
| Date: | Monday, April 14, 2025 10:23:31 PM |
| Attachments: | image001.png |
| | PF2025-22 Adjusting Department of Energy Grant Policy for Institutions of Higher Education.pdf |
| | DOE - IHE Indirect Rate Notification 4.11 - CORNELL UNIVERSITY.pdf |
| | DOE - IHE Indirect Rate Notification 4.11 - CORNELL UNIVERSITY (2).pdf |
| Importance: | High |

Dear Business Officer:

Please refer to the attached official notification of Indirect Rate Adjustment and the DOE Grant Policy guidance that accompanies it for your review and action.

Regards,

Gwendolyn R. Johnson
Grants Management Specialist
Office of Grants and Cooperative Agreements
Financial Assistance Division (CA-211)
Office of Science Consolidated Service Center
U.S. Department of Energy
☎ 630-252-2739
🖷 630-252-2522
✉ Email: gwendolyn.johnson@science.doe.gov




🌲 Please only print email when necessary

**JA284**

# POLICY FLASH 2025-22

**DATE**:     April 11, 2025

**TO**:     HCAs/Procurement Directors/Contracting Officers/Grants Officers

**FROM**:    Director
Office of Acquisition Management

**SUBJECT:**   **Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)**

**BACKGROUND:** Pursuant to 5 U.S.C. 553(a)(2), the Department of Energy ("Department") is updating its policy with respect to Department grants awarded to institutions of higher education (IHEs).

Through its grant programs, the Department funds Department-sanctioned research. A portion of the funding goes to "indirect costs", which include both facilities and administration costs. *See* 2 C.F.R. 200.414(a). "Facilities costs" comprise "depreciation on buildings, equipment and capital improvements, and operations and maintenance expenses," while "administration costs" are "general administration and [other] general expenses," like funding for "the director's office, accounting, [and] personnel." *Id.*

While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. *See* 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds.

This memorandum accordingly sets forth the Department's updated policies, procedures, and general decision-making criteria for establishing indirect cost rates when awarding grants to IHEs; these policies, procedures, and criteria are intended to better balance the Department's dual responsibilities to grant recipients and the American people.

The Department is initially taking this action only with respect to IHEs. *See* 2 C.F.R. 200.414(c)(1); *id.* 200.1.

**ESTABLISHING APPROPRIATE INDIRECT COST RATES:**

At present, the Department's indirect cost rate for IHE grants is typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). Though the Department generally must accept this negotiated rate, *see* 2 C.F.R. 200.414(c)(1), it may deviate therefrom for "a class of Federal awards" after implementing and making publicly available "the policies, procedures and general decision-making criteria" it will follow when seeking and justifying deviations. *Id.* 200.414(c)(1), (3). A "class of Federal awards" is defined to include "a group of Federal awards . . . to a specific type of recipient or group of recipients," such as grants to IHEs—the class relevant to this policy update. *Id.* 200.1.

For the reasons set forth in this memorandum, hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs. This is at the high end of the "up to 15 percent" *de minimis* rate permitted by government-wide regulation. *See, e.g.*, 2 C.F.R. 200.414(f). Consistent with this memorandum, the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy. *See* 2 C.F.R. 200.340(a), (b). Recipients subject to termination will receive separate notice and guidance.

All future Department grant awards to IHEs will default to this 15 percent indirect cost rate. This system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people.

Additional information is forthcoming.

This flash will be available online at the following website: http://energy.gov/management/listings/policy-flashes

For DOE questions concerning this policy flash, please email: ihe-icr-response@hq.doe.gov

**UNITED STATES DEPARTMENT OF ENERGY**
**OFFICE OF SCIENCE CONSOLIDATED SERVICE CENTER**
**GRANTS AND COOPERATIVE AGREEMENTS**

April 14, 2025

CORNELL UNIVERSITY

Dear Business Officer:

  This letter provides an update from the United States Department of Energy (Department) regarding your federal grants listed below:

DE-FG02-05ER15687; DE-SC0004911; DE-SC0008037; DE-SC0008431; DE-SC0010560; DE-SC0019250; DE-SC0019762; DE-SC0019997; DE-SC002014; DE-SC0021000; DE-SC0021003; DE-SC0021026; DE-SC0021038; DE-SC0021941; DE-SC0022860; DE-SC0023048; DE-SC0023896; DE-SC0023905; DE-SC0024046; DE-SC0024137; DE-SC0024172; DE-SC0024175; DE-SC0024287

  Pursuant to the Department's policy memorandum dated April 11, 2025, entitled *Adjusting Department of Energy Grant Policy for Institutions of Higher Education*, it is the Department's policy to improve efficiency and curtail costs where appropriate to "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." The Department has accordingly set "a standardized 15 percent indirect cost rate" for grant awards to the class consisting of institutions of higher education.

  To this end, the Department has undertaken a review of all Department grant awards to ensure that the awards comply with this updated Department policy. During this review, the Department determined that the grants listed above are not currently in compliance with the policy memorandum.

  **Therefore, in accordance with the foregoing, the policies set forth in the Department's April 11, 2025 memorandum, applicable regulations, and the terms of your grant awards, the Department is conditionally terminating your grant awards, effective thirty (30) days from the date of this notice.** *See* 2 C.F.R. 200.340(a), (b).

  This termination is conditional. You may avoid termination of these awards by having the duly authorized representative send an email to ihe-icr-response@hq.doe.gov and Michael.Neff@science.doe.gov. A letter must also be sent via first-class mail or overnight carrier to the Department official identified in the signature block below, confirming your agreement to an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025.

This confirmation notice should include:

1. a copy of this notice;

2. the date you received this notice;

3. confirmation that you accept an updated indirect cost rate of 15 percent as of May 14, 2025; and

4. any other documents or information you deem appropriate.

*See* 2 C.F.R. § 200.342.

The agreed update to the grant award indirect cost rate will be effective as of May 14, 2025.

If you wish to allow any of the above grants to terminate, costs incurred by you after termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov. *See id.* § 200.344(i). Finally, you are reminded of your duties under your agreement and Department guidance regarding retention of grant records and the Department's audit rights as stated in your grant documents.

Thank you,

Michael Neff
Contracting Officer
Michael.Neff@science.doe.gov
9800 S. Cass Avenue
Lemont, IL 60439

**UNITED STATES DEPARTMENT OF ENERGY**
**OFFICE OF SCIENCE CONSOLIDATED SERVICE CENTER**
**GRANTS AND COOPERATIVE AGREEMENTS**

April 14, 2025

CORNELL UNIVERSITY

Dear Business Officer:

This letter provides an update from the United States Department of Energy (Department) regarding your federal grants listed below:
DE-FG02-05ER15687; DE-SC0004911; DE-SC0008037; DE-SC0008431; DE-SC0010560; DE-SC0019250; DE-SC0019762; DE-SC0019997; DE-SC002014; DE-SC0021000; DE-SC0021003; DE-SC0021026; DE-SC0021038; DE-SC0021941; DE-SC0022860; DE-SC0023048; DE-SC0023896; DE-SC0023905; DE-SC0024046; DE-SC0024137; DE-SC0024172; DE-SC0024175; DE-SC0024287

Pursuant to the Department's policy memorandum dated April 11, 2025, entitled *Adjusting Department of Energy Grant Policy for Institutions of Higher Education*, it is the Department's policy to improve efficiency and curtail costs where appropriate to "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." The Department has accordingly set "a standardized 15 percent indirect cost rate" for grant awards to the class consisting of institutions of higher education.

To this end, the Department has undertaken a review of all Department grant awards to ensure that the awards comply with this updated Department policy. During this review, the Department determined that the grants listed above are not currently in compliance with the policy memorandum.

**Therefore, in accordance with the foregoing, the policies set forth in the Department's April 11, 2025 memorandum, applicable regulations, and the terms of your grant awards, the Department is conditionally terminating your grant awards, effective thirty (30) days from the date of this notice.** *See* 2 C.F.R. 200.340(a), (b).

This termination is conditional. You may avoid termination of these awards by having the duly authorized representative send an email to ihe-icr-response@hq.doe.gov and Michael.Neff@science.doe.gov. A letter must also be sent via first-class mail or overnight carrier to the Department official identified in the signature block below, confirming your agreement to an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025.

This confirmation notice should include:

1. a copy of this notice;

2. the date you received this notice;

3. confirmation that you accept an updated indirect cost rate of 15 percent as of May 14, 2025; and

4. any other documents or information you deem appropriate.

*See* 2 C.F.R. § 200.342.

      The agreed update to the grant award indirect cost rate will be effective as of May 14, 2025.

      If you wish to allow any of the above grants to terminate, costs incurred by you after termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov. *See id.* § 200.344(i). Finally, you are reminded of your duties under your agreement and Department guidance regarding retention of grant records and the Department's audit rights as stated in your grant documents.

Thank you,

Michael Neff
Contracting Officer
Michael.Neff@science.doe.gov
9800 S. Cass Avenue
Lemont, IL 60439

**JA290**

## DECLARATION OF DOUGLAS A. GAGE

I, Douglas A. Gage, Ph.D., declare as follows:

1.    I am the Vice President for Research and Innovation at Michigan State University ("MSU"), I make this declaration in further support of the Plaintiffs' Emergency Motion for a Temporary Restraining Order.

2.    I have personal knowledge of the contents of this declaration, or I have knowledge of the matters based on my review of information and records gathered by MSU personnel and my staff, and could testify thereto.

3.    On April 14, 2025, at 6:04 pm, MSU received an email from a Grants Management Specialist in the Department of Energy's ("DOE") Office of Science Consolidated Service Center. The email contained two attachments: a copy of DOE's Policy Flash 2025-22; and a letter purporting to "conditionally terminat[e]" fifty-seven (57) DOE awards to MSU on thirty days' notice.

4.    Without continued external funding, many of these projects will not be able to proceed.  We do not yet know whether additional notices will be issued by the DOE.

5.    Given the current 57 projects identified by DOE for rate cuts or terminations in thirty days, we—along with principal investigators and departments—will need to assess each situation individually, both at the project and position level.

6.    The effect of this notice on staffing for these projects will be most acute.  MSU units will need to evaluate whether impacted employees can be reassigned to other roles.  Based on the size and scope of the affected projects relative to MSU's total DOE-funded portfolio, we conservatively estimate that approximately 70 individuals may need to be laid off.  We will have to start making those decisions this week without action from the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of April 2025, in East Lansing, Michigan

Douglas A. Gage

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-10912-ADB |
| DEPARTMENT OF ENERGY *et al.*, | * * | |
| Defendants. | * * | |

**ORDER GRANTING PLAINTIFFS'**
**<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

BURROUGHS, D.J.

For purposes of Federal Rule of Civil Procedure 65(b), the Plaintiffs have made a

sufficient showing that they have provided notice to Defendants and that, unless their Motion for

a Temporary Restraining Order ("TRO"), [ECF No. 3 (the "Motion")], is granted, they will

sustain immediate and irreparable injury before there is an opportunity to hear from all parties.

Thus, a TRO is justified to preserve the status quo pending a hearing and the Plaintiffs' Motion is

**<u>GRANTED</u>**.

Defendants and their officers, employees, servants, agents, appointees, and successors are

hereby enjoined from implementing, instituting, maintaining, or giving effect to the DOE Policy

Flash: Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)

(the "Rate Cap Policy") in any form; from otherwise modifying negotiated indirect cost rates

except as permitted by statute and by the regulations of the Office of Management and the

Budget; and from terminating any grants pursuant to the Rate Cap Policy or based on a grantee's

refusal to accept an indirect cost rate less than their negotiated rate.

The Court further orders that (1) within 24 hours of entry of this Order, Defendants must provide written notice of the Order to all funding recipients affected by the Rate Cap Policy and (2) Defendants must notify the Court that they have done so within 48 hours of entry of this Order. Defendants shall additionally file status reports at biweekly intervals thereafter to confirm the regular disbursement and obligation of federal financial assistance funds for so long as the terms of the TRO remain in effect.

Defendants' opposition to the Motion is due by **Tuesday, April 22, 2025**. Plaintiffs may file a reply brief, limited to ten pages in length, by **Friday, April 25, 2025**. Counsel shall appear in-person for a hearing on the Motion at **11:00 AM** on **Monday, April 28, 2025**.

This TRO shall become effective immediately upon entry by this Court. It shall remain in effect until further order of this Court.

**SO ORDERED.**

April 16, 2025

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ASSOCIATION OF AMERICAN
UNIVERSITIES, et al.,

          Plaintiffs,

v.

DEPARTMENT OF ENERGY, et al.,

          Defendants.

Case No. 25-cv-10912-ADB

## <u>DEFENDANTS' RESPONSE TO COURT ORDER</u>

Pursuant to this Court's Order dated April 16, 2025 (ECF No. 34), Defendants respectfully submit the following response:

1.      On April 16, 2025, the Department of Energy issued a notice on SAM.gov announcing and providing a copy of the Temporary Restraining Order. SAM.gov is the official U.S. government system for contracting, which the Department of Energy uses to communicate with its contractors and grantees in exceptional circumstances, such as this one, where a time-sensitive communication to large groups of grantees is required. Subject to limited exceptions, all grant recipients are required to "[m]aintain a current and active registration in SAM.gov at all times during which it has an active award." 2 C.F.R. § 25.200(b)(2). To that end, the Department of Energy has used SAM.gov to circulate injunction notices in other pending funding litigation, just as it has done here.

2.     In an abundance of caution, the Department of Energy is also providing each individual grant recipient with a copy of the Temporary Restraining Order via email.  To ensure each individual grantee receives an email, at approximately 9 a.m. EST on April 17, 2025, the DOE Office of Management (MA) instructed its Heads of Contracting Officers to direct all DOE Grant Officials and Contracting Officers who administer active DOE grants involving Institutions of Higher Education (IHE) to provide written notice of the Temporary Restraining Order via email to each individual IHE grantee in their jurisdiction.  DOE instructed that its Heads of Contracting Activities send these written notifications via email to all individual IHE grantees by end of day on April 17, 2025.  DOE further instructed the Heads of Contracting Activities to provide responses including (1) the grant award ID and (2) recipient name for each IHE recipient emailed in this manner.  The notifications to the IHE recipients read as follows:

Dear Grant Recipient,

The U.S. Department of Energy is providing you notice of the attached court order related to Policy Flash "PF 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education." Written notice of this order has been published on SAM.gov: https://sam.gov/opp/5233f39f87af47baa7f5d79c1819a5bc/view.

Respectfully submitted:

LEAH B. FOLEY

United States Attorney

By:     */s/ Nicole M. O'Connor*
        Nicole M. O'Connor (BBO#675535)

**JA296**

Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3112
Nicole.O'Connor@usdoj.gov

Dated: April 18, 2025

## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, hereby certify that a true copy of the above document was served upon all parties of record via this court's electronic filing system and upon any non-registered parties via regular mail.

Dated: April 18, 2025

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant U.S. Attorney

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

ASSOCIATION OF AMERICAN
UNIVERSITIES, et al.,

        Plaintiffs,

v.

DEPARTMENT OF ENERGY, et al.,

        Defendants.

Case No. 25-cv-10912-ADB

<u>**DECLARATION OF BERTA SCHREIBER**</u>

I, Berta Schreiber, hereby declare as follows:

1.     I am the Director of the Office of Acquisition Management within the Office of
Management and the Senior Procurement Executive at the United States Department of Energy
(DOE). I have held this position since October 1, 2023. In this position, I am responsible for
overseeing DOE's acquisition and financial assistance policies, regulations and oversight
programs. As the Senior Procurement Executive, I delegate authority to thirteen Heads of
Contracting Activities to enter into contracts, financial assistance agreements, and other
transactions agreements. I have DOE-wide responsibility and authority to provide overall direction
of the Department's procurement system which includes acquisition and financial assistance. My
authority does not include the National Nuclear Security Administration, the Federal Energy
Regulatory Commission, or the Bonneville Power Administration.

2.     Prior to assuming my current role, I served as both the Deputy Director for the
Office of Acquisition Management since August 2022 and, prior to that, as the Director of the

Office of Procurement and Financial Assistance Policy (previously the Office of Policy). I was the Director of the Office of Policy within the Office of Acquisition Management since November 2011.

3. Through my official duties, I have become familiar with the DOE Policy Flash. A DOE Policy Flash is one type of communication tool used by the Office of Acquisition Management to disseminate acquisition or financial assistance-related information, guidance, and updates to procurement and financial assistance personnel. Policy Flashes can interpret existing authority, provide internal instructions or guidance, or provide notice of DOE's intent to take a certain action.

4. In order to promote transparency, Policy Flashes are viewable by the public on the DOE webpage, which describes the Policy Flash as follows:

> Policy Flashes are issued by the Office of Acquisition Management. Policy Flashes transmit information and items of interest to the DOE acquisition community. A Policy Flash itself is not a statement of policy and should not be referenced as such.

*Available at* https://www.energy.gov/management/policy-flashes (last visited April 22, 2025).

5. Attached as Exhibit A is a true and correct copy of Policy Flash PF 2025-22, "Adjusting Department of Energy Grant Policy for Institutions of Higher Education," which I issued on April 11, 2025 by publication on the webpage: https://www.energy.gov/management/policy-flashes.

6. I participated in and am familiar with the process by which Policy Flash PF 2025-22, "Adjusting Department of Energy Grant Policy for Institutions of Higher Education" was developed. PF 2025-22 was not intended to be a binding or final agency action. It was an announcement of DOE's intent to enter into negotiations with a class of awardees (as specifically noted in the Policy Flash, initially this would be Institutions of Higher Education) with an aim to

**JA299**

arrive at acceptance of a 15% indirect cost rate.  Subsequent to negotiations, the Department would take action to modify a particular grant agreement to stipulate the newly negotiated terms.  If agreement could not be reached, the Department would have the option to terminate the award.

7.     As stated, a Policy Flash is merely a communication mechanism; it is not a regulation and, as stated on the Policy Flash webpage, it is not even a statement of policy.  Policy Flashes can be modified or cancelled by DOE at any time; there is no public comment process related to them; and they do not have the force and effect of law.  While a Policy Flash is sometimes used to describe future plans of the Office of Acquisition Management that might have legal consequences when implemented by a future action, issuance of a Policy Flash itself does not have any legal consequence or any direct impact on an existing grant award or grantee.

8.     Attached as Exhibit B is a true and accurate copy of a statement issued by the Department of Energy on April 11, 2025, "Department of Energy Overhauls Policy for College and University Research, Saving $405 Million Annually for American Taxpayers".

9.     Attached as Exhibit C is a true and correct copy of an Assistance Agreement for Award No. DE-FE0032481 that memorializes a final grant from DOE to Washington University in St. Louis, effective May 1, 2024, for research related to "Novel Supercritical Fluid Extraction/Enrichment of Rare Earth Elements Directly from Solid Coal-Based Resources."  Upon information and belief, Washington University in St. Louis is a member of Plaintiff Association of American Universities.

10.     Attached as Exhibit D is a true and correct copy of the Negotiated Indirect Cost Rate Agreement (NICRA) provided by Washington University in St. Louis in association with Award No. DE-FE0032481. The document contains the following term:

> If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should

(1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

11.     Attached as Exhibit E is a true and correct copy of the "SPECIAL TERMS AND CONDITIONS FOR USE IN MOST GRANTS AND COOPERATIVE AGREEMENTS" attached to Award No. DE-FE0032481. The document contains, in part, the following term:

> This assistance agreement consists of the Assistance Agreement Cover Page and Award Terms and Conditions, plus the following:
> a.  Special terms and conditions.
> b.  Attachments:

| Attachment No. | Title |
|---|---|
| 1 | Intellectual Property Provisions |
| 2 | Statement of Project Objectives |
| 3 | Federal Assistance Reporting Checklist and Instructions |
| 4 | Budget Pages |
| 5 | Data Management Plan |

> c.  Applicable program regulations at http://www.eCFR.gov.
> d.  DOE Assistance Regulations, 2 CFR part 200 as supplemented by 2 CFR part 910 at http://www.eCFR.gov.
> e.  Research Terms and Conditions and the DOE Agency Specific Requirements at http://www.nsf.gov/bfa/dias/policy/rtc/index.jsp
> f.  Application/proposal as approved by DOE.
> g.  National Policy Requirements to Be Incorporated as Award Terms in effect on date of award at https://www.nsf.gov/awards/managing/rtc.jsp.

12.     Attached as Exhibit F is a true and correct copy of an Assistance Agreement for Award No. DE-SC0010113 that memorializes a final grant from DOE to The University of Iowa, effective April 1, 2023, for "High Energy Experimental and Theoretical Physics Research." Upon information and belief, The University of Iowa is a member of Plaintiff Association of American Universities.

13.     Attached as Exhibit G is a true and correct copy of a Negotiated Indirect Cost Rate Agreement (NICRA) with cover letter provided by The University of Iowa in association with Award No. DE-SC0010113. The document contains the following term:

> If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

14.     Attached as Exhibit H is a true and correct copy of the "SPECIAL TERMS AND CONDITIONS" attached to Award No. DE-SC0010113. The document contains, in part, the following term:

> This award/agreement consists of the Assistance Agreement cover page, plus the following:
> a.  Special terms and conditions.
> b.  Attachments:

| Attachment No. | Title |
|---|---|
| 1 | Intellectual Property Provisions and Patent Responsibility Requirements |
| 2 | Federal Assistance Reporting Checklist and Instructions |
| 3 | Budget Pages |
| 4 | If the award is for research, the Federal-Wide Research Terms and Conditions and DOE Agency Specific Requirements, available at https://www.nsf.gov/awards/managing/rtc.jsp |

> c.  Applicable program regulations, 10 CFR 605 at http://www.eCFR.gov.
> d.  DOE Assistance Regulations, 2 CFR part 200 as amended by 2 CFR part 910 at http://www.eCFR.gov.
> e.  Application/proposal as approved by DOE.
> f.  National Policy Requirements to Be Incorporated as Award Terms in effect on date of award at https://www.nsf.gov/awards/managing/rtc.jsp.

15.     Attached as Exhibit I is a true and correct copy of an April 14, 2025 letter from Michael Neff, the Contracting Officer for the DOE Office of Science, to The University of Iowa in regards to a number of federal grants, including Award No. DE-SC0010113.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 22nd day of April, 2025 at Washington, DC.


BERTA
SCHREIBER

Digitally signed by BERTA
SCHREIBER
Date: 2025.04.22 14:16:11
-04'00'

_____

Berta Schreiber

Case 3:25-cv-10392-ADB Document 38-2 Filed 04/23/25 Page 1 of 6
Case 1:25-cv-11048 Document 40-2 Filed 04/23/25 Page 1 of 6 ID: 6753258
4/22/25, 3:25 PM    Department of Energy Overhauls Policy for College and University Research, Saving $405 Million Annually for American Taxpayers



An official website of the United States government    Here's how you know



**U.S. DEPARTMENT**
*of* **ENERGY**

Energy.gov    Department of Energy Overhauls Policy for College and University Research, Saving $40...

# Department of Energy Overhauls Policy for College and University Research, Saving $405 Million Annually for American Taxpayers

The Department of Energy (DOE) today announced a new policy action aimed at halting inefficient spending by colleges and universities while continuing to expand American innovation and scientific research.

[Energy.gov](Energy.gov)

April 11, 2025

 5 min

**JA304**

4/22/25, 3:25 PM    Department of Energy Overhauls Policy for College and University Research, Saving $405 Million Annually for American taxpayers

**WASHINGTON–** The Department of Energy (DOE) today announced a new policy action aimed at halting inefficient spending by colleges and universities while continuing to expand American innovation and scientific research. In a new policy memorandum shared with grant recipients at colleges and universities, DOE announced that it will limit financial support of "indirect costs" of DOE research funding to 15%. This action is projected to generate over $405 million in annual cost savings for the American people, delivering on President Trump's commitment to bring greater transparency and efficiency to federal government spending.

"The purpose of Department of Energy funding to colleges and universities is to support scientific research – not foot the bill for administrative costs and facility upgrades," **U.S. Secretary of Energy Chris Wright** said. "With President Trump's leadership, we are ensuring every dollar of taxpayer funding is being used efficiently to support research and innovation – saving millions for the American people."

Through its grant programs, the Department provides over $2.5 billion annually to more than 300 colleges and universities to support Department-sanctioned research. A portion of the funding goes to "indirect costs", which include both facilities and administration costs.

According to DOE data, the average rate of indirect costs incurred by grant recipients at colleges and universities is more than 30%, a significantly higher rate than other for profit, non-profit and state and local government grant awardees. Limiting these costs to a standard rate of 15% will help improve efficiency, reduce costs and ensure proper stewardship of American taxpayer dollars.

Full memorandum is available here:

**POLICY FLASH**

**JA305**

**DATE:** April 11, 2025

**SUBJECT:** Adjusting Department of Energy Grant Policy for Institutions of Higher Education (IHE)

**BACKGROUND:** Pursuant to 5 U.S.C. 553(a)(2), the Department of Energy ("Department") is updating its policy with respect to Department grants awarded to institutions of higher education (IHEs).

Through its grant programs, the Department funds Department-sanctioned research. A portion of the funding goes to "indirect costs", which include both facilities and administration costs. See 2 C.F.R. 200.414(a). "Facilities costs" comprise "depreciation on buildings, equipment and capital improvements, and operations and maintenance expenses," while "administration costs" are "general administration and [other] general expenses," like funding for "the director's office, accounting, [and] personnel." *Id.*

While the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards, these payments are not for the Department's direct research funding. See 89 Fed. Reg. 30046-30093. As these funds are entrusted to the Department by the American people, the Department must ensure it is putting them to appropriate use on grant programs. To improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds.

This memorandum accordingly sets forth the Department's updated policies, procedures, and general decision-making criteria for establishing indirect cost rates when awarding grants to IHEs; these policies, procedures, and criteria are intended to better balance the Department's dual responsibilities to grant recipients and the American people.

**JA306**

The Department is initially taking this action only with respect to IHEs. See 2 C.F.R. 200.414(c)(1); *id.* 200.1.

**ESTABLISHING APPROPRIATE INDIRECT COST RATES:**

At present, the Department's indirect cost rate for IHE grants is typically negotiated by either "the Department of Health and Human Services (HHS) or the Department of Defense's Office of Naval Research (DOD), normally depending on which of the two agencies (HHS or DOD) provide[d] more funds to the [relevant] educational institution for the most recent three years." 2 C.F.R. pt. 200, app. III(C)(11)(a)(1). Though the Department generally must accept this negotiated rate, see 2 C.F.R. 200.414(c)(1), it may deviate therefrom for "a class of Federal awards" after implementing and making publicly available "the policies, procedures and general decision-making criteria" it will follow when seeking and justifying deviations. Id. 200.414(c)(1), (3). A "class of Federal awards" is defined to include "a group of Federal awards . . . to a specific type of recipient or group of recipients," such as grants to IHEs —the class relevant to this policy update. Id. 200.1.

For the reasons set forth in this memorandum, hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs. Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs. This is at the high end of the "up to 15 percent" de minimis rate permitted by government-wide regulation. See, e.g., 2 C.F.R. 200.414(f). Consistent with this memorandum, the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy. See 2 C.F.R. 200.340(a), (b). Recipients subject to termination will receive separate notice and guidance.

All future Department grant awards to IHEs will default to this 15 percent indirect cost rate. This system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people.

Additional information is forthcoming.

This flash will be available online at the Department of Energy Policy Flashes website.

| View Previous | View Next |
|---|---|
| Testing Starts on First Higher Enriched Fuel in U.S. Commercial Reactor | GE Hitachi Nuclear Demonstrates New Composite Blocks for Nuclear Construction |
| April 10, 2025 | April 14, 2025 |

## Media Inquiries:

(202) 586-4940 or DOENews@hq.doe.gov

## Read more at the energy.gov Newsroom

Committed to Restoring America's Energy Dominance.

## Quick Links

Leadership & Offices

Mission

Contact Us

Careers

## Resources

Budget & Performance

Directives, Delegations, & Requirements

Freedom of Information Act (FOIA)

Inspector General

Privacy Program

## Federal Government

USA.gov

The White House

Vote.gov

## Subscribe To Our Newsletter

Email

Subscribe

## Follow Us

Open Gov          Accessibility          Privacy          Information Quality          Web Policies

Vulnerability Disclosure Program          Whistleblower Protection

**JA309**

**ASSISTANCE AGREEMENT**

| 1. Award No. DE-FE0032481 | 2. Modification No. | 3. Effective Date 05/01/2024 | 4. CFDA No. 81.089 |
|---|---|---|---|

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| WASHINGTON UNIVERSITY, THE<br>Attn: TERI MEDLEY<br>CAMPUS BOX 1054<br>ONE BROOKINGS DRIVE<br>SAINT LOUIS MO 631304899 | Fossil Energy and Carbon Management<br>FECM-1<br>U.S. Department of Energy<br>1000 Independence Avenue, S.W.<br>Washington DC 20585 | 05/01/2024<br>through<br>04/30/2027 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | See Page 2 | 24FE001996 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| WASHINGTON UNIVERSITY, THE<br>Attn: TERI MEDLEY<br>CAMPUS BOX 1054<br>ONE BROOKINGS DRIVE<br>SAINT LOUIS MO 631304899 | Govt. Share: $499,683.00<br><br>Cost Share : $177,871.00<br><br>Total    : $677,554.00 | This action: $499,683.00<br><br>Total    : $499,683.00 |

| 14. Principal Investigator | 15. Program Manager | 16. Administrator |
|---|---|---|
| | Andrew E. Downs<br>Phone: 412-386-9373 | U.S. DOE/NETL<br>NATIONAL ENERGY TECH LAB<br>3610 Collins Ferry Road<br>Morgantown WV 26505-2353 |

| 17. Submit Payment Requests To | 18. Paying Office | 19. Submit Reports To |
|---|---|---|
| Payment - Direct Payment<br>from U.S. Dept of Treasury | Payment - Direct Payment<br>from U.S. Dept of Treasury | See Attachment 3 |

**20. Accounting and Appropriation Data**

00150-2023-31-232424-25500-1611501-0000000-0000000-0000000

**21. Research Title and/or Description of Project**

Novel Supercritical Fluid Extraction/Enrichment of Rare Earth Elements Directly from Solid Coal-Based Resources

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br><br>*Susan Miltenberger* |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Susan Miltenberger | 27. Date Signed<br>05/02/2024 |

**JA310**

| | | | | | | |
|---|---|---|---|---|---|---|
| **CONTINUATION SHEET** | REFERENCE NO. OF DOCUMENT BEING CONTINUED DE-FE0032481 | | | | PAGE 2 | OF 31 |

NAME OF OFFEROR OR CONTRACTOR
WASHINGTON UNIVERSITY, THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | UEI:  L6NFUM28LQM5 Project Period of Performance: 05/01/2024-04/30/2027 Budget Period: 05/01/2024-04/30/2027 Block 9. Authority: PL 109-58, Energy Policy Act 2005 Block 14. Principal Investigator: Young-Shin Jun ysjun@wustl.edu 314-935-4539 Recipient Business Point of Contact: Teri Medley researchgrants@wusm.wustl.edu 314-747-4134 Block 15. DOE Program Manager Andrew E. Downs Andrew.Downs@netl.doe.gov 412-386-9373 DOE Award Administrator: Davina Reed davina.reed@netl.doe.gov 412-386-9199 ASAP: YES Extent Competed: COMPETED Davis-Bacon Act: NO PI: Young-Shin Jun Fund: 00150 Appr Year: 2023 Allottee: 31 Report Entity: 232424 Object Class: 25500 Program: 1611501 Project: 0000000 WFO: 0000000 Local Use: 0000000 | | | | |

**JA311**

JULY 2004

## COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1430653611A1
ORGANIZATION:
Washington University in St. Louis
Campus Box 1034
700 Rosedale Avenue
Saint Louis, MO 63112-4899

Date: 07/11/2023
FILING REF.: The preceding
agreement was dated
04/28/2022

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| PRED. | 07/01/2023 | 06/30/2025 | 55.50 | On Campus | Organized Research |
| PRED. | 07/01/2021 | 06/30/2025 | 36.00 | On Campus | Instruction |
| PRED. | 07/01/2021 | 06/30/2025 | 36.00 | On Campus | Other Sponsored Activities |
| PRED. | 07/01/2021 | 06/30/2025 | 26.00 | Off Campus | All Programs |
| PROV. | 07/01/2025 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2025. |

### *BASE

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs of off-site facilities, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

ORGANIZATION: Washington University in St. Louis
AGREEMENT DATE: 07/11/2023

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2023 | 6/30/2024 | 31.80 | All | Faculty and staff |
| FIXED | 7/1/2023 | 6/30/2024 | 22.60 | All | Post-doctoral employees |
| FIXED | 7/1/2023 | 6/30/2024 | 21.80 | All | Clinical fellow employees |
| FIXED | 7/1/2023 | 6/30/2024 | 1.60 | All | Post-doctoral non-employees |
| FIXED | 7/1/2023 | 6/30/2024 | 0.80 | All | Clinical fellow non-employees |
| FIXED | 7/1/2023 | 6/30/2024 | 4.00 | All | Supplemental earnings |
| PROV. | 7/1/2024 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2024 |

## ** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

ORGANIZATION: Washington University in St. Louis
AGREEMENT DATE: 07/11/2023

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below. Fringe benefits are not charged on individual compensation exceeding an annual cap. Over/under recoveries from actual costs are adjusted in current or future periods.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

OFF-CAMPUS DEFINITION: The off-campus rate will apply for all activities: a) Performed in facilities not owned by the institution and where these facility costs are not included in the F&A pools; or b) Where rent is directly allocated/charged to the project(s). Actual costs will be apportioned between on-campus and off-campus components. Each portion will bear the appropriate rate.

ORGANIZATION Washington University in St. Louis
AGREEMENT DATE 07/11/2023

Per 2 CFR 200.414(g) – A rate extension has been granted applicable to indirect costs.

*This rate agreement only updates the fringe benefits section*.

Fringe Benefits:

Retirement Annuity
FICA
Disability Insurance
Worker's Compensation
Life Insurance
Unemployment Insurance
Health Insurance
Non-Dependent Employee Tuition Remission
Mass Transit Passes
Health Savings Accounts (Employer contribution $400 per employee)
Employee Assistance Program
Family Learning Center (day care)
Back-up Care (short-term assistance with child and elder/adult care)
Flu Shot Program
Adoption Assistance
Cost of benefit plan audits and trust administration fees
Other minor benefits

Adoption assistance
Cost of benefit plan audits and trust administration fees

The next indirect cost proposal based on actual costs for the fiscal year ending 06/30/2024 is due in our office by 12/31/2024.

The next fringe benefit proposal based on actual costs for the fiscal year ending 06/30/2023 is due in our office by 12/31/2023.

Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds $5000.

RU7397

ORGANIZATION: Washington University in St. Louis
AGREEMENT DATE: 07/11/2023

## SECTION III: GENERAL

A. **LIMITATIONS:**

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B. **ACCOUNTING CHANGES:**

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C. **FIXED RATES:**

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D. **USE BY OTHER FEDERAL AGENCIES:**

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E. **OTHER:**

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:

ON BEHALF OF THE GOVERNMENT:

Washington University in St. Louis

DEPARTMENT OF HEALTH AND HUMAN SERVICES

(INSTITUTION)

(AGENCY)

Arif M. Karim -S   Digitally signed by Arif M. Karim -S
Date: 2023.07.12 11:08:03 -05'00'

(SIGNATURE)

(SIGNATURE)

Amy Kweskin

Arif Karim

(NAME)

(NAME)

Executive Vice Chancellor & CFO

Director, Cost Allocation Services

(TITLE)

(TITLE)

7/12/23

07/11/2023

(DATE)

(DATE)

HHS REPRESENTATIVE:   Olulola Oluborode

TELEPHONE:   (214) 767-3261

RU7397

SPECIAL TERMS AND CONDITIONS FOR USE IN MOST GRANTS AND COOPERATIVE AGREEMENTS ....................................................................................................... 6

LEGAL AUTHORITY AND EFFECT (JUNE 2015) ........................................................ 6

RESOLUTION OF CONFLICTING CONDITIONS ......................................................... 6

AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – APRIL 2024) ......... 6

CONFERENCE SPENDING (FEBRUARY 2015) ............................................................ 6

PAYMENT PROCEDURES - REIMBURSEMENT THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM .......................................... 7

COST SHARING FFRDC'S NOT INVOLVED ............................................................... 7

REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS .............................................................. 8

USE OF PROGRAM INCOME - ADDITION ................................................................. 8

STATEMENT OF FEDERAL STEWARDSHIP ............................................................. 8

SITE VISITS ................................................................................................................ 8

REPORTING REQUIREMENTS (APRIL 2023) ............................................................ 8

PUBLICATIONS .......................................................................................................... 9

FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS .......................................... 9

INTELLECTUAL PROPERTY PROVISIONS AND CONTACT INFORMATION ............. 9

NATIONAL SECURITY: CLASSIFIABLE RESULTS ORIGINATING UNDER AN AWARD (DECEMBER 2014) ..................................................................................... 10

NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS ....................................................................... 11

INSURANCE COVERAGE (DECEMBER 2014) .......................................................... 11

EQUIPMENT (DECEMBER 2014) (NETL - APRIL 2024) ............................................ 11

SUPPLIES (DECEMBER 2014) .................................................................................. 12

INTANGIBLE PROPERTY (DECEMBER 2014) .......................................................... 12

PROPERTY TRUST RELATIONSHIP (DECEMBER 2014) .......................................... 12

CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022) ........... 12

PERFORMANCE OF WORK IN UNITED STATES ..................................................... 13

CATEGORICAL EXCLUSION (CX) ........................................................................... 13

SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS ........... 13

FINAL INCURRED COST AUDIT (DECEMBER 2014) ............................................... 14

LOBBYING RESTRICTIONS (MARCH 2012) ............................................................ 14

CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH 2014) ......... 14

NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015) ............. 15

REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015) ...................................................................................................................... 15

SUBAWARD/SUBCONTRACT CHANGE NOTIFICATION ............................................... 17

IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY (NOVEMBER 2020) ....................................................................... 18

ENERGY DATA EXCHANGE (EDX) REQUIREMENTS (DECEMBER 2022) ................... 18

FOREIGN NATIONAL PARTICIPATION (APRIL 2024) ................................................... 19

POST AWARD DUE DILIGENCE REVIEWS (APRIL 2024) ............................................. 19

EXPORT CONTROL (APRIL 2024) ..................................................................................... 19

CURRENT AND PENDING SUPPORT (APRIL 2024) ........................................................ 20

INTERIM CONFLICT OF INTEREST POLICY FOR FINANCIAL ASSISTANCE (MARCH 2023) ........... 22

ORGANIZATIONAL CONFLICT OF INTEREST (APRIL 2024) ....................................... 23

PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (APRIL 2024) ........................................................................ 23

PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT PROGRAMS (MARCH 2023) .............................................................................................. 24

PARTICIPANTS AND OTHER COLLABORATING ORGANIZATIONS (APRIL 2024) ........... 25

HUMAN SUBJECTS RESEARCH (MARCH 2023) ............................................................. 25

FRAUD, WASTE AND ABUSE (MARCH 2023) .................................................................. 26

TRANSPARENCY OF FOREIGN CONNECTIONS (APRIL 2024) .................................... 27

FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023) ............................... 28

REPORTING SUBAWARD AND EXECUTIVE COMPENSATION (SEPTEMBER 2023) ........... 28

POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023) .............................. 31

AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (MARCH 2023) ........... 31

## SPECIAL TERMS AND CONDITIONS FOR USE IN MOST GRANTS AND COOPERATIVE AGREEMENTS

### LEGAL AUTHORITY AND EFFECT (JUNE 2015)

(a) A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.

(b) Recipients are free to accept or reject the award. A request to draw down DOE funds constitutes the Recipient's acceptance of the terms and conditions of this Award.

### RESOLUTION OF CONFLICTING CONDITIONS

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this award must be referred to the DOE Award Administrator for guidance.

### AWARD AGREEMENT TERMS AND CONDITIONS (DECEMBER 2014) (NETL – APRIL 2024)

This assistance agreement consists of the Assistance Agreement Cover Page and Award Terms and Conditions, plus the following:
a.     Special terms and conditions.
b.     Attachments:

| Attachment No. | Title |
| --- | --- |
| 1 | Intellectual Property Provisions |
| 2 | Statement of Project Objectives |
| 3 | Federal Assistance Reporting Checklist and Instructions |
| 4 | Budget Pages |
| 5 | Data Management Plan |

c.     Applicable program regulations at http://www.eCFR.gov.
d.     DOE Assistance Regulations, 2 CFR part 200 as supplemented by 2 CFR part 910 at http://www.eCFR.gov.
e.     Research Terms and Conditions and the DOE Agency Specific Requirements at http://www.nsf.gov/bfa/dias/policy/rtc/index.jsp
f.     Application/proposal as approved by DOE.
g.     National Policy Requirements to Be Incorporated as Award Terms in effect on date of award at https://www.nsf.gov/awards/managing/rtc.jsp.

### CONFERENCE SPENDING (FEBRUARY 2015)

The recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or

**JA320**

office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

## PAYMENT PROCEDURES - REIMBURSEMENT THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM

a. Method of Payment. Payment will be made by reimbursement through the Department of Treasury's ASAP system.

b. Requesting Reimbursement. Requests for reimbursements must be made through the ASAP system. Your requests for reimbursement should coincide with your normal billing pattern, but not more frequently than every two weeks. Each request must be limited to the amount of disbursements made for the federal share of direct project costs and the proportionate share of allowable indirect costs incurred during that billing period.

c. Adjusting payment requests for available cash. You must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from DOE/NNSA.

d. Payments. All payments are made by electronic funds transfer to the bank account identified on the ASAP Bank Information Form that you filed with the U.S. Department of Treasury.

## COST SHARING FFRDC'S NOT INVOLVED

a. Total Estimated Project Cost is the sum of the Government share and Recipient share of the estimated project costs. The Recipient's cost share must come from non-Federal sources unless otherwise allowed by law. By accepting federal funds under this award, you agree that you are liable for your percentage share of total allowable project costs, on a budget period basis, even if the project is terminated early or is not funded to its completion. This cost is shared as follows:

| Budget Period No. | Government Share $/% | Recipient Share $/% | Total Estimated Cost |
|---|---|---|---|
| 1 | $499,683 / 73.75% | $177,871 / 26.25% | $677,554 |
| Totals | $499,683 / 73.75% | $177,871 / 26.25% | $677,554 |

b. If you discover that you may be unable to provide cost sharing of at least the amount identified in paragraph a of this term, you should immediately provide written notification to the DOE Award Administrator indicating whether you will continue or phase out the project. If you plan to continue the project, the notification must describe how replacement cost sharing will be secured.

c. You must maintain records of all project costs that you claim as cost sharing, including in-kind costs, as well as records of costs to be paid by DOE/NNSA. Such records are subject to audit.

d. Failure to provide the cost sharing required by this term may result in the subsequent recovery by DOE/NNSA of some or all the funds provided under the award.

**REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS**

a. If actual allowable indirect costs are less than those budgeted and funded under the award, you may use the difference to pay additional allowable direct costs during the project period. If at the completion of the award the Government's share of total allowable costs (i.e., direct and indirect), is less than the total costs reimbursed, you must refund the difference.

b. Recipients are expected to manage their indirect costs. DOE will not amend an award solely to provide additional funds for changes in indirect cost rates. DOE recognizes that the inability to obtain full reimbursement for indirect costs means the recipient must absorb the underrecovery. Such underrecovery may be allocated as part of the organization's required cost sharing.

**USE OF PROGRAM INCOME - ADDITION**

If you earn program income during the project period as a result of this award, you may add the program income to the funds committed to the award and use it to further eligible project objectives.

**STATEMENT OF FEDERAL STEWARDSHIP**

DOE/NNSA will exercise normal Federal stewardship in overseeing the project activities performed under this award. Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to correct deficiencies which develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the award objectives have been accomplished.

**SITE VISITS**

DOE/NNSA's authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required. You must provide, and must require your subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties. All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

**REPORTING REQUIREMENTS (APRIL 2023)**

a. Requirements. The reporting requirements for this award are identified on the Federal Assistance Reporting Checklist, DOE F 4600.2, attached to this award. Failure to comply with these reporting requirements is considered a material noncompliance with the terms of the award. Noncompliance may result in withholding of future payments, suspension, or termination of the current award, and withholding of future awards. A willful failure to perform, a history of failure to perform, or unsatisfactory performance of this and/or other financial assistance awards, may also result in a debarment action to preclude future awards by Federal agencies.

b. Dissemination of scientific/technical reporting products. Reporting project results in scientific and technical information (STI) publications/products to the DOE Office of Scientific and Technical Information (OSTI) ensures dissemination of research results to the public as well as preservation of the results. The DOE form F 4600.2, B. Scientific/Technical Reporting, has instructions for the DOE Energy Link (E-Link) system managed by OSTI. Scientific/technical reports and other STI products submitted under this award will be disseminated publicly on the Web via OSTI.GOV (https://www.osti.gov), unless the STI contains patentable material, protected data, or SBIR/STTR data, which must be indicated per instructions in DOE 4600.2.

c. Restrictions. Restrictions. STI products submitted to the DOE via E-link must not contain any Protected Personally Identifiable Information (PII), limited rights data, classified information, information subject to export control classification, or other information not subject to public release. The Contracting Officer or Technical Project Officer should be contacted with any questions. Limited rights data means data (other than computer software) developed at private expense that embody trade secrets or are commercial or financial and confidential or privileged. SBIR/STTR Protected Data, and other data subject to statutory data protection authorized by the award may be submitted, provided such data is properly marked and identified during submission. Submissions must not contain any "Proprietary", "Confidential" or "Business Sensitive" markings or similar restrictive markings not authorized by the applicable government agreement.; it is acknowledged that DOE has the right to cancel or ignore such markings.

## PUBLICATIONS

a. You are encouraged to publish or otherwise make publicly available the results of the work conducted under the award.

b. An acknowledgment of Federal support and a disclaimer must appear in the publication of any material, whether copyrighted or not, based on or developed under this project, as follows:

Acknowledgment: "This material is based upon work supported by the Department of Energy under Award Number DE-FE0032481."

Disclaimer: "This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

## FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS

You must obtain any required permits and comply with applicable federal, state, and municipal laws, codes, and regulations for work performed under this award.

## INTELLECTUAL PROPERTY PROVISIONS AND CONTACT INFORMATION

a. The intellectual property provisions applicable to this award are provided as an attachment to this award or are referenced on the Assistance Agreement Face Page. A list of all intellectual property provisions may be found at http://energy.gov/gc/standard-intellectual-property-ip-provisions-financial-assistance-awards

b. Questions regarding intellectual property matters should be referred to the DOE Award Administrator and the Patent Counsel designated as the service provider for the DOE office that issued the award. The IP Service Providers List is found at http://energy.gov/gc/downloads/intellectual-property-ip-service-providers-acquisition-and-assistance-transactions

**NATIONAL SECURITY: CLASSIFIABLE RESULTS ORIGINATING UNDER AN AWARD (DECEMBER 2014)**

This award is intended for unclassified, publicly releasable research. You will not be granted access to classified information. DOE/NNSA does not expect that the results of the research project will involve classified information. Under certain circumstances, however, a classification review of information originated under the award may be required. The Department may review research work generated under this award at any time to determine if it requires classification.

b. Executive Order 12958 (60 Fed. Reg. 19,825 (1995)) states that basic scientific research information not clearly related to the national security shall not be classified. Nevertheless, some information concerning (among other things) scientific, technological, or economic matters relating to national security or cryptology may require classification. If you originate information during the course of this award that you believe requires classification, you must promptly:

1. Notify the DOE Project Officer and the DOE Award Administrator;

2. Submit the information by registered mail directly to the Director, Office of Classification and Information Control, SO-10.2; U.S. Department of Energy; P.O. Box A; Germantown, MD 20875-0963, for classification review.

3. Restrict access to the information to the maximum extent possible until you are informed that the information is not classified, but no longer than 30 days after receipt by the Director, Office of Classification and Information Control.

c. If you originate information concerning the production or utilization of special nuclear material (i.e., plutonium, uranium enriched in the isotope 233 or 235, and any other material so determined under section 51 of the Atomic Energy Act) or nuclear energy, you must:

1. Notify the DOE Project Officer and the DOE Award Administrator;

2. Submit the information by registered mail directly to the Director, Office of Classification and Information Control, SO-10.2; U.S. Department of Energy; P. O. Box A; Germantown, MD 20875-0963 for classification review within 180 days of the date the recipient first discovers or first has reason to believe that the information is useful in such production or utilization; and

3. Restrict access to the information to the maximum extent possible until you are informed that the information is not classified, but no longer than 90 days after receipt by the Director, Office of Classification and Information Control.

d. If DOE determines any of the information requires classification, you agree that the Government may terminate the award with consent of the recipient in accordance with 2 CFR part 200.339(a)(3). All material deemed to be classified must be forwarded to the DOE, in a manner specified by DOE.

e. If DOE does not respond within the specified time periods, you are under no further obligation to restrict access to the information.

## NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this award should be American-made.

## INSURANCE COVERAGE (DECEMBER 2014)

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds.

## EQUIPMENT (DECEMBER 2014) (NETL - APRIL 2024)

Subject to the conditions provided in 2 CFR 200.313 and 2 CFR 910.360 (as applicable), title to equipment (property) acquired under a Federal award will vest conditionally with the non-Federal entity.

The non-Federal entity cannot encumber this property or permit encumbrance without prior written approval by the DOE Contracting Officer and must follow the requirements of 2 CFR 200.313 before disposing of the property.

States must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by the Federal awarding agency in the priority order specified in 2 CFR  200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR 200.313(d).

Subject to the vesting of any property pursuant to Section 309 of the FY23 Consolidated Appropriations Act (Pub. L. No. 117-328), Division D, Title III, when equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from the Federal awarding agency or pass-through entity.  Disposition will be made as follows: (a) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency; (b) non-Federal entity may retain title or sell the equipment after compensating the Federal awarding agency as described in 2 CFR 200.313(e)(2); or (c) transfer title to the Federal awarding agency or to an eligible third Party as specified in 2 CFR 200.313(e)(3).

See 2 CFR 200.313 for additional requirements pertaining to equipment acquired under a Federal award. Also see 2 CFR 200.439 Equipment and other capital expenditures.

See 2 CFR 910.360 for supplemental requirements for Equipment for for-profit Recipients.

**SUPPLIES (DECEMBER 2014)**

See 2 CFR Part 200.314 for requirements pertaining to supplies acquired under a Federal award.

See also § 200.453 Materials and supplies costs, including costs of computing devices.

**INTANGIBLE PROPERTY (DECEMBER 2014)**

Title to intangible property (as defined in 2 CFR Part 200.59) acquired under a Federal award vests upon acquisition in the non-Federal entity. Intangible property includes trademarks, copyrights, patents and patent applications.

See 2 CFR Part 200.315 for additional requirements pertaining to intangible property acquired under a Federal award.

Also see 2 CFR Part 910.362 for amended requirements for Intellectual Property for For-Profit recipients.

**PROPERTY TRUST RELATIONSHIP (DECEMBER 2014)**

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.

See 2 CFR Part 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

**CONTINUED USE OF REAL PROPERTY AND EQUIPMENT (OCTOBER 2022)**

Real property and equipment purchased with project funds (federal share and recipient cost share) under this Award are subject to the requirements at 2 CFR 200.311, 200.313, and 200.316 (non-Federal entities, except for-profit entities) and 2 CFR 910.360 (for-profit entities). The Recipient may continue to use the real property and equipment after the conclusion of the award period of performance so long as the Recipient:

a. Continues to use the property for the authorized project purposes;
b. Complies with the applicable reporting requirements and regulatory property standards;
c. As applicable to for-profit entities, UCC filing statements are maintained; and
d. Submits a written Request for Continued Use for DOE authorization, which is approved by the DOE Contracting Officer.

The Recipient must request authorization from the Contracting Officer to continue to use the property for the authorized project purposes beyond the award period of performance ("Request for Continued Use"). The Recipient's written Request for Continued Use must identify the property and include: a summary of how the property will be used (must align with the authorized project purposes); a proposed use period (e.g., perpetuity,

until fully depreciated, or a calendar date where the Recipient expects to submit disposition instructions); acknowledgement that the recipient shall not sell or encumber the property or permit any encumbrance without prior written DOE approval; current fair market value of the property; and an Estimated Useful Life or depreciation schedule for equipment.

When the property is no longer needed for authorized project purposes, the Recipient must request disposition instructions from DOE. For-profit entity disposition requirements are set forth at 2 CFR 910.360. Property disposition requirements for other non-federal entities are set forth in 2 CFR 200.310 through 200.316.

## PERFORMANCE OF WORK IN UNITED STATES

The Recipient agrees that 100% of the direct labor cost for the project (including subrecipient labor) shall be incurred in the United States, unless the Recipient can demonstrate to the satisfaction of the Department of Energy that the United States economic interest will be better served through a greater percentage of the work being performed outside the United States.

## CATEGORICAL EXCLUSION (CX)

DOE must comply with the National Environmental Policy Act (NEPA) prior to authorizing the use of federal funds. Based on all information provided by the Recipient, DOE has made a NEPA determination by issuing a CX, thereby authorizing use of funds for the defined project activities. If the Recipient later adds to or modifies the activities reviewed and approved under the original DOE NEPA determination, the Recipient must notify the DOE Contracting Officer before proceeding with the new and/or modified activities. Those additions or modifications may be subject to review by the DOE NEPA Compliance Officer and approval by the DOE Contracting Officer, and may require a new NEPA determination.

## SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

A. Requirement for System for Award Management (SAM) Unless exempted from this requirement under 2 CFR 25.110, the prime recipient must remain registered and maintain current information in SAM for the entire period of performance of the award. This includes providing information on the prime recipient's immediate and highest level owner and subsidiaries, as well as on all of its predecessors that have been awarded a Federal contract or Federal financial assistance agreements within the last three years, if applicable, until the prime recipient submits the final financial report required under this award or receives the final payment, whichever is later. This requires the prime recipient to review its information in SAM at least annually after the initial registration, and to update its information as soon as there are changes. Reviews and updates may be required more frequently due to changes in recipient information or as required by another award term.

B. Requirement for Unique Entity Identifier

If authorized to make subawards under this award, the prime recipient:

   1. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward until the entity has provided its unique entity identifier to the prime recipient.

   2. Must not make a subaward to an entity unless the entity has provided its unique entity identifier to the prime recipient. Subrecipients are not required to obtain an active SAM registration, but must obtain a unique entity identifier.

C. Definitions

For purposes of this term:

   1. System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

   2. Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

   3. Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following for purposes of this part:

      a. A foreign organization;

      b. A foreign public entity;

      c. A domestic for-profit organization; and

      d. A Federal agency.

   4. Subaward has the meaning given in 2 CFR 200.1.

   5. Subrecipient has the meaning given in 2 CFR 200.1.

**FINAL INCURRED COST AUDIT (DECEMBER 2014)**

In accordance with 2 CFR Part 200 as amended by 2 CFR Part 910, DOE reserves the right to initiate a final incurred cost audit on this award. If the audit has not been performed or completed prior to the closeout of the award, DOE retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

**LOBBYING RESTRICTIONS (MARCH 2012)**

By accepting funds under this award, you agree that none of the funds obligated on the award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913. This restriction is in addition to those prescribed elsewhere in statute and regulation.

**CORPORATE FELONY CONVICTION AND FEDERAL TAX LIABILITY ASSURANCES (MARCH 2014)**

By entering into this agreement, the undersigned attests that The Washington University has not been convicted of a felony criminal violation under Federal law in the 24 months preceding the date of signature.

The undersigned further attests that The Washington University does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

**JA328**

For purposes of these assurances, the following definitions apply:

A Corporation includes any entity that has filed articles of incorporation in any of the 50 states, the District of Columbia, or the various territories of the United States [but not foreign corporations]. It includes both for-profit and non-profit organizations.

**NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)**

(1) By entering into this agreement, the undersigned attests that The Washington University does not and will not require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(2) The undersigned further attests that The Washington University does not and will not use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

    a.''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''

    b. The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

    c. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

**REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015)**

a. General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and

performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

b. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

2. Reached its final disposition during the most recent five year period; and

3. Is one of the following:

   (A) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

   (B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

   (C) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

   (D) Any other criminal, civil, or administrative proceeding if:

      (i) It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

      (ii) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

      (iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

c. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

d. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

e. Definitions

For purposes of this award term and condition:

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or A. Reporting of Matters Related to Recipient Integrity and Performance.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

    (A) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

    (B) The value of all expected funding increments under a Federal award and options, even if not yet exercised.

**SUBAWARD/SUBCONTRACT CHANGE NOTIFICATION**

Except for subawards and/or subcontracts specifically proposed as part of the Recipient's Application for award, the Recipient must notify the DOE Contracting Officer and Project Officer in writing 30 days prior to the execution of new or modified subawards/subcontracts.  This notification does not constitute a waiver of the prior approval requirements outlined in 2 CFR 200, nor does it relieve the Recipient from its obligation to comply with applicable Federal statutes, regulations, and executive orders.

In order to satisfy this notification requirement, Recipient documentation must, as a minimum, include the following:

1. A description of the research to be performed, the service to be provided, or the equipment to be purchased;
2. Cost share commitment letter if the subawardee is providing cost share to the award;
3. Updated budget justification, budget pages;
4. An assurance that the process undertaken by the Recipient to solicit the subaward/subcontract complies with their written procurement procedures as outlined in 2 CFR 200.317 through 200.327.

5. An assurance that no planned, actual or apparent conflict of interest exists between the Recipient and the selected subawardee/subcontractor and that the Recipient's written standards of conduct were followed[1]
6. A completed Environmental Questionnaire, if applicable;
7. An assurance that the subawardee/subcontractor is not a debarred or suspended entity; and
8. An assurance that all required award provisions will be flowed down in the resulting subaward/subcontract.

The Recipient is responsible for making a final determination to award or modify subawards/subcontracts under this agreement, but the Recipient may not proceed with the subaward/subcontract until the Contracting Officer determines, and provides the Recipient written notification, that the information provided is adequate.

Should the Recipient not receive a written notification of adequacy from the Contracting Officer within 30 days of the submission of the subaward/subcontract documentation stipulated above, Recipient may proceed to award or modify the proposed subaward/subcontract.

## IMPLEMENTATION OF EXECUTIVE ORDER 13798, PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY (NOVEMBER 2020)

States, local governments, or other public entities may not condition sub-awards in a manner that would discriminate, or disadvantage sub-recipients based on their religious character.

## ENERGY DATA EXCHANGE (EDX) REQUIREMENTS (DECEMBER 2022)

Any data products generated under this award shall be submitted to the Energy Data eXchange (EDX) at https://edx.netl.doe.gov/. Data products include but are not limited to software code, tools, applications, webpages, portfolios, images, videos, and datasets.

EDX supports a wide variety of file types and formats including: 1) data, 2) metadata, 3) software/tools, and 4) articles, provided that there is an accompanying Government use license. A partial list of file formats accepted by EDX is provided below, however, EDX accepts all types of file formats.

    **Common Data Product Submission Formats: ASC, AmiraMesh, AVI, CAD, CSV, DAT, DBF, DOC, DSV, DWG, GIF, HDF, HTML, JPEG2000, JPG, MOV, MPEG4, MSH/CAS/DAT, NetCDF, PDF, PNG, PostScript, PPT, RTF, Surface, TAB, TIFF, TIFF Stacks, TXT, XLS, XML, ,Xradio, ZIP, and others.
    **Geographic Formats: APR, DBF, DEM, DLG, DRG, DXF, E00, ECW, GDB, GeoPDF, GeoTIFF, GML, GPX, GRID, IMG, KML, KMZ, MDB, MrSID, SHP, and others.

---

[1] It is DOE's position that the existence of a "covered relationship" as defined in 5 C.F.R. § 2635.502(a)&(b) between a member of the Recipient's owners or senior management and a member of a subawardee's/subcontractor's owners or senior management creates at a minimum an apparent conflict of interest that would require the Recipient to notify the Contracting Officer and provide detailed information and justification (including, for example, mitigation measures) as to why the subaward or subcontract does not create an actual conflict of interest. Recipients must also notify the Contracting Officer of any new subcontract or subaward to: (1) an entity that is owned or otherwise controlled by the Recipient; or (2) an entity that is owned or otherwise controlled by another entity that also owns or otherwise controls the Recipient, as it is DOE's position that these situations also create at a minimum an apparent conflict of interest.

Information provided to EDX will be made publicly available, unless otherwise prohibited under the award. Additional information on EDX is available at https://edx.netl.doe.gov/about.

When data products are submitted to EDX, the data product will need to be registered with a digital object identifier (DOI) through OSTI to ensure more visibility in other search repositories (i.e., osti.gov, data.gov, Google Scholar, etc.). The OSTI DOI can be established through an application programming interface (API) by completing just a few additional fields.

The Recipient shall submit annually to EDX any data products generated under the award using any of the file formats listed above.  All final data products shall be submitted to EDX  prior to the completion  of the project.

The Recipient must include this term in any subaward and in any applicable contractual agreement(s) associated with this Award.

**FOREIGN NATIONAL PARTICIPATION (APRIL 2024)**

If the Recipient (including any of its subrecipients and contractors) anticipates involving foreign nationals in the performance of this award, the Recipient must provide DOE with specific information about each foreign national to ensure compliance with the requirements for foreign national participation and access approvals. The volume and type of information required may depend on various factors associated with the award.

Approval for foreign nationals from countries identified on the U.S. Department of State's list of State Sponsors of Terrorism (https://www.state.gov/state-sponsors-of-terrorism/) must be obtained from DOE before they can participate in the performance of any work under this award.

A "foreign national" is defined as a person without United States citizenship or nationality (may include a stateless person. DOE may elect to deny a foreign national's participation in the award. Likewise, DOE may elect to deny a foreign national's access to a DOE sites, information, technologies, equipment, programs or personnel. DOE's determination to deny participation or access is not appealable.

**The Recipient must include this term in any subaward and in any applicable contractual agreement(s) associated with this award.**

**POST AWARD DUE DILIGENCE REVIEWS (APRIL 2024)**

During the period of performance of the Award, DOE may conduct ongoing due diligence reviews, through Government resources, to identify potential risks of undue foreign influence. In the event a risk is identified, DOE may require risk mitigation measures, including but not limited to, requiring an individual or entity not participate in the Award. As part of the research, technology, and economic security risk review, DOE may contact the Recipient project team members for additional information to inform the review.

**EXPORT CONTROL (APRIL 2024)**

The United States government regulates the transfer of information, commodities, technology, and software considered to be strategically important to the U.S. to protect national security, foreign policy, and economic interests without imposing undue regulatory burdens on legitimate international trade.  There is a network of Federal agencies and regulations that govern exports that are collectively referred to as "Export Controls."  The

**JA333**

Recipient is responsible for ensuring compliance with all applicable United States Export Control laws and regulations relating to any work performed under the award.

The Recipient must immediately report to DOE any export control changes, indictments, convictions, and violations related to the project funded under this Award and any export control investigations potentially implicating any technologies or equipment under the subject Award, at the recipient or subrecipient level, and if the charge/indictment/investigation results in a conviction or violation, provide the corrective action(s) to prevent future violations.

**CURRENT AND PENDING SUPPORT (APRIL 2024)**

**A. Definitions**

For purposes of this term, the following definitions are applicable:

i. **Current and pending support** – (a) All resources made available, or expected to be made available, to an individual in support of the individual's RD&D efforts, regardless of (i) whether the source is foreign or domestic; (ii) whether the resource is made available through the Recipient or directly to the individual; or (iii) whether the resource has monetary value; and (b) includes in-kind contributions requiring a commitment of time and directly supporting the individual's RD&D efforts, such as the provision of office or laboratory space, equipment, supplies, employees, or students. This term has the same meaning as the term Other Support as applied to researchers in the National Security Presidential Memorandum (NSPM) 33: For researchers, Other Support includes all resources made available to a researcher in support of and/or related to all of their professional RD&D efforts, including resources provided directly to the individual or through the organization, and regardless of whether or not they have monetary value (e.g., even if the support received is only in-kind, such as office/laboratory space, equipment, supplies, or employees). This includes resource and/or financial support from all foreign and domestic entities, including but not limited to, gifts provided with terms or conditions, financial support for laboratory personnel, and participation of student and visiting researchers supported by other sources of funding.

ii. **Foreign Government-Sponsored Talent Recruitment Program** – An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government. Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose. Some programs allow for or encourage continued employment at United States research facilities or receipt of federal research funds while concurrently working at and/or receiving compensation from a foreign institution, and some direct participants not to disclose their participation to United States entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

**Senior/key personnel** – an individual who contributes in a substantive, meaningful way to the scientific development or execution of a research, development and demonstration (RD&D) project proposed to be carried out with DOE award.[2]

## B. Disclosure Requirements

Prior to award, the Recipient was required to provide current and pending support disclosure statements and a Curriculum Vitae (CV) or Biosketch for each principal investigator (PI) and senior/key personnel, at the recipient and subrecipient level, regardless of funding source. In accordance with the Federal Assistance Reporting Checklist, throughout the life of the award, the Recipient must submit current and pending support disclosure statements and a CV or Biosketch for any new PI and senior/key personnel at the recipient and subrecipient level, added to the project funded under this Award within thirty (30) calendar days of the individual joining the project. In addition, if there are any changes to current and pending support disclosure statements previously submitted to DOE, the Recipient must submit updated current and pending disclosure statements within thirty (30) calendar days of the change. The Recipient must ensure all PIs and senior/key personnel at the recipient and subrecipient level, are aware of the requirement to submit updated current and pending support disclosure statements to DOE.

Current and pending support is intended to allow the identification of potential duplication, overcommitment, potential conflicts of interest or commitment, and all other sources of support. All PIs and senior/key personnel at the recipient and subrecipient level must provide a list of all sponsored activities, awards, and appointments, whether paid or unpaid; provided as a gift with terms or conditions or provided as a gift without terms or conditions; full-time, part-time, or voluntary; faculty, visiting, adjunct, or honorary; cash or in-kind; foreign or domestic; governmental or private-sector; directly supporting the individual's research or indirectly supporting the individual by supporting students, research staff, space, equipment, or other research expenses. All involvement with foreign government-sponsored talent recruitment programs must be identified in current and pending support.

For every activity, list the following items:
- The sponsor of the activity or the source of funding.
- The award or other identifying number.
- The title of the award or activity. If the title of the award or activity is not descriptive, add a brief description of the research being performed that would identify any overlaps or synergies with the proposed research.
- The total cost or value of the award or activity, including direct and indirect costs and cost share. For pending proposals, provide the total amount of requested funding.
- The award period (start date – end date).
- The person-months of effort per year being dedicated to the award or activity.

To identify overlap, duplication of effort, or synergistic efforts, append a description of the other award or activity to the current and pending support.

Details of any obligations, contractual or otherwise, to any program, entity, or organization sponsored by a foreign government must be provided to DOE upon request to either the applicant institution or DOE.

---

[2] Typically, these individuals have doctoral or other professional degrees, although individuals at the masters or baccalaureate level may be considered senior/key personnel if their involvement meets this definition. Consultants, graduate students, and those with a postdoctoral role also may be considered senior/key personnel if they meet this definition.

Supporting documents of any identified source of support must be provided to DOE on request, including certified translations of any document.

All PIs and senior/key personnel must provide a separate disclosure statement listing the required information above regarding current and pending support. The individual must sign and date their respective disclosure statement and include the following certification statement:

> I, [Full Name and Title], certify to the best of my knowledge and belief that the information contained in this Current and Pending Support Disclosure Statement is true, complete and accurate. I understand that any false, fictitious, or fraudulent information, misrepresentations, half-truths, or omissions of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (18 U.S.C. §§ 1001 and 287, and 31 U.S.C. 3729-3733 and 3801-3812). I further understand and agree that (1) the statements and representations made herein are material to DOE's funding decision, and (2) I have a responsibility to update the disclosures during the period of performance of the award should circumstances change which impact the responses provided above.

The information may be provided in the approved common disclosure format available at Common Form for Current and Pending (Other) Support (nsf.gov) to be implemented by DOE.

Regardless of the format used, the individual must still include a signature, date, and a certification statement using the language included in the paragraph above.

**INTERIM CONFLICT OF INTEREST POLICY FOR FINANCIAL ASSISTANCE (MARCH 2023)**

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, technology investment agreement, or other transaction authority) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must identify all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy.

**ORGANIZATIONAL CONFLICT OF INTEREST (APRIL 2024)**

Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization (2 CFR 200.318(c)(2)).

The Recipient must disclose in writing any potential or actual organizational conflict of interest to the DOE Contracting Officer. The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian Tribe. For a list of the information that must be included the disclosure, see Section VI. of the DOE interim Conflict of Interest Policy for Financial Assistance at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance.

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the Recipient must procure goods and services from other sources when using project funds.

The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. The Recipient is responsible for ensuring subrecipient compliance with this term.

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian Tribe, the Recipient must maintain written standards of conduct covering organizational conflicts of interest.

**PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (APRIL 2024)**

As set forth in 2 CFR 200.216, recipients and subrecipients are prohibited from obligating or expending project funds (Federal and non-Federal funds) to:

(1) Procure or obtain;

(2) Extend or renew a contract to procure or obtain;

(3) Exercise an option to procure; or

(4) Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(i) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou

**JA337**

Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(ii) Telecommunications or video surveillance services provided by such entities or using such equipment.

(iii) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

See Public Law 115-232, section 889 for additional information.

## PROHIBITION RELATED TO FOREIGN GOVERNMENT-SPONSORED TALENT RECRUITMENT PROGRAMS (MARCH 2023)

**A.** **Prohibition**

Persons participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk* are prohibited from participating in this Award. The Recipient must exercise ongoing due diligence to reasonably ensure that no individuals participating on the DOE-funded project are participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. Consequences for violations of this prohibition will be determined according to applicable law, regulations, and policy. Further, the Recipient must notify DOE within five (5) business days upon learning that an owner of the Recipient or subrecipient or individual on the project team is or is believed to be participating in a *Foreign Government-Sponsored Talent Recruitment Program of a Foreign Country of Risk*. DOE may modify and add requirements related to this prohibition to the extent required by law.

**B.** **Definitions**

1. **Foreign Government-Sponsored Talent Recruitment Program**. An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government. Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose. Some programs allow for or encourage continued employment at United States research facilities or receipt of federal research funds while concurrently working at and/or receiving compensation from a foreign institution, and some direct participants not to disclose their participation to U.S. entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

2. **Foreign Country of Risk**. DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

## PARTICIPANTS AND OTHER COLLABORATING ORGANIZATIONS (APRIL 2024)

Prior to award, the Recipient was required to provide the following information on participants and other collaborating organizations. If there are any changes to Participants and Collaborating Organizations information previously submitted to DOE, the Recipient must submit updated information within thirty (30) calendar days after the end of the quarterly reporting period in which the change occurred:

**A. What individuals have worked on the project**
Provide the following information for individuals at the prime recipient and subrecipient level: (1) all senior and key personnel; (2) authorized representative of applicant with primary responsibility for business support (e.g., financial management, fiscal oversight, providing resources, award administration, etc.), if other than listed senior/key personnel, e.g., the Administrative Officer listed on the SF-424 Application; and (3) each person who has worked or is expected to work at least one person month per year on the project regardless of the source of compensation (a person month equals approximately 160 hours of effort).

    i. Name
   ii. Organization
  iii. Job Title
  iv. Role in the project
   v. Start and end date (month and year) working on the project
  vi. State, U.S. territory, and/or country of residence
 vii. Whether this person collaborated with an individual or entity located in a foreign country in connection with the scope of this Award, and
viii. If yes to vii, whether the person traveled to the foreign country as part of that collaboration, and, if so, where and what the duration of stay was.

**B. Organizations**
Identify all subrecipients, contractors, U.S. National Laboratories, partners, and collaborating organizations. Recipients must also include all foreign collaborators as outlined in the Foreign Collaboration Considerations term of the award Terms and Conditions. For each, provide name, UEI, zip code or latitude/longitude, role in the project, contribution to the project and start and end date.

## HUMAN SUBJECTS RESEARCH (MARCH 2023)

Research involving human subjects, biospecimens, or identifiable private information conducted with Department of Energy (DOE) funding is subject to the requirements of DOE Order 443.1C, *Protection of Human Research Subjects*, 45 CFR Part 46, *Protection of Human Subjects* (*subpart A which is referred to as the "Common Rule"),* and 10 CFR Part 745, *Protection of Human Subjects*.

Federal regulation and the DOE Order require review by an Institutional Review Board (IRB) of all proposed human subjects research projects. The IRB is an interdisciplinary ethics board responsible for ensuring that the

proposed research is sound and justifies the use of human subjects or their data; the potential risks to human subjects have been minimized; participation is voluntary; and clear and accurate information about the study, the benefits and risks of participating, and how individuals' data/specimens will be protected/used, is provided to potential participants for their use in determining whether or not to participate.

The Recipient shall provide the Federal Wide Assurance number identified in item 1 below and the certification identified in item 2 below to DOE <u>prior to</u> initiation of any project that will involve interactions with humans in some way (e.g., through surveys); analysis of their identifiable data (e.g., demographic data and energy use over time); asking individuals to test devices, products, or materials developed through research; and/or testing of commercially available devices in buildings/homes in which humans will be present. *Note:* This list of examples is illustrative and not all inclusive.

No DOE funded research activity involving human subjects, biospecimens, or identifiable private information shall be conducted without:

1) A registration and a Federal Wide Assurance of compliance accepted by the Office of Human Research Protection (OHRP) in the Department of Health and Human Services; and
2) Certification that the research has been reviewed and approved by an Institutional Review Board (IRB) provided for in the assurance. IRB review may be accomplished by the awardee's institutional IRB; by the Central DOE IRB; or if collaborating with one of the DOE national laboratories, by the DOE national laboratory IRB.

The Recipient is responsible for ensuring all subrecipients comply and for reporting information on the project annually to the DOE Human Subjects Research Database (HSRD) at https://science.osti.gov/HumanSubjects/Human-Subjects-Database/home. *Note:* If a DOE IRB is used, no end of year reporting will be needed.

Additional information on the DOE Human Subjects Research Program can be found at: https://science.osti.gov/ber/human-subjects.

**FRAUD, WASTE AND ABUSE (MARCH 2023)**

The mission of the DOE Office of Inspector General (OIG) is to strengthen the integrity, economy and efficiency of DOE's programs and operations including deterring and detecting fraud, waste, abuse and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department of Energy activities to include grants, cooperative agreements, loans, and contracts. The OIG maintains a Hotline for reporting allegations of fraud, waste, abuse, or mismanagement. To report such allegations, please visit
https://www.energy.gov/ig/ig-hotline.

Additionally, the Recipient must be cognizant of the requirements of 2 CFR 200.113 Mandatory disclosures, which states:

> The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal

award. Non-Federal entities that have received a Federal award including the term and condition outlined in appendix XII of 2 CFR Part 200 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in § 200.339. (See also 2 CFR part 180, 31 U.S.C. 3321, and 41 U.S.C. 2313.)

**TRANSPARENCY OF FOREIGN CONNECTIONS (APRIL 2024)**

The Recipient must notify the DOE Contracting Officer within fifteen (15) business days of learning of the following circumstances in relation to the Recipient and subrecipients:

1. Any current or pending subsidiary, foreign business entity, or offshore entity that is based in or funded by any foreign country of risk or foreign entity based in a country of risk;
2. Any current or pending contractual or financial obligation or other agreement specific to a business arrangement, or joint venture-like arrangement with an entity owned by a country of risk or foreign entity based in a country of risk;
3. Any current or pending change in ownership structure of the Recipient or subrecipients that increases foreign ownership related to a country of risk. Each notification shall be accompanied by a complete and up-to-date capitalization table showing all equity interests held including limited liability company (LLC) and partnership interests, as well as derivative securities. Include both the number of shares issued to each equity holder, as well as the percentage of that series and of all equity on fully diluted basis. For each equity holder, provide the place of incorporation and the principal place of business, as applicable. If the equity holder is a natural person, identify the citizenship(s);
4. Any current or pending venture capital or institutional investment by an entity that has a general partner or individual holding a leadership role in such entity who has a foreign affiliation with any foreign country of risk;
5. Any current or pending technology licensing or intellectual property sales to a foreign country of risk;
6. Any changes to the Recipient or the subrecipients' board of directors, including additions to the number of directors, the identity of new directors, as well as each new director's citizenship, shareholder affiliation (if applicable); each notification shall include a complete up-to-date list of all directors (and board observers), including their full name, citizenship and shareholder affiliation, date of appointment, duration of term, as well as a description of observer rights as applicable; and
7. Any proposed changes to the equipment used on the project that would result in:
   a. Equipment originally made or manufactured in a foreign country of risk (including relabeled or rebranded equipment).
   b. Coded equipment where the source code is written in a foreign country of risk.
   c. Equipment from a foreign country of risk that will be connected to the internet or other remote communication system.
   d. Any companies from a foreign country of risk that will have physical or remote access to any part of the equipment used on the project after delivery.

Should DOE determine the connection poses a risk to economic or national security, DOE will require measures to mitigate or eliminate the risk.

DOE has designated the following countries as foreign countries of risk: Iran, North Korea, Russia, and China. This list is subject to change.

Recognizing the disclosures may contain business confidential information, subrecipients may submit their disclosures directly to DOE.

**FOREIGN COLLABORATION CONSIDERATIONS (MARCH 2023)**

A.   Consideration of new collaborations with foreign entities, organizations, and governments. The Recipient must provide DOE with advanced written notification of any potential collaboration with foreign entities, organizations or governments in connection with its DOE-funded award scope. The Recipient must await further guidance from DOE prior to contacting the proposed foreign entity, organization or government regarding the potential collaboration or negotiating the terms of any potential agreement.

B.   Existing collaborations with foreign entities, organizations and governments. The Recipient must provide DOE with a written list of all existing foreign collaborations, organizations, and governments in which has entered in connection with its DOE-funded award scope.

C.   In general, a collaboration will involve some provision of a thing of value to, or from, the Recipient. A thing of value includes but may not be limited to all resources made available to, or from, the recipient in support of and/or related to the Award, regardless of whether or not they have monetary value. Things of value also may include in-kind contributions (such as office/laboratory space, data, equipment, supplies, employees, students). In-kind contributions not intended for direct use on the Award but resulting in provision of a thing of value from or to the Award must also be reported. Collaborations do not include routine workshops, conferences, use of the Recipient's services and facilities by foreign investigators resulting from its standard published process for evaluating requests for access, or the routine use of foreign facilities by awardee staff in accordance with the Recipient's standard policies and procedures.

**REPORTING SUBAWARD AND EXECUTIVE COMPENSATION (SEPTEMBER 2023)**

a.   Reporting of first-tier subawards.

  1.   Applicability.  Unless the Recipient is exempt as provided in paragraph d. of this award term, the Recipient must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph e. of this award term).

  2.   Where and when to report.

    i.   The non-Federal entity or Federal agency must report each obligating action described in paragraph a.1. of this award term to http://www.fsrs.gov.
    ii.   For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

3. What to report. The Recipient must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov specify.

b. Reporting total compensation of recipient executives for non-Federal entities.

    1. Applicability and what to report. The Recipient must report total compensation for each of its five most highly compensated executives for the preceding completed fiscal year, if

        i. The total Federal funding authorized to date under this Federal award is $30,000 or more as defined in 2 CFR 170.320;

        ii. In the preceding fiscal year, the Recipient received:

            a) 80 percent or more of the Recipient's annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at https://www.sec.gov/answers/execomp.htm.)

    2. Where and when to report. The Recipient must report executive total compensation described in paragraph b.1. of this award term:

        i. As part of the Recipients registration profile at https://www.sam.gov.

        ii. By the end of the month following the month in which this award is made, and annually thereafter.

c. Reporting of total compensation of subrecipient executives.

    1. Applicability and what to report. Unless the Recipient is exempt as provided in paragraph d. of this award term, for each first-tier non-Federal entity subrecipient under this award, the Recipient shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if:

        i. In the subrecipient's preceding fiscal year, the subrecipient received;

            a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

    ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at https://www.sec.gov/answers/execomp.htm.)

2. Where and when to report. The Recipient must report subrecipient executive total compensation described in paragraph c.1. of this award term:

    i. To the recipient
    ii. By the end of the month following the month during which the Recipient makes the subaward. For example, if a subaward is obligated on any date during the month of October of a given year ( i.e., between October 1 and 31), the Recipient must report any required compensation information of the subrecipient by November 30 of that year.

d. Exemptions
If, in the previous tax year, the Recipient had gross income, from all sources, under $300,000, it is exempt from the requirements to report:

    i. Subawards, and
    ii. The total compensation of the five most highly compensated executives of any subrecipient.

e. Definitions. For purposes of this award term:

1. *Federal Agency* means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).
2. *Non-Federal entity* means all of the following, as defined in 2 CFR part 25:

    i. A Governmental organization, which is a State, local government, or Indian tribe;
    ii. A foreign public entity;
    iii. A domestic or foreign nonprofit organization; and
    iv. A domestic or foreign for-profit organization.

3. *Executive* means officers, managing partners, or any other employees in management positions.

4. *Subaward*:

    i. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which the Recipient received this award and that the recipient awards to an eligible subrecipient.
    ii. The term does not include the Recipient's procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

       iii.     A subaward may be provided through any legal agreement, including an agreement that the Recipient or a subrecipient considers a contract.

5.   *Subrecipient* means a non-Federal entity or Federal agency that:

      i.     Receives a subaward from the Recipient under this award; and
     ii.     Is accountable to the Recipient for the use of the Federal funds provided by the subaward.

6.   *Total compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year.  For more information on disclosure and reporting requirements, see 17 CFR 229.402(c)(2).

## POTENTIALLY DUPLICATIVE FUNDING NOTICE (MARCH 2023)

If the Recipient or subrecipients have or receive any other award of federal funds for activities that potentially overlap with the activities funded under this Award, the Recipient must promptly notify DOE in writing of the potential overlap and state whether project funds (i.e., recipient cost share and federal funds) from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items under this Award. If there are identical cost items, the Recipient must promptly notify the DOE Contracting Officer in writing of the potential duplication and eliminate any inappropriate duplication of funding.

## AFFIRMATIVE ACTION AND PAY TRANSPARENCY REQUIREMENTS (MARCH 2023)

All federally assisted construction contracts exceeding $10,000 annually will be subject to the requirements of Executive Order 11246:

    (1) Recipients, subrecipients, and contractors are prohibited from discriminating in employment decisions on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.

    (2) Recipients and Contractors are required to take affirmative action to ensure that equal opportunity is provided in all aspects of their employment. This includes flowing down the appropriate language to all subrecipients, contractors and subcontractors.

    (3) Recipients, subrecipients, contractors and subcontractors are prohibited from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, under certain circumstances, the pay of their co-workers.

The Department of Labor's (DOL) Office of Federal Contractor Compliance Programs (OFCCP) uses a neutral process to schedule contractors for compliance evaluations. OFCCP's Technical Assistance Guide should be consulted to gain an understanding of the requirements and possible actions the recipients, subrecipients, contractors and subcontractors must take.  See OFCCP's Technical Assistance Guide at:  https://www.dol.gov/sites/dolgov/files/ofccp/Construction/files/ConstructionTAG.pdf?msclkid=9e397d68c4b111ec9d8e6fecb6c710ec.

# ASSISTANCE AGREEMENT

| 1. Award No. DE-SC0010113 | 2. Modification No. 0013 | 3. Effective Date 04/01/2023 | 4. CFDA No. 81.049 |
|---|---|---|---|

| 5. Awarded To | 6. Sponsoring Office | 7. Period of Performance |
|---|---|---|
| UNIVERSITY OF IOWA, THE<br>Attn: Patricia Cone-Fisher<br>DIVISION OF SPONSORED PROGRAMS<br>2 GILMORE HALL<br>IOWA CITY IA 522421320 | Office of Science<br>SC-1<br>U.S. Department of Energy<br>1000 Independence Avenue, S.W.<br>Washington DC 20585 | 05/01/2013<br>through<br>03/31/2024 |

| 8. Type of Agreement | 9. Authority | 10. Purchase Request or Funding Document No. |
|---|---|---|
| [X] Grant<br>[ ] Cooperative Agreement<br>[ ] Other | Public Law 95-91, U.S. Department of Energy Organization Act | 23SC504335 |

| 11. Remittance Address | 12. Total Amount | 13. Funds Obligated |
|---|---|---|
| UNIVERSITY OF IOWA, THE<br>Attn: Patricia Cone-Fisher<br>Grant Accounting Office<br>2410 UCC<br>IOWA CITY IA 52242 | Govt. Share: $5,356,546.00<br><br>Cost Share : $0.00<br><br>Total     : $5,356,546.00 | This action: $543,000.00<br><br>Total     : $4,426,546.00 |

| 14. Principal Investigator | 15. Program Manager | 16. Administrator |
|---|---|---|
| | Brian O. Beckford<br>Phone: 301-903-5106 | U.S. Department of Energy<br>Office of Science<br>Consolidated Service Center<br>Office of Grants & Coop Agreements<br>9800 South Cass Avenue<br>Lemont, IL 60439 |

| 17. Submit Payment Requests To | 18. Paying Office | 19. Submit Reports To |
|---|---|---|
| | Payment - Direct Payment from U.S. Dept of Treasury | See Federal Assistance Reporting Checklist and Instructions |

**20. Accounting and Appropriation Data**

See Schedule

**21. Research Title and/or Description of Project**

High Energy Experimental and Theoretical Physics Research at the University of Iowa

| For the Recipient | For the United States of America |
|---|---|
| 22. Signature of Person Authorized to Sign | 25. Signature of Grants/Agreements Officer<br><br>Signature on File |
| 23. Name and Title | 24. Date Signed | 26. Name of Officer<br>Warren Riley | 27. Date Signed<br>09/20/2023 |

**JA346**

| | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE | OF |
|---|---|---|---|
| **CONTINUATION SHEET** | DE-SC0010113/0013 | 2 | 2 |

NAME OF OFFEROR OR CONTRACTOR
UNIVERSITY OF IOWA, THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | DUNS Number: Not Available<br>UEI: Z1H9VJS8NG16<br>SCHEDULE<br><br>PURPOSE OF MODIFICATION:<br><br>This unilateral renewal award obligates funds for the budget period commencing on the Effective Date specified in Block No. 3 and continuing through the Period of Performance end date specified in Block No. 7. The Special Terms and Conditions previously incorporated in this award are replaced with the Special Terms and Conditions attached hereto.<br><br>All other terms and conditions remain unchanged.<br><br>CONTACT INFORMATION:<br><br>Recipient Business Officer:<br><br>J. Martin Scholtz<br>319-335-2123<br>era@uiowa.edu<br>See Address in Block 5 of Assistance Agreement<br><br>Recipient Principal Investigator (Block 14 Continued):<br><br>Jane Nachtman<br>319-335-1844<br>jane-nachtman@uiowa.edu<br>See Address in Block 5 of Assistance Agreement<br><br>DOE Program Manager (Block 15 Continued):<br><br>Brian O. Beckford<br>brian.beckford@science.doe.gov<br>See Address in Block 6 of Assistance Agreement<br><br>DOE Assistance Agreement Administrator:<br><br>Gwendolyn R. Johnson<br>630-252-2739<br>gwendolyn.johnson@science.doe.gov<br>See Address in Block 16 of Assistance Agreement<br><br>THE INFORMATION BELOW IS FOR DOE INTERNAL USE ONLY:<br>ASAP: YES Extent Competed: COMPETED Davis-Bacon Act: NO PI: Jane Nachtman | | | | |

**JA347**

JULY 2004



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center
Financial Management Portfolio
Cost Allocation Services

1301 Young Street | Suite 1140
Dallas, TX 75202
PHONE: (214) 767-3261
FAX: (214) 767-3264
EMAIL: CAS-Dallas@psc.hhs.gov

June 2, 2023

Terry Johnson
Chief Financial Officer and Treasurer
University of Iowa
105 Jessup Hall
Iowa City, IA 52242

Dear Mr. Johnson:

A copy of a facilities and administrative (F&A) cost and fringe benefit (FB) Rate Agreement are being sent to you for your signature. This Agreement reflects an understanding reached between your organization and a member of my staff concerning F&A and FB rates that may be used to support your claim for these indirect costs on grants and contracts with the Federal Government.

Please have the Agreement signed by an authorized representative of your organization and return it to me by email, retaining the copy for your files. Our email address is CAS-Dallas@psc.hhs.gov. We will reproduce and distribute the Agreement to the appropriate awarding organizations of the Federal Government for their use.

In addition, your FB cost rate(s) for the fiscal year ended June 30, 2023 based on actual costs for the fiscal year ended June 30, 2021, and FB cost rates for the fiscal year ending June 30, 2024 based on actual costs for the fiscal year ended June 30, 2022. The under-recovered (-) or over-recovered (+) amounts are listed below:

|  | 2021/2023 | 2022/2024 |
|---|---|---|
| Clinical Faculty: | ($1,849,269) | ($4,523,227) |
| Fellows: | ($120,334) | $122,644 |
| Post-Doctoral/Graduate Assistants: | $441,780 | ($200,101) |
| Non-Clinical Faculty: | $223,795 | ($1,117,624) |
| Professional & Scientific: | $4,847,029 | ($7,105,130) |
| Temporary Staff: | ($402,589) | ($190,462) |
| Composite: | ($677,874) | ($356,909) |

The fixed rates for the fiscal years ended June 30, 2021 and June 30, 2022 are considered final.

**JA349**

Proposal Tracking Number: 000271559

A Fringe Benefit cost proposal, together with supporting information and the certified audit financial statement, is required each year. Thus, your next Fringe Benefit cost proposal based on actual costs for the fiscal year ending June 30, 2023 is due in our office by December 31, 2023. The Facilities and Administrative cost rate proposal based on actual costs for the fiscal year ended June 30, 2025 is due in our office by December 31, 2025.

Since this is an integral part of the negotiation agreement, please note your acceptance by signing in the space provided below of this letter.

Thank you for your cooperation.

Sincerely,

Arif M. Karim -S    Digitally signed by Arif M. Karim - S
Date: 2023.06.07 08:31:35 -05'00'

Arif Karim
Director
Cost Allocation Services

Enclosures

<u>ACCEPTANCE</u>

<u>University of Iowa</u>
Institution

_____
Signature

<u>Terry L. Johnson</u>
Name

<u>CFO + Treasurer</u>
Title

<u>June 7, 2023</u>
Date

**JA350**

  Received Date: 7/3/2023

Proposal Tracking Number: 000271559

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1426004813A1
ORGANIZATION:
University of Iowa
105 Jessup Hall
Iowa City, IA 52242

Date: 06/02/2023
FILING REF.: The preceding
agreement was dated
06/21/2022

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:    FIXED    FINAL    PROV. (PROVISIONAL)    PRED. (PREDETERMINED)

| | EFFECTIVE PERIOD | | | | |
|------|------------|--------------|---------|-------------|-------------------------------|
| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
| PRED. | 07/01/2019 | 06/30/2022 | 54.50 | On Campus | Organized Research |
| PRED. | 07/01/2018 | 06/30/2022 | 45.00 | On Campus | Instruction |
| PRED. | 07/01/2019 | 06/30/2022 | 25.00 | On Campus | Other Sponsored Activities |
| PRED. | 07/01/2019 | 06/30/2022 | 17.00 | Off Campus | Other Sponsored Activities |
| PRED. | 07/01/2019 | 06/30/2022 | 26.00 | Off Campus | Org. Research & Instruction |
| PRED. | 07/01/2022 | 06/30/2026 | 55.50 | On Campus | Organized Research |
| PRED. | 07/01/2022 | 06/30/2026 | 46.00 | On Campus | Instruction |
| PRED. | 07/01/2022 | 06/30/2026 | 27.00 | On Campus | Other Sponsored Activities |
| PRED. | 07/01/2022 | 06/30/2026 | 26.00 | Off Campus | Org. Research & Instruction |
| PRED. | 07/01/2022 | 06/30/2026 | 16.00 | Off Campus | Other Sponsored Activities |
| PROV. | 07/01/2026 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2026. |

*BASE

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

**JA351**

Received Date: 7/3/2023

ORGANIZATION: University of Iowa
AGREEMENT DATE: 06/02/2023

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2022 | 6/30/2023 | 24.40 | All | Clinical Faculty |
| FIXED | 7/1/2022 | 6/30/2023 | 11.50 | All | Fellows |
| FIXED | 7/1/2022 | 6/30/2023 | 19.10 | All | Post Docs & G.A.'s |
| FIXED | 7/1/2022 | 6/30/2023 | 30.50 | All | Non–Clinical Faculty |
| FIXED | 7/1/2022 | 6/30/2023 | 39.20 | All | Professional & Scientific |
| FIXED | 7/1/2022 | 6/30/2023 | 12.20 | All | Temporary Staff |
| FIXED | 7/1/2022 | 6/30/2023 | 5.80 | All | Composite |
| FIXED | 7/1/2023 | 6/30/2024 | 25.60 | All | Clinical Faculty |
| FIXED | 7/1/2023 | 6/30/2024 | 9.80 | All | Fellows |
| FIXED | 7/1/2023 | 6/30/2024 | 20.30 | All | Post Docs & G.A.'s |
| FIXED | 7/1/2023 | 6/30/2024 | 31.20 | All | Non–Clinical Faculty |
| FIXED | 7/1/2023 | 6/30/2024 | 41.20 | All | Professional & Scientific |
| FIXED | 7/1/2023 | 6/30/2024 | 11.80 | All | Temporary Staff |
| FIXED | 7/1/2023 | 6/30/2024 | 5.30 | All | Composite |
| PROV. | 7/1/2024 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2024 |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

ORGANIZATION: University of Iowa
AGREEMENT DATE: 06/02/2023

## SECTION II: SPECIAL REMARKS

<u>TREATMENT OF FRINGE BENEFITS:</u>
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below.

<u>TREATMENT OF PAID ABSENCES:</u>
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

OFF–CAMPUS DEFINITION: The off–campus rate will apply for all activities: a) Performed in facilities not owned by the institution and where these facility costs are not included in the F&A pools; or b) Where rent is directly allocated/charged to the project(s). Grants or contracts will not be subject to more than one F&A cost rate. If more than 50% of a project is performed off–campus, the off–campus rate will apply to the entire project.

FRINGE BENEFITS:

FICA Post Employment Retirement Benefit
Disability Insurance Worker's Compensation
Life Insurance Unemployment Insurance
Health Insurance Dental Insurance
Death Benefit Waiver of TIAA/CREF Retirement Premium
Dividend Allocation Early Retirement Incentive Program
Retirement Vacation & Sick Leave Termination Payouts

*This Rate Agreement reflects new Indirect Cost Rates only.*

The next fringe benefit rate proposal, based on actual costs for the fiscal year ending June 30, 2023, is due in our office by December 31, 2023.

The indirect cost rate proposal, based on actual costs for the fiscal year ending June 30, 2025, is due in our office by December 31, 2025.

Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds $5000.

ORGANIZATION: University of Iowa
AGREEMENT DATE: 06/02/2023

## SECTION III: GENERAL

A.   LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.   ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.   FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.   USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.   OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

### BY THE INSTITUTION:

University of Iowa

_____
(INSTITUTION)

_____
(SIGNATURE)

Terry L. Johnson
(NAME)

CFO & Treasurer
(TITLE)

June 7, 2023
(DATE)

### ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
(AGENCY)

Arif M. Karim -S   Digitally signed by Arif M. Karim -S
Date: 2023.06.07 08:30:59 -05'00'
_____
(SIGNATURE)

Arif Karim
(NAME)

Director, Cost Allocation Services
(TITLE)

06/02/2023
(DATE)

HHS REPRESENTATIVE:   Olulola Oluborode

TELEPHONE:   (214) 767-3261

Proposal Tracking Number: 000271559

Revised Scope of Work

PI's Nachtman and Onel proposed work on both CMS and DUNE under this proposal; however, CMS was not funded. Therefore work will shift to the DUNE effort, where we will focus on construction of Photon Detectors for the Far Detector, ProtoDUNE analysis including travel to Fermilab and CERN, and R&D for the Near Detector. Funding from other sources will be sought in order to fulfill our institutional responsibilities to Iowa-built detector operations as well as supporting our two current graduate students on CMS physics analysis.

**JA355**

Received Date: 7/3/2023

**SPECIAL TERMS AND CONDITIONS**

**FA-TC-0001-CH    LEGAL AUTHORITY AND EFFECT (DECEMBER 2014)**

a.  A DOE financial assistance award is valid only if it is in writing and is signed, either in writing or electronically, by a DOE Contracting Officer.   This individual is reflected as the Grants/Agreements Officer on the Assistance Agreement.

b.  Recipients are free to accept or reject the award.   Acceptance of the award is effected by:
    1.  Performance;
    2.  Recipient's submission of a request for payment;
    3.  Recipient's withdrawal of funds obligated; or
    4.  Recipient's signature on the Assistance Agreement.

**FA-TC-0001A    RESOLUTION OF CONFLICTING CONDITIONS**

Any apparent inconsistency between Federal statutes and regulations and the terms and conditions contained in this award must be referred to the DOE Award Administrator for guidance.

**FA-TC-0001B-CH    PART 605 AWARD AGREEMENT CONTENTS (APRIL 2017)**

This award/agreement consists of the Assistance Agreement cover page, plus the following:

a.  Special terms and conditions.

b.  Attachments:

| Attachment No. | Title |
| --- | --- |
| 1 | Intellectual Property Provisions and Patent Responsibility Requirements |
| 2 | Federal Assistance Reporting Checklist and Instructions |
| 3 | Budget Pages |
| 4 | If the award is for research, the Federal-Wide Research Terms and Conditions and DOE Agency Specific Requirements, available at https://www.nsf.gov/awards/managing/rtc.jsp |

c.  Applicable program regulations, 10 CFR 605 at http://www.eCFR.gov.

d.  DOE Assistance Regulations, 2 CFR part 200 as amended by 2 CFR part 910 at http://www.eCFR.gov.

e.  Application/proposal as approved by DOE.

f.  National Policy Requirements to Be Incorporated as Award Terms in effect on date of award at http://www.nsf.gov/awards/managing/rtc.jsp.

**FA-TC-0001C    AWARD PROJECT PERIOD AND BUDGET PERIODS**

The Project Period for this award is 05/01/2013 through 03/31/2027 consisting of the following Budget Periods.

| Budget Period | Start Date | End Date | Government Share |
| --- | --- | --- | --- |
| 1 | 04/01/2023 | 03/31/2024 | $543,000.00 |
| 2 | 04/01/2024 | 03/31/2025 | $340,000.00 |
| 3 | 04/01/2025 | 03/31/2026 | $334,000.00 |
| 4 | 04/01/2026 | 03/31/2027 | $256,000.00 |

**FA-TC-0002.1    CONFERENCE SPENDING (FEBRUARY 2015)**

The recipient shall not expend any funds on a conference not directly and programmatically related to the purpose for which the grant or cooperative agreement was awarded that would defray the cost to the United States Government of a conference held by any Executive branch department, agency, board, commission, or office for which the cost to the United States Government would otherwise exceed $20,000, thereby circumventing the required notification by the head of any such Executive Branch department, agency, board, commission, or office to the Inspector General (or senior ethics official for any entity without an Inspector General), of the date, location, and number of employees attending such conference.

**FA-TC-0003.1    PAYMENT PROCEDURES - ADVANCES THROUGH THE AUTOMATED STANDARD APPLICATION FOR PAYMENTS (ASAP) SYSTEM**

a.   Method of Payment.   Payment will be made by advances through the Department of Treasury's ASAP system.

b.   Requesting Advances.   Requests for advances must be made through the ASAP system. You may submit requests as frequently as required to meet your needs to disburse funds for the Federal share of project costs.   If feasible, you should time each request so that you receive payment on the same day that you disburse funds for direct project costs and the proportionate share of any allowable indirect costs.   If same-day transfers are not feasible, advance payments must be as close as is administratively feasible to actual disbursements.

c.   Adjusting payment requests for available cash.   You must disburse any funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds before requesting additional cash payments from DOE.

d.   Payments.   All payments are made by electronic funds transfer to the bank account identified on the ASAP Bank Information Form that you filed with the U.S. Department of Treasury.

**FA-TC-0007.1    REBUDGETING AND RECOVERY OF INDIRECT COSTS - REIMBURSABLE INDIRECT COSTS AND FRINGE BENEFITS**

a.   If actual allowable indirect costs are less than those budgeted and funded under the award, you may use the difference to pay additional allowable direct costs during the project period.   If at the completion of the award the Government's share of total allowable costs (i.e., direct and indirect), is less than the total costs reimbursed, you must refund the difference.

b.   Recipients are expected to manage their indirect costs.   DOE will not amend an award solely to provide additional funds for changes in indirect cost rates.   DOE recognizes that the inability to obtain full reimbursement for indirect costs means the recipient must absorb the underrecovery.   Such underrecovery may be allocated as part of the organization's required cost sharing.

**FA-TC-0010    STATEMENT OF FEDERAL STEWARDSHIP**

DOE will exercise normal Federal stewardship in overseeing the project activities performed under this award. Stewardship activities include, but are not limited to, conducting site visits; reviewing performance and financial reports; providing technical assistance and/or temporary intervention in unusual circumstances to correct deficiencies which develop during the project; assuring compliance with terms and conditions; and reviewing technical performance after project completion to ensure that the award objectives have been accomplished.

**FA-TC-0012    SITE VISITS**

DOE authorized representatives have the right to make site visits at reasonable times to review project accomplishments and management control systems and to provide technical assistance, if required.   You must provide, and must require your subrecipients to provide, reasonable access to facilities, office space, resources, and assistance for the safety and convenience of the government representatives in the performance of their duties.   All site visits and evaluations must be performed in a manner that does not unduly interfere with or delay the work.

**FA-TC-0013.1    REPORTING REQUIREMENTS (APRIL 2023)**

a.  Requirements. The reporting requirements for this award are identified on the Federal Assistance Reporting Checklist, DOE F 4600.2, attached to this award. Failure to comply with these reporting requirements is considered a material noncompliance with the terms of the award. Noncompliance may result in withholding of future payments, suspension, or termination of the current award, and withholding of future awards. A willful failure to perform, a history of failure to perform, or unsatisfactory performance of this and/or other financial assistance awards, may also result in a debarment action to preclude future awards by Federal agencies.

b.  Dissemination of scientific/technical reporting products. Reporting project results in scientific and technical information (STI) publications/products to the DOE Office of Scientific and Technical Information (OSTI) ensures dissemination of research results to the public as well as preservation of the results. The DOE form F 4600.2, B. Scientific/Technical Reporting, has instructions for the DOE Energy Link (E-Link) system managed by OSTI. Scientific/technical reports and other STI products submitted under this award will be disseminated publicly on the Web via OSTI.GOV (https://www.osti.gov), unless the STI contains  patentable material, protected data, or SBIR/STTR data, which must be indicated per instructions in DOE 4600.2.

c.  Restrictions. Restrictions. STI products submitted to the DOE via E-link must not contain any Protected Personally Identifiable Information (PII), limited rights data, classified information, information subject to export control classification, or other information not subject to public release. The Contracting Officer or Technical Project Officer should be contacted with any questions. Limited data means data (other than computer software) developed at private expense that embody trade secrets or are commercial or financial and confidential or privileged. SBIR/STTR Protected Data, and other data subject to statutory data protection authorized by the award may be submitted, provided such data is properly marked and identified during submission. Submissions must not contain any "Proprietary", "Confidential" or "Business Sensitive" markings or similar restrictive markings not authorized by the applicable government  agreement.; it is acknowledged that DOE has the right to cancel or ignore such markings.

**FA-TC-0014-CH    PUBLICATIONS**

a.  You are encouraged to publish or otherwise make publicly available the results of the work conducted under the award.

b.  An acknowledgment of Federal support and a disclaimer must appear in the publication of any material, whether copyrighted or not, based on or developed under this project, as follows:

Acknowledgment:   "This material is based upon work supported by the U.S. Department of Energy, Office of Science, Office of [*insert the SC Program Office funding the award, e.g., Basic Energy Sciences*],   [*Add any additional acknowledgements or information requested by the sponsoring SC Program Office*] under Award Number(s) [*Enter the award number(s)*]."

Disclaimer:   "This report was prepared as an account of work sponsored by an agency of the United States Government.   Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights.   Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof.   The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof."

**FA-TC-0015    FEDERAL, STATE, AND MUNICIPAL REQUIREMENTS**

You must obtain any required permits and comply with applicable federal, state, and municipal laws, codes, and regulations for work performed under this award.

**FA-TC-0016      INTELLECTUAL PROPERTY PROVISIONS AND CONTACT INFORMATION**

a.  The intellectual property provisions applicable to this award are provided as an attachment to this award or are referenced on the Assistance Agreement Face Page. A list of all intellectual property provisions may be found at http://energy.gov/gc/standard-intellectual-property-ip-provisions-financial-assistance-awards.

b.  Questions regarding intellectual property matters should be referred to the DOE Award Administrator and the Patent Counsel designated as the service provider for the DOE office that issued the award.   The IP Service Providers List is found at http://energy.gov/gc/downloads/intellectual-property-ip-service-providers-acquisition-and-assistance-transactions.

**FA-TC-0017.1-CH      NATIONAL SECURITY: CLASSIFIABLE RESULTS ORIGINATING UNDER AN AWARD (DECEMBER 2014)**

a.  This award is intended for unclassified, publicly releasable research.   You will not be granted access to classified information.   DOE/NNSA does not expect that the results of the research project will involve classified information.   Under certain circumstances, however, a classification review of information originated under the award may be required.   The Department may review research work generated under this award at any time to determine if it requires classification.

b.  Executive Order 13526 (75 Fed. Reg. 707 (January 5, 2010)) states that basic scientific research information not clearly related to the national security shall not be classified. Nevertheless, some information concerning (among other things) scientific, technological, or economic matters relating to national security or cryptology may require classification.   If you originate information during the course of this award that you believe requires classification, you must promptly:

1.  Notify the DOE Project Officer and the DOE Award Administrator;
2.  Submit the information by registered mail directly to the Director, Office of Classification, Office of Document Reviews, EHSS-63/Germantown Building, US Department of Energy, 1000 Independence Ave, S.W., Washington, DC 20585-1290, for classification review.
3.  Restrict access to the information to the maximum extent possible until you are informed that the information is not classified, but no longer than 30 days after receipt by the Director, Office of Classification and Information Control.

c.  If you originate information concerning the production or utilization of special nuclear material (i.e., plutonium, uranium enriched in the isotope 233 or 235, and any other material so determined under section 51 of the Atomic

Energy Act) or nuclear energy, you must:

1.  Notify the DOE Project Officer and the DOE Award Administrator;
2.  Submit the information by registered mail directly to the Director, Office of Classification, Office of Document Reviews, US Department of Energy, Post Office Box A, Germantown, MD 20875-0963 for classification review within 180 days of the date the recipient first discovers or first has reason to believe that the information is useful in such production or utilization; and
3.  Restrict access to the information to the maximum extent possible until you are informed that the information is not classified, but no longer than 90 days after receipt by the Director, Office of Classification and Information Control.

d.  If DOE determines any of the information requires classification, you agree that the Government may terminate the award with consent of the recipient in accordance with 2 CFR part 200.340 (a)(3).   All material deemed to be classified must be forwarded to the DOE, in a manner specified by DOE.

e.  If DOE does not respond within the specified time periods, you are under no further obligation to restrict access to the information.

**FA-TC-0018.2   CONTINUATION APPLICATION AND FUNDING - AWARDS UNDER 10 CFR 605**

a. Continuation Application.   A continuation application is a non-competitive application for an additional budget period within a previously approved project period.   At least 90 days before the end of each budget period, you must submit your continuation application through the Office of Science's Portfolio Analysis Management System (PAMS) at https://pamspublic.science.energy.gov/webpamsepsexternal/login.aspx .

Your continuation application must include the following information:

1.  A report on your progress towards meeting the objectives of the project, including any significant findings, conclusions, or developments, and an estimate of any unobligated balances remaining at the end of the budget period.   If the remaining unobligated balance is estimated to exceed 10 percent of the funds available for the budget period, explain why the excess funds have not been obligated and how they will be used in the next budget period.

2.  A completed budget page and supporting justification for the upcoming budget period when a change (increase or decrease) to anticipated future costs will exceed 25 percent of the original recommended future budget or when a budget for the upcoming budget period was not approved at the time of award.

3.  A description of your plans for the conduct of the project during the upcoming budget period, if there are changes from the DOE approved application.

b. Continuation Funding.   Continuation funding is contingent on (1) availability of funds appropriated by Congress for the purpose of this program; (2) the availability of future-year budget authority; (3) substantial progress towards meeting the objectives of your approved application; (4) submittal of required reports; and (5) compliance with the terms and conditions of the award.

**FA-TC-0020A   NOTICE REGARDING THE PURCHASE OF AMERICAN-MADE EQUIPMENT AND PRODUCTS -- SENSE OF CONGRESS**

It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this award should be American-made.

**FA-TC-0023   ENVIRONMENTAL, SAFETY AND HEALTH (ES&H) PERFORMANCE OF WORK AT DOE FACILITIES**

With respect to the performance of any portion of the work under this award which is performed at a DOE-owned or controlled site, the recipient agrees to comply with all State and Federal ES&H regulations and with all other ES&H requirements of the operator of such site.

Prior to the performance on any work at a DOE-Owned or controlled site, the recipient shall contact the site facility manager for information on DOE and site specific ES&H requirements.

The recipient shall apply this term to its sub-recipients and contractors.

**FA-TC-0025A   INSURANCE COVERAGE (DECEMBER 2014)**

See 2 CFR 200.310 for insurance requirements for real property and equipment acquired or improved with Federal funds.

**FA-TC-0025C.2-CH   EXEMPT PROPERTY (MAY 2023)**

Exempt property means property acquired under a federal award where DOE has chosen to vest title to the property to the non-federal entity without further obligations to the Federal Government, based upon the explicit terms and conditions of the Federal award.

Except items of equipment identified as Federally-owned in FA-TC-0025C.1-CH, Federally-Owned Property, incorporated in this award, if applicable, equipment acquired by the Recipient with funds provided by this financial assistance award are exempt property in accordance with 2 CFR 200.312(c) and Section 6306 of the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. Section 6301 et seq.

Exempt property must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by the Federal awarding agency in the priority order specified in 2 CFR Part 200.313(c)(1)(i) and (ii).

## FA-TC-0025D    EQUIPMENT (DECEMBER 2014)

Subject to the conditions provided in 2 CFR Part 200.313, title to equipment (property) acquired under a Federal award will vest conditionally with the non-Federal entity.

The non-Federal entity cannot encumber this property and must follow the requirements of 2 CFR Part 200.313 before disposing of the property.

States must use equipment acquired under a Federal award by the state in accordance with state laws and procedures.

Equipment must be used by the non-Federal entity in the program or project for which it was acquired as long as it is needed, whether or not the project or program continues to be supported by the Federal award. When no longer needed for the originally authorized purpose, the equipment may be used by programs supported by the Federal awarding agency in the priority order specified in 2 CFR Part 200.313(c)(1)(i) and (ii).

Management requirements, including inventory and control systems, for equipment are provided in 2 CFR Part 200.313(d).

When equipment acquired under a Federal award is no longer needed, the non-Federal entity must obtain disposition instructions from the Federal awarding agency or pass-through entity.

Disposition will be made as follows: (a) items of equipment with a current fair market value of $5,000 or less may be retained, sold, or otherwise disposed of with no further obligation to the Federal awarding agency; (b) Non-Federal entity may retain title or sell the equipment after compensating the Federal awarding agency as described in 2 CFR Part 200.313(e)(2); or (c) transfer title to the Federal awarding agency or to an eligible third party as specified in 2 CFR Part 200.313(e)(3).

See 2 CFR Part 200.313 for additional requirements pertaining to equipment acquired under a Federal award.

Also see 2 CFR Part 910.360 for additional requirements for Equipment for For-Profit recipients.

See also 2 CFR Part 200.439 Equipment and other capital expenditures.

## FA-TC-0025E    SUPPLIES (DECEMBER 2014)

See 2 CFR Part 200.314 for requirements pertaining to supplies acquired under a Federal award

See also § 200.453 Materials and supplies costs, including costs of computing devices.

## FA-TC-0025G    PROPERTY TRUST RELATIONSHIP (DECEMBER 2014)

Real property, equipment, and intangible property, that are acquired or improved with a Federal award must be held in trust by the non-Federal entity as trustee for the beneficiaries of the project or program under which the property was acquired or improved.

See 2 CFR Part 200.316 for additional requirements pertaining to real property, equipment, and intangible property acquired or improved under a Federal award.

**FA-TC-0041-CH    REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION**

a.  ***Reporting of first-tier subawards.***

  1.  ***Applicability.*** Unless you are exempt as provided in paragraph d. of this award term, you must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph e. of this award term).

  2.  ***Where and when to report.***

    i.  The non-Federal entity or Federal agency must report each obligating action described in paragraph a.1. of this award term to *http://www.fsrs.gov.*

    ii.  For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

  3.  ***What to report.*** You must report the information about each obligating action that the User Guide/Awardee Guide submission instructions posted at *http://www.fsrs.gov* specifies.

b.  ***Reporting total compensation of recipient executives for non-Federal entities.***

  1.  ***Applicability and what to report.*** You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if -

    i.  The total Federal funding authorized to date under this Federal award equals or exceeds $30,000 as defined in 2 CFR 170.320;

    ii.  in the preceding fiscal year, you received -

      (A)  80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), and

      (B)  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and,

    iii.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm.*)

  2.  ***Where and when to report.*** You must report executive total compensation described in paragraph b.1. of this award term:

    i.  As part of your registration profile at *https://www.sam.gov.*

    ii.  By the end of the month following the month in which this award is made, and annually thereafter.

c.  ***Reporting of Total Compensation of Subrecipient Executives.***

  1.  ***Applicability and what to report.*** Unless you are exempt as provided in paragraph d. of this award term, for each first-tier non-Federal entity subrecipient under this award, you shall report the names and total

compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if -

    i.   in the subrecipient's preceding fiscal year, the subrecipient received -

        (A)   (A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards) and,

        (B)   (B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

    ii.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm.*)

  2.  ***Where and when to report.*** You must report subrecipient executive total compensation described in paragraph c.1. of this award term:

    i.   To the recipient.

    ii.   By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

  d.  ***Exemptions.***

    If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    i.   Subawards, and

    ii.   The total compensation of the five most highly compensated executives of any subrecipient.

  e.  ***Definitions.*** For purposes of this award term:

  1.  Federal Agency means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

  2.  Non-Federal *entity* means all of the following, as defined in 2 CFR part 25:

    i.   A Governmental organization, which is a State, local government, or Indian tribe;

    ii.   A foreign public entity;

    iii.   A domestic or foreign nonprofit organization; and,

    iv.   A domestic or foreign for-profit organization

  3.  ***Executive*** means officers, managing partners, or any other employees in management positions.

  4.  **Subaward**:

    i.   This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

    ii.   The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

    iii.  A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

5.   ***Subrecipient*** means a non-Federal entity or Federal agency that:

    i.    Receives a subaward from you (the recipient) under this award; and

    ii.   Is accountable to you for the use of the Federal funds provided by the subaward.

6.   ***Total compensation*** means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)).

## FA-TC-0042.1-CH      SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

A.   Requirement for System for Award Management (SAM)

Unless exempted from this requirement under 2 CFR 25.110, the prime recipient must remain registered and maintain current information in SAM for the entire period of performance of the award. This includes providing information on the prime recipient's immediate and highest-level owner and subsidiaries, as well as on all of its predecessors that have been awarded a Federal contract or Federal financial assistance agreements within the last three years, if applicable, until the prime recipient submits the final financial report required under this award or receives the final payment, whichever is later. This requires the prime recipient to review its information in SAM at least annually after the initial registration, and to update its information as soon as there are changes. Reviews and updates may be required more frequently due to changes in recipient information or as required by another award term.

B.   Requirement for Unique Entity Identifier

If authorized to make subawards under this award, the prime recipient:

1.   Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward until the entity has provided its unique entity identifier to the prime recipient.

2.   Must not make a subaward to an entity unless the entity has provided its unique entity identifier to the prime recipient. Subrecipients are not required to obtain an active SAM registration, but must obtain a unique entity identifier.

C.   Definitions

For purposes of this term:

1.   System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2.   Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

3.   Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following for purposes of this part:

    a.   A foreign organization;

    b.   A foreign public entity;

    c.   A domestic for-profit organization; and

    d.   A Federal agency.

4.   Subaward has the meaning given in 2 CFR 200.1.

5.   Subrecipient has the meaning given in 2 CFR 200.1.

**FA-TC-0043-CH   PORTFOLIO ANALYSIS AND MANAGEMENT SYSTEM (FEBRUARY 2023)**

a.   A recipient is required to submit the following actions through DOE's Portfolio Analysis and Management Systems (PAMS):

    1.   A request for a no-cost extension (NCE) or notification of a NCE pursuant to 2 CFR 200.308(d)(2).   A request or notification should be submitted as soon as the need for an extension is known but **no later than 10 calendar days** before the end of the period of performance and must contain the following information:

        i. The reason(s) why the project could not be completed within the existing award schedule.

        ii. An explanation of the work that will be done during the extension including confirmation that all such work is part of the original scope of work selected for funding; and

        iii. Confirmation that DOE funds remain available for the proposed work to continue during the extension.

    2.   Principal Investigator (PI) change and/or PI departure.   Prior approval is required for a change in the PI in accordance with 2 CFR Part 200.308(c)(1)(ii).   The request must include the following:

        i.    The proposed PI's name and contact information.

        ii.   An explanation for the departure/change.

        iii.  A copy of the proposed PI's biographical sketch.

b.   An action as described above must be submitted by an authorized representative of the recipient organization.

c.   PAMS is available at https://pamspublic.science.energy.gov. If you have trouble using PAMS, consult the "PAMS Help" link on the PAMS website or contact the PAMS Helpdesk at (855) 818-1846 (toll-free) or (301) 903-9610 or sc.pams-helpdesk@science.doe.gov.

**FA-TC-0065      LOBBYING RESTRICTIONS (MARCH 2012)**

By accepting funds under this award, you agree that none of the funds obligated on the award shall be expended, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913. This restriction is in addition to those prescribed elsewhere in statute and regulation.

**FA-TC-0068.1      NONDISCLOSURE AND CONFIDENTIALITY AGREEMENTS ASSURANCES (JUNE 2015)**

(1)   By entering into this agreement, the undersigned attests that the awardee listed in Block 5 of the Assistance Agreement **does not and will not** require its employees or contractors to sign internal nondisclosure or confidentiality agreements or statements prohibiting or otherwise restricting its employees or contactors from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(2)   The undersigned further attests that the awardee listed in Block 5 of the Assistance Agreement **does not and will not** use any Federal funds to implement or enforce any nondisclosure and/or confidentiality policy, form, or agreement it uses unless it contains the following provisions:

    a.   *''These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.''*

b. The limitation above shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

c. Notwithstanding provision listed in paragraph (a), a nondisclosure or confidentiality policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure or confidentiality forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

**FA-TC-0070      REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE (DECEMBER 2015)**

**a. General Reporting Requirement**

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

**b. Proceedings About Which You Must Report**

Submit the information required about each proceeding that:

1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

2. Reached its final disposition during the most recent five year period; and

3. Is one of the following:

    (A) criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

    (B) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

    (C) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

    (D) Any other criminal, civil, or administrative proceeding if:

       (i) It could have led to an outcome described in paragraph b.3.(A), (B), or (C) of this award term and condition;

       (ii) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

       (iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

**c. Reporting Procedures**

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second

**JA366**

time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

**d.   Reporting Frequency**

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five-year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**e.   Definitions**

For purposes of this award term and condition:

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (*e.g.,* Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or A. Reporting of Matters Related to Recipient Integrity and Performance.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

   (A) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

   (B) The value of all expected funding increments under a Federal award and options, even if not yet exercised.

### FA-TC-0072-CH   PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY

States, local governments, or other public entities may not condition sub-awards in a manner that would discriminate, or disadvantage sub-recipients based on their religious character or discourage their freedom of speech.

### FA-TC-0073-CH    INTERIM CONFLICT OF INTEREST POLICY FOR FINANCIAL ASSISTANCE

The DOE interim Conflict of Interest Policy for Financial Assistance (COI Policy) can be found at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance. This policy is applicable to all non-Federal entities applying for, or that receive, DOE funding by means of a financial assistance award (e.g., a grant, cooperative agreement, or technology investment agreement) and, through the implementation of this policy by the entity, to each Investigator who is planning to participate in, or is participating in, the project funded wholly or in part under this Award. The term "non-Federal entity" means a State, local government, Indian tribe, Institution of Higher Education, nonprofit organization, or for-profit organization that carries out a DOE award as a recipient or subrecipient. The term "Investigator" means the PI and any other person, regardless of title or position, who is responsible for the purpose, design, conduct, or reporting of a project funded by DOE or proposed for funding by DOE. The Recipient must flow down the requirements of the interim COI Policy to any subrecipient non-Federal entities, with the exception of DOE National Laboratories. Further, the Recipient must include all financial conflicts of interests (FCOI), i.e., managed and unmanaged/ unmanageable, in its initial and ongoing FCOI reports.

Prior to award, the Recipient was required to: 1) ensure all Investigators on this Award completed their significant financial disclosures; 2) review the disclosures; 3) determine whether a FCOI exists; 4) develop and implement a management plan for FCOIs; and 5) provide DOE with an initial FCOI report that includes all FCOIs (i.e., managed and unmanaged/unmanageable). Within 180 days of the date of the Award, the Recipient must be in full compliance with the other requirements set forth in DOE's interim COI Policy.

**JA367**

Failure to comply with this term may result in DOE taking any action identified in section VII of the Interim COI Policy or any other action available under the terms of the financial assistance award or in applicable regulations.

**FA-TC-0073.1-CH     ORGANIZATIONAL CONFLICT OF INTEREST**

If the Recipient has a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe, the Recipient must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflicts of interest are those where, because of relationships with a parent company, affiliate, or subsidiary organization, the Recipient is unable or appears to be unable to be impartial in conducting procurement action involving a related organization as discussed in 2 CFR 200.318(c)(2).

The Recipient must disclose in writing any potential or actual organizational conflict of interest to the DOE Contracting Officer.   The Recipient must provide the disclosure prior to engaging in a procurement or transaction using project funds with a parent, affiliate, or subsidiary organization that is not a state, local government, or Indian tribe. For a list of the information that must be included the disclosure, see Section VI. of the DOE Interim Conflict of Interest Policy for Financial Assistance at https://www.energy.gov/management/department-energy-interim-conflict-interest-policy-requirements-financial-assistance (Interim COI Policy).

If the effects of the potential or actual organizational conflict of interest cannot be avoided, neutralized, or mitigated, the Recipient must procure goods and services from other sources when using project funds.   Otherwise, DOE may terminate the Award unless continued performance is determined to be in the best interest of the Federal government.

The Recipient is responsible for ensuring non-Federal subrecipient entities' compliance with this term.

Failure to comply with this term may result in DOE taking any action identified in section VII of the Interim COI Policy or any other action available under the terms of the financial assistance award or in applicable regulations.

**FA-TC-0076-CH     CURRENT AND PENDING SUPPORT**

Definitions:

***Current and pending support:***   (a) All resources made available, or expected to be made available, to an individual in support of the individual's RD&D efforts, regardless of (i) whether the source is foreign or domestic; (ii) whether the resource is made available through the entity applying for an award or directly to the individual; or (iii) whether the resource has monetary value; and (b) includes in-kind contributions requiring a commitment of time and directly supporting the individual's RD&D efforts, such as the provision of office or laboratory space, equipment, supplies, employees, or students. This term has the same meaning as the term Other Support as applied to researchers in NSPM-33: For researchers, Other Support includes all resources made available to a researcher in support of and/or related to all of their professional RD&D efforts, including resources provided directly to the individual or through the organization, and regardless of whether or not they have monetary value (e.g., even if the support received is only in-kind, such as office/laboratory space, equipment, supplies, or employees). This includes resource and/or financial support from all foreign and domestic entities, including but not limited to, gifts provided with terms or conditions, financial support for laboratory personnel, and participation of student and visiting researchers supported by other sources of funding.

***Foreign Government-Sponsored Talent Recruitment Program:***   An effort directly or indirectly organized, managed, or funded by a foreign government, or a foreign government instrumentality or entity, to recruit science and technology professionals or students (regardless of citizenship or national origin, or whether having a full-time or part-time position). Some foreign government-sponsored talent recruitment programs operate with the intent to import or otherwise acquire from abroad, sometimes through illicit means, proprietary technology or software, unpublished data and methods, and intellectual property to further the military modernization goals and/or economic goals of a foreign government. Many, but not all, programs aim to incentivize the targeted individual to relocate physically to the foreign state for the above purpose. Some programs allow for or encourage continued employment at U.S. research facilities or receipt of federal research funds while concurrently working at and/or receiving

compensation from a foreign institution, and some direct participants not to disclose their participation to U.S. entities. Compensation could take many forms including cash, research funding, complimentary foreign travel, honorific titles, career advancement opportunities, promised future compensation, or other types of remuneration or consideration, including in-kind compensation.

***Senior/key personnel*** – an individual who contributes in a substantive, meaningful way to the scientific development or execution of a RD&D project proposed to be carried out with a DOE award. DOE has designated any individual who meets the definition of senior/key personnel as a covered individual responsible for completing a current and pending support disclosure. DOE may further designate covered individuals during award negotiations or the award period of performance.

Prior to award, the Recipient was required to provide current and pending support disclosure statements and a CV or Biosketch for each principal investigator (PI) and senior/key personnel, at the recipient and subrecipient level, regardless of funding source. In accordance with the Federal Assistance Reporting Checklist, throughout the life of the award, the Recipient must submit current and pending support disclosure statements and a CV or Biosketch for any new PI and senior/key personnel at the recipient and subrecipient level, added to the project funded under this Award within thirty (30) days of the individual joining the project. In addition, if there are any changes to current and pending support disclosure statements previously submitted to DOE, the Recipient must submit updated current and pending disclosure statements within thirty (30) days of the change. The Recipient must ensure all PIs and senior/key personnel at the recipient and subrecipient level, are aware of the requirement to submit updated current and pending support disclosure statements to DOE.

Current and pending support is intended to allow the identification of potential duplication, overcommitment, potential conflicts of interest or commitment, and all other sources of support. All PIs and senior/key personnel at the recipient and subrecipient level must provide a list of all sponsored activities, awards, and appointments, whether paid or unpaid; provided as a gift with terms or conditions or provided as a gift without terms or conditions; full-time, part-time, or voluntary; faculty, visiting, adjunct, or honorary; cash or in-kind; foreign or domestic; governmental or private-sector; directly supporting the individual's research or indirectly supporting the individual by supporting students, research staff, space, equipment, or other research expenses. All foreign government-sponsored talent recruitment programs must be identified in current and pending support.

For every activity, list the following items:

- The sponsor of the activity or the source of funding.
- The award or other identifying number.
- The title of the award or activity. If the title of the award or activity is not descriptive, add a brief description of the research being performed that would identify any overlaps or synergies with the proposed research.
- The total cost or value of the award or activity, including direct and indirect costs and cost share. For pending proposals, provide the total amount of requested funding.
- The award period (start date – end date).
- The person-months of effort per year being dedicated to the award or activity.
- Identify any overlap, duplication of effort, or synergistic efforts, with a description of the other award or activity to the current and pending support.
- Details of any obligations, contractual or otherwise, to any program, entity, or organization sponsored by a foreign government must be provided to DOE.

All PIs and senior/key personnel must provide a separate disclosure statement listing the required information above regarding current and pending support. If the current version of the NSF form (January 19, 2023 or later) is not used, the individual must sign and date their respective disclosure statement and include the following certification statement:

I, [Full Name and Title], certify to the best of my knowledge and belief that the information contained in this Current and Pending Support Disclosure Statement is true, complete and accurate.   I understand that any false, fictitious, or fraudulent information, misrepresentations, half-truths, or omissions of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (18 U.S.C. §§ 1001 and 287, and 31 U.S.C. §§ 3729-3730 and 3801-3812).   I further understand and agree that (1) the statements and representations made herein are material to DOE's funding decision, and (2) I have a responsibility to update the disclosures during the period of performance of the award should circumstances change which impact the responses provided above.

Supporting documents of any identified source of support must be provided to DOE upon request, including certified translations of any document.

The information may be provided in the format approved by the National Science Foundation (NSF), which may be generated by the Science Experts Network Curriculum Vita (SciENcv), a cooperative venture maintained at https://www.ncbi.nlm.nih.gov/sciencv/, and is also available at https://www.nsf.gov/bfa/dias/policy/nsfapprovedformats/cps.pdf.   The use of a format required by another agency is intended to reduce the administrative burden to researchers by promoting the use of common formats.   If the NSF format is used, the individual must still include a signature, date, and a certification statement using the language included in the paragraph above or ensure a similar certification is included on the NSF form, i.e., January 19, 2023 version or later).

**UNITED STATES DEPARTMENT OF ENERGY**
**OFFICE OF SCIENCE CONSOLIDATED SERVICE CENTER**
**GRANTS AND COOPERATIVE AGREEMENTS**

April 14, 2025

The University of Iowa

Dear Business Officer:

     This letter provides an update from the United States Department of Energy (Department) regarding your federal grants listed below:
DE-SC0010113, DE-SC0022969, DE-SC0022974, DE-SC0023393, DE-SC0023479, DE-SC0023995, DE-SC0024035, DE-SC0024559, DE-SC025311, DE-SC0025361, DE-SC0025544,

     Pursuant to the Department's policy memorandum dated April 11, 2025, entitled *Adjusting Department of Energy Grant Policy for Institutions of Higher Education*, it is the Department's policy to improve efficiency and curtail costs where appropriate to "better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people." The Department has accordingly set "a standardized 15 percent indirect cost rate" for grant awards to the class consisting of institutions of higher education.

     To this end, the Department has undertaken a review of all Department grant awards to ensure that the awards comply with this updated Department policy. During this review, the Department determined that the grants listed above are not currently in compliance with the policy memorandum.

     **Therefore, in accordance with the foregoing, the policies set forth in the Department's April 11, 2025 memorandum, applicable regulations, and the terms of your grant awards, the Department is conditionally terminating your grant awards, effective thirty (30) days from the date of this notice.** *See* 2 C.F.R. 200.340(a), (b).

     This termination is conditional. You may avoid termination of these awards by having the duly authorized representative send an email to ihe-icr-response@hq.doe.gov and Michael.Neff@science.doe.gov. A letter must also be sent via first-class mail or overnight carrier to the Department official identified in the signature block below, confirming your agreement to an updated indirect cost rate of 15 percent for each of your awards effective as of May 14, 2025.

This confirmation notice should include:

1. a copy of this notice;

2. the date you received this notice;

3. confirmation that you accept an updated indirect cost rate of 15 percent as of May 14, 2025; and

4. any other documents or information you deem appropriate.

*See* 2 C.F.R. § 200.342.

The agreed update to the grant award indirect cost rate will be effective as of May 14, 2025.

If you wish to allow any of the above grants to terminate, costs incurred by you after termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov. *See id.* § 200.344(i). Finally, you are reminded of your duties under your agreement and Department guidance regarding retention of grant records and the Department's audit rights as stated in your grant documents.

Thank you,

MICHAEL NEFF
Digitally signed by MICHAEL NEFF
Date: 2025.04.14 16:28:50 -05'00'

Michael Neff
Contracting Officer
Michael.Neff@science.doe.gov
9800 S. Cass Avenue
Lemont, IL 60439

## DECLARATION OF SALLY MORTON

I, Sally Morton, hereby declare:

1.  I am a resident of the State of Arizona. I am currently employed by Arizona State University as Executive Vice President of the ASU Knowledge Enterprise and as a Professor in the College of Mathematical and Statistical Sciences and the College of Health Solutions. In my capacity as Executive Vice President, I lead the university's research and economic development portfolio to advance research priorities, oversee ASU's research institutes and initiatives, and drive corporate engagement, strategic partnerships, intellectual property, and technology transfer.

2.  As Executive Vice President of the ASU Knowledge Enterprise, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by ASU employees and believe that information to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3.  I previously submitted a declaration in support of Plaintiffs' Motion for a Temporary Restraining Order (TRO) in this matter, to explain certain impacts of the Department of Energy (DOE)'s policy that would immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15% for both ongoing and future grants.

4.  I am providing this declaration to share an update about the implementation of this DOE policy, in further support of Plaintiffs' Motion.

5.  On April 18, 2025 at 9:16 AM, two ASU employees received an email from a DOE Technical Project Officer concerning an invoice previously submitted for a DOE-funded project. The email, attached hereto as Exhibit A, states that "Due to the Policy Flash from DOE, and the pending process changes, currently invoices from IHEs are not being processed….The

1

**JA373**

option we have at this time is for the invoice to be submitted without any indirect charges and we can pay the direct costs. Once guidance is received on implementing the new policy flash for IHE awardees, we would have you submit an invoice for the indirect costs. Otherwise, unfortunately, we will not be able to process your invoice at this time."

6. This email was received two days after the Court issued a TRO in this action. ASU complied with the directions of the Technical Project Officer by submitting a revised invoice for only direct costs, which was paid. ASU then contacted the Technical Project Officer to inform her of the TRO and request permission to submit a second invoice for indirect costs. She granted that permission after seeking additional guidance from the Contracting Officer. See Exhibit A.

7. ASU has subsequently submitted a second invoice seeking indirect costs.

I declare under penalty of perjury that the foregoing is true and correct.

Dated April 25, 2025

Tempe, Arizona

_____

SALLY MORTON

# EXHIBIT A

| From: | Kim, Lexie |
|---|---|
| To: | Steven Winn; Heather Clark |
| Cc: | Sridhar Seetharaman; Coy, Ava; Franke, Matt (CONTR); Jamison, Keith |
| Subject: | RE: EPIXC Invoice Status |
| Date: | Wednesday, April 23, 2025 9:46:00 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

This looks good and is what I expected to see submitted.

**Lexie Kim**
Technical Project Officer
720-584-8843

---

**From:** Steven Winn <Steven.Winn@asu.edu>
**Sent:** Wednesday, April 23, 2025 10:40 AM
**To:** Kim, Lexie <lexie.kim@ee.doe.gov>; Heather Clark <Heather.Christina.Clark@asu.edu>
**Cc:** Sridhar Seetharaman <seetharaman@asu.edu>; Coy, Ava <ava.coy@ee.doe.gov>; Franke, Matt (CONTR) <matt.franke@ee.doe.gov>; Jamison, Keith <keith.jamison@ee.doe.gov>
**Subject:** [EXTERNAL] RE: EPIXC Invoice Status

Hi Lexie,

Can you review this invoice before we submit it through VIPERS? Let me know if I need to change anything.

Thanks,

Steve

---

**From:** Kim, Lexie <lexie.kim@ee.doe.gov>
**Sent:** Wednesday, April 23, 2025 8:33 AM
**To:** Heather Clark <Heather.Christina.Clark@asu.edu>
**Cc:** Steven Winn <Steven.Winn@asu.edu>; Sridhar Seetharaman <seetharaman@asu.edu>; Coy, Ava <ava.coy@ee.doe.gov>; Franke, Matt (CONTR) <matt.franke@ee.doe.gov>; Jamison, Keith <keith.jamison@ee.doe.gov>
**Subject:** RE: EPIXC Invoice Status

Heather,

Thank you for reaching out. The Contracting Officer confirmed you can submit the invoice for the indirect costs. I would recommend it would be only the indirect costs for the most recently approved invoice to avoid any confusion.

Thanks,

Lexie

**Lexie Kim**
Technical Project Officer
720-584-8843

---

**From:** Heather Clark <Heather.Christina.Clark@asu.edu>
**Sent:** Wednesday, April 23, 2025 8:41 AM
**To:** Kim, Lexie <lexie.kim@ee.doe.gov>
**Cc:** Steven Winn <Steven.Winn@asu.edu>; Sridhar Seetharaman <seetharaman@asu.edu>; Coy, Ava <ava.coy@ee.doe.gov>; Franke, Matt (CONTR) <matt.franke@ee.doe.gov>; Jamison, Keith <keith.jamison@ee.doe.gov>
**Subject:** [EXTERNAL] RE: EPIXC Invoice Status

Dear DOE colleagues,

I'm writing to follow up on our correspondence about invoicing.

We prepared and submitted a revised invoice per your directions, and that has been paid.

However, we also understand that a TRO has been issued that affects the Policy Flash from DOE.  Are we able to submit the rest of our invoice, covering the indirect costs, for payment at this time?

Sincerely, Heather

**Heather Christina Clark**
Assistant Vice President – Research Operations
Email:  heather.christina.clark@asu.edu
Ph: 480-965-1427

---

**From:** Heather Clark
**Sent:** Friday, April 18, 2025 1:15 PM
**To:** lexie.kim@ee.doe.gov
**Cc:** Steven Winn <Steven.Winn@asu.edu>; Sridhar Seetharaman <seetharaman@asu.edu>; Coy, Ava <ava.coy@ee.doe.gov>; Franke, Matt (CONTR) <matt.franke@ee.doe.gov>; keith.jamison@ee.doe.gov
**Subject:** FW: EPIXC Invoice Status

Dear DOE colleagues,

At the direction of DOE, we are resubmitting this invoice for only ASU's direct costs noted herein.  ASU submits this invoice reserving all of its rights relating to amounts owed for indirect or facilities and administrative costs.  You will see the invoice soon in VIPERS.

Sincerely, Heather

**Heather Christina Clark**
Assistant Vice President – Research Operations
Email:  heather.christina.clark@asu.edu
Ph: 480-965-1427

---

**From:** Kim, Lexie <lexie.kim@ee.doe.gov>
**Sent:** Friday, April 18, 2025 9:16 AM
**To:** Steven Winn <Steven.Winn@asu.edu>; Sridhar Seetharaman <seetharaman@asu.edu>
**Cc:** Coy, Ava <ava.coy@ee.doe.gov>; Franke, Matt (CONTR) <matt.franke@ee.doe.gov>; Jamison, Keith <keith.jamison@ee.doe.gov>
**Subject:** EPIXC Invoice Status
**Importance:** High

Steve and Sridhar,

Due to the Policy Flash from DOE, and the pending process changes, currently invoices from IHEs are not being processed. We understand EPIXC would like payment soon for past costs. The option we have at this time is for the invoice to be submitted without any indirect charges and we can pay the direct costs. Once guidance is received on implementing the new policy flash for IHE awardees, we would have you submit an invoice for the indirect costs. Otherwise, unfortunately we will not be able to process your invoice at this time.

Thank you,
Lexie



**Lexie Kim**
*Technical Project Officer*

**MOBILE**  720.584.8843
Follow us:


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message does not originate from a known Department of Energy email system.
Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message does not originate from a known Department of Energy email system. Use caution if this message contains attachments, links or requests for information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF ENERGY, et al., <br><br> Defendants. | Case No. 25-cv-10912-ADB |

## **STATUS REPORT**

Pursuant to this Court's Order Granting Plaintiffs' Motion For A Temporary Restraining Order (Doc. 34) (the "Order"), Defendants respectfully submit the following status report:

1.      In its first status report required by the Order, Defendants stated that they issued a notice and provided a copy of the Order on SAM.gov, the U.S. government's official system for communicating with contractors and grantees.  Doc. 46.  Defendants stated further that the Department of Energy ("DOE") Office of Management instructed its Heads of Contracting Officers to direct all DOE Grant Officials and Contracting Officers who administer active DOE grants involving Institutions of Higher Education ("IHE") to provide written notice of the Order via email to each individual IHE grantee in their jurisdiction.  Doc. 46.

2.      Defendants confirm that, consistent with the Order, they have instructed all components responsible for disbursement (1) not to implement or enforce the indirect cost rate described in the DOE Policy Flash: Adjusting Department of Energy Grant Policy for Institutions

1

**JA380**

of Higher Education, and thus (2) to continue the regular disbursement and obligation of federal

financial assistance funds for so long as the terms of the TRO remain in effect.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

BRIAN C. LEA
Deputy Associate Attorney General


By:    */s/ Nicole M. O'Connor*
    Nicole M. O'Connor (BBO#675535)
    Assistant United States Attorney
    United States Attorney's Office
    John Joseph Moakley U.S. Courthouse
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    (617) 748-3112
    Nicole.O'Connor@usdoj.gov

Dated:  May 2, 2025


### CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, hereby certify that a true copy of the above document was served upon all parties of record via this court's electronic filing system and upon any non-registered parties via regular mail.

Dated: May 2, 2025

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant U.S. Attorney

2

**JA381**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|                                                      |     |                              |
| ---------------------------------------------------- | --- | ---------------------------- |
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.*       | )   |                              |
|                                                      | )   |                              |
|                                                      | )   |                              |
|                                                      | )   |                              |
| Plaintiffs,                                          | )   |                              |
|                                                      | )   |                              |
| v.                                                   | )   | Case No. 1:25-cv-10912-ADB   |
|                                                      | )   |                              |
| DEPARTMENT OF ENERGY, *et al.*,                      | )   |                              |
|                                                      | )   |                              |
| Defendants.                                          | )   |                              |
|                                                      | )   |                              |

## <u>SECOND DECLARATION OF BERTA SCHREIBER</u>

I, Berta Schreiber, hereby declare as follows:

1.      I am the Director of the Office of Acquisition Management within the Office of Management and the Senior Procurement Executive at the United States Department of Energy (DOE). I have held this position since October 1, 2023. In this position, I am responsible for overseeing DOE's acquisition and financial assistance policies, regulations and oversight programs. As the Senior Procurement Executive, I delegate authority to thirteen Heads of Contracting Activities to enter into contracts, financial assistance agreements, and other transactions agreements. I have DOE-wide responsibility and authority to provide overall direction of the Department's procurement system which includes acquisition and financial assistance. My authority does not include the National Nuclear Security Administration, the Federal Energy Regulatory Commission, or the Bonneville Power Administration.

2.      Prior to assuming my current role, I served as both the Deputy Director for the Office of Acquisition Management since August 2022 and, prior to that, as the Director of the

JA382

Office of Procurement and Financial Assistance Policy (previously the Office of Policy). I was

the Director of the Office of Policy within the Office of Acquisition Management since

November 2011.

      3.      DOE's financial assistance award process typically begins when the relevant DOE

program office publishes a Notice of Funding Opportunity (NOFO) (also sometimes called a

Funding Opportunity Announcement). NOFOs are issued by numerous DOE offices, including

the Office of Science, Office of Environmental Management, the Advanced Research Projects

Agency-Energy (ARPA-E), and the Idaho Operations Office, among many others. NOFOs and

their amendments are published to Grants.gov. Each NOFO contains a description of the funding

opportunity and usually attaches documentation that provides additional details, terms, and

conditions, including more information about the program or activity to be funded; applicant

eligibility criteria; application requirements; application submission deadline; selection criteria

and timeline; and the process for negotiations with the selectee and finalizing the award. NOFOs

typically require applicants to submit a proposed budget as part of the application materials. The

budget should identify funds the applicant requests for direct costs and indirect costs.

      4.      By default, Institutions of Higher Education (IHEs) generally use a preexisting

indirect cost rate negotiated by the IHE with a cognizant federal agency—usually the U.S.

Department of Health and Human Services (HHS) or the U.S. Department of Defense's Office of

Naval Research (DOD)—responsible for negotiating and approving cost allocation plans or

indirect cost proposals on behalf of all Federal agencies.  The negotiations result in a written

agreement establishing the negotiated indirect cost rate. This agreement is often called a

Negotiated Indirect Cost Rate Agreement (NICRA). An authorized representative for both the

cognizant agency and the IHE signs the NICRA.

5.      Further, IHEs identify their negotiated indirect cost rate(s) and the indirect costs for the award when they submit their application under the NOFO (SF 424) and the associated budget information (SF 424A). IHEs submit their NICRA to support the indirect cost rate(s) included in their application and budget, and it is by default used by the DOE Contracting Officer in reviewing the application to justify the IHE-submitted budget.

6.      Applications submitted in response to a NOFO are reviewed and assessed by authorized representatives from the relevant DOE office. When the DOE office selects an applicant, it notifies the applicant and requests that it enter into negotiations for a final award. The DOE office negotiates final award terms with the applicant and prepares the award documents.

7.      Once all terms and conditions are commemorated in final award documents, an authorized representative for both the selected applicant and the awarding DOE office executes the final award documents, which typically include a financial assistance agreement, terms and conditions of the award, and other items attached and incorporated by reference.

8.      Attached as Exhibit A is a true and correct copy of the NICRA provided by Washington University in St. Louis in association with Award No. DE-FE0032481. This document was attached to my prior declaration executed April 22, 2025, and is an example of a NICRA executed by HHS. Upon information and belief, Washington University in St. Louis is a member of Plaintiff Association of American Universities.

9.      Attached as Exhibit B is a true and correct copy of the NICRA provided by University of Wisconsin-Madison associated with Award No. DE-NE0009488. This is an example of a NICRA executed by HHS. Upon information and belief, the University of Wisconsin-Madison is a member of Plaintiff Association of American Universities.

10.     Attached as Exhibit C is a true and correct copy of the NICRA provided by Plaintiff Massachusetts Institute of Technology in association with Award No. DE-NE0009506. This is an example of a NICRA executed by DOD.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 2nd day of May, 2025 at Washington, DC.

BERTA
SCHREIBER
Digitally signed by
BERTA SCHREIBER
Date: 2025.05.02
16:59:18 -04'00'

Berta Schreiber

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1396006492A1

ORGANIZATION:

University of Wisconsin – Madison

21 North Park Street

Suite 6401

Madison, WI 53715

Date: 11/21/2023

FILING REF.: The preceding agreement was dated

06/23/2022

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

---

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED    FINAL    PROV. (PROVISIONAL)      PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| PRED. | 07/01/2023 | 06/30/2026 | 55.50 | On Campus | Organized Research |
| PRED. | 07/01/2023 | 06/30/2026 | 53.00 | On Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2026 | 38.00 | On Campus | Public Service |
| PRED. | 07/01/2023 | 06/30/2026 | 38.50 | On Campus | Primate Ctr Core Grant (1) |
| PRED. | 07/01/2023 | 06/30/2026 | 26.00 | Off Campus | All Programs |
| PROV. | 07/01/2026 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2026 |

*BASE

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

(1) Wisconsin National Primate Research Center – See Section II – Special Remarks

---

ORGANIZATION: University of Wisconsin – Madison
AGREEMENT DATE: 11/21/2023

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2023 | 6/30/2024 | 36.50 | All | (1) |
| FIXED | 1/1/2023 | 6/30/2024 | 37.80 | All | (2) |
| FIXED | 7/1/2023 | 6/30/2024 | 22.50 | All | (3) |
| FIXED | 7/1/2023 | 6/30/2024 | 19.80 | All | (4) |
| FIXED | 7/1/2023 | 6/30/2024 | 16.40 | All | (5) |
| FIXED | 7/1/2023 | 6/30/2024 | 4.80 | All | (6) |
| FIXED | 7/1/2023 | 6/30/2024 | 6.80 | All | (7) |
| FIXED | 7/1/2023 | 6/30/2024 | 1.50 | All | (8) |
| FIXED | 7/1/2024 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2024. |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages of faculty and staff including vacation, holiday and sick leave pay and other paid absences of only the faculty and staff. Rate does not apply to student employees, research or teaching assistants.

(1) Regular Faculty and Academic Staff
(2) University Staff
(3) Research Assistants, Project Assistants, Teaching Assistants, Pre-Doc Fellows and/or Trainees
(4) Research Associates and Grad Interns
(5) Post-Doc Fellows and/or Trainees
(6) Limited Term Employees (LTE's)
(7) Ad Hoc Program Specialists, Undergraduate Assistants and Undergraduate Interns
(8) Student Hourly Employees

7/1/2020–6/30/2021
Fringe Benefit rates are only for the UW-Madison campus. Beginning with the fixed rate for FY 2021, UW-Milwaukee submitted it own Fringe Benefit rates.

**JA387**

U27201

ORGANIZATION: University of Wisconsin – Madison
AGREEMENT DATE: 11/21/2023

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

OFF–CAMPUS DEFINITION: The off–campus rate will apply for all activities: a) Performed in facilities not owned by the institution and where these facility costs are not included in the F&A pools; or b) Where rent is directly allocated/charged to the project(s). Grants or contracts will not be subject to more than one F&A cost rate. If more than 50% of a project is performed off–campus, the off–campus rate will apply to the entire project.

ORGANIZATION: University of Wisconsin – Madison
AGREEMENT DATE: 11/21/2023

FRINGE BENEFITS:

FICA
Retirement
Disability Insurance
Worker's Compensation
Life Insurance
Unemployment Insurance
Health Insurance
Severance Allowance
ERA Administration
Income Continuation Insurance

Primate Center Rates:

The Wisconsin National Primate Research Center (WNPRC) has two federally recognized rates. The Office of Research Infrastructure Programs (ORIP) Core Grant rate (A-Rate) and the Non-Core Federal Rate which is the sum of the A-Rate and the WNPRC specific F&A Expenses (B-Rate).

Fiscal Year A-Rate B-Rate Total (Non-Core Federal Rate)
2020 38.0% 17.0% 55.0%
2021 38.0% 17.0% 55.0%
2022 38.5% 17.0% 55.5%
2023 38.5% 17.0% 55.5%
2024 38.0% 17.0% 55.0%
2025 38.5% 17.0% 55.5%
2026 38.5% 17.0% 55.5%

This rate agreement updates both F&A rates and Fringe benefit rates.

The next fringe benefit proposal based on actual costs for the fiscal year ending 06/30/2023 is due in our office by 12/31/2023.

The next F&A proposal based on actual costs for the fiscal year ending 06/30/2025 is due in our office by 12/31/2025.

Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds $5,000.

**JA389**

ORGANIZATION: University of Wisconsin – Madison
AGREEMENT DATE: 11/21/2023

# SECTION III: GENERAL

A.   <u>LIMITATIONS:</u>

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its facilities and administrative cost pools as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as facilities and administrative costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.   <u>ACCOUNTING CHANGES:</u>

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from facilities and administrative to direct. Failure to obtain approval may result in cost disallowances.

C.   <u>FIXED RATES:</u>

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.   <u>USE BY OTHER FEDERAL AGENCIES:</u>

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.   <u>OTHER:</u>

If any Federal contract, grant or other agreement is reimbursing facilities and administrative costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of facilities and administrative costs allocable to these programs.

## BY THE INSTITUTION:

University of Wisconsin – Madison
_____
(INSTITUTION)

*Kim Moreland* (signature)
_____
(SIGNATURE)

  Kim Moreland, Assoc. Vice Chancellor
_____
(NAME)

  for Research Administration
_____
(TITLE)

12-14-23
_____
(DATE)

## ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

Darryl W. Mayes -S
  Digitally signed by Darryl W. Mayes -S
  DN: c=US, o=U.S. Government, ou=HHS, ou=PSC,
  ou=People, 0.9.2342.19200300.100.1.1=2000131669,
  cn=Darryl W. Mayes -S
  Date: 2023.11.22 11:17:11 -05'00'
_____
(SIGNATURE)

for   Arif Karim
_____
(NAME)

Director, Cost Allocation Services
_____
(TITLE)

11/21/2023
_____
(DATE)

HHS REPRESENTATIVE:   Olulola Oluborode
_____
TELEPHONE:   (214) 767–3261
_____



**DEPARTMENT OF THE NAVY**
OFFICE OF NAVAL RESEARCH
875 NORTH RANDOLPH STREET
SUITE 1425
ARLINGTON, VA  22203-1995

IN REPLY REFER TO:

Agreement Date: July 13, 2022

## NEGOTIATION AGREEMENT

INSTITUTION:    **MASSACHUSETTS INSTITUTE OF TECHNOLOGY**
**CAMBRIDGE, MA  02139-4307**

The Facilities and Administrative (F&A) Cost rates contained herein are for use on grants, contracts and/or other agreements issued or awarded to the Massachusetts Institute of Technology by all Federal Agencies of the United States of America, in accordance with the provisions and cost principles mandated by 2 CFR Part 200.  These rates shall be used for forward pricing and billing purposes for the Massachusetts Institute of Technology Fiscal Years 2023 and 2024.  This rate agreement supersedes all previous rate agreements/determinations related to these rates for Fiscal Years 2023 and 2024.

**Section I: RATES - TYPE:  FIXED (FIXED)**

**F&A Rates:**

| TYPE | FROM | TO | RATE | BASE | APPLICABLE TO | LOCATION |
|------|------|------|------|------|---------------|----------|
| Fixed | 7/1/2022 | 6/30/2023 | 59.0% | (a) | Organized Research | On Campus |
| Fixed | 7/1/2022 | 6/30/2023 | 6.2% | (a) | Organized Research | Off Campus |
| Fixed | 7/1/2023 | 6/30/2024 | 59.0% | (a) | Organized Research | On Campus |
| Fixed | 7/1/2023 | 6/30/2024 | 6.2% | (a) | Organized Research | Off Campus |

DISTRIBUTION BASES

(a) Modified Total Direct Cost (MTDC), consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## SECTION II - GENERAL TERMS AND CONDITIONS

A. **LIMITATIONS**:  Use of the rates set forth under Section I is subject to availability of funds and to any other statutory or administrative limitations.  The rates are applicable to a given grant, contract or other agreement only to the extent that funds are available and consistent with any and all limitations of cost clauses or provisions, if any, contained therein.  Acceptance of any or all of the rates agreed to herein is predicated upon the following conditions: (1) that no costs other than those incurred by the institution were included in this indirect cost pool as finally accepted and that such costs are legal obligations of the institution and allowable under governing cost principles; (2) that the same costs that have been treated as indirect costs are not claimed as direct costs; (3) that similar types of costs have been accorded consistent accounting treatment; and (4) that the information provided by the institution which was used as a basis for acceptance of the rates agreed to herein, and expressly relied upon by the Government in negotiating and accepting the said rates is not subsequently found to be materially incomplete or inaccurate.

B. **ACCOUNTING CHANGES**:  The rates contained in Section I of this agreement are based on the accounting system in effect at the time the agreement was negotiated.  Changes to the method(s) of accounting for costs, which affect the amount of reimbursement resulting from the use of these rates require the prior written approval of the authorized representative of the cognizant agency for indirect costs.  Such changes include but are not limited to changes in the charging of a particular type of cost from indirect to direct.  Failure to obtain such approval may result in subsequent cost disallowances.

C. **FIXED RATES WITH CARRY-FORWARD PROVISIONS**:  The fixed rates contained in this agreement are based on estimates of the costs for FYs 2023 and 2024. When actual costs for this fiscal year are determined, adjustments will be applied to a rate negotiation for a subsequent fiscal year to recognize the difference between the FYs 2023 and 2024 estimated costs used to establish the fixed rates and the negotiated actual FYs 2023 and 2024 costs.

D. **CARRY FORWARD AMOUNTS**:  The following FY 2019-2020 final and FY 2021 estimated carry-forward amounts were included in the establishment of the FY 2023 and 2024 rates:

( ) indicates over-recovery

|  | **On-Campus** | **Off -Campus** |
|---|---|---|
| **FY 2023 Rates** | | |
| FY 2019 Final | ($202,000) | ($5,000) |
| FY 2020 Final | $3,892,000 | $750,000 |
| FY 2021 Estimated | $9,700,000 | $2,088,000 |
| | | |
| **FY 2024 Rates** | | |
| FY 2020 Final | $3,893,000 | $749,000 |
| FY 2021 Estimated | $13,386,000 | $2,088,000 |

E. **USE BY OTHER FEDERAL AGENCIES**: The rates set forth in Section I are negotiated in accordance with and under the authority set forth in 2 CFR Part 200. Accordingly, such rates shall be applied to the extent provided in such regulations to grants, contracts, and other agreements to which 2 CFR Part 200 applies, subject to any limitations in part A of this section. Copies of this document may be provided by either party to other federal agencies to provide such agencies with documentary notice of this agreement and its terms and conditions.

F. **DFARS WAIVER**: Signature of this agreement by the authorized representative of the Massachusetts Institute of Technology and the Government acknowledges and affirms the University's request to waive the prohibition contained in DFARS 231.303(1) and the Government's exercise of its discretion contained in DFARS 231.303(2) to waive the prohibition in DFARS 231.303(1). The waiver request by the Massachusetts Institute of Technology is made to simplify the University's overall management of DoD cost reimbursements under DoD contracts.

G. **SPECIAL REMARKS**:

1. Off Campus rates are used when the preponderance of effort is performed at Lincoln Laboratory, Haystack Observatory or other off-site locations.

2. The Government's agreement with the rates set forth in Section I is not an acceptance of the Massachusetts Institute of Technology's accounting practices or methodologies. Any reliance by the Government on cost data or methodologies submitted by the Massachusetts Institute of Technology is on a non-precedence-setting basis and does not imply Government acceptance.

Accepted:

FOR MASSACHUSETTS INSTITUTE
OF TECHNOLOGY:

Maria T. Zuber
Vice President for Research

07/14/2022
Date

FOR THE U.S. GOVERNMENT:

WOOD.LINDA.MORGAN.1514688946
Digitally signed by WOOD.LINDA.MORGAN.1514688946
Date: 2022.07.18 08:41:23 -04'00'

Linda Morgan Wood
Contracting Officer

7/18/22
Date

*For information concerning this agreement contact:*
Linda Morgan Wood
Office of Naval Research

Phone: (571) 416-9016
E-mail: linda.m.wood31.civ@us.navy.mil

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-10912-ADB |
| DEPARTMENT OF ENERGY et al., | * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs Association of American Universities ("AAU"), Association of Public and

Land-Grant Universities ("APLU"), American Council on Education ("ACE," and, with AAU

and APLU, the "Organizational Plaintiffs"), and several public and private universities (together

with the Organizational Plaintiffs, "Plaintiffs") seek a preliminary injunction halting

implementation of a Department of Energy ("DOE" or "the Department") "Policy Flash," which

sets a universal cap on indirect funding costs for Institutes of Higher Education ("IHEs") (the

"Rate Cap Policy" or the "Policy Flash").  Plaintiffs allege that the Rate Cap Policy is arbitrary

and capricious, impermissibly retroactive, and contrary to governing law.  For the foregoing

reasons, the Plaintiffs' motion for a preliminary injunction is **GRANTED**.

I.        **BACKGROUND**

A.        **Factual Background**

1.        DOE Funding for Indirect Costs

The federal government awards billions of dollars each year to universities to support research that can effectively further the DOE's goals.  [Compl. ¶ 27].  In fact, the majority of DOE-funded research occurs at outside institutions—and, as relevant here, IHEs—which allows the DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.  [Id. ¶ 29].  During fiscal year 2023, the DOE awarded more than $2.6 billion to nearly 400 different universities.  [Id.].  As such, at any given time, many individual research universities are likely depending on DOE grants to support independent research projects across multiple departments and research centers.  [Id. ¶ 30].  This DOE-funded research at universities has made the United States a world leader in science, resulting in innumerable scientific breakthroughs, all to the benefit of the United States and the rest of the world, as evidenced by the fact that dozens of DOE-supported scientists have earned Nobel Prizes for their groundbreaking work.  [Id. ¶¶ 27, 28].

Universities and other grant recipients generally do not receive lump-sum grants from the DOE.  [Compl. ¶ 34].  Rather, they use cost-based accounting systems whereby the universities first incur expenses and then recover their actual, documented direct and indirect costs for conducting their research.  [Id. ¶¶ 34, 35].  "Direct costs" are those costs which can be readily attributed to a specific research project; for example, the salary of a graduate student assigned to a particular research project or the cost of a specialized piece of equipment purchased for a particular research project.  [Id.].  "Indirect costs," on the other hand, are costs that are necessary

for research but support multiple research projects, making them more difficult to trace back to a specific project. [Id. ¶ 36].

Indirect costs are comprised of "facilities" and "administration" costs (and are often referred to as "F&A costs"). [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))]; see also 2 C.F.R. § 200.1 (noting that, for IHEs, the term "facilities and administrative (F&A) cost is often used to refer to indirect costs"). The "facilities" costs are "defined as depreciation on buildings, equipment, and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses." [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))]. This category includes the costs of the physical infrastructure necessary for carrying out research, such as the construction and maintenance of buildings, including specialized facilities and laboratories. [Id.]. These costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects. [Id.]. The "administration" costs are defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" [Id. ¶ 38 (quoting 2 C.F.R. § 200.414(a))]. This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security, technical staff, and many others. [Id.]. These are indirect costs because a single employee or group of employees will typically handle these necessary administrative activities across multiple DOE grants. [Id.]. Because of caps on administrative costs, universities often contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants in what can be characterized as a mutually beneficial partnership. [Id.].

The computation and determination of indirect costs are subject to extensive regulation, discussed further infra, and then fixed for a specific period of time in recognition of the institutions' needs for predictability and to allow proper planning. [Compl. ¶¶ 39–50]. The regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs, with the purpose of ensuring that indirect costs are allocated fairly across supported projects. [Id. ¶ 39]. Resource-intensive research projects are typically the most expensive and are allocated a larger share of indirect costs. [Id.]. Plaintiffs provide a simplified example: Suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing costs and the other with $25,000—and that the laboratory's sole indirect cost is electricity, which costs $10,000 per year. [Id.]. Because the cost of electricity is 10 percent of the overhead-bearing direct costs (or, $100,000), the indirect cost rate would be 10 percent. [Id.]. Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 would be allocated to the second project. [Id.].

Because different institutions conduct different types of research, negotiated rates vary significantly from institution to institution. [Compl. ¶ 48]. Certain facilities, like specialized laboratories, and certain types of research are more expensive than others. [Id.]. As such, institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research, such as state of the art nuclear and energy research. [Id. ¶ 49]. Many Plaintiffs in this action have indirect cost rates exceeding 50 or 60 percent. See, e.g., [ECF No. 2-1 at ¶ 11 ("Many of the AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15 percent, often in the 50-to-60-percent range.")]; [ECF No. 2-4 ¶ 13 (Cornell University has a negotiated indirect cost rate of 64

percent)]; [ECF No. 2-5 ¶ 12 (University of Illinois Urbana-Champaign has a negotiated indirect cost rate of 58.6 percent)]; [ECF No. 2-6 ¶ 10 (MIT has a negotiated indirect cost rate of 59 percent)]; [ECF No. 2-7 ¶ 11 (University of Michigan has a negotiated indirect cost rate of 56 percent)].

2. Regulatory Framework

DOE grants to IHEs are, and have long been, issued pursuant to an elaborate, well-established legislative and regulatory framework that facilitates long range planning by maintaining predictability in funding levels.  [Compl. ¶¶ 3–4, 8, 31].  Congress has authorized the DOE to provide grants under various statutes, and it has further permitted agencies to set indirect cost rates in connection with such grants.  [Id. ¶ 31(citing 41 U.S.C. § 4708)]; see also [id. ¶ 36 (explaining that, in 1962, Congress authorized the use of "predetermined fixed-percentage rates" for "payment of reimbursable indirect costs" attributable to research agreements with educational institutions)].  Congress also instructed the Office of Management and Budget ("OMB") to issue general guidance on fiscal administration issues.  [Compl. ¶ 31 (citing 31 U.S.C. § 503(a), (b)(2)(C))].  Pursuant to statutory authority, OMB has in turn established uniform guidance for agencies to administer grants under the agencies' purview, [id. (citing 2 C.F.R. pt. 200)], which the DOE has adopted into its own regulations, [id. (citing 2 C.F.R. § 910.120)].

These regulations prescribe a detailed and well-settled methodology for negotiating indirect cost rates with IHEs, [Compl. ¶ 40], and establish that "negotiation of predetermined rates for indirect (F&A) costs for a period of two to four years should be the norm,"  2 C.F.R. pt. 200, app. III(C)(4).  The process begins when a single agency (the "cognizant agency") negotiates an indirect cost rate with an institution.  Id. at app. III(C)(11).  For IHEs, rates are

generally negotiated by either the Department of Health and Human Services ("HHS") or the

Department of Defense's Office of Naval Research ("DOD"). [Compl. ¶ 3 (citing 2 C.F.R. pt.

200, app. III(C)(11)(a)(1))]. To facilitate these negotiations, the institutions are required to

conduct and then submit to their federal agency comprehensive cost analyses that follow detailed

federal cost accounting guidelines governing reasonable and allowable indirect costs. [Id. ¶ 41].

For example, an institution which seeks to recover the cost of building maintenance must

document and allocate the maintenance costs across research and non-research programs. [Id.].

The federal agency then reviews and verifies these proposals and determines the institution's

indirect cost rate, which reflects actual, verified costs incurred by the institution. [Id. ¶ 42].

After costs are incurred, federal agencies audit institutions to ensure that the negotiated indirect

cost rate approximates to the actual indirect costs that were incurred, with the understanding that

the rate can be adjusted if the audit establishes that it does not. [Id. ¶ 44].

Once negotiated with the cognizant agency, the final negotiated indirect cost rate is

memorialized in writing, in a document commonly referred to as a "Negotiated Indirect Cost

Rate Agreement," or "NICRA." [ECF No. 60 ¶ 4]; see also [ECF No. 2-16 ¶ 11 (explaining

University of Wisconsin-Madison "has a Negotiated Indirect Cost Rate Agreement ('NICRA')

with DHHS, covering all federal agencies"); [ECF No. 2-8 ¶ 10 (same regarding Michigan State

University)]. An authorized representative for both the cognizant agency and the individual IHE

signs the NICRA. [ECF No. 60 ¶ 4]. The NICRA is then used for all of an IHE's grants across

the entire federal government during the period that the negotiated rate is in effect, which is

typically at least one year, although in some cases that rate can remain in effect for up to four

years. [Compl. ¶¶ 41, 43].

As such, when the DOE issues a Notice of Funding Opportunity ("NOFO"), which is what begins the DOE's competitive grantmaking process, an IHE applying for that funding will submit its NICRA as part of the application process.  [ECF No. 60 ¶ 5]; see also [Compl. ¶ 32 (citing 2 C.F.R. § 200.204)].  After a formal review process that includes peer review, the DOE issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested from the agency.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(b)(7))]; [ECF No. 60 ¶¶ 5–6.  A NOA is issued for the initial budget period and then each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(c)(1)(iv))].

The negotiated indirect cost rate, memorialized in the NICRA, "must be accepted by all federal agencies" granting awards unless certain exceptions apply.  As relevant here, Section (c)(1) establishes the conditions under which the awarding agency is permitted use a different rate.  2 C.F.R. § 200.414(c)(1) ("Section (c)"); see also [Compl. ¶¶ 3, 8].  Specifically, Section (c)(1) provides that the awarding agency "may use a different rate" from the NICRA "for either a class of Federal awards or a single Federal award" when "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]."  2 C.F.R. § 200.414(c)(1).  A "class of Federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply."  2 C.F.R. § 200.1.  Section (c)(3), in turn, requires that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  2 C.F.R. § 200.414(c)(3).  Section (c)(2) requires the agency to notify OMB of any approved deviations, and Section (c)(4) requires the agency to include the

policies relating to indirect cost rate reimbursement in the notice of funding opportunity.  2 C.F.R. §§ 200.414(c)(2), (4).

3.  Rate Cap Policy

On Friday, April 11, 2025, the DOE issued the Rate Cap Policy, titled "Adjusting Department of Energy Grant Policy for Institutes of Higher Education (IHE)."  [Compl. ¶ 60]; see also [ECF No. 2 at 2–3].  The Rate Cap Policy announced that "hereinafter, the Department will no longer use the negotiated indirect cost rate for grants awarded to IHEs.  Instead, it is setting a standardized 15 percent indirect cost rate for all grant awards to IHEs."  [ECF No. 2 at 3].  The Rate Cap Policy further provides that "[a]ll future Department grant awards to IHEs will default to this 15 percent indirect cost rate" and that "the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy."  [Id.].

The Rate Cap Policy purports to justify this sweeping change by stating 1) "[t]his system will better balance the Department's twin aims of funding meaningful research and upholding its fiduciary duties to the American people," and 2) "[t]o improve efficiency and curtail costs where appropriate, the Department seeks to better balance the financial needs of grant recipients with the Department's obligation to responsibly manage federal funds."  [ECF No. 2 at 3].  By its terms, the Rate Cap Policy applies this supposedly necessary limit on indirect cost rates "only with respect to" IHEs, and not to other recipients of DOE grants.  [Id. at 2].

Since the Rate Cap Policy was issued, at least one IHE, Cornell, has received a letter conditionally terminating its awards "in accordance with" the new policy.  [ECF No. 33-1].  Specifically, the letter stated that "[p]ursuant to the Department's policy memorandum dated April 11, 2025 . . . the Department has undertaken a review of all Department grant awards to ensure that the awards comply with this updated Department policy," and that "[d]uring this

review, the Department determined that [certain Cornell] grants . . . are not currently in compliance with the policy memorandum." [Id. at 8]. The letter further advised that Cornell could "avoid termination of these awards" by agreeing to "an updated indirect cost rate of 15 percent." [Id.]. Another IHE, Arizona State University, received an email regarding an invoice previously submitted for a DOE funded project, which stated that "[d]ue to the Policy Flash from DOE, and the pending process changes, currently invoices from IHEs are not being processed . . . The option we have at this time is for the invoice to be submitted without any indirect charges and we can pay the direct costs." [ECF No. 53-1 at 7].

### 4.    Prior Attempts to Limit Indirect Cost Funding

This is not the government's—or even this administration's—first attempt to limit indirect funding costs. [Compl. ¶¶ 5, 6]. In 2017, the then-administration released a budget proposal that would have slashed indirect cost rates for the National Institutes of Health ("NIH") to 10 percent. [Id. ¶ 51]. The proposal was met with "widespread criticism and alarm," particularly in Congress, which enacted a bipartisan appropriations rider that provided that regulator "provisions relating to indirect costs . . . including with respect to the approval of deviations from negotiated rates[] shall continue to apply to [NIH] to the same extent and in the same manner." [Id. ¶¶ 52–53]. Both the House and Senate Report on the rider identified serious problems with the proposal, observing that it would "radically change the nature of the Federal Government's relationship with the research community" by altering a methodology for indirect rates that "has been in place since 1965," and concluded that the proposal was "misguided and would have a devastating impact on biomedical research across the country." [Id. ¶ 5 (first citing S. Rep. No. 115-150, at 109 (2017); and then citing H.R. Rep. No. 115-244, at 50 (2017))]. The rider that was subsequently enacted has been repeatedly reenacted ever since. [Id. ¶ 55].

**JA402**

Despite Congress' evidenced commitment to the grant funding regime, in February 2025, the current administration tried again, with NIH issuing a notice that stated that it was "imposing a standard indirect cost rate on all grants of 15%" for all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.  [Compl. ¶¶ 6, 57 (quoting NIH, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (or, the "NIH Rate Change Notice"), NOT-OD-25-068 (Feb. 7, 2025))].  Shortly thereafter, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in the present action—filed complaints and motions for temporary restraining orders, arguing that the NIH Rate Change Notice was unlawful under the Administrative Procedure Act ("APA").  [Id. ¶ 58].

Another session of this Court found that the serious consequences of the NIH Rate Change Notice warranted issuance of a nationwide temporary restraining order to maintain the status quo until the matter could be fully addressed, following which the Court also issued a nationwide preliminary injunction.  [Compl. ¶ 59]; see also Massachusetts v. Nat'l Insts. of Health, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), judgment entered, No. 25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ("NIH").  The Court found that the administration had not only flouted the appropriations rider that Congress had enacted in the wake of the 2017 NIH episode but also that it had violated the government-wide regulations governing indirect cost rates and the reasoned decision-making requirements of the APA. [Compl ¶ 6].

## B.    Procedural History

On April 14, 2025, Plaintiffs filed their Complaint seeking declaratory and injunctive relief.  See [Compl.].  They also filed a motion for a temporary restraining order ("TRO"), [ECF

No. 3], which the Court granted on April 16, 2025, [ECF No. 34].  Defendants submitted an

opposition on April 22, 2025, [ECF No. 47], and Plaintiffs filed a further reply in support of their

motion on April 25, 2025, [ECF No. 53].

 The Court held a hearing on the motion for injunctive relief on April 28, 2025, at which

time it took the motion for injunctive relief under advisement.  [ECF No. 54].

## II. DISTRICT COURT JURISDICTION

 As a threshold matter, Defendants assert that this Court lacks subject matter jurisdiction

over Plaintiffs' claims because the waiver of sovereign immunity in the APA, 5 U.S.C. § 702,

does not extend to actions of contract, which are within the exclusive jurisdiction of the Court of

Federal Claims under the Tucker Act, 28 U.S.C. § 1491.  [ECF No. 47 at 6–8].  Plaintiffs, who

contend they have brought a proper challenge under the APA, disagree that the Tucker Act

divests this Court of jurisdiction.  [ECF No. 19 at 24–29]; [ECF No. 53 at 7–10].

 The APA "confers a general cause of action upon persons 'adversely affected or

aggrieved by agency action within the meaning of a relevant statute.'"  Block v. Cmty. Nutrition

Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702).  The APA's waiver of sovereign

immunity, however, "does not apply 'if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought.'"  Dep't of Educ. v. California, 145 S. Ct. 966, 968

(2025) (quoting 5 U.S.C. § 702).  One such statute, the Tucker Act, vests jurisdiction in the

United States Court of Federal Claims with respect to "any claim against the United States

founded either upon the Constitution, or any Act of Congress or any regulation of an executive

department, or upon any express or implied contract with the United States, or for liquidated or

unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Although "[t]he

'jurisdictional boundary' between the Tucker Act and [APA] is well-traversed by litigants

seeking relief against the federal government,. . . the boundary's precise contours remain

elusive." NIH, 2025 WL 702163, at *5 (quoting Suburban Mortg. Assocs., Inc. v. U.S. Dep't of

Hous. & Urb. Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007)).

Both parties focus their dispute on a recent per curium decision from the United States

Supreme Court, Department of Education v. California ("California"), which granted a stay of a

temporary restraining order issued by another session of this Court pending appeal of that order.

That suit arose after the Department of Education sent termination letters to almost all awardees

of Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED)

grants on the grounds that "[t]he grant[s were] . . . inconsistent with, and no longer effectuate[d],

Department priorities." California v. U.S. Dep't of Educ., No. 25-cv-10548, 2025 WL 760825,

at *3 (D. Mass. Mar. 10, 2025). Plaintiffs sought an injunction preventing the Department of

Education from implementing the grant terminations, asserting that the terminations were

arbitrary and capricious and not in accordance with governing law proscribing methods by which

agencies can terminate grants. Id. at *2.

The district court granted the application for a temporary restraining order, finding that

the terminations were arbitrary and capricious under the APA. California v. U.S. Dep't of Educ.,

2025 WL 760825, at *3. In so doing, the district court, accepting NIH's position, held that the

action did not fall within the Court of Federal Claims' jurisdiction under the Tucker Act because

"the 'essence' of the action was not contractual in nature since the source of the plaintiffs' rights

was in federal statute and regulations and because the relief was injunctive in nature." Id. at *1

(quoting NIH, 2025 WL 702163, at *8). Defendants moved for a stay pending appeal, and the

First Circuit denied the stay and affirmed the district court on the jurisdictional issue, reasoning

that "if the Department breached any contract, it did so by violating the APA. And if the

Department did not violate the APA, then it breached no contract." California v. U.S. Dep't of Educ., 132 F.4th 92, 97 (1st Cir. 2025).

Defendants in California then petitioned the Supreme Court for emergency relief. A per curium panel of the court granted the stay, finding that "the District Court's 'basis for issuing the order [is] strongly challenged,' as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." California, 145 S. Ct. at 968 (alteration in original) (quoting Sampson v. Murray, 415 U.S. 61, 87 (1974)). The analysis that followed was brief, providing in full:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." Ibid. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. Bowen v. Massachusetts, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Id. Defendants in this action contend that this language from California is dispositive as to this Court's jurisdiction, contending it "addressed [the jurisdictional] issue in the same context in which Plaintiffs' claims arise, i.e., grant awards" and thus forecloses "Plaintiffs['] attempt to shoehorn their claims into the APA by styling their complaint as one for injunctive relief ." [ECF No. 47 at 7–8].

Although mindful of the fact that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991), this Court is hesitant to conclude that California requires it to cede jurisdiction to the Federal Court of Claims simply because both cases involve federal grant

funding and bear a superficial resemblance to one another.  It is true that an injunction in each

action would have the effect of requiring the government to continue to pay money pursuant to

certain grant agreements.  That said, on a closer look, the two actions are far from identical

twins.  For example, contrary to the facts here, the California plaintiffs asserted violations of

governing law rooted in regulations about terminating rather than awarding grants.  Thus, the

"source of the right[]" to the grant was, in California, arguably, the grant agreements, and the

relief contemplated was the money owed under those grants, making the case more akin to a

contract action.  Widakuswara v. Lake, No. 25-cv-1015, 2025 WL 1166400, at *9 (D.D.C. Apr.

22, 2025) (quoting Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 38 F.4th 1099, 1106 (D.C.

Cir. 2022).  Additionally, the plaintiffs in California sued to enjoin terminations on already

awarded grants; they did not sue to enjoin any action as to future, unawarded grants.

        By contrast to the paucity of relevant regulations in California, as discussed supra, a vast

regulatory structure protects Plaintiffs' right to rely on negotiated indirect cost rates with regards

to current and future grants.  Although the negotiated rates are ultimately incorporated into

written agreements and awards, and an injunction here may impact payments on current and

future grants, Plaintiffs are not suing to enforce those rates or to collect those costs.  Rather,

Plaintiffs are seeking to protect their right to maintain the memorialized rates absent the DOE

meeting the regulatory requirement for a deviation (as to current awards) and to be able to

negotiate those rates, institution by institution, based on reimbursable costs and subsequent

audits (as to future awards), both of which are rights provided by the regulations, not the

NICRAs themselves, and that are alleged to have been usurped by the Rate Cap Policy.  The

terms and conditions of each individual NICRA (or the terms of any existing grants) are not at

issue, as the DOE's Rate Cap Policy "was not based on individualized assessments of any

particular grant terms or conditions or agreements." New York v. Trump, No. 25-cv-00039,

2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025). Rather, the issue is whether the "broad,

categorical" policy itself runs afoul of the APA, warranting forward-looking injunctive relief. Id.

It may well be that these distinctions would not differentiate this case from California in

the eyes of the Supreme Court, but this Court cannot read those tea leaves. The brief analysis

within the California stay order lacks guideposts as to which facts the Supreme Court viewed as

distinguishing that case from the longstanding precedent it cited for the proposition that "a

district court's jurisdiction 'is not barred by the possibility' that an order setting aside an

agency's action may result in the disbursement of funds." California, 145 S. Ct. at 968 (citing

Bowen, 487 U.S. at 910); see also Woonasquatucket River Watershed Council v. U.S. Dep't of

Agric., No. 25-cv-00097, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) ("The Supreme

Court's brief treatment of Bowen and Great-West Life in California and the cursory mention of

potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite the

Government's arguments to the contrary."). In light of well-settled precedent and practice, as

well as the many facts that distinguish this case from California, the Court declines, on this

record, to adopt a categorical rule that would see all federal grant funding disputes go to the

Court of Claims. Rather, this Court returns to first principles and asks "[w]hether [the

Plaintiffs'] claim is 'at its essence' contractual," which "'depends both on the source of the rights

upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate),'"

and determines that it is not. Crowley, 38 F.4th at 1106 (quoting Megapulse, Inc. v. Lewis, 672

F.2d 959, 968 (D.C. Cir. 1982)).

The Court agrees with the well-reasoned opinion of a sister session of this court in NIH

and, for the reasons articulated supra, finds that "the gravamen of Plaintiffs' Complaint[] does

**JA408**

not turn on terms of a contract between the parties[, but rather] on federal statute and regulations put in place by Congress and [DOE].” NIH, 2025 WL 702163, at *6.  “While it is true that the Notice of Award operates as a contract, the claims in this case turn on how the regulations govern the provision of these awards”—a fact which “is further underscored by the [Rate Cap Policy’s] impact not just on current grants, but future ones as well.”  Id.  Moreover “Plaintiffs do not bring claims for past pecuniary harms.  Rather, like the petitioners in Bowen, their claims are to preserve their ongoing and prospective agreements with” the DOE and, as discussed further infra, to avoid various irreparable harms unrelated to any monetary relief.  Id. at *7.

For the forgoing reasons, the Court finds it has jurisdiction pursuant to the APA.[1]

## III.      STANDING

The Constitution gives the judiciary power to hear only “Cases” and “Controversies.” U.S. Const. art. III, § 2, cl. 1.  The Supreme Court has interpreted this requirement to mean that courts may decide only “cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.”  Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 102 (1998).  A plaintiff’s standing to sue is “part of the common understanding of what it takes to make a justiciable case.”  Id.  Therefore, “the absence of standing sounds the death knell for a case.”  Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is “claim-specific,” meaning that an individual plaintiff “must have standing to bring each and every claim that [he or] she asserts.”  Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

---

[1] For the reasons the Court determines this is not an action where jurisdiction lies with the Federal Court of Claims pursuant to the Tucker Act, the Court also disagrees with Defendants’ contention that this is an action seeking to compel the government to specifically perform a contract.  [ECF No. 47 at 10–11.]

Article III standing requires that three conditions be satisfied.  "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'"  Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical."  Whitmore, 495 U.S. at 155 (internal quotations and citations omitted).  Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  Steel Co., 523 U.S. at 103.  Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury."  Id.

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances."  Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  The first two Hunt prongs are constitutional, and the third is prudential.  United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–57 (1996).  Only one member of an organization need have individual standing in order for that organization to satisfy the first Hunt factor.  See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that every member of an association have standing before it can sue on behalf of its members. 'The association must allege that its members, or any

one of them, are suffering immediate or threatened injury as a result of the challenged action of

the sort that would make out a justiciable case had the members themselves brought suit.'"

(emphasis omitted) (quoting Warth, 422 U.S. at 511)).

Defendants contest only the third Hunt prong. Specifically, they contend that, "[a]s

shown by the sheer number of declarations submitted by the Organizational Plaintiffs' member

institutions in an attempt to show irreparable harm, Plaintiffs fail the third requirement:

Individual members must participate to show entitlement to injunctive relief—particularly if this

Court follows the proper practice of limiting any injunction to those institutions that have shown

that the Policy Flash will cause them irreparable harm." [ECF No. 47 at 17]. Plaintiffs respond

that "if that were the law, no associational plaintiff would ever have standing. In fact, injunctive

suits like this one are bread-and-butter association standing cases." [ECF No. 53 at 13].

The Organizational Plaintiffs' argument is ultimately more availing. The injunctive and

declaratory relief Plaintiffs request need not be tailored to or require any individualized proof

from any particular member. See Camel Hair, 799 F.2d at 12 ("Actions for declaratory,

injunctive and other forms of prospective relief have generally been held particularly suited to

group representation."); see also Playboy Enters., 906 F.2d at 35 ("[J]ust because a claim may

require proof specific to individual members of an association does not mean the members are

required to participate as parties in the lawsuit." (emphasis omitted)). "The nub of the

[P]laintiff[s'] claim," that the Rate Cap Policy violates the APA, depends on the text of that

policy and the underlying regulatory structure, "not on evidence that differs from member to

member." Camel Hair, 799 F.2d at 12. "In addition, the relief sought, that the [Rate Cap Policy]

be enjoined, will affect all members in the same way . . . [a]nd [D]efendants have adduced no

reason to suggest that the [Organizational Plaintiffs] cannot adequately represent [their]

members' interests." Id.  As Defendants do not challenge the other Hunt factors, and because the

Court finds that, in any event, they are satisfied, the Organizational Plaintiffs have standing.

## IV.     PRELIMINARY INJUCTION LEGAL STANDARD

When deciding whether to grant a motion for preliminary injunction, courts must

consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii)

whether and to what extent the movant will suffer irreparable harm if the injunction is withheld;

(iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction

(or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731

F.3d 6, 9 (1st Cir. 2013).  The First Circuit has held that these four factors "are not entitled to

equal weight in the decisional calculus." Id.  Rather, the movant's likelihood of success on the

merits "is the main bearing wall of the four-factor framework." Id. at 10 (citation omitted).

"[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015)

(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their]

quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm

Wireless Servs., 287 F.3d at 9).  Likewise, the balance of hardships and public interest factors

"merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435

(2009).  As the moving party, Plaintiffs bear the burden of satisfying each of these four elements.

See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

Preliminary injunctions function to "preserve the relative positions of the parties until a

trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  As a

result, "findings of fact and conclusions of law made by a court granting a preliminary injunction

are not binding at trial on the merits." Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir. 1968)). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).

## V.    DISCUSSION

### A.    Likelihood of Success on the Merits

Plaintiffs contend that Defendants committed substantive violations of the APA by taking agency action that is (1) not in accordance with the governing law, (2) arbitrary and capricious, and (3) impermissibly retroactive.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As a general matter, judicial review of an APA claim is "narrow" as the "APA standard affords great deference to agency decisionmaking . . . because the [agency's] action is presumed valid." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

#### 1.    Final Agency Action

As discussed infra, the APA entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to judicial review. 5 U.S.C. § 702. Such review, however, is limited to final agency actions unless otherwise specified by statute. See id. § 704.

An agency action is final if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or

interlocutory nature," and, second, it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 117 (1st Cir. 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

Defendants contend that the Rate Cap Policy "is not a final agency action subject to judicial review under the APA because it does not have a legal effect or consequence." [ECF No. 47 at 12]. Rather, they contend that "[i]t is a mechanism for communicating financial assistance-related information [which] does not itself have the force or effect of law or direct any impact on any existing grant award." [Id.]. They further assert that the Rate Cap Policy itself "removes any doubt on this score: It closes by promising that '[a]dditional information is forthcoming'—making clear that the formal policy marking the end of the agency's decisionmaking process and carrying concrete consequences has not yet arrived." [Id. (alteration in original) (quoting Rate Cap Policy)].

Plaintiffs counter that, as to the first Bennett factor, the text of the Rate Cap Policy "could not be clearer: It says '[f]or the reasons set forth [here], hereinafter, [DOE] will no longer use the negotiated indirect cost rate,'" then establishes a standardized 15 percent rate, and says that the accompanying memorandum "sets forth the Department's policies, procedures, and general decision-making criteria" regarding the change. [ECF No. 53 at 10]. To the extent it promises that "additional information is forthcoming," Plaintiffs contend that this simply "promises more information about a decision already made." [Id. at 10].

As to the second prong, Plaintiffs assert that "the Policy's consequences are, in fact, quite clear," as evidenced by "the conditional termination letters DOE rushed out ahead of this Court's TRO ruling" that state that "they were issued 'pursuant to the [Rate Cap] Policy,'" [id. at 11 (quoting ECF No. 33-1 at 8, 10)], as well as the DOE email to Arizona State University communicating that "[d]ue to the Policy Flash from DOE, . . . currently invoices from IHEs are not being processed," [id. (emphasis omitted) (quoting ECF No. 53-1)].

For the purposes of a preliminary injunction, the Court is satisfied that the Rate Cap Policy constitutes final agency action. On the first Bennet prong, the Rate Cap Policy unambiguously states that, for the reasons set forth therein, the DOE "will no longer use the negotiated indirect cost rate for grants awarded to IHEs" and will instead use "a standardized 15 percent indirect cost rate for all grant awards to IHEs." [ECF No. 2 at 3]. This language is not "merely tentative or interlocutory" in nature, Harper, 118 F.4th at 116; rather, it is "mandatory," Union of Concerned Scientists v. Wheeler, 377 F. Supp. 3d 34, 42 (D. Mass. 2019), aff'd in part, rev'd in part and remanded, 954 F.3d 11 (1st Cir. 2020), in that it unequivocally states that the DOE has made a decision and is moving forward with it. Even accepting that IHEs will "receive separate notice and guidance," [ECF No. 2 at 3], there is no suggestion in the text that any such subsequent notice would backtrack on, rather than simply clarify or provide further instructions regarding, the Rate Cap Policy.

With regard to the legal effect, again, the plain text of the Rate Cap Policy communicates that consequences are forthcoming in short order. Specifically, as to current awards, the Rate Cap Policy establishes that the DOE is "undertaking action to terminate all grant awards to IHEs that do not conform with [the update]," [ECF No. 2 at 3], and, as to future awards, it similarly dictates that "[a]ll future [DOE] grant awards to IHEs will default to this 15 percent indirect cost

rate," [id.].  Moreover, if this announcement left any room for doubt as to whether Plaintiffs

would experience any legal effect, the DOE's conduct has removed any such doubt, as it has

begun to send conditional termination letters to IHEs, [ECF No. 33-1], as well as (mistakenly,

given the existence of the TRO at the time of the email) deny invoices based on that Rate Cap

Policy, [ECF No. 53-1].  As such, this Court is satisfied that the decision-making process is

complete, the policy is set, and the result of that process has already or will soon directly affect

the parties.  Brnovich, 630 F. Supp. 3d at 1171.[2]

## 2.   Arbitrary and Capricious

"The task of a court reviewing agency action under the APA's 'arbitrary and capricious'

standard is to determine whether the agency has examined the pertinent evidence, considered the

relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made.'"  Penobscot Air Servs., Ltd. v. FAA,

164 F.3d 713, 719 (1st Cir. 1999) (second-level internal quotation marks omitted) (quoting

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "While

---

[2] Defendants raise a separate challenge regarding the Rate Cap Policy's reviewability under the APA, contending that the "APA precludes judicial review because the DOE's grant funding decisions are 'committed to agency discretion by law.'"  [ECF No. 47 at 14–16 (quoting 5 U.S.C. § 701(a)(2))].  The Court disagrees.  Even assuming that this type of grant funding would be considered an "administrative decision traditionally regarded as committed to agency discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), and the Court is not convinced that it is, the exception is typically limited to those "rare circumstances" where "no meaningful standard" exists by which a reviewing judge could cabin that agency discretion, Dep't of Com. v. New York, 588 U.S. 752, 772 (2019).  Here, "applicable regulations cabin the Department's discretion as to when it can" deviate from negotiated indirect costs, which "create meaningful standards by which to judge the agency's action."  California, 132 F.4th at 97 (cleaned up); see Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations cabined its termination authority).

this is a highly deferential standard of review, it is not a rubber stamp." Id. at 720 (quoting

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)).  The Court "may not

supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting

State Farm, 463 U.S. at 43).

  In the context of a policy change, "the requirement that an agency provide a reasoned

explanation for its action would ordinarily demand that it display awareness that it is changing

position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis omitted).

"An agency may not, for example, depart from a prior policy sub silentio or simply disregard

rules that are still on the books." Id. (citing United States v. Nixon, 418 U.S. 683, 696 (1974)).

That said, agencies are "free to change their existing policies as long as they provide a reasoned

explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)

(citations omitted).  The agency must further "show that there are good reasons for the new

policy," although it need not demonstrate that "the reasons for the new policy are better than the

reasons for the old one." Fox Television Stations, 556 U.S. at 515 (emphasis omitted).  "[I]t

suffices that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency believes it to be better, which the conscious change of course adequately

indicates." Id. (emphasis omitted).

  That said, a "more detailed justification" may be required when 1) the agency's new

position "rests upon factual findings that contradict those which underlay [the] prior" position or

2) when the agency's prior position "has engendered serious reliance interests." Fox Television

Stations, 556 U.S. at 515; see NLRB v. Lily Transp. Corp., 853 F.3d 31, 36 (1st Cir. 2017)

(Souter, J.) ("[A]n about-face . . . owing to facts changed from those underlying the prior view

requires that the new facts be addressed explicitly by reasoned explanation for the change of

direction.").  Further, "when an agency rescinds a prior [position,] its reasoned analysis must

consider the 'alternative[s]' that are 'within the ambit of the existing [position].'"  <u>DHS v.

Regents of the Univ. of Cal.</u>,140 S. Ct. 1891, 1913 (2020) (second alteration in original) (quoting

<u>State Farm</u>, 463 U.S. at 51).

      Regardless of whether the DOE was required to put forth a "more detailed justification"

for the Rate Cap Policy, the Court cannot discern any "reasoned explanation" for the change.

The whole of the purported explanation seems to be:

> While the Department is cognizant that many grant recipients use indirect cost
> payments to effectuate research funded by the Department's grant awards, these
> payments are not for the Department's direct research funding. See 89 Fed. Reg.
> 30046–30093. As these funds are entrusted to the Department by the American
> people, the Department must ensure it is putting them to appropriate use on grant
> programs. To improve efficiency and curtail costs where appropriate, the
> Department seeks to better balance the financial needs of grant recipients with the
> Department's obligation to responsibly manage federal funds.

[ECF No. 2 at 2]; <u>see also</u> [ECF No. 47 at 25–26 (discussing justifications within the Rate Cap

Policy)].  To be sure, this excerpt articulates very reasonable agency goals, namely, to allocate

"funds . . . entrusted to [DOE] by the American people . . . to appropriate use on grant programs"

and [t]o "improve efficiency and curtail costs where appropriate."  [ECF No. 2 at 2].  Statements

of aspirational goals, however, are not the same as reasoned explanations for why an action is

chosen or how the chosen action will effectuate the stated goals.

      Here, the Rate Cap Policy falls short.  It provides no reasoned explanation for how or

why the DOE concluded that indirect cost rates exceeding 15 percent do not constitute an

appropriate or efficient use of DOE funds, nor does it explain how limiting funding for indirect

costs would lead to that money being put to more appropriate and efficient uses.  For instance,

the Rate Cap Policy does not, as Defendants contend, explain that the money spent on indirect

costs will be redirected to direct costs; it simply says that indirect costs are not direct.  [ECF No.

JA418

2 at 2].  That said, even if the DOE had stated an intent to reinvest indirect costs in direct research funding, that explanation would not be particularly well-reasoned, given the amount of support in the record for the notion that Plaintiffs would not be able to accept further direct research funding (or, indeed, even utilize their current direct research funding) absent an indirect cost rate that continues to approximate actual expenditures.  See, e.g., [ECF No. 2-4 at ¶ 18 ("[W]ithout continuing indirect cost reimbursement at Cornell's negotiated rates, Cornell would no longer be able to carry out all of the sponsored activities and properly maintain the facilities and equipment currently in use, jeopardizing the current and future conduct of the DOE-supported projects.")].  Nor does the Rate Cap Policy provide any rationale for concluding that subjecting all IHEs to the 15 percent de minimis rate, typically reserved for IHEs without negotiated rates, is more efficient or appropriate than the current negotiation and audit system. Uniformity is not necessarily efficient or appropriate, particularly when the record is clear that IHEs constitute a sizeable portion of the DOE's budget across distinct institutions, each with unique awards governed by individualized indirect cost rates.  See, e.g., [ECF No. 2-1 ¶ 4 ("Together, [AAU member universities] receive a total of roughly $1.8 billion in DOE research and development expenditures . . . To give a sense of scale: DOE's research and development ('R&D') expenditures nationwide total approximately $2.7 billion, meaning that funding to AAU's members makes up about two-thirds of all such expenditures.")]; [ECF No. 2-5 ¶¶ 4, 12 (University of Illinois Urbana-Champaign's DOE portfolio includes 123 active awards at a 58.6% indirect cost rate)]; [ECF No. [ECF No. 2-18 ¶¶ 3, 11 (University of Nevada, Reno's DOE portfolio includes 48 active awards at a 47% indirect cost rate); [ECF No. 2-19 ¶ 4 (Tufts DOE portfolio has 29 active awards at a 58% indirect cost rate)].

These examples, and there are others, illustrate the overarching problem: Although the DOE need not demonstrate that "the reasons for the new policy are better than the reasons for the old one," Fox Television Stations, 556 U.S. at 515 (emphasis omitted), it must, at base, offer "good reasons for the new policy," Encino, 579 U.S. at 223 (quoting Fox Television Stations, 556 U.S. at 515), not the mere conclusion that the Rate Cap Policy is more efficient or appropriate, Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("At bottom, an agency must explain 'why it chose to do what it did.'" (quoting Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001)). Because the Rate Cap Policy does not offer more than conclusory policy goals, the Court need go no further: Plaintiffs have demonstrated a likelihood of success in demonstrating that the Rate Cap Policy is arbitrary and capricious and therefore runs afoul of the APA. See Encino, 579 U.S. at 224 ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all.").

That said, the Court would be remiss if it did not note that the Rate Cap Policy's lack of reasoned explanation is particularly troubling in light "of decades of industry reliance on [DOE's] prior policy" of accepting individually negotiated indirect cost rates for IHEs. Encino, 579 U.S. at 222 (noting that "[a] summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy— the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position"). The well-established, decades-long relationship between IHEs and the DOE prior to the Rate Cap Policy afforded Plaintiffs several reasonable assumptions about the DOE's position on indirect costs, all of which were consistent with DOE goals of advancing science through cutting edge research in partnership with America's foremost research institutions, including that: 1) "negotiation of predetermined rates for indirect (F&A) costs for a

JA420

period of two to four years should be the norm," 2 C.F.R. pt. 200, app. III(C)(4); 2) the

negotiated indirect cost rate, when finalized with Plaintiffs' cognizant agency, would be based on

"an informed judgment as to the probable level of indirect (F&A) costs during the ensuing

accounting periods," id.; 3) that rate would then, as it "must[,] be accepted by all Federal

agencies," 2 C.F.R. § 200.414(c)(1); and, 4) the agreed-upon rate could only be changed after the

DOE met certain regulatory requirements, id. § 200.414(c)(1)–(4).  Pursuant to these reasonable

expectations, Plaintiffs have, among other things, formulated their overall operating budgets;

staffed departments; accepted undergraduate students, graduate, and post-doctoral candidates;

and built and improved infrastructure to support both current and future research.  See, e.g.,

[ECF No. 2-7 ¶ 14 ("The University of Michigan has for decades relied on the payment of

indirect costs.  And until now, we have been able to rely on the well-established process for

negotiating indirect cost rates with the government to inform our budgeting and planning.

Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for

annual staffing needs (e.g., post-docs, PhD students, and other research staff), infrastructure

support (e.g., IT networks, regulatory compliance, and grant management support), and facility

and equipment purchases.  And in some cases, the University of Michigan has long-term

obligations—for example, long-term equipment maintenance contracts and service agreements,

specialized technical staff positions in facilities supporting DOE research, debt service on

research infrastructure investments and laboratory renovations; and it relies on budgeted grant

funding, including associated indirect cost recovery, to fulfill these commitments.")]; see also

[ECF Nos. 2-5 ¶ 15; 2-8 ¶ 15; 2-9 ¶ 28; 2-10 ¶ 14; 2-11 ¶ 15; 2-12 ¶ 16; 2-13 ¶ 13; 2-16 ¶ 14; 2-

18 ¶ 15].

In the face of this longstanding course of conduct and the reliance it has engendered, the Rate Policy Flash offers only that "the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." [ECF No. 2 at 2]. It then notes that, despite this fact, "these payments are not for the Department's direct research funding." [Id.] This is both obvious and ultimately unhelpful. The distinction between direct and indirect costs has been recognized and embedded in the regulatory structure since OMB undertook to fund research at IHEs. The Rate Cap Policy wholly disregards the prior mutually understood reality that these indirect cost payments, while perhaps not sufficient for direct research to occur, are necessary to that research. They are, in fact, a crucial part of the funding structure which must be managed and protected to ensure our nation's ability to advance scientific innovation to meet very real energy, environmental, and nuclear challenges. Missing from the Rate Cap Policy's purported recognition of the indisputable reliance interest is a "reasoned explanation . . . for disregarding [that understanding, which was] engendered by the prior policy," and, notably, any acknowledgement of the potential consequences of the policy change. Encino, 579 U.S. at 222 (quoting Fox Television Stations, 556 U.S. at 515). As such, the Rate Cap Policy "f[alls] short of [DOE's] duty to explain why it deemed it necessary to overrule its previous position," id., and Plaintiffs are likely to succeed in establishing that the Rate Cap Policy is arbitrary and capricious for this reason as well.

### 3.   2 C.F.R. § 200.414

As discussed supra, one of the key regulatory provisions governing indirect cost rates is 2 C.F.R. § 200.414. In particular, Section (c), entitled "Federal Agency Acceptance of Negotiated

Indirect Cost Rates," proscribes the process by which OMB, and by extension DOE, can

"deviate" from previously negotiated indirect cost funding rates.[3]  2 C.F.R. § 200.414(c).

Plaintiffs contend that the Rate Cap Policy violates the requirements for utilizing an

indirect cost rate different from the rate memorialized in the NICRA.  [ECF No. 19 at 31–34].  In

particular, they contend that the requirements of Section (c), taken together, "at most authorize

the agencies to announce policies and procedure governing <u>subsequent</u> decisions to make

<u>individualized</u> deviations from the baseline negotiated rate.  They do not license agencies to, by

fiat, wipe out all negotiated rates for institutions of higher education."  [<u>Id.</u> at 32].  They urge the

Court to read Section (c) as mandating a sequential process by which "agencies 'must' accept[]

negotiated rates unless [the] agency publicizes 'policies, procedures and general decision-making

criteria' and <u>then</u> 'follow[s]' them "to seek and justify deviations from negotiated rates."  [ECF

No. 53 at 16 (emphasis added)].  They contend that, pursuant to this sequencing, the Rate Cap

Policy fails because "[w]hile the Rate Cap Policy insists that it 'sets forth [DOE's] policies,

---

[3] For ease of reference, Section (c) provides:
    (1) Negotiated indirect cost rates must be accepted by all Federal agencies.  A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section.
    (2) The Federal agency must notify OMB of any approved deviations.  The recipient or subrecipient may notify OMB of any disputes with Federal agencies regarding the application of a federally negotiated indirect cost rate.
    (3) The Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates.
    (4) The Federal agency must include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement or cost share as approved under paragraph (e). As appropriate, the Federal agency should incorporate discussion of these policies into its outreach activities with applicants before posting a notice of funding opportunity.  See § 200.204.

procedures, and general-decision making criteria,' it does no such thing [because] a categorical dictate of a 15% rate is not a 'procedure' and does not set forth 'general decision-making criteria' under the plain meaning of those terms."  [ECF No. 19 at 32].

Defendants counter that "Plaintiffs improperly seek to read into Subsection (c)(3) a requirement that any 'deviation' from negotiated indirect cost rates occur on a case-by-case basis," which is not supported by Subsection (c)(1) as it "specifically authorizes the use of [a] non-negotiated rate for a 'class of Federal awards,' without limiting the size of that class."  [ECF No. 47 at 19].  They further assert that to the extent Plaintiffs suggest that Subsection (c)(3) requires "some temporal distance between announcement of new 'policies, procedures, and general decision making criteria' and actual determination of a non-negotiated rate," that will occur here through "[a]pplication of the non-negotiated rates to new grant awards, and (in this case) future action to terminate existing grant awards."  [Id. at 20–21].  Defendants' position is that, in issuing the Rate Cap Policy, "DOE publicized the policy and decision-making criteria that it may later use in seeking and justifying deviations from negotiated rates" and "announced the procedure it would use for applying the new policy—application of a 15% rate for the IHEs."  [Id. at 18–19].  As such, Defendants contend that the Rate Cap Policy "rests on a straightforward application of Section 200.414(c)(3), and therefore satisfies Section 200.414(c)(1)."  [Id. at 19].

Even assuming that all awards to all IHE's can properly be construed as a "class of Federal awards" under Section (c)(1) such that a rate change is permissible, [4] the Court disagrees

_____

[4] Given the purported size of this "class," this is far from clear to the Court.  As noted elsewhere, a "class of federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply."  2 C.F.R. § 200.1.  Although Defendants' reading of that definition as permitting the DOE to classify all IHEs as a "type of recipient" is

with Defendants' contention that the Rate Cap Policy clears Section (c)(1) by virtue of its (purported) compliance with Section (c)(3). By its plain terms, Section (c)(1) requires more than just compliance with Section (c)(3): It requires the awarding agency to "approve[]" the change. 2 C.F.R. § 200.414(c)(1). The Federal Register notice discussing 2 C.F.R. § 200.414(c) is instructive as to what this approval requires, explaining that the text of Section (c) contemplates "approval of the Federal awarding agency head . . . based on documented justification." Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). It continues on to discuss that it was important to the provision's drafters that a well-reasoned approval underlie Section (c)(1), explaining that "[s]ome commenters recommended that for even greater consistency decisions about the use of rates be subject to OMB approval rather than Federal agency approval," but this proposal was ultimately rejected on the basis "that the conditions set by OMB for these determinations are stringent enough to ensure that they do not occur <u>without strong justification</u>." <u>Id.</u> (emphasis added). Thus, although the term "documented justification" does not appear in Section (c)(1),[5] the provision clearly contemplates that agency approval of a departure from a

---

not inherently antithetical to the English language, the Court is skeptical that such a broad-based classification is what the regulations intended. IHEs, as discussed elsewhere in this order, account for a substantial percentage of the DOE's research and development budget, and they are awarded hundreds (if not thousands) of individualized grants to further distinct research goals. To permit an exception to the negotiated indirect cost rates for all these institutions and all their grant awards in the same missive strikes this Court as lacking the specificity that the definition contemplates.

[5] The term "documented justification" does appear in the substantially similar regulations governing permissible exceptions to NIH indirect cost rates. <u>See</u> 45 C.F.R. § 75.414(c)(1) ("An HHS awarding agency may use a rate different from the negotiated rate for a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by a Federal awarding agency head or delegate based on <u>documented justification</u> as described in paragraph (c)(3) of this section.") (emphasis added).

negotiated rate must be based on the careful consideration of a strong underlying rationale that warrants the change.

On the present record, there is nothing to indicate that the DOE approved the change to IHE indirect cost rates based on a "strong" or "documented" justification. As discussed <u>supra</u>, the Rate Cap Policy, even read generously, offers very little by way of explanation or justification for the decision to so suddenly and drastically limit reimbursement for indirect costs. The Court is mindful that the DOE is privy to information that could, in theory, have supported the policy change. If such data exists, however, it was not made public or otherwise articulated, and Plaintiffs are, at this stage, more likely than not to prevail on their argument that the Rate Cap Policy did not receive the "approv[al]" contemplated by Section (c)(1). Moreover, Plaintiffs are more likely than not to prevail on their argument that the Rate Cap Policy violates Section (c)(3) to the extent that the cross-reference to that provision within Section (c)(1) requires the documented justification underlying agency approval to be made publicly available, which did not happen here.

Additionally, the Court agrees with Plaintiffs that the Rate Cap Policy more likely than not violates Section (c) because the regulation contemplates a step-by-step process for a change to a negotiated indirect cost rate, rather than a one fell swoop approach invalidating all pre-existing NICRAs and changing the well-established procedure for all future grants. The plain terms of Section (c)(3), which outline the requirements for deviating from the negotiated indirect cost rate pursuant to Section (c)(1), appear to require sequencing. The provision states that the awarding agency seeking a deviation "'must'—present tense—make available the policies, procedures, and decision-making criteria that [it] 'will follow'—future tense—to seek and justify the deviation." <u>NIH</u>, 2025 WL 702163, at *10. To read the provision to permit the DOE to

make the 15 percent rate cap policy public at the same time as it seeks to enforce it would read these verb tenses, as well as the requirement that the DOE "justify" the deviation, out of the provision. On this, the Federal Register is again instructive, as it describes Section (c) as functioning through a sequential process, stating:

> Language in paragraph (c) provides for the consistent application of negotiated indirect cost rates, and articulates the conditions under which a Federal awarding agency may use a different rate. These conditions include approval of the Federal awarding agency head (as delegated per standard delegations of authority) based on documented justification, the public availability of established policies for determinations to use other than negotiated rates, the inclusion of notice of such a decision in the announcement of funding opportunity, as well as in any pre-announcement outreach, and notification to OMB of the decision.

78 Fed. Reg. at 78,600.

Additionally, reading Section (c)(3) to require a sequence of events has the benefit of affording meaning to Section (c)(4), which otherwise would seem to have little relevance as it, again on its plain terms, is aimed at providing notice to IHEs of the DOE's indirect cost reimbursement policies before the IHEs even decide to bid on the grant opportunity. Section (c)(4) requires the awarding agency to "include, in the notice of funding opportunity, the policies relating to indirect cost rate reimbursement." 2 C.F.R. § 200.414(c)(4). As discussed supra, NOFOs are the precursors to federal awards, which are followed by IHE applications for the funding which must include the IHE's current NICRA. The awards, once granted, are required by Appendix III to use the NICRAs in effect at the time of the award, unless that award is exempt under Section (c)(1). 2 C.F.R. pt. 200, app. III(C)(7) ("Except as provided in paragraph (c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the initial award throughout the life of the Federal award." ). In other words, in the normal course, all agencies are subject to the same consistent policy, publicly mandated by Appendix III, which requires that the NOA use the current NICRA, and all IHEs responding to that NOFO would be

aware of that policy. Thus, unless the policies underlying an exception were expected to precede a deviation to the NICRA, it is difficult to imagine why the drafters of Section (c)(4) would have thought it necessary to provide a specific safeguard requiring the awarding agency to include "policies relating to indirect cost rate reimbursement" in a NOFO.

A concrete hypothetical is instructive. MIT negotiates its indirect cost rate with DOD, specifically the Office of Naval Research ("ONR"), its cognizant agency. [ECF No. 2-6 ¶ 10]. For fiscal year 2025, that rate is 59 percent, which would have been memorialized in a NICRA. [Id.]; [ECF No. 60 ¶ 4]. MIT conducts research under 286 direct and indirect funding awards from the DOE that are currently active for Fiscal Year 2025. [ECF No. 2-6 ¶ 9]. It would have received those grants by responding to DOE NOFOs, and each application would have included its NICRA. At the time those NOFOs were posted, the Rate Cap Policy was not in effect and the DOE grant award would have provided for a 59 percent indirect cost reimbursement rate to MIT pursuant to its NICRA with ONR. On this basis, MIT was granted and accepted awards. Enter the Rate Cap Policy. As to the awards that existed at its inception, there was no opportunity for the DOE to include that policy in the NOFO, as that part of the process is already done, and Section (c)(4) would be rendered irrelevant. For future awards, that is awards granted after the Rate Cap policy became effective, the DOE can include the 15 percent rate cap in the NOFO when it solicits an application from MIT, but the policy will have preceded the opportunity—supporting Plaintiffs' contention that Section (c) contemplates a sequence.

Further, a sequenced reading of Section (c) is also consistent with the spirit of Section (c)(2), which also appears aimed at building procedural safeguards around indirect cost rate changes. Specifically, it requires that, following approval of a deviation pursuant to Section (c)(1), the awarding agency "must notify OMB" of such deviations such that the "recipient or

subrecipient may notify OMB of any disputes." 2 C.F.R. § 200.414(c)(2). The ability to dispute the approval with OMB would ring hollow were the deviation permitted to take effect immediately.

In sum, the Court is inclined to agree with Plaintiffs' reading of the regulation as mandating a proscribed process for changing procedures about indirect cost reimbursement. Defendants' reading of the regulations to permit a blanket approach to negotiated indirect cost rate deviations would read disorder, rather than order, into this structure by conflating or otherwise reading out numerous procedural safeguards contemplated by the regulations' plain text. McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 168 (1st Cir. 1987) ("In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions."). In light of the above, the Rate Cap Policy directly conflicts with the plain language of 2 C.F.R. § 200.414, by wholly disregarding existing regulations and the attendant regulatory structure. Fox Television Stations, 556 U.S. at 515 ("An agency may not . . . simply disregard rules that are still on the books."). As a result, the Plaintiffs are likely to succeed in claiming that the Rate Cap Policy conflicts with existing regulation.

4.   Impermissible Retroactivity

Plaintiffs contend that the Rate Cap Policy exceeds the DOE's statutory authority because it is impermissibly retroactive. [ECF No. 19 at 45–46]. Specifically, they contend that "there is no indication whatsoever that DOE has the authority to make the Rate Cap Policy retroactive" and that, as to existing grants, "the reduced rate necessarily undermines project budgets that were previously approved and upsets the institutions' commitments made in reliance upon those budgets." [Id. at 46]. Defendants do not argue that the enabling statute authorizes the DOE to

retroactively modify indirect cost rates; rather, they counter that this case "is unlike the cases cited by Plaintiffs, in which an agency attempted to claw back money that had already been paid out" because the Rate Cap Policy "proposes no such thing; it simply announces an intent to take subsequent actions that will terminate certain grants moving forward.  That is a prospective action."  [ECF No. 47 at 33].

Defendants' argument is unavailing.  While the DOE might not be attempting to claw back money, this is not necessary to bring the Rate Cap Policy within "the ban on retrospective legislation[, which] embrace[s] all statutes [that] though operating only from their passage, affect vested rights and past transactions."  Landgraf v. USI Film Prods., 511 U.S. 244, 268–69 (1994) (quotation omitted).  The relevant inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment," and courts regularly "appl[y] the presumption against statutory retroactivity [in cases] involv[ing] new provisions affecting contractual and property rights."  Id. at 271; see also id. at 269 (noting "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective" (quoting Society for Propagation of the Gospel v. Wheeler, 22 F.Cas. 756 (No. 13,156) (CCNH 1814) (Story, J.))).

Plaintiffs are recipients of grant awards which "are both legally binding and have many of the key hallmarks of a contract," including a negotiated indirect cost rate.  2 C.F.R. § 200.1 (defining "federal award" as "[t]he instrument setting forth the terms and conditions").  For many Plaintiffs, this indirect cost rate far exceeds the proposed 15 percent cap.  See, e.g., [ECF No. 2-7 ¶ 12 (University of Michigan has an indirect cost rate of 56 percent)]; [ECF No. 2-18 ¶ 12 (University of Nevada, Reno has an indirect cost rate of 47 percent)]; [ECF No. 2-19 ¶ 4

(Tufts University has an indirect cost rate of 58 percent)]. Thus, if the Rate Cap Policy were to take effect, it "would impair the rights that the institution possessed when accepting the Notice of Award" by "impos[ing] a new, lower rate, [and] displacing the institutions' right to the previously negotiated—and legally binding—" indirect cost rate upon which they have operated and relied since accepting the award. NIH, 2025 WL 702163, at *27; see also Landgraf, 511 U.S. at 270 (in assessing retroactivity, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance").

Thus, at least as to current grants, Plaintiffs are likely to succeed on the merits of their claim that the Rate Cap Policy is impermissibly retroactive.

### 5. Other Claims

Plaintiffs make a series of additional statutory and regulatory claims, including that the Rate Cap Policy violates the authorizing statute (42 U.S.C. § 4708) and runs afoul of regulations governing termination of existing grants and cost recovery. [Compl. ¶¶ 75–81 (alleging violations of regulations governing grant termination); ¶¶ 82–89 (alleging violation of regulations governing cost recovery); ¶¶ 1–6[6] (alleging violation of authorizing statute)]. Without commenting on the substance, the Court finds its unnecessary to address those claims at this stage of the litigation, as the likelihood of success on the merits on each claim addressed above is independently sufficient to support the issuance of a preliminary injunction. The parties are free to re-raise these claims and any opposition thereto at a later stage.

---

[6] These allegations are misnumbered. The Court is referencing the factual allegations which appear in "Count V."

### B.    Irreparable Harm

"Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm," Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991), rather than mere "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  That said, a movant "need not demonstrate that the denial of injunctive relief will be fatal to its business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996); see also P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005) ("These injuries are not irreparable because later-issued damages can properly compensate any wrong committed.").  The alleged harm must be "to the movant[,] rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted).

Additionally, courts in the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown.'" Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42–43 (1st Cir. 2010) (cleaned up).

Defendants make three main arguments regarding indirect harm.  First, they contend that Plaintiffs' "primary claimed injury . . . is that they will not receive the full amount of money to

which they claim to be entitled under negotiated indirect cost rates," which "can easily be redressed if Plaintiffs succeed in this litigation." [ECF No. 47 at 35]. Second, Defendants assert that "many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm" because they are not harms to Plaintiff; rather, they are generalized concerns, such as "that a reduction in indirect cost rates will harm the economy and the United States' competitiveness on a global scale," which "properly belong to the democratically elected President and his Administration." [Id. at 36]. Third, they contend that Plaintiffs' allegations of irreparable harm are speculative and remote. [Id. at 36–37].

The Court agrees with Defendants that if this case concerned only indirect cost reimbursements, Plaintiffs would be unable to show irreparable harm given that the lost reimbursement could be made up. But a temporary loss of funding is not the only harm Plaintiffs have alleged and might in fact be the least of it. Rather, Plaintiffs have alleged that, without the predetermined indirect cost reimbursements to support their DOE direct grants, the research they are conducting pursuant to those grants will be inordinately delayed in some instances and entirely abandoned in others. [ECF No. 2-1 ¶¶ 9,13–14, 18]; [ECF No. 2-2 ¶¶ 9, 10]; [ECF No. 2-3 ¶¶ 11–12, 15–17, 24]; [ECF No. 2-4 ¶¶ 17–18]; [ECF No. 2-5 ¶¶ 7–8, 14]; [ECF No. 2-6 ¶¶ 17–21]; [ECF No. 2-7 ¶¶ 6, 8]; [ECF No. 2-8 ¶¶ 7, 13–14]; [ECF No. 2-9 ¶¶ 13–16, 18, 26]; [ECF No. 2-10 ¶¶ 6, 13]; [ECF No. 2-11 ¶ 14]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 8, 11]; [ECF No. 2-14 ¶¶ 17–18]; [ECF No. 2-15 ¶¶ 6, 8, 14]; [ECF No. 2-16 ¶¶ 5–6, 13]; [ECF No. 2-17 ¶¶ 5, 8, 13]; [ECF No. 2-18 ¶ 6–8, 14]; [ECF No. 2-19 ¶¶ 7–8, 12]; [ECF No. 25 ¶ 11, 13, 15]. Without those studies, and in absence of other funding to support staff, the universities run a likely and imminent risk that they will, at best, struggle to reallocate and train the next generation of scientists in their programs and, at worst, need to lay off or otherwise be unable to

hire the brilliant minds that make up their world-renowned programs, including the

undergraduate, doctoral, and post-graduate researchers, administrative professionals, and faculty

members.  [ECF No. 2-1 ¶¶ 10, 13]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 15]; [ECF No. 2-4

¶¶ 18–19]; [ECF No. 2-5 ¶¶ 8, 14]; [ECF No. 2-6 ¶¶ 16, 20]; [ECF No. 2-8 ¶ 14]; [ECF No. 2-9

¶¶ 21, 26]; [ECF No. 2-10 ¶ 13]; [ECF No. 2-12 ¶ 14]; [ECF No. 2-14 ¶¶ 11, 17]; [ECF No. 2-15

¶ 14]; [ECF No. 2-16 ¶ 13]; [ECF No.2-17 ¶ 14]; [ECF No. 2-18 ¶14].  As the people go, so do

the Nobel Prizes, the universities' acclaim, their pipelines to students and postdoctoral

researchers, and their ability to build and maintain unique facilities that, in some instances, exist

nowhere else in the world.  [ECF No. 2-1 ¶ 13]; [ECF No. 2-6 ¶¶ 17, 22]; [ECF No. 2-7 ¶ 15];

[ECF No. 2-9 ¶ 27]; [ECF No. 2-12 ¶¶ 14, 17]; [ECF No. 2-13 ¶11]; [ECF No. 2-14 ¶ 21]; [ECF

No. 2-15 ¶¶ 8, 16]; [ECF No. 2-16 ¶ 8]; [ECF No. 2-17 ¶¶ 8, 14]; [ECF No. 2-18 ¶ 16]; [ECF

No. 25 ¶ 12].  In other words, the harm is the massive disruption and its collateral effects, rather

than issues around reimbursement.  While Plaintiffs may someday be able to obtain

reimbursement for those indirect costs, the harm will have been long done, as the

reimbursements would be earmarked for studies and programs already irreparably compromised

and that perhaps no longer exist or involve researchers and research no longer based in the

United States.

      The Court also disagrees that these harms are downstream or speculative.  Absent the

injunction, the Rate Cap Policy would have gone into effect, as evidenced by both the

conditional termination letter in the record and the text of the Rate Cap Policy, which clearly

states that "the Department is undertaking action to terminate all grant awards to IHEs that do

not conform with this updated policy."  [ECF No. 2 at 3].  Faced with the 15 percent rate cap,

Plaintiffs will immediately have to make the difficult choices, described in their affidavits, including whether and how to curtail research, freeze hiring, and lay off staff.

Defendants further contend that the harms identified exist only as to current grants, rather than future grants, and thus any injunction should be appropriately limited to current grants. [ECF No. 47 at 38]. Specifically, Defendants assert that that to hold otherwise would lead to a slippery slope as "there is no stopping point to this argument: If a plaintiff's desire for a future government grant or contract, or a future government grant or contract with more advantageous terms, qualifies as irreparable harm, the irreparable harm element would be automatically met in every case involving a potential future government grant or contract." [Id.]  In essence, they contend that Plaintiffs cannot establish irreparable harm in speculative future grants.

This argument has some initial intuitive appeal. If future grants are speculative, so too must be the harm that could befall Plaintiffs if those grants include a 15 percent indirect cost rate cap. On further examination, however, the underlying premise that IHEs have nothing but a speculative interest in future DOE grants that would incorporate indirect costs is divorced from reality. The DOE and IHEs co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the DOE's need for cutting edge research and the IHEs' ability to provide it. As a result of this relationship, each IHE has a reasonable, non-speculative assumption that it will obtain future grants because, through the past grants and its own investment, it has built the highly technical, often one-of-a-kind infrastructure needed to conduct the research with the assistance of those future grants, as well as assembled a team of specially trained, uniquely qualified researchers and support staff needed to operate and maintain that equipment. These grants are forthcoming to IHEs because, unless the DOE intends to stop funding this type of research, they must be. The Rate Cap Policy itself manifests an intent on the

DOE's part to continue funding IHEs; all that has changed is that the DOE now wants IHEs to foot more of the bill, without regard to the individual circumstances and overhead costs of each IHE, which Plaintiffs have adequately established they cannot do.  [ECF No. 2-1 ¶¶ 19–21]; [ECF No. 2-2 ¶¶ 15–17]; [ECF No. 2-3 ¶¶ 20–23]; [ECF No. 2-4 ¶¶ 22–24]; [ECF No. 2-5 ¶¶ 18–19]; [ECF No. 2-6 ¶¶ 29–31]; [ECF No. 2-8 ¶¶ 19–20[7]]; [ECF No. 2-9 ¶¶ 32–33]; [ECF No. 2-10 ¶ 18]; [ECF No. 2-11 ¶ 16]; [ECF No. 2-12 ¶ 20]; [ECF No. 2-13 ¶¶ 17–18]; [ECF No. 2-14 ¶¶ 12–16]; [ECF No. 2-15 ¶¶ 19–20].

Further, Plaintiffs have sufficiently alleged not only that the Rate Cap Policy will result in immediate harms but also that its "long-term impacts . . . are both cumulative and cascading." [ECF No. 2-7 ¶ 15]; [ECF No. 2-8 ¶ 16]; [ECF No. 2-9 ¶ 29]; [ECF No. 2-12 ¶ 17]; [ECF No. 2-13 ¶ 14]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶ 16]; [ECF No. 2-19 ¶ 14]; see also [ECF No. 2-2 ¶ 9].  These projects, once stopped, cannot simply be restarted later:  The loss of human capital, cumulative knowledge and sometimes the degradation of physical infrastructure, is simply too great.  [ECF No. 2-1 ¶ 10]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 12]; [ECF No. 2-4 ¶ 18]; [ECF No. 2-5 ¶¶ 8, 9]; [ECF No. 2-6 ¶¶ 17, 21]; [ECF No. 2-7 ¶¶ 8, 15]; [ECF No. 2-8 ¶¶ 6, 16]; [ECF No. 2-9 ¶¶ 19, 21, 27]; [ECF No. 2-10 ¶¶ 6–7]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 11]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶¶ 8, 14, 16].

Plaintiffs have demonstrated that because their collective harm "is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Ross-Simons, 102 F.3d at 19.  "Even though, as established above, the likelihood of success on

---

[7] The final two paragraphs of Exhibit 2-8 are both enumerated as paragraph 19.  The Court assumes the second paragraph 19 was inadvertent and refers to it as paragraph 20.

the merits is great, which would allow a movant to show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." NIH, 2025 WL 702163, at *31 (cleaned up). The Court is more than convinced that the harms to Plaintiffs' programs cannot be remedied by a later monetary award and may well be irreparable in the truest sense of the word.

### C.     Balance of Equities and Public Interest

The Court also finds that the balance of the equities and the public interest favor granting Plaintiffs their requested relief. Plaintiffs have sufficiently established that the Rate Cap Policy's impact on their programs will have a swift and deleterious effect on the public interest. Perhaps most concerning, several Plaintiffs have noted that "[f]unding disruptions would compromise crucial safety protocols for handling hazardous materials, high-voltage equipment, and radiation sources, potentially leading to accidents." [ECF No. 2-7 ¶ 15]; see also [ECF No. 2-8 ¶ 13 ("This reduction will have deeply damaging effects on MSU's ability to conduct DOE-funded research from day one, leaving unfunded . . . [l]ow-level radioactive waste removal[ and] [c]ritical environmental health and safety oversight."); [ECF No. 2-19 ¶ 14 ("These cuts not only endanger the health and well-being of researchers, staff, and students, but also increase the risk of regulatory noncompliance, accidents, and hazardous material exposure—threatening both the continuity and credibility of the institution's research enterprise.")]. Beyond the obvious danger of unattended radioactive materials and other byproducts of nuclear research, Plaintiffs' programs also have a profound impact on their local economies, both by employing the local community and through the power of innovation that sparks further development and spending, which would be impacted by interruption to those programs. See, e.g., [ECF No. 2-5 ¶ 16 ("The University [of Illinois Urbana-Champaign] employs thousands of Illinois residents and

collaborates with state and local partners to help solve regional challenges through joint research and innovation.  The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.")]; [ECF No. 2-6 ¶ 6 ("MIT's research also translates into innovation that helps drive the U.S. economy."); id. ¶ 24 ("MIT employs nearly 14,000 Massachusetts residents, including more than 2,300 Cambridge residents.  Spending from students, staff, and faculty support the local economy.")]; [ECF No. 2-16 ¶ 15 ("For example, as recently reported by Northstar Analytics, LLC, UW-Madison affiliated organizations and startups collectively contribute $30.8B per year to the Wisconsin economy, this economic activity supports more than 232,000 jobs and generates $1 billion in state and local taxes.")].

Fundamentally, the Rate Cap Policy will harm the public interest by significantly compromising the ability of the DOE and IHEs to continue their federal research partnerships, which, by their nature, seek to advance the country's energy, economic, and national security interests, as well as impacting basic quality of life considerations, as the affidavits in this case amply reflect.  Cornell alone, in partnership with the DOE, performs work "on: plasma physics research to control fusion and maintain safety and security of nuclear weapons; conversion of cheap carbon dioxide or methane to produce chemical fuels for economic competitiveness in the United States chemical industry; circuit design for artificial intelligence, high performance computing, and quantum technology; better materials for stealth and camouflage technologies; recovery/extraction of rare earth minerals; development of biodegradable plastics that disappear from the environment; simulation tools to make fusion energy a practical reality; clarifying drought risks impacting agriculture in the Western United States; and the contribution of urban land-use development and changes to flood risks in Philadelphia, and the extent to which zoning

or other urban development policies can exacerbate or ameliorate these risks." [ECF No. 2-4 ¶ 10]. And Cornell is just one of nine Plaintiffs in this action and one of the many IHEs that partner with the DOE, all of whom perform vital research in similarly cutting-edge arenas. It is beyond dispute that the advancements these universities make can and often do benefit the public in critically important ways, and any setback to that progress is to the detriment of the country as a whole.

### D.    Scope of the Injunction

Having concluded that Plaintiffs have met their burden under the preliminary injunction standard, the Court must determine the scope of that injunction. Plaintiffs urge the Court to preliminarily enjoin Defendants from taking any further steps to implement the Rate Cap Policy in its entirety as to all grant recipients. [ECF No. 53 at 25]. Defendants urge that the Court instead "limit any remedy to those plaintiff institutions, or institutions represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief." [ECF No. 47 at 40]. They contend that "universal injunctive relief is an improper exercise of judicial authority." [ECF No. 47 at 39].

On this front and under the facts of this case, the Court agrees with its sister session in NIH that, despite awareness that some members of the Supreme Court have expressed concerns about the use of nationwide or "universal" injunctions, as the law currently stands, a nationwide injunction is a reasonable and appropriate remedy in this action. Such an injunction is necessary "to protect similarly situated nonparties, [and] to avoid the 'chaos and confusion' of a patchwork of injunctions . . . where the plaintiffs are dispersed throughout the United States." NIH, 2025 WL 702163, at *33 (quoting Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281–82 (11th Cir. 2021)). This is further supported by the nature of the action, given that "[t]he normal

remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." Id. at *34. "It would be anathema to reasonable jurisprudence that only the named Plaintiffs should be protected from the irreparable harms of an unlawful regulation." Id.

### E.    Stay Pending Appeal/Bond

Defendants additionally request a stay pending appeal and ask that this Court order Plaintiffs to post bond.

Regarding the stay, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433–34 (2009). The decision is "an exercise of judicial discretion," which involves "consideration of four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" Id. (first quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672, (1926); and then quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). Defendants offer no argument as to their basis for the stay, nor do they articulate what irreparable harm will result from this Court's refusal to grant one. Per the analysis supra, the Court finds it unlikely that Defendants will succeed on the merits of their appeal, and the substantial public interests involved warrant maintaining the status quo. As such, Defendants' request for a stay pending appeal is **DENIED**.

As to bond, pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). That said, Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," P.J.E.S. ex rel. Escobar Francisco v. Wolf, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). Further, a number of cases have found that a bond is "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Plaintiffs here are seeking an injunction against the Rate Cap Policy because of the irreparable harm that would result if they cannot access or use funds beyond the 15 percent cap to support ongoing and future research. Requiring them to post that difference as bond would necessarily have the same financial effect and thus lead to the same harms. As such, the Court declines to require bond. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 25-cv-00239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm. That is especially so when Defendants—OMB and its director—will personally face no monetary injury from the injunction.").

## VI.    CONCLUSION

Accordingly, for the reasons sets forth above, Plaintiffs' motion for a preliminary injunction is **<u>GRANTED</u>**. Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or

giving effect to the Rate Cap Policy in any form with respect to IHEs nationwide until a further

order is issued by this Court.

**SO ORDERED.**

May 15, 2025                                          */s/ Allison D. Burroughs*
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10912-ADB |
| DEPARTMENT OF ENERGY, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**<u>FINAL JUDGMENT</u>**

Pending before the Court is the Defendants' Unopposed Motion for Entry of Final Judgment, in which Defendants seek entry of final judgment, while fully reserving their right to appeal. After reviewing the motion, the record, and the applicable law, the Court is of the opinion that the motion should be **GRANTED**.

For reasons stated in this Court's Memorandum and Order on Plaintiffs' motion for a preliminary injunction, <u>Doc. No. 62</u>, the Court finds that this Court has jurisdiction over Plaintiffs' claims, and that the Court of Federal Claims does not have exclusive jurisdiction over Plaintiffs' claims under the Tucker Act, <u>28 U.S.C. § 1491(a)(1)</u>. The Court also concludes that Plaintiffs have demonstrated success on the merits of their Administrative Procedure Act claims that the Department of Energy's issuance of Policy Flash 2025-22: Adjusting Department of Energy Grant Policy for Institutions of Higher Education[1] ("Policy Flash 2025-22") on April 11, 2025: (1) departed from negotiated cost rates in violation of <u>2 C.F.R. § 200.414</u>; (<u>2</u>) was arbitrary and capricious; and (3) was impermissibly retroactive. Compl. Counts I, IV, and VI, <u>Doc. No. 1</u>.

---

[1] *See* Decl. of Berta Schreiber, Exh. A, <u>Doc. No. 48-1</u>.

The Court further concludes, as stated in its Memorandum and Order, that nationwide relief is appropriate and that the remedy is "vacatur of the rule and its applicability to all who would have been subject to it." Doc. No. 62 at 47. Accordingly, the Court concludes that entry of final judgment is appropriate.

Therefore, it is hereby **ORDERED**:

1.      The Court has subject matter and personal jurisdiction over this action and the Parties.

2.      Venue is proper before this District.

3.      For the reasons stated in this Court's Memorandum and Order on Plaintiffs' motion for preliminary injunction, Doc. No. 62, judgment is entered in favor of the Plaintiffs on Count I (illegal departure from negotiated cost rates in violation of 2 C.F.R. 200.414), Count IV (arbitrary and capricious), and Count VI (retroactivity) of their Complaint against the Department of Energy and Chris Wright, in his official capacity as Secretary of the Department of Energy.

4.      Pursuant to 5 U.S.C. § 706(2), the Court VACATES, in its entirety, Policy Flash 2025-22. The Court DECLARES that Policy Flash 2025-22 (1) departed from negotiated cost rates in violation of 2 C.F.R. § 200.414; (2) was arbitrary and capricious; and (3) was impermissibly retroactive.

5.      As vacating Policy Flash 2025-22 moots Plaintiffs' remaining claims, Counts II, III, and V of Plaintiffs' Complaint are dismissed without prejudice.

This is an appealable Final Judgment. It is **SO ORDERED**.

Signed this <u>30th</u> of June, 2025.


/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10912-ADB |
| DEPARTMENT OF ENERGY, *et al*., | ) ) | |
| Defendants. | ) ) ) | |

## NOTICE OF APPEAL

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Defendants Department of Energy and Chris Wright, in his official capacity as Secretary of the Department of Energy, hereby appeal to the United States Court of Appeals for the First Circuit from the Final Judgment entered in this case on June 30, 2025, Doc No. 71, as well as from all interlocutory orders merged into that judgment, including the court's preliminary injunction of May 15, 2025, Doc No. 62.

Dated: July 31, 2025

Respectfully submitted:

LEAH B. FOLEY
United States Attorney

BRIAN C. LEA
Deputy Associate Attorney General

By: */s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3112

nicole.o'connor@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: July 31, 2025

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant United States Attorney